FILED
2024 Sep-16  PM 02:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |
|---|---|
| ALABAMA COALITION FOR IMMIGRANT JUSTICE; LEAGUE OF WOMEN VOTERS OF ALABAMA; LEAGUE OF WOMEN VOTERS OF ALABAMA EDUCATION FUND; ALABAMA STATE CONFERENCE OF THE NAACP; ROALD HAZELHOFF; JAMES STROOP; CARMEL MICHELLE COE; and EMILY JORTNER, <br><br> *Plaintiffs*, <br><br> v. <br><br> WES ALLEN, in his official capacity as Alabama Secretary of State; STEVE MARSHALL, in his official capacity as Alabama Attorney General; and JAN BENNETT, BARRY STEPHENSON, CINDY WILLIS THRASH, and SHEILA COX BARBUCK, in their official capacities as Chairs of Boards of Registrars of Elmore, Jefferson, Lee, and Marshall Counties; <br><br> *Defendants*. | Case No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Alabama Coalition for Immigrant Justice; League of Women Voters of Alabama; League of Women Voters of Alabama Education Fund; Alabama State Conference of the NAACP; Roald Hazelhoff; James Stroop; Carmel Michelle Coe; and Emily Jortner bring this action against Wes Allen, in his official capacity as Alabama Secretary of State; Steve Marshall, in his official capacity as Alabama Attorney General; and the chairs of the Elmore, Jefferson, Lee, and Marshall County Boards of Registrars, in their official capacities, and allege the following:

## **INTRODUCTION**

1.      The right to vote is fundamental and foundational to American democracy. Every American citizen has the right to vote, regardless of where they were born.

2.      On August 13, 2024, only 84 days before the upcoming November general election, Alabama Secretary of State Wes Allen announced that he had identified and would seek to purge 3,251 registered Alabama voters who had previously been issued noncitizen identification numbers by the Department of Homeland Security (the Purge Program). Secretary Allen admitted the virtual certainty that voters on this list (the Purge List) included naturalized citizens, who are U.S. citizens and therefore eligible to vote. But, he nevertheless directed the immediate inactivation of these voters' registrations. Although Secretary Allen's subsequent statements have been ambiguous and contradictory, both Secretary

Allen's initial press release and the notice sent to voters on the Purge List instruct that these voters must re-register and undergo verification (the Re-Registration Process) before they may vote in 2024 or in future elections. He further referred everyone on the Purge List to Attorney General Steve Marshall for criminal investigation and potential prosecution. In announcing the Purge Program, Secretary Allen promised to continue to conduct similar "reviews" of the voter rolls.

3.     This lawsuit challenges Secretary Allen's Purge Program, which by design and in implementation targets and threatens the voting rights of eligible Alabama voters who are naturalized citizens.

4.     The Purge Program, designed by Secretary Allen and implemented by Secretary Allen, Attorney General Marshall, and Alabama county Boards of Registrars, undermines the fundamental right to vote. The Purge Program inactivates and constructively removes thousands of Alabamians from the active voter rolls shortly before the November 2024 general election and forces them to needlessly re-register in order to vote and be registered to vote, based solely on Secretary Allen's belief that they were at one point issued a noncitizen identification number—even if they have since become naturalized citizens and lawfully registered to vote.

5.     The methodology of the Purge Program predictably sweeps in naturalized citizens—as Secretary Allen has admitted. Every naturalized citizen was once issued a noncitizen identification number, prior to becoming a citizen. That is

because all naturalized citizens were once legal permanent residents, and all legal permanent residents are issued noncitizen identification numbers. But _no_ U.S.-born citizens are issued noncitizen identification numbers at any point in their lives. Thus, Secretary Allen created a Purge Program designed to target naturalized citizens for removal from the voter rolls.

6.      The Purge Program is therefore set up to target and disproportionately burden naturalized citizens. By singling out anyone ever issued a noncitizen identification number—a group that Secretary Allen recognized *in announcing the purge program* includes naturalized citizens—the Purge Program is deeply flawed and does not accurately identify *noncitizens* registered to vote, Secretary Allen's purported goal in creating the program. Instead, the Purge Program discriminates against Alabamians based on their national origin.

7.      What's more, Secretary Allen included on the Purge List voters who have never been issued noncitizen identification numbers, based on faulty information that they had been. As a result, the Purge List includes and the Purge Program has also removed from the active voter rolls some eligible voters who are U.S.-born citizens, and has also required these voters to re-register.

8.      In implementation, the Purge Program thus arbitrarily sweeps in both targeted naturalized citizens and U.S.-born citizens not targeted by the program.

9.     Secretary Allen has characterized the Purge Program as moving voters to "inactive" status, but in fact the Purge Program creates a process requiring voters to re-*register* entirely in order to vote in the 2024 general election and be on Alabama's voter rolls, by submitting a new voter registration form and undergoing verification. The notice letter sent by county Boards of Registrars at Secretary Allen's directive does not tell recipients that they may vote on Election Day, but rather sends them an Alabama voter registration form—which prominently states that a voter *cannot* register in the fourteen days preceding an election. This process (the Re-Registration Process) is, functionally and legally, constructive removal from the voter rolls, and is a different requirement and process than for voters on Alabama's ordinary inactive list.

10.     The Purge Program also refers all voters on Secretary Allen's Purge List to Attorney General Marshall for criminal investigation and potential prosecution, which is not a feature of Alabama's ordinary inactive list.

11.     Thus far, Secretary Allen has not produced any documents relating to the Purge Program, including identifying the persons subject thereto, despite Plaintiffs' requests for that information. Thus, Plaintiffs have not been able to determine conclusively who has been identified for removal, how the Purge List was compiled, or what additional "reviews" he will perform to add names to the Purge

List. What is clear is that Secretary Allen's initial purge relies on erroneous data—it includes U.S. citizens, including both naturalized citizens and U.S.-born citizens.

12.     Secretary Allen implemented the Purge Program as part of a nationwide, bad-faith effort falsely claiming that noncitizen voting is prevalent in American elections.  Indeed, in announcing the Purge Program, he made sure to tie himself to that campaign by stating that he "will not tolerate the participation of noncitizens in our elections" and "ha[d] even gone so far as to testify before a United States Senate Committee regarding the importance of this issue." Such testimony and similar allegations have repeatedly failed to provide evidence supporting their claims; instead, evidence overwhelmingly shows that noncitizen voting is vanishingly rare in the United States and that voter purges aimed at alleged noncitizens primarily prevent eligible naturalized citizens from casting ballots.

13.     Plaintiffs are individual naturalized and U.S.-born citizens, and nonprofit organizations whose missions are to help Alabamians register and vote and to provide services to Alabama's immigrant community and whose members include eligible U.S. citizens whose registrations are at risk under the Purge Program. The Purge Program harms the Individual Plaintiffs directly: Plaintiffs Hazelhoff and Stroop have already received a purge letter, and Plaintiffs Coe and Jortner will likely be targeted by the Purge Program because they have previously received a noncitizen identification number. Injunction of the Purge Program is necessary to ensure all

Individual Plaintiffs can vote in the November 2024 general election and future elections and can be registered on the Alabama voter rolls, without unjustified and unlawful burdens to their right to vote.

14.     The Purge Program harms Organizational Plaintiffs Alabama Coalition for Immigrant Justice, League of Women Voters of Alabama, League of Women Voters of Alabama Education Fund, and Alabama State Conference of the NAACP directly because, instead of registering additional new voters and providing programs for Alabama's immigrant community, they will spend time and money helping the already-registered voters on the Purge List defend their registrations and right to vote as new Americans, identifying registered voters who have been purged or likely will be, and educating the public about ensuring that they remain registered. It further harms Organizational Plaintiffs for the same reason that it harms Individual Plaintiffs: all Organizational Plaintiffs have members who are naturalized citizens. Injunction of the Purge Program is necessary to end these harms to Organizational Plaintiffs.

15.     Secretary Allen's Purge Program violates the First and Fourteenth Amendments of the United States Constitution, the National Voter Registration Act (NVRA), and the Voting Rights Act. Plaintiffs therefore respectfully request that the Court declare the Purge Program unlawful, enjoin Defendants from implementing the Purge Program, and afford Plaintiffs all other just and proper relief.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction to hear this case under 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1357 because the claims in this action arise under the Constitution and laws of the United States, as well as under 42 U.S.C. §§ 1983 and 1988, 52 U.S.C. § 10308(d), and 52 U.S.C. § 20510. This Court has jurisdiction to grant declaratory and injunctive relief and all other forms of relief available under federal law, including 28 U.S.C. §§ 2201 and 2202, 52 U.S.C. § 10310(e), and 52 U.S.C. § 10302(c).

17.     This Court has personal jurisdiction over the Defendants, who are all elected or appointed officials and citizens of Alabama.

18.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the Defendants engage in their official duties in this District, because a substantial part of the events or omissions giving rise to the claims occurred in this District, and because at least one Defendant resides in this District and all Defendants are Alabama residents.

## PARTIES

**Plaintiffs**

19.     Plaintiffs **League of Women Voters of Alabama** and **League of Women Voters of Alabama Education Fund (collectively LWVAL or the League)**, formed under Section 501(c)(4) and Section 501(c)(3) of the Internal

Revenue Code, respectively, are nonpartisan, nonprofit, membership organizations that seek to encourage informed and active participation in government, work to increase understanding of major public policy issues, and influence public policy through education and advocacy. LWVAL is a state chapter of the League of Women Voters, which was founded in 1920 as an outgrowth of the struggle to win voting rights for women, has more than 500,000 members and supporters, and is organized in more than 750 communities in all 50 states and the District of Columbia. LWVAL has approximately 515 members across the state of Alabama. Some of LWVAL's members are naturalized citizens.

20.    LWVAL is comprised of dues-paying members who volunteer in Alabama communities to provide voter services. LWVAL has no paid employees or staff involved with the operation of the League. LWVAL provides regular training to its members and to its nonpartisan partners to assist Alabamians, including those who are naturalized citizens, in getting registered, voting, and confirming their registration status. LWVAL does this work as a part of its mission to protect the right to vote for Alabama voters and considers its work registering voters, encouraging them to vote, and confirming their registration to be an expression of those core values. LWVAL uses voter registration assistance as a part of a larger dialogue about a citizen's voter registration, voting plan, and the importance of voter turnout: the

goal is to ensure all eligible Alabama voters are registered to vote, have a plan to vote, and can and do actually vote.

21.     The Purge Program has harmed and will continue to harm the League and its members in various ways. First, the League has diverted and will continue to divert resources to counteract the harms created by the Purge Program. For instance, the League has already spent at least $1,000, and will spend more money, to create and distribute a public service announcement (PSA) throughout the state reminding voters of their right to vote and instructing them to check that their registration is valid before Election Day. The League created and distributed the PSA in direct response to the Purge Program, to ensure that all Alabama voters—including voters that the League has registered and voters who are League members—are registered and are able to vote on Election Day, in furtherance of the League's goals of registering eligible voters and ensuring all eligible voters can vote. That PSA was necessary because the Purge Program has deregistered thousands of Alabamians, including—as Secretary Allen has admitted—Alabamians eligible to vote, and has unquestionably intimidated many more naturalized Alabamians who are now less likely to vote for fear of criminal investigation and prosecution. Therefore, the Purge Program will decrease the number of registered voters and decrease voter turnout, directly harming the League's mission of increasing the number of registered voters and increasing voter turnout. The PSA was necessary to ameliorate those harms.

22.     Separately, the League has devoted and will devote resources and members' time to counteract the effects of the Purge Program, such as by helping members and registered voters determine whether they remain eligible and by helping voters who are purged restore their eligibility. Absent such diversion, the League would spend its money and member time on getting out the vote for the 2024 general election and planning its advocacy activities for the next year. It would also hold more voter registration drives.

23.     Aside from resource diversion, the Purge Program directly harms the League's mission. When voters are unlawfully purged, it decreases the number of voters in Alabama, contrary to the League's mission of increasing the number of registered voters and voter turnout. When voters are intimidated or must take additional steps to remain registered, it harms the League's mission of ensuring that voting is easy and open for all eligible Alabamians.

24.     The Purge Program also harms the League's members. The League's membership includes naturalized citizens, and those members are at particular risk of being purged because they previously received noncitizen identification numbers. Those members must constantly re-check their registration status, may need to provide additional documentation to vote, are intimidated by the Purge Program and the threat of investigation or prosecution, and face other burdens due to the Purge Program.

25.     Plaintiff **Alabama State Conference of the NAACP (AL NAACP)** is the state conference of the National Association for the Advancement of Colored People, Inc. AL NAACP was founded in 1913 and is the oldest and one of the most significant civil rights organizations in Alabama. AL NAACP has thousands of members in branches across the state, most of whom are registered voters. Some of AL NAACP's members are naturalized citizens. AL NAACP works to ensure the political, educational, social, and economic equality of Black Americans and all other Americans. Two central organizational objectives of AL NAACP are the elimination of racial discrimination in the democratic process and the enforcement of federal laws and constitutional provisions securing voting rights. Alabama NAACP's promotion of voting rights has been central to this mission.

26.     AL NAACP regularly engages in voter registration in furtherance of its mission. In the months preceding a general election, such as September 2024, AL NAACP typically conducts voter registration at numerous events. AL NAACP also engages in individual voter registration in the communities it serves, when the organization encounters individuals who have not registered to vote.

27.     The Purge Program has harmed and will continue to harm AL NAACP and its members. First, AL NAACP has devoted and will devote resources and members' time to counteract the effects of the Purge Program, including by seeking to ascertain the names of individuals on the Purge List, by coordinating a response

to the Purge Program with local branches and partner groups, and by using volunteer time to spread the message to communities that AL NAACP serves that voters must check and re-check voter registration status. AL NAACP has directed those who are rendered ineligible to call the organization and will use volunteer time to assist any purged voters who reach out with re-registration.

28.   AL NAACP has already expended approximately five hours of organizational time just in contacting Secretary Allen's and Attorney General Marshall's offices as part of a fruitless quest to determine the names of individuals on the Purge List, in order to aid eligible voters on the List in accordance with AL NAACP's mission. AL NAACP's president called the Secretary of State's office, which referred him to the Attorney General's office, which then referred him back to the Secretary of State's office. The Secretary of State's office then told AL NAACP's president that the office would not provide the lists despite a recent Eleventh Circuit ruling affirming that the Secretary must make such records accessible to the public under the National Voter Registration Act. AL NAACP's president stated that he wanted to know the names on the lists so that AL NAACP could assist the eligible voters on the lists in taking action to ensure they are registered to vote. The Secretary of State's office repeated that the office would not release the list.

29.   AL NAACP has already begun the process of designing written materials like pamphlets to tell Alabamians to double check their voter registration

statuses in light of the Purge Program, which has already cost member time. Printing and distributing those materials, which AL NAACP plans to do, will cost additional member time and money.

30.     Absent such diversion of resources, AL NAACP would be able to spend more of its time and money on proactive voter education and engagement, instead of responding to the Purge Program.

31.     The Purge Program directly harms AL NAACP in its achievement of its mission. When voters are unlawfully purged, it decreases the number of voters in Alabama, contrary to AL NAACP's goals of securing and promoting voting rights with a particular focus on voter registration.

32.     Further, Secretary Allen's refusal to release the Purge List harms AL NAACP's mission. Because AL NAACP cannot contact the voters on the Purge List—including any AL NAACP members on the list—AL NAACP cannot further its goals by ensuring all eligible voters targeted by the Purge Program are registered to vote.

33.     The Purge Program also harms AL NAACP's members. AL NAACP's membership includes naturalized citizens, and those members are at particular risk of being purged because they previously received noncitizen identification numbers. Those members must constantly re-check their registration status, may need to provide additional documentation in order to vote, are intimidated by the Purge

Program and the threat of investigation or prosecution, and face other burdens due to the Purge Program.

34.     Plaintiff **Alabama Coalition for Immigrant Justice (ACIJ)** is a group of individuals and organizations working for the rights and dignity of all people by cultivating just policies, encouraging grassroots leadership and participation, building alliances, and amplifying the voices and contributions of immigrants in Alabama.

35.     ACIJ serves Alabama's immigrant community statewide and is headquartered in Irondale. ACIJ has a dues-paying membership of 158 active members who participate in member-specific programs. Some of ACIJ's members are naturalized citizens.

36.     ACIJ's programs include voter registration, get-out-the-vote canvassing, and encouragement of civic participation year-round in pursuit of an engaged civic culture among Alabamian immigrant communities. Many of ACIJ's programs are English-Spanish bilingual. Voter engagement is a critical part of ACIJ's work to help elect representatives who will enact reforms for Alabama's immigrant communities.

37.     Typically, ACIJ canvasses across Alabama in Tuscaloosa, Decatur, Montgomery, Mobile, Conecuh County, Madison County, Jefferson County, and Baldwin County. ACIJ's civic engagement programs also engage in Tallapoosa

County, Talladega County, Chilton County, and the cities of Dothan and Enterprise in the Wiregrass.

38.    The Purge Program has impacted ACIJ's mission and compelled a diversion of resources. ACIJ has adjusted its get-out-the-vote canvass scripts to incorporate a thoroughgoing examination to ensure that eligible voters are registered to vote, including, with voter consent, a live lookup of their voter registration record, and a diagnosis of whether they may have been impacted by the Purge Program. This adjustment results in longer door-knocking conversations, greater training needs, fewer door visits overall, a shrunken canvassing geography, and higher costs of canvassing since ACIJ's canvassers are paid by the hour.

39.    The adaptations to address the Purge Program have cost core ACIJ staff (other than canvassers) approximately 20 hours of labor time already. That time would otherwise have been spent addressing the community crises for immigrants in Albertville and Sylacauga, which has been an ongoing effort core to ACIJ's mission standing up for the rights and dignity of immigrants. ACIJ also anticipates significant expenditures, previously unplanned, on paper educational materials to address the impacts of the Purge Program.

40.    ACIJ has observed the Purge Program revive fear and concern in Alabama's immigrant community. Some eligible voters are reconsidering their plans to vote due to suspicion they would be monitored by the government or otherwise

bring trouble on their families, not least because of the involvement of Defendant Marshall in implementing a voter purge that has swept up naturalized citizens. ACIJ already faces difficulty in encouraging naturalized citizens to register to vote. Anti-immigrant rhetoric makes many naturalized citizens nervous to register because they are afraid of intimidation, targeting, or investigations of exactly the kind deployed in the Purge Program. Naturalized citizens with mixed status families (families that include undocumented people) are also afraid that registering to vote or voting may invite scrutiny that will affect their loved ones. Despite going through the process of naturalization, these citizens do not exercise their full rights out of fear of retribution.

41.    The Purge Program also directly harms ACIJ's members. ACIJ membership includes naturalized citizens, and those members are at particular risk of being purged because they previously received noncitizen identification numbers. Those members must constantly re-check their registration status, may need to provide additional documentation in order to vote, are intimidated by the Purge Program and the threat of investigation or prosecution, and face other burdens due to the Purge Program.

42.    Plaintiff **Roald Hazelhoff** is a naturalized U.S. citizen who was born in the Netherlands and lives in Jefferson County, Alabama. He has lived in the United States since 1977, when he moved to the country to study political science at Western Washington University on a student visa. He became a legal permanent resident

roughly a decade ago. Plaintiff Hazelhoff has three children, all of whom were born and raised in the United States. Plaintiff Hazelhoff became a citizen in 2022, first registered to vote in 2022 in Jefferson County, Alabama, and has previously voted once pursuant to that registration.

43.     Plaintiff Hazelhoff first got an Alabama driver's license in 1988, prior to becoming a U.S. citizen. After becoming a citizen, Plaintiff Hazelhoff used his U.S. passport to obtain an enhanced driver's license, often called a "star license," from the state of Alabama. Plaintiff Hazelhoff applied for Alabama unemployment benefits in 2018 or 2019 while legally working in the state, before becoming a U.S. citizen.

44.     Following Secretary Allen's announcement of the Purge Program, Plaintiff Hazelhoff received a letter from the Chair of the Jefferson County Board of Registrars informing him that he had been placed on the Purge List. The letter stated, "Secretary of State Wes Allen has provided our Office with information that shows you have been issued a noncitizen identification number by the Department of Homeland Security. You are also a registered voter in Alabama." The letter informed Plaintiff Hazelhoff that for this reason "your voter record has been made inactive and you have been placed on a path for removal from the statewide voter list." The letter directed Plaintiff Hazelhoff to "complete and submit the enclosed Voter Removal Request form to immediately be removed from the voter list and become compliant

18

with state and federal law requirements" and simultaneously directed him, if he was a U.S. citizen and otherwise eligible to register, to complete and submit a state voter registration form and include his Alabama driver's license or non-driver identification number or the last four digits of his Social Security number. The letter did not state that Plaintiff Hazelhoff would be able to vote in the November 2024 general election if he did not submit a state voter registration form and provide the additional information listed.

45.    Following receipt of the letter, Plaintiff Hazelhoff visited the office of the Jefferson County Board of Registrars to attempt to fix his voter registration status. The Board of Registrars directed him to fill out a voter registration form and write down the last four digits of his social security number. Plaintiff Hazelhoff completed these steps and turned in the form while at the office.

46.    Plaintiff Hazelhoff intends to vote in the 2024 general election. Although he is presently listed as active on the voter registration rolls, he remains uncertain whether he will be able to vote on November 5, 2024. Plaintiff Hazelhoff is further concerned and worried by Secretary Allen's referral of him to the Attorney General for criminal investigation despite the fact that he has not violated the law.

47.    Plaintiff **James Stroop** is a U.S.-born citizen and resident of Marshall County, Alabama. He was born in Melbourne, Florida, and has lived in Alabama since 1978.

48.     Voting is deeply important to Plaintiff Stroop. Voting is a strong tradition in Plaintiff Stroop's family: his mother engrained in him that voting is both a right and a duty. Many members of Plaintiff Stroop's family have served in the military—Plaintiff Stroop's grandfather retired from the U.S. Navy as an admiral, for example—and Plaintiff Stroop's family strongly values serving their country and views voting as such a duty. Plaintiff Stroop in turn has sought to engrain these same values in the next generations of his family. Each time one of his grandchildren has turned 18, he has reminded them that they have the opportunity to register to vote. Prior to receiving the Purge Letter, Plaintiff Stroop had applied to be a poll worker for the November general election.

49.     Following Secretary Allen's announcement of the Purge Program, Plaintiff Stroop received a letter from the Chair of the Marshall County Board of Registrars informing him that he had been placed on the Purge List, immediately inactivated as a voter, and "placed on a path for removal from the statewide voter list" because Secretary Allen had provided the Marshall County Board of Registrars with information that Plaintiff Stroop was a person previously issued a noncitizen identification number. The letter instructed Plaintiff Stroop to submit a voter removal request form to "become compliant with state and federal law requirements" and, if he was an eligible U.S. citizen, to submit a new voter registration form and his driver's license or non-driver ID number or the last four digits of his social security

number. The letter did not state that Plaintiff Stroop would be able to vote in the November 2024 general election if he did not submit a state voter registration form and provide the additional information listed. The language of this letter was identical to the language in the letter received by Plaintiff Hazelhoff.

50.     Following receipt of the letter informing him that he was on the Purge List, Plaintiff Stroop first called the Marshall County Board of Registrars. The Board of Registrars transferred him to Secretary Allen's office. Plaintiff Stroop informed Secretary Allen's office that he had never been issued a noncitizen identification number and was purged in error. In a second phone call, Secretary Allen's office told Plaintiff Stroop that he would need to re-register as a voter because information from the Alabama Department of Labor showed that he was a noncitizen.

51.     As a U.S.-born citizen, Plaintiff Stroop has never been issued a noncitizen identification number. In 2021, he applied for unemployment assistance after leaving his job of 26 years. While filling out the application forms, he mistakenly checked a box identifying himself as a noncitizen. The unemployment office sent him a letter about the form. Plaintiff Stroop mailed the office a form and a copy of his birth certificate to correct the error. The office informed him in 2022 that the error had been corrected.

52.     Plaintiff Stroop called the Alabama Department of Labor after receiving his purge letter to confirm that his citizenship information on file with the

Department of Labor was still correct. Soon after, Alabama Labor Secretary Fitzgerald Washington called Plaintiff Stroop to personally apologize for the error. Secretary Washington told Plaintiff Stroop that the department had identified at least 15 other errors on the list and that he was concerned about the program.

53.    Plaintiff Stroop reapplied to vote through the Alabama Secretary of State website. While he was told verbally by the Marshall County Board of Registrars that his voter status is currently active, in light of the ongoing confusion over his citizenship and voter registration status—despite assurance years ago from the state of Alabama that the error regarding his citizenship status had been corrected—Plaintiff Stroop remains uncertain that he will be registered to vote on Election Day. Plaintiff Stroop has received no written confirmation that he is an active registered voter in the State of Alabama or that the error regarding his citizenship status has been resolved.

54.    Plaintiff Stroop is concerned and distressed that he has been referred to the Alabama Attorney General for investigation and possible prosecution. He is concerned about potential effects on his life, including that criminal investigation may affect future employment opportunities, may lead to law enforcement coming to his house to question him, may take up his time in requiring him to respond to the investigation, and may cause undue stress. Plaintiff Stroop views his referral for criminal investigation and possible prosecution due to being a registered voter as the

sort of infringement on civil rights and liberties that happens in authoritarian regimes.

55.     Plaintiff **Carmel Michelle Coe** is a naturalized U.S. citizen who was born in England and lives in Elmore County, Alabama. She moved to the United States in 1979 after marrying her husband, who is a U.S. citizen and retired Marine. They moved to Alabama in 1994. Plaintiff Coe has worked at Resurrection Catholic Missions in Montgomery, Alabama since 1994. She is currently the chief executive assistant. Plaintiff Coe became a citizen in September 2021 and immediately registered to vote. She voted in Alabama's primary election earlier this year. Plaintiff Coe first obtained an Alabama's driver's license in 1994. Because she is a naturalized citizen and has received a noncitizen identification number in the past, she is concerned that she will be purged from the voter rolls or made inactive before the November 2024 general election, perhaps due to Secretary Allen's further "reviews" of the voter rolls, and therefore will be unable to vote. She also fears that she has been or will be referred to the Attorney General for investigation or prosecution, based on Secretary Allen's announcement of the Purge Program. Although Plaintiff Coe has not broken the law either by registering to vote or by voting, she is concerned about the potential for negative consequences from referral to the Attorney General, particularly as a naturalized citizen.

56.     Plaintiff **Emily Asplund Jortner** is a naturalized U.S. citizen and is a resident of Lee County, Alabama. Plaintiff Jortner was born in 1974 in Ontario, Canada. In August 1992, Plaintiff Jortner moved to the United States on a student visa to attend college at Brigham Young University in Utah. She remained in the United States on a combination of school and work visas almost continuously for approximately 22 years.

57.     In 2010, Plaintiff Jortner met her husband, a professor at Auburn University in Auburn, Alabama. In 2011, Plaintiff Jortner and her husband married. In 2012, Plaintiff Jortner and her husband moved to their home in Auburn, Alabama, where they have lived ever since and started their family. In 2015, Plaintiff Jortner became a legal permanent resident. Since approximately 2015, Plaintiff Jortner has been a stay-at-home mother to her two minor children, both of whom are U.S.-born U.S. citizens.

58.     In October 2023—after nearly 30 years of living in the United States, and nearly a decade of being a legal permanent resident—Plaintiff Jortner became a U.S. citizen. Plaintiff Jortner felt it was important to become a U.S. citizen because she considers the United States her home country, wanted to share citizenship status with her children, and wanted to vote. In or around November or December of 2023, shortly after becoming a U.S. citizen, Plaintiff Jortner registered to vote in Alabama.

59.     Plaintiff Jortner is distressed, anxious, and fearful that she and/or her family will be harmed because of Secretary Allen's Purge Program. Plaintiff Jortner is currently an active, registered voter in Alabama, but she is concerned that she will be made inactive and/or purged from the voter rolls before the November 5, 2024 general election due to her prior status as a non-U.S. citizen living in Alabama. She is further scared that she has been or will be referred to the Alabama Attorney General for criminal investigation and prosecution for registering to vote and exercising her right to vote. After decades of living in the United States without the right to vote, Plaintiff Jortner wants to exercise her right to vote for the first time in the November general election and to do so without fear of criminal investigation, prosecution, or other retribution.

**Defendants**

60.     Defendant Wes Allen is the Alabama Secretary of State. The Secretary of State is "the chief elections official in the state" and "shall provide uniform guidance for election activities." Ala. Code § 17-1-3(a); *see also* Ala. Code §§ 17-4-60, -63. Defendant Allen is responsible for the design and implementation of the Purge Program. Defendant Allen created the Purge List, sent the Purge List to the Boards of Registrars in all 67 counties, directed the Board of Registrars in all 67 counties "to immediately inactivate and initiate steps necessary to remove" individuals on the Purge List, referred all individuals on the Purge List to Attorney

General Marshall for criminal investigation and potential prosecution, and intends to continue the Purge Program.  Defendant Allen is sued in his official capacity.

61.     Defendant Steve Marshall is the Attorney General of Alabama. Under Alabama law, the Attorney General may "at any time he [] deems proper, . . . superintend and direct the prosecution of any criminal case in any of the courts of this state," Ala. Code § 36-15-14, and "direct any district attorney to aid and assist in the investigation . . . of any case in which the state is interested," *id.* § 36-15-15. Secretary Allen has referred all individuals on the Purge List to Attorney General Marshall for criminal investigation and possible criminal prosecution. Attorney General Marshall has endorsed the Purge Program and evinced an intent to engage in prosecutions pursuant to the Program. Attorney General Marshall is responsible for criminal investigation and enforcement of the Purge Program. He is sued in his official capacity.

62.     Defendants Jan Bennett, Barry Stephenson, Cindy Willis Thrash, and Sheila Cox Barbuck are the Chairs of the Boards of Registrars for Elmore, Jefferson, Lee, and Marshall Counties, respectively.

63.     Defendant Chairs of Boards of Registrars are responsible, at the direction of Secretary Allen, for the implementation of the Purge Program in their respective Alabama counties. The Boards of Registrars are responsible for removing

ineligible voters from the rolls pursuant to state law. *See* Ala. Code § 17-4-3. The

Defendant Chairs of Boards of Registrars are sued in their official capacities.

## FACTUAL ALLEGATIONS

I.      **Secretary Allen's Announcement of His Voter Purge Program**

64.     On August 13, 2024, the Secretary of State's Office issued a press

release announcing that Secretary Allen is "implement[ing] [a] process to remove"

registered Alabama voters from Alabama's voter rolls. Exhibit 1, Secretary Allen's

Press Release.

65.     Secretary Allen's Press Release announced that Secretary Allen "ha[d]

identified 3,251 individuals who are registered to vote in Alabama who have been

issued noncitizen identification numbers by the Department of Homeland Security."

*Id.* Secretary Allen explained in his Press Release that "[w]e have examined the

current voter file in an attempt to identify anyone who appears on that list that has

been issued a noncitizen identification number." *Id.*

66.     In his Press Release, Secretary Allen admitted that "it is possible that

some of the individuals" on his list of 3,251 registered Alabama voters previously

issued identification numbers as noncitizens by the federal government "have, since

receiving them, become naturalized citizens and are, therefore, eligible to vote." *Id.*

In fact, Secretary Allen viewed this possibility as so likely that he created the Re-

Registration Process—a specific process for naturalized citizens on the Purge List,

whereby they must submit additional information by completing a new State of Alabama voter registration form and undergo a verification process, and specifically described this process in the same press release in which he announced the Purge Program. Secretary Allen was therefore aware of the virtual certainty that the Purge List included naturalized citizens who—like U.S.-born American citizens—had committed no crime by registering to vote.

67.    Nevertheless, Secretary Allen's Press Release announced that Secretary Allen "today . . . is instructing the Boards of Registrars in all 67 counties to immediately inactivate and initiate steps necessary to remove" purported noncitizens. *Id.*

68.    By "immediately inactivat[ing]" the voters on the Purge List and requiring them to submit a new voter registration form and undergo a verification process before they are again registered to vote and allowed to vote, the Purge Program in fact is tantamount to removal of the voters on the Purge List from the voter rolls. The Purge Program creates a Re-Registration Process by requiring the voters on the Purge List to submit a new registration form and undergo a verification process to be on the voter rolls and to vote.

69.    Secretary Allen's Press Release also informed Alabamians that "Allen has . . . provided the list of registered voters identified as having been issued a

noncitizen identification number to the Office of Alabama Attorney General Steve Marshall for further investigation and possible criminal prosecution." Ex. 1.

70.     Secretary Allen referred those on the Purge List to the Attorney General for investigation and prosecution *while simultaneously admitting* the possibility— and in fact, the virtual certainty—that the Purge List includes naturalized citizens. Again, Secretary Allen implicitly acknowledged the inclusion of naturalized citizens on the Purge List as essentially certain, by creating a specific process for naturalized citizen voters on the Purge List to provide additional information and undergo verification in order to re-register to vote and, ultimately, to vote.

71.     Further, Secretary Allen confirmed in his Press Release that the Purge Program is ongoing and will continue, stating that "[t]his is not a one-time review of our voter file" and that "[w]e will continue to conduct such reviews." *Id.*

## II.     Counties Are Implementing Secretary Allen's Purge Program and Requiring Voters on the Purge List to Complete a New Voter Registration Form to Restore Their Active Status

72.     Based on public reporting, residents of every Alabama county are on the Purge List.[1]

73.     Based on public reporting, 210 Montgomery County residents are on the Purge List. A representative of the Montgomery County Board of Registrars

---

[1] Jon Paebcke, *Alabama Purging 3,251 Noncitizens from Voting Rolls*, WVTM 13 (Aug. 14, 2024), https://www.wvtm13.com/article/alabama-purging-non-citizens-voting-rolls-election/61881112 (county-by-county numerical breakdown).

stated to media, regarding the Purge List, that the Board of Registrars "just got the list, we followed instructions and sent out the letters."

74.     Based on public reporting, roughly 555 residents of Jefferson County are on the Purge List. Based on public reporting, these residents have received a notice letter and must complete a voter registration form to reactivate their voter registration status. On information and belief, individuals on the Purge List in numerous if not all counties in Alabama have received identical notice letters stating that they are on the Purge List. These letters have the same wording as the letter received by Plaintiff Hazelhoff.

75.     The letters are confusing, because they both direct *all* recipients—with no exceptions—to complete a voter removal request form to "become compliant with state and federal law requirements" and direct recipients who are U.S. citizens eligible to vote to complete an Alabama voter registration form.

76.     The letters direct recipients who are U.S. citizens otherwise eligible to vote to complete the Re-Registration Process. Specifically, recipients must complete a new voter registration form and provide their Alabama driver's license number, their Alabama non-driver identification number, or the last four digits of their Social Security number.

**III.     The Purge List Includes and By Design Sweeps in Large Numbers of Naturalized U.S. Citizens**

77.     On information and belief, the Purge List includes numerous people who are naturalized U.S. citizens. Despite the fact that these U.S. citizens have the same fundamental right to vote as U.S.-born U.S. citizens, the Purge Program by design targets these eligible voters for removal from the voter rolls. The Purge Program removes these eligible voters from the rolls and requires them to re-register under the Re-Registration Process in order to vote.

78.     Data from the Department of Homeland Security shows that hundreds and often thousands of Alabama residents are naturalized every year. In Fiscal Year 2022, the most recent year for which data is available, 3,998 Alabama residents became naturalized citizens.

79.      The Census Bureau has found that roughly 61% of naturalized citizens are registered to vote.[2]

80.     To become a naturalized citizen, a person must first be a lawful permanent resident (often colloquially called a "green card holder") for years. The sole exceptions are for a small number of people who become naturalized citizens due to certain service in the U.S. military or who were previously noncitizen nationals of the United States because they were born in certain U.S. territories. For

---

[2] *Voting and Registration in the Election of November 2022,* U.S. Census Bureau (April 2023), https://www.census.gov/data/tables/time-series/demo/voting-and-registration/p20-586.html.

that reason, all (or virtually all) naturalized citizens in Alabama lived in the United States for years before they were citizens, as noncitizens and lawful permanent residents.[3]

81.   All naturalized citizens who have previously been permanent residents of the U.S. have previously been issued a noncitizen identification number by the federal government—because they have *previously* been noncitizens with permanent resident status and an accompanying noncitizen identification number.

82.   On information and belief, Secretary Allen has not taken any meaningful step to ensure that individuals on the Purge List are not naturalized U.S. citizens, even though (1) all naturalized U.S. citizens have previously been issued a noncitizen identification number and (2) issuance of a noncitizen identification number is the sole criterion for placing an individual on the Purge List.

83.   To the contrary, Secretary Allen has employed a methodology for creating the Purge List—the sole criterion of previously having been issued a

---

[3] In addition, some children born outside the U.S. who are legal permanent residents become U.S. citizens by operation of law, in what is called "derived citizenship." These children are not required to go through the naturalization process or obtain any documentation when they become citizens. When they turn 18, they can register to vote if they are otherwise eligible. Individuals with derived citizenship were typically children when at least one parent became a naturalized citizen. *See Policy Manual, Chapter 4 - Automatic Acquisition of Citizenship after Birth (INA 320)*, U.S. Citizenship & Immigration Servs., https://www.uscis.gov/policy-manual/volume-12-part-h-chapter-4. Derived citizens are subject to the same unlawful practices as naturalized citizens under the Purge Program, and the claims regarding the unlawfulness of the Purge Program with respect to naturalized citizens in this lawsuit apply equally to derived citizens—since they, too, were previously legal permanent residents.

noncitizen identification number—that predictably sweeps in all naturalized citizens in source agency records. Secretary Allen is aware that his methodology is flawed in this way: He expressly admitted that "it is possible that some of the individuals" on the Purge List "have . . . become naturalized citizens and are, therefore, eligible to vote." Ex. 1. In fact, Secretary Allen considered this possibility so likely that in the Purge Program announcement he provided for the Re-Registration Process, specifically for "those naturalized citizens." *Id.* Of course, Secretary Allen's language is an extreme understatement; it is not merely a "possibility" that "some" of the individuals on the Purge List are naturalized citizens but rather a virtual certainty that many (perhaps most) of the individuals on the Purge List are naturalized citizens.

84. Secretary Allen created the Purge List based on information regarding noncitizen identification numbers that Secretary Allen obtained from state agencies. On information and belief, Secretary Allen used information from at least two state agencies, the Alabama Law Enforcement Agency and Alabama Department of Labor, to create the Purge List. Upon information and belief, Secretary Allen used outdated and error-riddled data to create the Purge List.

### A. Alabama Law Enforcement Agency and Citizenship Information

85.     Lawful permanent residents and some other noncitizens are eligible for driver's licenses in Alabama. Ala. Code § 32-6-10.1 ("Foreign national licenses"). These driver's licenses are issued by the Alabama Law Enforcement Agency.

86.     To obtain a driver's license in Alabama, a noncitizen must provide proof of authorized presence in the United States. Ala. Admin. Code r. 760-X-1-.20. This proof consists of federal immigration documents or a federal employment authorization document. *Id.*

87.     Alabama has one of the highest rates of licensed drivers in the country. In 2022, Alabama had 999 drivers per 1,000 members of the driving age population.[4]

88.     Because a person must ordinarily be a lawful permanent resident for years before becoming a naturalized citizen, because a lawful permanent resident may obtain a driver's license in Alabama, and because 999 out of 1,000 eligible individuals in Alabama have a driver's license, it is extremely likely that many naturalized citizen residents of Alabama had an Alabama driver's license before they became citizens.

89.     An Alabama driver's license lasts for four years before expiration. Ala. Code § 32-6-1(b). There is no requirement under Alabama law that a person with a

---

[4] *Highway Statistics 2022: Licensed Drivers by Sex and Ratio to Population – 2022*, U.S. Dep't of Transportation, Fed. Highway Admin (Jan. 2024), https://www.fhwa.dot.gov/policyinformation/statistics/2022/dl1c.cfm.

foreign national driver's license must update their driver's license when they become a naturalized citizen, rather than waiting until the expiration of their license.

90.    Over the four-year period from Fiscal Year 2017 to 2022—the life span of an Alabama driver's license—12,084 Alabama residents became naturalized citizens.[5] If just 27% of these 12,084 newly naturalized citizens registered to vote upon their naturalization, they would equal the total number of registered voters on Secretary Allen's Purge List.

91.    It is virtually certain that more than 27% of the 12,084 citizens who naturalized over the last four years in Alabama have registered to vote, because roughly 61% of naturalized citizens are registered to vote.

92.    For those reasons, the mere fact that a person once had a foreign national driver's license, or even that they currently do, does not demonstrate that that person is currently a noncitizen. Plaintiffs Hazelhoff, Coe, and Jortner are all naturalized citizens, for example, and all had a driver's license in Alabama before they became citizens.

93.    In other states, state officials have created similar legally flawed programs in reliance on information provided when an individual obtained a driver's

---

[5] *Profiles on Naturalized Citizens*, U.S. Dep't of Homeland Sec., Office of Homeland Sec. Statistics, https://ohss.dhs.gov/topics/immigration/naturalizations/profiles.

license. In each of those cases, public reporting and lawsuits have uncovered that the programs targeted naturalized citizens.

94.     To the extent that Alabama's Purge Program relies on information provided upon obtaining a driver's license, it is highly likely to sweep in many naturalized citizens.

**B. Alabama Department of Labor and Citizenship Information**

95.     Like other workers in Alabama, noncitizens who are authorized to work in the United States are eligible for Alabama unemployment compensation if they lose their job.

96.     A noncitizen worker who files a claim for unemployment compensation with the Alabama Department of Labor (ADOL) must supply ADOL with a noncitizen identification number. ADOL may then subsequently verify the number with U.S. Citizenship and Immigration Services to determine that the worker is authorized to work in the United States.

97.     Typically, a worker who is eligible for unemployment benefits in Alabama qualifies for roughly fourteen to twenty full benefit weeks.

98.     If a worker receives unemployment benefits as a noncitizen and subsequently becomes a naturalized citizen, they are under no obligation to update ADOL as to their new citizenship status.

99.    If a worker receives unemployment benefits as a noncitizen and subsequently becomes a naturalized citizen, they have no reason to update ADOL as to their new citizenship status unless they file again for unemployment benefits.

### C. The Purge Program Likely Flags Large Numbers of Eligible, Registered Voters Who Are Naturalized Citizens

100.    Because Secretary Allen's Purge Program only considers, as the sole criterion for including an individual on the Purge List, whether they have ever had a noncitizen identification number, the Purge Program is likely to flag large numbers of eligible and registered voters who are naturalized citizens, leading to their removal from the voter rolls.

101.    By contrast, U.S.-born citizens are meant to be categorically excluded from the Purge Program—because the only criterion for the Purge Program is whether an individual has been issued a *non*citizen identification number.

102.    Because the Purge Program by design singles out individuals who were once noncitizens and subjects them to scrutiny not faced by U.S.-born citizens, the Purge Program discriminates against naturalized citizens.

103.    Further, naturalized citizens in Alabama overwhelmingly come from communities of color that have historically been subject to discrimination in the exercise of their voting rights. For instance, in fiscal year 2022, the top five countries of origin for the 3,998 naturalized Alabama residents were Mexico (578), India (416), Vietnam (316), the Philippines (244), and South Korea (193). The top five

countries of origin for the 1,614 naturalized Alabama residents in fiscal year 2021 were the same: Mexico (234), India (167), the Philippines (141), Vietnam (137), and South Korea (94).[6]

104.   By disproportionately burdening the right to vote for naturalized citizens in Alabama, Secretary Allen's Purge Program thus burdens the right to vote for citizens from communities of color that have historically suffered discrimination and discriminates against voters from communities of color.

## IV.       The Purge Program's Effects on Naturalized Citizens

105.   Secretary Allen "instruct[ed] the Boards of Registrars in all 67 counties," pursuant to the Purge Program, to take immediate steps to remove all 3,251 people on the Purge List from the Alabama voter rolls, and to require them to successfully complete the Re-Registration Process in order to vote and be registered to vote. Ex. 1.

106.   Registration is the largest obstacle to voting in the United States. H.R. Rep. No. 103-9, at 3 (1993) ("Public opinion polls, along with individual testimony . . . indicate that failure to become registered is the primary reason given by eligible citizens for not voting. It is generally accepted that over 80 percent of those citizens who are registered vote in Presidential elections.").

---

[6] *Profiles on Naturalized Citizens*, U.S. Dep't of Homeland Sec., Office of Homeland Sec. Statistics, https://ohss.dhs.gov/topics/immigration/naturalizations/profiles-naturalized-citizens.

107.   The notice letters sent by local registrars at Secretary Allen's direction directed individuals on the Purge List—including naturalized and U.S. Born citizens—to complete the Re-Registration Process. Secretary Allen has kept the details of the Re-Registration Process secret, including what exactly the "verifi[cation]" process entails. However, the letters sent by county Boards of Registrars to individuals on the Purge List direct recipients who are eligible Alabama voters to submit anew a voter registration form, along with their Alabama driver's license or non-driver ID number or the last four digits of their Social Security number.

108.   In effect, Alabama's Purge Program subjects naturalized citizens who have previously attested to their U.S. citizenship under penalty of perjury—as all other Alabama voters do—a duplicative, arbitrary, and discriminatory Re-Registration Process in order to vote and be on the voter rolls.

109.   This program was announced just 84 days before in-person voting in the November 2024 general election in Alabama, and even fewer days before the start of absentee voting. This short time frame creates an additional barrier for naturalized citizens to complete the Re-Registration Process created by the Purge Program in order to vote.

110.   Because the Purge Program knowingly and by design places these additional burdens on naturalized citizens by intentionally relying on flawed and

incomplete citizenship data, it is discriminatory. Under the Purge Program, naturalized citizens are subjected to a heightened burden on their exercise of the right to vote relative to U.S.-born citizens, simply because they were at one time not U.S. citizens.

111.   The Purge Program deters naturalized citizens from exercising their right to vote. Although they are eligible once they naturalize, rhetoric against noncitizen voting makes them feel that they still do not have this right.

112.   The Purge Program puts naturalized citizens at unique risk of being removed from the voter rolls and uniquely burdens naturalized citizens with re-registering to vote under the Re-Registration Process—within a narrow window of time if they wish to vote in the November 2024 general election.

## V.   Secretary Allen's Purge List Also Erroneously Includes Individuals Who Are U.S.-Born U.S. Citizens

113.   By design, Secretary Allen's Purge Program includes naturalized U.S. citizens. On information and belief, his Purge List includes numerous individuals who are U.S.-born U.S. citizens, due to Alabama agencies erroneously identifying these individuals as having had a noncitizen identification number and Secretary Allen thus erroneously including them on his Purge List—for which having ever had a noncitizen identification number is the sole criterion.

114.   On information and belief, the Purge List inaccurately identified James Stroop, a U.S.-born U.S. citizen, as an individual issued a noncitizen identification number.

115.   On information and belief, the Alabama Department of Labor has identified *at least* 15 errors on the Purge List.

## VI.   Intent to Continue Purge and to Criminally Investigate Individuals on the Purge List

116.   Secretary Allen has publicly expressed his intent to continue his Purge Program. Secretary Allen told media about his Purge Program, "We're going to keep pushing and we're not going to slow down."  He further told media that his office had obtained noncitizen identification numbers from two state agencies and is "working to obtain more."[7]

117.   Secretary Allen's expressed intent to continue the Purge Program chills naturalized citizens in Alabama from exercising their right to register and vote and intimidates these eligible U.S. voters with threats of unwarranted criminal investigation and prosecution.

118.   As part of the Purge Program, Secretary Allen has referred all individuals on the Purge List for criminal investigation and potential prosecution by

---

[7] Jon Paebcke, *Alabama Purging 3,251 Noncitizens From Voting Rolls*, WVTM 13 (Aug. 14, 2024),          https://www.wvtm13.com/article/alabama-purging-non-citizens-voting-rolls-election/61881112.

the Office of the Alabama Attorney General. Secretary Allen has taken this step

notwithstanding his admission that the Purge List almost certainly includes

naturalized citizens.

119.   Attorney General Marshall has publicly endorsed Secretary Allen's

Purge Program. On X (formerly Twitter), Attorney General Marshall stated in his

official capacity (@AGSteveMarshall): "Alabama knows how to run elections. Well

done by @alasecofstate Wes Allen. BE ADVISED: Violations of state election laws

will be prosecuted to the fullest extent of the law." The post linked to an article about

Secretary Allen's Purge Program.[8] Attorney General Marshall's endorsement creates

the perception for the reasonable Alabama observer that Attorney General Marshall's

office is engaging in the Purge Program by investigating the individuals on the Purge

List.

120.   Secretary Allen's referral of all individuals on the Purge List for

criminal investigation and potential prosecution, as well as Attorney General

Marshall's endorsement of the Purge Program, intimidate and create a chilling effect

for naturalized citizens in Alabama as to voter registration and voting.

121.   The letters to individuals on the Purge List from the Boards of

Registrars—identical across several counties, and therefore likely created by

---

[8] Alabama Attorney General Steve Marshall (@AGSteveMarshall), X (Aug. 14, 2024, 7:33 AM),
https://x.com/AGSteveMarshall/status/1823699430081704083.

Secretary Allen's office—likewise create a chilling effect for recipients and intimidate these eligible voters. Specifically, by directing all recipients to complete a voter removal request form "to immediately be removed from the voter list and become compliant with state and federal law requirements," these letters sent as part of Secretary Allen's Purge Program intimidate and coerce eligible voters who receive them into removing themselves from the voter rolls.

122.   The letters themselves implicitly admit that at least some recipients are eligible voters, because they provide additional instructions for eligible voters. Nevertheless, they direct *all* recipients to complete a voter removal request form. In so doing, they attempt to intimidate and coerce eligible voters into giving up their right to vote.

**VII.     Secretary Allen's Belated and Unsuccessful Attempt to Downplay the Purge Program**

123.   On August 19, 2024, Plaintiffs LWVAL, AL NAACP, and ACIJ, along with other organizations, sent a pre-suit notice letter under the NVRA to Secretary Allen, copying Attorney General Marshall and the County Boards of Registrars. That letter is attached as Exhibit 2.

124.   Plaintiffs' notice letter warned of potential violations of the NVRA and included three straightforward demands: (1) Discontinue the Purge Program; (2) publicly announce that "no person shall be removed from Alabama's voter rolls pursuant to the Program and that no person shall be removed from Alabama's voter

rolls based on the fact of having" had a DHS noncitizen ID number; and (3) notify "any and all individuals contacted or noticed pursuant to the Program that they remain registered to vote in Alabama elections, including the November 2024 election, and that no further action on their part is needed." Exhibit 2.

125.   On September 6, 2024, General Counsel for Secretary Allen responded by letter to Plaintiffs' notice letter (Secretary Allen's response). That letter is attached as Exhibit 3.

126.   As to the first demand in Plaintiffs' NVRA notice letter, to discontinue the Purge Program, Secretary Allen's response denied that any program exists, stating, "there is no voter removal program operating systematically or otherwise in Alabama in advance of the 2024 general election as referenced in your letter." Secretary Allen's response claimed that "[o]nly registered voters on the list of 3,251 who have requested to be removed, themselves, in writing, have been removed." The response further stated, "Discrete self-removal is available for all such individuals, meaning the applicable removal form does not require an individual to disclose a reason for their request." Exhibit 3.

127.   Secretary Allen's response omitted that letters sent by county Boards of Registrars to individuals on the Purge List order recipients to "[p]lease complete and submit the enclosed **Voter Removal Request** form to immediately be removed from the voter list and become compliant with state and federal law requirements." The

wording of the letters is identical across multiple counties, indicating that their language comes directly from Secretary Allen. By directing recipients to submit a voter removal request form to "become compliant with state and federal law requirements," these letters intimidate recipients who are eligible voters by falsely leading recipients to believe they have violated the law, threaten to cause eligible voters to remove themselves from the voter rolls, and may have already done so. As a result, requests for removal sent pursuant to the receipt of a Board of Registrars letter are not voluntary removals independent of underlying intimidation. Rather, they are the product of intimidation and coercion.

128. Secretary Allen's response further elided that county Boards of Registrars have targeted only voters on the Purge List, rather than all voters, in mailing voter removal request forms and directing these voters to fill out the form to "become compliant with state and federal law requirements."

129. As to the second demand in Plaintiffs' notice letter, to make a public statement that no voter would be removed pursuant to the Purge Program, Secretary Allen's response neither acknowledged the request nor made any commitment to inform the public of his view that there is no voter removal program underway. In the public square, the Secretary has been conspicuously silent about this view as well. Instead, as of September 12th, the announcements page on the Secretary's website still prominently features the initial press release headline: "Secretary of

State Wes Allen Implements Process to Remove Noncitizens Registered to Vote in Alabama."[9]

130.   As to the third demand in Plaintiffs' notice letter, to notify voters that they remain registered to vote and that they need not take further action, Secretary Allen's response neither made any commitment to alleviate voters' worries nor assured that voters need not take further action. On the contrary, the wording of the voter notices ("submit a voter removal request form to become compliant with state and federal law requirements") stands at odds with Secretary Allen's response to Plaintiffs, which claims that "registered voters with noncitizen data associated with their records on the list of 3,251 are *simply being invited to correct or update their voter registration form* as applicable to their circumstances." The response also asserted that the process for such voters to return to the active voter rolls "is no different for any voter placed on inactive status, whether so classified due to an address-related reason or an eligibility-based issue" (emphasis added).

131.   But this purported "invit[ation]" to submit a new voter registration form is a *requirement* for anyone on the Purge List to vote in future elections in Alabama. As the Press Release from Secretary Allen's office stated, the Purge Program immediately inactivates individuals on the Purge List and initiates steps to remove those individuals from the voter rolls. Letters from county Boards of Registrars to

---

[9] Ala. Sec'y of State, *Newsroom* (Sep. 12, 2024), https://www.sos.alabama.gov/newsroom.

individuals on the Purge List confirm that recipients "have been placed on the path for removal from the statewide voter list."

132.   Even Secretary Allen's response to the NVRA letter confirms that individuals on the Purge List must, because they are on the Purge List, re-register in order to vote. Secretary Allen's response claims this re-registration "is no different for any voter placed in inactive status, whether so classified due to an address-related reason or an eligibility-based issue." But the response fails to acknowledge that the re-registration Secretary Allen and county Boards of Registrar require for people on the Purge List is materially different from the lack of such requirement for individuals *not* placed on the Purge List. While voters on the Purge List must submit a new voter registration form, all other inactive voters need only complete a "voter reidentification form." Secretary Allen's response also fails to acknowledge that this re-registration requirement is based on discriminatory and arbitrary information that does not accurately reflect any "eligibility-based issue" regarding voting.

133.   Worse still, while Secretary Allen's response stated that voters could submit an updated registration form on Election Day, that information is not in the letters sent by county Boards of Registrars to individuals on the Purge List. The deadline to register to vote for the 2024 general election in Alabama is October 21, 2024. Voter registration forms for the State of Alabama—the forms that voters on the Purge List must complete in order to vote—state at the top of the form that the

deadline for voter registration and updating of voter records is 14 days prior to each election in Alabama, and that in the 14-day window before the election voter registration is closed. By telling eligible voters that they must complete a new voter registration form, the letter creates the impression for the reasonable Alabama recipient that they must re-register by October 21, the registration deadline, in order to vote in the 2024 general election.

134. On information and belief, the Secretary of State has issued no corrective notice or communication to voters on the Purge List since the initial, identical notices instructing that they request to self-remove or engage in the Re-Registration Process.

135. Taken together, Secretary Allen's response conflicts with observable reality in several respects and almost entirely ignores Plaintiffs' straightforward demands. When Plaintiffs' notice letter demanded an end to the Purge Program, the response denied any program existed. When Plaintiffs' notice letter demanded a public clarification that voters would not be removed according to the Purge Program as the Press Release described it, the response ignored this demand and the Secretary instead has maintained the Press Release online. Crucially, when Plaintiffs' notice letter demanded follow-up outreach to voters assuring them that they would be able to vote and that further action was unnecessary, the response was silent, and voters have received no such assurance from the Secretary.

136.   In short, Secretary Allen's response is a belated and unconvincing effort to downplay the serious effects of the Purge Program on Alabamian voters, particularly naturalized citizens. The numerous instances in which reality belies Secretary Allen's response indicate that voters on the Purge List remain on a path toward removal, constructively or otherwise, and that the Secretary is currently implementing and intends to continue to implement the Purge Program.

## VIII.   Alabama's History of Discrimination in Voting and Toward Immigrants

137.   Alabama has a long history of enacting voting restrictions to target and disenfranchise voters of color.

138.   For example, in 1893, in response to increased Black political activism, Alabama passed the Sayre Law. *See Harris v. Siegelman*, 695 F. Supp. 517, 525 (M.D. Ala. 1988). Among other restrictions, the Sayre Law required a person seeking assistance with voting to swear an oath to the inspectors that he or she was unable to write the English language. It also limited the time that a voter could remain inside the voting booth to five minutes. *Id*. at 525.

139.   In 1901, all-white delegates crafted a new state Constitution, which conditioned the right to vote on land ownership and employment, and instituted a poll tax, literacy test, criminal disenfranchisement rule, and a "grandfather clause" to keep descendants of enslaved people from voting. *See South Carolina v. Katzenbach*, 383 U.S. 301, 311-12 (1966). By 1909, only 4,000 of the nearly 182,000

Black persons of voting age in Alabama remained on the voter rolls. *Harris*, 695 F. Supp. at 523-24.

140.   Over the next half-century, Alabama passed a series of other laws requiring "black persons who wished to register and vote to satisfy different and more stringent standards and tests than white persons" and constructed discriminatory poll taxes and other barriers to the ballot. *Harris*, 695 F. Supp. at 524. Federal courts repeatedly struck down these restrictions as violating the Fourteenth and Fifteenth Amendments and other civil rights laws. *See United States v. Penton*, 212 F. Supp. 193, 197 (M.D. Ala. 1962) (holding that state officials "deliberately and consistently engaged in procedures and practices which [] favored white applicants and discriminated against Negro applicants who were seeking to become registered voters"); *United States v. Parker*, 236 F. Supp. 511, 515 (M.D. Ala. 1964) (holding that Alabama's voter registration application violated the Fourteenth and Fifteenth Amendments and the Civil Rights Act of 1964); *Davis v. Schnell*, 81 F. Supp. 872, 874 (S.D. Ala. 1949) (holding that state constitution amendment requiring prospective voters to "understand and explain" article of U.S. Constitution violated Fifteenth Amendment).

141.   Even after the Voting Rights Act was enacted in 1965, which subjected Alabama to the pre-clearance provisions of Section 5 thereunder, Alabama's attempts to disenfranchise and dilute the power of voters of color persisted. Between

1965 and 2013, at least 100 voting changes proposed by Alabama state, county, or city officials were either blocked or altered pursuant to the VRA.

142.   Now Alabama is targeting its growing immigrant population through a voter purge intended to intimidate and disenfranchise naturalized citizens.

143.   This is not the first time Alabama has targeted the state's Hispanic and immigrant population. In 2011, the Alabama state legislature passed HB 56, a draconian law targeting the state's undocumented residents. Among other severe restrictions, the law required schools to collect data on their students' immigration status, which the Eleventh Circuit found violated the Equal Protection Clause. *Hisp. Int. Coal. of Ala. v. Governor of Alabama*, 691 F.3d 1236, 1249 (11th Cir. 2012). It prohibited courts from enforcing certain contracts—even contracts for basic necessities—entered into by undocumented residents, a restriction the Eleventh Circuit described as making "the ability to maintain even a minimal existence [] no longer an option for unlawfully present aliens in Alabama." *United States v. Alabama*, 691 F.3d 1269, 1293 (11th Cir. 2012). The law also criminalized even an undocumented resident's mere application for work in the state, including for work as an independent contractor. *Id.* at 1277. The most egregious provisions of HB 56 were permanently enjoined as a result of an agreement reached between the state and civil rights groups who filed a federal class action lawsuit alleging numerous constitutional violations. However, vestiges of the law still remain today. For

example, undocumented residents remain barred from attending state-funded higher education institutions.

## CLAIMS

### COUNT ONE
**Violation of the National Voter Registration Act, 52 U.S.C. § 20507(c)(2)(A)**
(*Ex parte Young*, 52 U.S.C. § 20510)
All Plaintiffs Against All Defendants

140.   Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

141.   The National Voter Registration Act (NVRA) requires that Alabama complete "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters" "not later than 90 days prior to the date of a . . . general election for Federal office." 52 U.S.C. § 20507(c)(2)(A). This provision, called the "90-Day Provision," means that Alabama may not take any steps to implement any program to systematically remove voters within the 90-day period before the date of a general election—the "quiet period."

142.   The Purge Program violates the NVRA's 90-Day Provision because it (1) is a program with the purpose of systematically removing voters from the rolls and (2) has not been completed before the 90-day quiet period before the 2024 general election, and in fact has occurred and is occurring entirely within the quiet period.

143.   On August 19, 2024, Plaintiffs ACIJ, AL NAACP, and LWVAL sent a notice letter to Secretary Allen, copying Attorney General Marshall and county Boards of Registrars, informing Secretary Allen that the Purge Program violates the NVRA's 90-Day Provision. Secretary Allen has not corrected the violations identified by Plaintiffs. Plaintiffs ACIJ, AL NAACP, and LWVAL have therefore provided pre-suit notice pursuant to 52 U.S.C. § 20510(b)(2).

## COUNT TWO
**Violation of the National Voter Registration Act, 52 U.S.C. § 20507(b)(1)**
(*Ex parte Young*, 52 U.S.C. § 20510)
All Plaintiffs Against All Defendants

140.   Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

141.   The NVRA requires that voter list maintenance programs be "uniform" and "nondiscriminatory." 52 U.S.C. § 20507(b)(1).

142.   Secretary Allen's Purge Program violates the NVRA's requirement that voter list maintenance programs be (1) "uniform" and (2) "nondiscriminatory" because it targets and disproportionately burdens naturalized citizens. Because Secretary Allen's Purge Program bases the Purge List on whether an individual has ever been issued a noncitizen identification number, Secretary Allen's Purge Program is designed to affect only naturalized, not U.S.-born, citizens, and it

knowingly places burdens exclusively on those citizens who Alabama believes to be naturalized.

143.   On August 19, 2024, Plaintiffs ACIJ, AL NAACP, and LWVAL sent a notice letter to Secretary Allen, copying Attorney General Marshall and county Boards of Registrars, informing Secretary Allen that the Purge Program violates the NVRA's requirement that voter list maintenance programs be "uniform" and "nondiscriminatory." 52 U.S.C. § 20507(b)(1). Plaintiffs ACIJ, AL NAACP, and LWVAL have therefore provided pre-suit notice pursuant to 52 U.S.C. § 20510(b)(2).

## COUNT THREE
**Violation of the National Voter Registration Act, 52 U.S.C. § 20507(a)**
(*Ex parte Young*, 52 U.S.C. § 20510)
All Plaintiffs Against All Defendants

144.   Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

145.   The NVRA requires that Alabama "ensure that any eligible applicant is registered to vote in an election" if they apply to register within the registration deadline through the NVRA's prescribed methods. 52 U.S.C. § 20507(a)(1).

146.   Removals of eligible voters from the voter list pursuant to purported self-requests under the Purge Program are not free and voluntary requests for removal under § 20507(a)(3)(A). The letters sent pursuant to the Purge Program direct all recipients to complete and return a removal request form "to . . . become

compliant with state and federal law requirements." Because the letters direct all recipients to take these steps and imply that doing so is necessary to comply with the law, letter recipients are not freely and voluntarily requesting removal from the rolls. This lack of voluntariness is compounded by Secretary Allen's public referral of all individuals on the list for criminal investigation and prosecution and Attorney General Marshall's public statements evincing intent to prosecute.

147.   By relying on data that Secretary Allen publicly acknowledges inaccurately includes eligible voters to inactivate voter registrations and require voters to complete an additional process to re-register to vote, Secretary Allen's Purge Program does not ensure that eligible applicants remain registered to vote in future elections. By directing those on the Purge List to remove themselves from the voter rolls under threat of criminal prosecution, Secretary Allen's Purge Program does not evade this legal requirement: eligible voters' removal of themselves from the voter rolls is not free or voluntary. Accordingly, the Purge Program violates the NVRA.

## COUNT FOUR
**Violation of the Fourteenth Amendment Equal Protection Clause**
**Discrimination Based on Citizenship Classification and National Origin**
(*Ex parte Young*, 42 U.S.C. § 1983)
All Plaintiffs Against All Defendants

148.   Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

149.   The Fourteenth Amendment to the United States Constitution prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws."

150.   Under the Equal Protection Clause, discrimination based on naturalized citizenship and on national origin is presumptively unconstitutional and subject to strict scrutiny.

151.   The Purge Program, designed by Secretary Allen and implemented by Secretary Allen, Attorney General Marshall, and county Boards of Registrars, discriminates against naturalized citizens by creating a process that by design will include all naturalized citizens but categorically excludes all U.S.-born citizens. Defendants treat naturalized citizens differently from U.S.-born citizens by requiring naturalized citizens who have previously interacted with the state using their noncitizen identification number to submit new information under the threat of being removed from the voter rolls and losing their right to vote. This requirement, by design, does not apply to U.S.-born citizens.

152.   Defendants further treat naturalized citizens differently from U.S.-born citizens by publicly referring naturalized citizens who have previously interacted with the state using their noncitizen identification number for criminal investigation and threatening to prosecute them. U.S.-born citizens are exempt from such investigation and threat of prosecution, while naturalized citizens are subject to

investigation and threat of prosecution.

153.   Secretary Allen acknowledges that the Purge Program by its very terms includes naturalized citizens. The Purge Program creates a classification that discriminates against naturalized citizens.

154.   Because the Purge List is based on information that *at some point* individuals on the Purge List were not U.S. citizens, Secretary Allen is classifying individuals on the basis of national origin.

155.   The classification established by the Purge List is neither justified by nor narrowly tailored to promote substantial or compelling state interests.

156.   The fact that some U.S.-born citizens have been swept into the Purge Program through Secretary Allen's erroneous identification of them as having previously had noncitizen identification numbers adds further arbitrariness in implementation of the Purge Program but does not undermine the *design* of the Purge Program to target naturalized citizens and categorically exclude U.S.-born citizens.

157.   Through the Purge Program, Defendants unlawfully discriminate against Alabamians on the basis of national origin and with respect to the fundamental right to vote in violation of the Fourteenth Amendment. Defendants treat foreign-born citizens differently from those born in the United States by imposing greater burdens on foreign-born citizens' right to vote, referring foreign-born citizens for criminal investigation for registering to vote, and threatening

foreign-born citizens with criminal prosecution for registering to vote and voting.

158.   Through the Purge Program, Defendants also unlawfully discriminate against a group of citizens—naturalized citizens—with respect to the fundamental right to vote in violation of the Fourteenth Amendment. Through the Purge Program, Defendants impose greater burdens on foreign-born citizens' right to vote, refer foreign-born citizens for criminal investigation for registering to vote, and threaten foreign-born citizens with criminal prosecution for registering to vote and voting.

**COUNT FIVE**
**Violation of the Fourteenth Amendment Equal Protection Clause**
**Arbitrary and Disparate Treatment**
(*Ex parte Young*, 42 U.S.C. § 1983)
All Plaintiffs Against All Defendants

159.   Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

160.   The Fourteenth Amendment to the United States Constitution prohibits states from "deny[ing] to any person within its jurisdiction the equal protection of the laws." "A citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). Alabama may not engage in "arbitrary and disparate treatment" of similarly situated voters. *Bush v. Gore*, 531 U.S. 98, 104-05 (2000).

161.   Although they are similarly situated, registered voters on the Purge List are treated differently from registered voters not on the Purge List. Specifically, the

Purge Program requires registered voters on the Purge List to re-register under the Re-Registration Process—including by completing a voter registration form anew and undergoing a verification process—to vote in the 2024 general election and other future elections and to be registered to vote. Voters not on the Purge List are not subject to this process and are not being required to re-register under the Re-Registration Process. Voters not on the Purge List who are on Alabama's ordinary inactive list are not subject to the Re-Registration Process and need not complete an entirely new registration form. Secretary Allen has also publicly referred these registered voters to Attorney General Marshall for criminal investigation and potential prosecution, and Attorney General Marshall has evinced an intent to investigate. Registered voters who are not on the Purge List have not been systematically referred to Attorney General Marshall for criminal investigation and potential prosecution.

162.   The criterion used to select registered voters for inclusion on the Purge List is both arbitrary as a means of ferreting out ineligible voters, and discriminatory in that it targets naturalized citizens for extra burdens. The fact of having once had a noncitizen identification number is neither proof nor a reliable indicator that a registered voter is currently a noncitizen.

163.   The inclusion of registered voters on the Purge List is also arbitrary because the Purge List contains numerous errors even based on its own criterion.

That is, the Purge List includes multiple individuals who have never in fact been issued a noncitizen identification number.

164.   Voters on the Purge List face a different, arbitrary, and unnecessarily burdensome set of barriers to register and vote than voters not on the Purge List. The Purge Program is not narrowly tailored to a potential state interest. Nor is there any rational basis for treating voters on the Purge List and voters not on the Purge List differently. Thus, Secretary Allen's design and Secretary Allen's, Attorney General Marshall's, and county Boards of Registrars' implementation of the Purge Program violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

<u>**COUNT SIX**</u>
**Violation of the First and Fourteenth Amendments**
**Undue Burden on the Right to Vote**
(*Ex parte Young*, 42 U.S.C. § 1983)
All Plaintiffs Against All Defendants

165.   Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

166.   The Purge Program lacks adequate justification and burdens the ability of eligible voters to vote, in violation of the First and Fourteenth Amendments.

167.   The Purge Program is burdensome, unnecessary, and discriminatory. It subjects registered, eligible voters identified under the Purge Program to intimidation in the form of a letter threatening them with unjustified criminal

prosecution and requires them to re-register under the Re-Registration Process in order to vote and be on the voter rolls. Voters must complete the Re-Registration Process, re-registering to vote and undergoing verification, in order to vote and be on the voter rolls.

## COUNT SEVEN
### Violation of the Voting Rights Act, 52 U.S.C. § 10307(b)
(*Ex parte Young*, 42 U.S.C. § 1983)
All Plaintiffs Against Secretary Allen and Attorney General Marshall

168.   Plaintiffs reallege, as though fully set forth in this paragraph, all the allegations of this Complaint.

169.   Section 11(b) of the Voting Rights Act prohibits any person, whether acting under color of law or otherwise, from intimidating, threatening, or coercing, or attempting to intimidate, threaten, or coerce any person for voting or attempting to vote. 52 U.S.C. § 10307(b).

170.   In announcing the Purge Program, Secretary Allen publicly announced that he was referring all individuals on the Purge List to Attorney General Marshall's office for "further investigation and possible criminal prosecution." Ex. 1.

171.    In the exact same announcement, Secretary Allen admitted the virtual certainty that naturalized citizens—who are eligible to vote—are on the Purge List. This outcome is foreseeable, because Secretary Allen's sole criterion for including individuals on the Purge List is that they at one point had a noncitizen identification number, and all naturalized citizens have had a noncitizen identification number.

172.   And this foreseeable outcome was in fact foreseen, because Secretary Allen established the Re-Registration Process specifically for naturalized citizens, as he stated in his announcement of the Purge Program. While intent is not a required element of this claim, Secretary Allen thus acted with intent, knowledge, and reckless disregard in designing and implementing the Purge Program to predictably create fear of unwarranted criminal prosecution and stoke anxiety among eligible Alabama voters, particularly naturalized citizens, about criminal investigation and prosecution for registering to vote and voting.

173.   Attorney General Marshall has likewise endorsed the Purge Program. Attorney General Marshall's endorsement creates the impression for the reasonable Alabama observer that his office is engaging in and will engage in criminal investigations and prosecutions pursuant to Secretary Allen's referral of all individuals on the Purge List to the Office of the Attorney General.

174.   Further, letters sent by county Boards of Registrar to voters on the Purge List direct all recipients to complete and return a removal request form "to . . . become compliant with state and federal law requirements." Because the letters direct all recipients to take these steps and imply that doing so is necessary to comply with the law, the letters intimidate and coerce recipients who are eligible voters into removing themselves from the voter rolls. The intimidation and coercion are compounded by Secretary Allen's public referral of all individuals on the Purge List

for criminal investigation and possible prosecution and Attorney General Marshall's statements evincing an intent to criminally investigate the individuals on the Purge List.

175.   On information and belief, Secretary Allen is responsible for the language in the letters sent by county Boards of Registrars throughout Alabama.

176.   Since Secretary Allen's announcement of the Purge Program on August 13, 2024, public reporting has made clear that the Purge List contains many eligible Alabama voters. But neither Secretary Allen nor Attorney General Marshall have publicly acknowledged the errors or taken any public steps to ensure that eligible Alabama voters targeted by the Purge Program know that they can vote in the 2024 election. Rather, Secretary Allen has further publicly stated that he intends to continue the Purge Program and intends to gather data from additional agencies.

177.   Secretary Allen's and Attorney General Marshall's statements and conduct are intimidating to eligible Alabama voters on the Purge List, including naturalized citizens, and to naturalized citizens in Alabama who worry that they are included on the current Purge List or will be included on a future purge list.

178.   Secretary Allen's and Attorney General Marshall's statements and conduct have the effects of chilling eligible voters, particularly naturalized citizens, in voting, registering to vote, and participating in the democratic process, and of

reducing the likelihood that eligible voters, particularly naturalized citizens, will register to vote and will vote.

179.   Secretary Allen's and Attorney General Marshall's actions intimidate and threaten naturalized citizens who are eligible voters for voting and attempting to vote, including by registering to vote. Secretary Allen's and Attorney General Marshall's actions attempt to intimidate and threaten naturalized citizens who are eligible voters for voting and attempting to vote, including by registering to vote. Thus, Secretary Allen and Attorney General Marshall have violated and are violating 52 U.S.C. § 10307.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and award the following relief:

a.   Declare that Secretary Allen's Purge Program violates federal law and the United States Constitution;

b.   Preliminarily and permanently enjoin Defendants from implementing the Purge Program and from inactivating or removing any voter from the rolls on the basis of the Purge List, on the basis of having previously been issued a noncitizen identification number, or on the basis of failing to respond to a notice letter issued due to the Purge List or prior issuance of a noncitizen identification number;

c.      Order Defendants Allen and Chairs of County Boards of Registrars to retract the notice letters already sent out on the basis of the Purge List;

d.      Order Defendants Allen and Chairs of County Boards of Registrars to place back on the rolls in active status any persons who were removed from the rolls, including by being placed in inactive status, as a result of implementation of the Purge List;

e.      Order all Defendants to take all such steps as are necessary to alert all individuals on the Purge List and the public that the notice letters sent pursuant to the Purge List are being rescinded, that all eligible voters on the Purge List may vote in the November 2024 general election, and that all eligible voters on the Purge List are on the voter rolls and need not re-register to vote;

f.      Order all Defendants to take all such steps as are necessary to alert all individuals on the Purge List and the public that no voter on the Purge List will be criminally investigated or prosecuted on the basis of the Purge List or otherwise absent specific, individualized information that they have violated a law, that naturalized citizens have a fundamental right to vote on an equal basis with U.S.-born citizens, and that otherwise eligible voters who are naturalized citizens are eligible to vote and will not be criminally investigated or prosecuted for voting because they have committed no crime;

g.     Enter an order pursuant to Section 3(c) of the Voting Rights Act, 52 U.S.C. § 10302(c), retaining jurisdiction for such period of time as may be appropriate, and requiring preclearance of voting changes that the State of Alabama enacts or seeks to administer with respect to removal of persons from the voting rolls on grounds of alleged non-citizenship, as specified in Section 3(c);

h.     Award Plaintiffs their costs and reasonable attorneys' fees in this action;

i.     Retain jurisdiction over this matter until all Defendants have complied with all orders and mandates of this Court; and

j.   Grant Plaintiffs such other relief as this Court may deem just and proper.

Date: September 13, 2024                                  Respectfully submitted,

/s/ Joseph Mitchell McGuire
Joseph Mitchell McGuire (ASB-8317-S69M)
MCGUIRE & ASSOCIATES, LLC
31 Clayton Street
Montgomery, Alabama 36104
334-517-1000 Office
334-517-1327 Fax
jmcguire@mandabusinesslaw.com

/s/ Michelle Kanter Cohen
Michelle Kanter Cohen (D.C. Bar No. 989164)*
Nina Beck (WI State Bar No. 1079460)*
Jon Sherman (D.C. Bar No. 998271)*
FAIR ELECTIONS CENTER
1825 K St. NW, Ste. 701
Washington, D.C. 20006

/s/ Danielle Lang
Danielle Lang*
Brent Ferguson*
Kathryn Huddleston*
Kate Hamilton*
Shilpa Jindia*
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, DC 20005
(202) 736-2200
dlang@campaignlegalcenter.org
bferguson@campaignlegalcenter.org
khuddleston@campaignlegalcenter.org
khamilton@campaignlegalcenter.org
sjindia@campaignlegalcenter.org

(202) 331-0114

/s/ Ellen Degnan
Ellen Degnan, ASB 3244I12V
Southern Poverty Law Center
400 Washington Ave.
Montgomery, AL 36104
(334) 313-0702
ellen.degnan@splcenter.org


/s/ Jess Unger
Bradley Heard*
Sabrina Khan*
Jess Unger*
Southern Poverty Law Center
1101 17th Street NW
Suite 550
Washington, DC 20036
bradley.heard@splcenter.org
sabrina.khan@splcenter.org
jess.unger@splcenter.org

*Motions for admission or pro hac vice
participation forthcoming.*

/s/ Ahmed Soussi
Ahmed Soussi*
Southern Poverty Law Center
201 St. Charles Avenue, Suite 2000
New Orleans, LA 70170
ahmed.soussi@splcenter.org