FILED

2024 Sep-23  PM 03:43
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| ALABAMA COALITION FOR IMMIGRANT JUSTICE; LEAGUE OF WOMEN VOTERS OF ALABAMA; LEAGUE OF WOMEN VOTERS OF ALABAMA EDUCATION FUND; ALABAMA STATE CONFERENCE OF THE NAACP; ROALD HAZELHOFF; JAMES STROOP; CARMEL MICHELLE COE; and EMILY JORTNER, | Case No. 2:24-cv-01254-AMM<br>Judge Anna M. Manasco<br><br>**Oral Argument Requested**<br>**Opposed Motion** |
| *Plaintiffs*, | |
| v. | |
| WES ALLEN, in his official capacity as Alabama Secretary of State; STEVE MARSHALL, in his official capacity as Alabama Attorney General; and JAN BENNETT, BARRY STEPHENSON, CINDY WILLIS THRASH, and SHEILA COX BARBUCK, in their official capacities as Chairs of Boards of Registrars of Elmore, Jefferson, Lee, and Marshall Counties; | |
| *Defendants*. | |

## OPPOSED MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Table of Authorities ................................................................................................ ii

Opposed Motion for Preliminary Injunction ........................................................ 1

I. Factual Background ............................................................................................ 1

    A. Purge Program ............................................................................................. 1

    B. Individual Plaintiffs and Declarants ......................................................... 4

    C. Organizational Plaintiffs ............................................................................ 7

II. Legal Standard .................................................................................................. 9

III. Argument ......................................................................................................... 9

    A. Plaintiffs are likely to succeed on the merits ........................................... 9

        1. Plaintiffs are likely to succeed on Count One, their claim that the Purge Program violates the NVRA's 90 Day Provision ....................... 9

        2. Plaintiffs are likely to succeed on Count Two, their claim that the Purge Program is nonuniform and discriminatory .............................. 16

        3. Plaintiffs are likely to succeed on Count Four, their claim that the Purge Program violates the Equal Protection Clause ......................... 20

    B. An injunction is necessary to prevent irreparable harm .............................. 23

    C. Balance of Equities and the Public Interest ............................................... 28

IV. Conclusion ....................................................................................................... 29

Certificate of Service ............................................................................................ 33

## TABLE OF AUTHORITIES

**Cases**                                           **Page**

*A. Philip Randolph Institute v. Husted*, 907 F.3d 913 (6th Cir. 2018) ....................15

*Arcia v. Florida Secretary of State*,
772 F.3d 1335 (11th Cir. 2014) ..................................................10, 11, 13, 14, 16

*Boustani v. Blackwell*, 460 F. Supp. 2d 822 (N.D. Ohio 2006)..............................21

*Charles H. Wesley Education Foundation, Inc. v. Cox*,
408 F.3d 1349 (11th Cir. 2005) .................................................................29

*City of Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985)........................21

*Common Cause/New York v. Brehm*, 432 F. Supp. 3d 285 (S.D.N.Y. 2020) .........15

*Dunn v. Blumstein*, 405 U.S. 330 (1972) ...................................................21

*Fernandez v. Georgia*, 716 F. Supp. 1475 (M.D. Ga. 1989)............................20, 22

*Fish v. Kobach*, 309 F. Supp. 3d 1048 (D. Kan. 2018) ...........................................23

*Georgia State Conference of the NAACP v. Georgia*, No. 1:17-cv-01397-TCB,
2017 WL 9435558 (N.D. Ga. May 4, 2017)..........................................29

*Gonzalez v. Governor of Georgia*, 978 F.3d 1266 (11th Cir. 2020) ......................23

*Graham v. Richardson*, 403 U.S. 365 (1975) ..........................................19

*Grutter v. Bollinger*, 539 U.S. 306 (2003)...............................................21

*Hispanic Interest Coalition of Alabama v. Governor of Alabama*,
691 F.3d 1236 (11th Cir. 2012) .........................................................21

*Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013) ..................29

*Honeyfund.com Inc. v. Governor of Florida*, 94 F.4th 1272 (11th Cir. 2024).........9

*KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261 (11th Cir. 2006) ..............29

*League of Women Voters of Florida v. Detzner*, 314 F. Supp 3d 1205
(N.D. Fla. 2018)................................................................22

*League of Women Voters of the United States v. Newby*, 838 F.3d 1
    (D.C. Cir. 2016) ................................................................26

*Luria v. United States*, 231 U.S. 9 (1913)................................................20

*Madera v. Detzner*, 325 F. Supp. 3d 1269 (N.D. Fla. 2018) ......................29

*Mi Familia Vota v. Fontes*, No. 2:22-cv-00509, 2024 WL 862406
    (D. Ariz. Feb. 29, 2024)..............................................18, 19, 22

*Schneider v. Rusk*, 377 U.S. 163 (1964) .............................................3, 20

*Singleton v. Merrill*, 582 F. Supp. 3d 924 (N.D. Ala. 2022) ......................24

*Texas League of United Latin American Citizens v. Whitley*, No. SA-19-CA-074-
    FB, 2019 WL 7938511 (W.D. Tex. Feb. 27, 2019)..............18, 19, 22

*United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012) ....................28

*United States v. Florida*,
    870 F. Supp. 2d 1346 (N.D. Fla. 2012) ...................17, 18, 19, 22, 23

*United States Student Association Foundation v. Land*,
    546 F.3d 373 (6th Cir. 2008) ...............................................29

*Woodall v. City of Gadsden*, 179 So. 2d 759 (Ala. 1965) ......................16

**Codes and Constitutional Provisions**                    **Page**

8 U.S.C. § 1427(a) ..............................................................3, 17

52 U.S.C. § 20501 ................................................................28

52 U.S.C. § 20507(b) ............................................................16

52 U.S.C. § 20507(c)(2)(A) ...................................9, 11, 12, 13, 14

U.S. Const., 14th Am., § 1 ......................................................20

**Other Authorities**                                      **Page**

*Removal*, *Black's Law Dictionary* (12th ed. 2024)................................14

*Remove*, Oxford English Dictionary,
    https://www.oed.com/dictionary/remove_v?tab=meaning_and_use ................14

Secretary of State Wes Allen launched a voter purge program within the 90-day window before the November 2024 general election in which the National Voter Registration Act (NVRA) bars systematic voter list maintenance. The purge systematically targets naturalized citizens: Even Secretary Allen has expressly admitted the virtual certainty that it includes naturalized citizens. This is nonuniform and discriminatory, and violates the Fourteenth Amendment's equal protection guarantee. This Court should enjoin Secretary Allen's unlawful purge.

## I.     Factual Background

### A.     Purge Program

Secretary Allen created and Defendants are implementing the voter purge (the Purge Program), "[a] [p]rocess to [r]emove" registered Alabama voters from the rolls on the sole basis that the voter was once issued a noncitizen identification number. *See* Exh. 1. Secretary Allen announced the Purge Program on August 13, 84 days before the 2024 general election. *See id.* To date, Secretary Allen has identified at least 3,251 people (the Purge List) and has directed all county Boards of Registrars to immediately inactivate and "initiate steps necessary to remove" these individuals. *Id.* This identification is based on stale data from state agencies, *id.*—at minimum, from the Alabama Department of Labor and Alabama Law Enforcement Agency. Exhs. 13, 14, 15; Stroop Decl. ¶¶ 10-12. Secretary Allen has further publicly referred *everyone* on the Purge List to Attorney General Marshall

for criminal investigation and potential prosecution. Exh. 1. Eligible voters on the Purge List must submit a new voter registration form and undergo "verif[ication]" to be registered and to vote, including in the 2024 general election (the Re-Registration Process). Exh. 1.

Alabama counties, including Autauga, Jefferson, and Marshall Counties, have sent identical letters to people on the Purge List (Purge Letters), including Mr. James Cozadd, Mr. Roald Hazelhoff and Mr. James Stroop. Exhs. 3, 4, 5; *see also* Cozadd Decl. ¶ 8; Hazelhoff Decl. ¶ 11; Stroop Decl. ¶ 7. The Purge Letters direct *all* recipients to complete a "voter removal request form" to "become compliant with state and federal law requirements." Exhs. 3, 4, 5. They direct recipients who are eligible voters to re-register to vote under the Re-Registration Process by completing an Alabama voter registration form and providing a driver's license or non-driver's ID number, or Social Security number (last four digits). Exhs. 3, 4, 5. The enclosed registration form prominently tells voters that "[v]oter registration and the updating of voter records is closed during the 14 days prior to each election." Exh. 6.

The Purge Program's methodology is fundamentally flawed: the sole criterion for inclusion on the Purge List is whether Defendants believe a person has *ever* been issued a noncitizen identification number by the U.S. Department of Homeland Security. *See* Exh. 1. *All* naturalized citizens have previously been issued such numbers, because all naturalized citizens were once legal permanent residents of the

United States. 8 U.S.C. § 1427(a); *see also* Exh. 10. Therefore, by design, the Purge Program sweeps in *all* naturalized citizens in Alabama for immediate inactivation and ultimate removal. By design, U.S.-born U.S. citizens are categorically excluded from the Purge Program. Naturalized citizens are, of course, eligible to vote on the same basis as U.S.-born citizens. *See, e.g.*, *Schneider v. Rusk*, 377 U.S. 163, 165 (1964). Secretary Allen in fact expressly admitted the virtual certainty that the Purge List includes naturalized citizens, and stated that he had created the Re-Registration Process for naturalized citizens. Exh. 1.

On August 19, 2024, Plaintiffs ACIJ, LWVAL, and AL NAACP sent a pre-suit notice letter under the NVRA to Secretary Allen. Exh. 7. General counsel for Secretary Allen responded on September 6, Exh. 8, but the response does not resolve Plaintiffs' NVRA concerns. It fails to recognize that any purported "self-removals" pursuant to the Purge Letters are not voluntary, because the Letters instruct recipients to complete a removal request form to "become compliant with state and federal law." Exh. 3. And it elides that the Letters target only voters on the Purge List—categorically including naturalized and excluding U.S.-born citizens—and that the purported "invit[ation]" to submit a new registration form is a *requirement* for anyone on the Purge List to vote in Alabama elections. Exhs. 3, 6.

**B.      Individual Plaintiffs and Declarants**

Plaintiff **Roald Hazelhoff** is a naturalized U.S. citizen who resides and votes in Jefferson County and received a Purge Letter. Hazelhoff Decl. ¶¶ 1, 11. He submitted a new voter registration form under the Re-Registration Process. Hazelhoff Decl. ¶¶ 13-14. Although he currently appears as active on Alabama's voter rolls, he has not received written confirmation of registration from the county. *Id*. ¶ 14. Mr. Hazelhoff remains uncertain that he will be able to vote in November and is further worried about his referral for criminal investigation. *Id*. ¶¶ 14, 15.

Plaintiff **James Stroop** is a U.S-born citizen who lives and votes in Marshall County. Stroop Decl. ¶ 1. He received a Purge Letter. *Id.* ¶ 7. Mr. Stroop then informed Secretary Allen's office that he was a U.S.-born citizen, but Secretary Allen's office told him that he would need to re-register. *Id.* ¶¶ 9-10.

Years ago, Mr. Stroop mistakenly checked a box on an unemployment benefits application identifying himself as a noncitizen, but the Alabama Department of Labor informed him in 2022 he had successfully corrected the error. *Id.* ¶¶ 8, 11. Mr. Stroop called the Department of Labor after receiving his Purge Letter to confirm the error was corrected. *Id.* ¶ 11. The Secretary of Labor apologized to Mr. Stroop personally for his inclusion and told him the Department was aware of at least 15 other misidentifications of U.S. citizens on the Purge List. *Id.* ¶ 12.

4

Mr. Stroop reapplied to vote but has received no written confirmation of re-registration. *Id.* ¶ 16. He remains uncertain that he will be able to vote in the November election. *Id.* He is concerned and worried that he has been referred to the Attorney General for criminal investigation and possible prosecution. *Id.* ¶ 17.

Plaintiff **Carmel Michelle Coe** is a naturalized U.S. citizen who lives in Elmore County. Coe Decl. ¶ 1. Ms. Coe obtained an Alabama driver's license before she became a naturalized citizen. *Id.* ¶ 12. Ms. Coe registered to vote after naturalizing and is an active registered voter. *Id.* ¶¶ 9-10. She intends to vote in the 2024 general election. *Id.* ¶ 10. Because she provided information as to her noncitizen status to Alabama before naturalizing, she is at risk of and concerned about inclusion on the Purge List, including before the November election. *Id.* ¶¶ 14, 16, 18. She is at risk of being and worried that she will be unable to vote in November and that she has been or will be referred for criminal investigation. *Id.* ¶ 17. She is checking her voter registration status multiple times a week. *Id.* ¶ 15.

Plaintiff **Emily Asplund Jortner** is a naturalized U.S. citizen and a resident of Lee County. Jortner Decl. ¶¶ 2-3. She obtained a "foreign national" driver's license in Alabama before becoming a U.S. citizen. *Id*. ¶ 24. Ms. Jortner registered to vote after naturalizing and is an active registered voter. *Id*. ¶¶ 4, 26. She intends to vote in the 2024 general election. *Id*. ¶¶ 29-30. She is distressed, anxious, and fearful that she will be unable to vote and is checking her voter registration status multiple times

per week to ensure that she is still listed as an active, registered voter. *Id*. ¶¶ 31-33. She is scared that she has been or will be referred to the Attorney General for criminal investigation and prosecution for registering and voting. *Id*. ¶ 34.

Declarant **Jose Sampen** is a naturalized U.S. citizen and a resident of Lee County who received a Purge Letter. Exhs. 27-28, Sampen Decl. ¶¶ 1, 9. Declarant Sampen went in person to the Lee County Board of Registrars to re-register, bringing his passport "just in case" although his Purge Letter, like the others, said that he could re-register with only his driver's license number. *Id.* ¶ 10. The Board of Registrars initially told him that he needed to provide a naturalization certificate to re-register. *Id.* ¶ 12. They were unwilling to accept his U.S. passport until Mr. Sampen argued with the employee and a second employee agreed to accept the passport as sufficient, made a copy, and said that they would keep the copy in their files. *Id.* ¶¶ 12-13. Mr. Sampen believed, based on his understanding of the Purge Letter, that if he did not re-register before voting again, he would face criminal penalties. *Id.* ¶ 16.

Declarant **James Cozadd** is a U.S-born citizen who lives and votes in Autauga County and received a Purge Letter. Cozadd Decl. ¶¶ 1, 8. Mr. Cozadd has never, to his knowledge, mistakenly identified himself as a noncitizen. Upon receiving the Letter, Mr. Cozadd re-registered to vote on AlabamaVotes.Gov. He received a confirmation email indicating that it would take 10-14 days for his

application to be processed, and stating, "You are not registered to vote until your County Board of Registrars reviews and approves your application!" Exh. 11. Mr. Cozadd would like to vote in the 2024 general election, but he is not confident he will be able to do so. Cozadd Decl.¶ 15. Receiving the Purge Letter made him lose faith in the voting system and made him question whether his vote counts at all. *Id.*

Declarant **Olaf Rowland** is a naturalized U.S. citizen and a resident of Tuscaloosa County. Rowland Decl. ¶ 1. He obtained a "foreign national" driver's license in Alabama before becoming a U.S. citizen. *Id.* ¶ 9. He registered to vote in 2022 after naturalizing and intends to vote for the first time in November, but is nervous that he will not be able to because of the Purge Program. *Id.* ¶¶ 7, 8, 12. He is worried that he will be misidentified as a noncitizen and will check and re-check his voter registration status until the Purge Program ends. *Id.* ¶ 13.

### C.   Organizational Plaintiffs

Plaintiffs ACIJ, LWVAL, and AL NAACP (collectively Organizational Plaintiffs) all have naturalized citizen members harmed by the Purge Program, and are all directly harmed as well. First, Organizational Plaintiffs' naturalized citizen members are at risk of being placed on the Purge List (if they are not already) and of being required to undergo the Re-Registration Process, possibly on short notice, to vote in the 2024 election. Hamilton Decl. ¶ 9; Jones Decl. ¶ 24; Simelton Decl. ¶

20. They are intimidated by the Purge Program and its accompanying threat of criminal investigation. Hamilton Decl. ¶¶ 8-9; Jones Decl. ¶ 24; Simelton Decl. ¶ 20.

Second, the Purge Program interferes with all Organizational Plaintiffs' core organizational activities engaging Alabama voters in the political process (including, for all organizations, voter registration and assisting eligible voters in registering, checking their status, and voting) and forces them to spend resources responding to the Purge Program instead of engaging in mission-furthering activities. Hamilton Decl. ¶¶ 10-11; Jones Decl. ¶¶ 20-22; Simelton Decl. ¶¶ 16-18.

Plaintiff **ACIJ** has 158 active members. Hamilton Decl. ¶ 2. Civic and voter engagement is a core programmatic activity for ACIJ, to encourage Alabama's naturalized citizens to register and vote. *Id.* ¶ 4. ACIJ employs canvassers during election season to conduct door-knocking in Alabama to ensure that eligible voters are registered. *Id.* ¶ 5. The Purge Program is directly harming ACIJ. *Infra* III.B.

Plaintiff **LWVAL** protects Alabamians' voting rights and encourages informed and active participation in government. Jones Decl. ¶ 2. It has approximately 522 members. *Id.* ¶ 4. The Purge Program is directly harming LWVAL. *Infra* III.B.

Plaintiff **AL NAACP** has nearly 5,000 members. Simelton Decl. ¶ 3. Most are registered voters, and some are naturalized citizens. *Id.* To further its objectives, AL NAACP regularly holds voter registration events and town halls and campus

events focused on helping voters register to vote, update their registrations, and confirm their registration status. *Id.* ¶¶ 7-12.

## II.     Legal Standard

A preliminary injunction is warranted if Plaintiffs establish: (1) a substantial likelihood of success on the merits; (2) irreparable harm; (3) the threatened harm outweighs any injury to the opposing party; and (4) the injunction would not be adverse to the public interest. *Honeyfund.com Inc. v. Governor of Fla.*, 94 F.4th 1272, 1277 (11th Cir. 2024). Plaintiffs satisfy all four requirements.

## III.    Argument

### A.     Plaintiffs are likely to succeed on the merits

#### 1.     Plaintiffs are likely to succeed on Count One, their claim that the Purge Program violates the NVRA's 90 Day Provision.

Plaintiffs are likely to succeed on Count One, the claim that the Purge Program violates the 90 Day Provision. Under that provision:

> A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters.

52 U.S.C. § 20507(c)(2)(A).

This provision prohibits states from implementing any voter removal program *or any step in a voter removal program* within the 90 days before a federal election. But that is exactly what Defendants have done here. Secretary Allen announced and began implementing the Purge Program 84 days before the November 2024 election.

9

*See* Exh. 1. He is now implementing the Purge Program: as Mr. Hazelhoff's and Mr. Stroop's experiences demonstrate, eligible Alabama voters received Purge Letters less than 90 days before the election and are being required to undergo the Re-Registration Process to be registered and vote. *See* Stroop Decl. ¶ 10; Hazelhoff Decl. ¶¶ 11, 13. Further, Secretary Allen has made public his intent to continue implementing the Purge Program. Exhs. 12, 16.

The Eleventh Circuit held that an almost identical program violated the 90 Day Provision, and that precedent controls here. *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1339 (11th Cir. 2014). In *Arcia*, shortly before an election the Florida Secretary of State compiled a list of registered voters who had previously presented the state with identification suggesting they were noncitizens, such as green cards or foreign passports. *Id.* at 1339. He sent that list to county election officials and instructed them to perform additional research and initiate a notice and removal process. *See id*. Unsurprisingly, and just like Secretary Allen's Purge Program, the "effort . . . to identify non-citizens was far from perfect"—it included citizens who were eligible to vote. *Id*. The program was virtually the same in all legally meaningful respects to Secretary Allen's Purge Program.

The Eleventh Circuit held in *Arcia* that (1) the NVRA means exactly what it says, that states may not operate any program with the purpose of systematically

10

removing ineligible voters within the 90-day window, and (2) accordingly, Florida's purge program was unlawful. *Id.* at 1344.

Secretary Allen's Purge Program is, like the *Arcia* program, "[a] program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A). As in *Arcia*, Secretary Allen's expressed purpose in creating and implementing the Purge Program is to remove voters from the rolls, specifically individuals he alleges are ineligible noncitizens. Exh. 1; *see* 772 F.3d at 1344. Further, the term "any program" in the 90 Day Provision "has a broad meaning," encompassing both the Purge Program here and in Florida. *Arcia*, 772 F.3d at 1344.

As in *Arcia*, the Purge Program "*systematically* remove[s] the names" of voters. 52 U.S.C. § 20507(c)(2)(A) (emphasis added). Secretary Allen created the Purge List by comparing the state's list of registered voters with other state databases *See, e.g.*, Exh. 12. This is indistinguishable from the lists used in *Arcia*. 772 F.3d at 1344.[1] Secretary Allen implicitly admitted that the Purge Program, like the program in *Arcia*, does "not rely upon individualized information . . . to determine which names" should be included by explaining the Purge Program hinges solely on

---

[1] The Purge Program in fact relies even less on individualized inquires than the program in *Arcia*, because the Florida program instructed county officials to perform "additional research" after the list was created. *Id.* at 1339. Further, the fact that U.S.-born citizens such as Mr. Stroop are on Secretary Allen's Purge List shows that the Purge Program is more error-prone than the Florida program due to its reliance on unreliable data. *See* Stroop Decl. ¶¶ 7-8; Cozadd Decl. ¶¶ 8-9.

whether someone has ever had a noncitizen identification number and admitting the virtual certainty that naturalized citizens, eligible voters, are on the Purge List. *Id.*; *see* Exh. 1. Rather than performing any individualized inquiry to avoid purging those eligible voters, Secretary Allen included them on the Purge List and has required them to undergo the Re-Registration Process. Exh. 1.

The "purpose" of the Purge Program is such systematic removals. 52 U.S.C. § 20507(c)(2)(A). Secretary Allen unequivocally instructed Boards of Registrars "to immediately inactivate and initiate steps necessary to remove" those on the Purge List. Exh. 1. Their "voter record has been made inactive and [they] have been placed on the path for removal from the statewide voter list." Exh. 3. There can be no question that it will ultimately "remove" voters from the rolls.[2]

Because the Purge Program's purpose is removing voters and has not been "complete[d]" prior to the 90-day window, 52 U.S.C. 20507(c)(2)(A), it violates the 90 Day Provision. Secretary Allen's claim that voters are now only "inactivate[d]" and will be removed later does not affect this analysis, for three reasons. Exh. 1. First, the *purpose* of the Purge Program is the systematic removal of voters from the rolls, as described above. Second, the 90 Day Provision requires a state to "*complete*"

---

[2] Nor is there any question that the Purge Program's purpose is to remove voters from the rolls as soon as possible. The Purge Letters demonstrate this: they misleadingly instruct all voters to complete a voter removal request form, explain that eligible voters must re-register before they may vote, and enclose a voter registration form that explicitly bars registration within fourteen days of an election. Exh. 3.

a program with the purpose of systematic removals "not later than 90 days prior to" an election. 52 U.S.C. 20507(c)(2)(A) (emphasis added). Its plain language bars programs that take steps to change a voter's status just before an election to ultimately effectuate full removal, even if such full removal were effectuated later. There can be no question that Secretary Allen is currently implementing a program with the purpose of systematic removal.

Third, even if the 90 Day Provision only prohibited removal within the 90-day window (by its terms, it does not), the Purge Program would still be unlawful. Immediate "inactivation" under the Purge Program is in fact removal, notwithstanding the Secretary's characterization. Because those on the Purge List must go through the Re-Registration Process to be registered and vote, Exh. 1; *see also, e.g.*, Hazelhoff Decl. ¶ 13, they have been "removed" from the voter rolls under the NVRA. This is clear based on both the "ordinary meaning of the words used" in the statute and "the statutory context and policy of the NVRA," *Arcia*, 772 F.3d at 1344-45, which lead to the same conclusion: If a state changes an active voter's status such that they may not vote again without taking additional action that must be approved, such as *re*-registering, the state effectively removes the voter from the rolls. Secretary Allen's description of the process as mere "inactivation" in response to Plaintiffs' NVRA notice letter, Exh. 8, is belied by the registrars' explicit instructions to people on the Purge List to complete a new voter registration

application and undergo a "verification" process, just like any other new registrant. *See, e.g.*, Hazelhoff Decl. ¶ 13; Stroop Decl. ¶ 10.

The ordinary meaning of "remove" is to "transfer" or "mov[e]" "a person or thing from one position, location, or residence to another." *Removal*, *Black's Law Dictionary* (12th ed. 2024); *see also Remove*, Oxford English Dictionary, https://www.oed.com/dictionary/remove_v?tab=meaning_and_use. Here, the voters on the Purge List have been constructively "removed," because they have been transferred from one position to another: they were eligible to vote in November's general election, but now they must undergo the Re-Registration Process. Exhs. 1, 3. If a voter must *re-register* before voting, that voter cannot be construed to be on the "official list[] of eligible voters." 52 U.S.C. § 20507(c)(2)(A).

Analysis of statutory context and the NVRA's purpose lead to the same conclusion. The NVRA's purpose is to both "enhance[] the participation of eligible citizens as voters" and "ensure that accurate and current voter registration rolls are maintained." *Arcia*, 772 F.3d at 1346 (quoting 52 U.S.C. §§ 20501(b)(2), (4)). The NVRA bars systematic removals in the 90 days before an election "because that is when the risk of disfranchising eligible voters is the greatest." *Id*. at 1346. The Purge Program creates an extremely high risk of disenfranchising eligible voters: among other reasons, some eligible voters will follow the Purge Letter's misleading instruction to submit a voter removal request form due to confusion or fear; some

will not vote due to confusion or fear; some will not timely complete the Re-Registration Process because of burden or because they never see the letter; and Defendants may not "verify" some in time.[3] Hamilton Decl. ¶¶ 8-9; Jones Decl. ¶¶ 23-24. This is constructive removal.

Thus, despite Secretary Allen's "inactivity" label, the facts remain the same: voters on the Purge List are not treated as fully eligible voters and must take action before they are allowed to vote. Courts confronting similar situations have found that voters deemed "inactive" by a state are "effectively removed" if they cannot cast a valid ballot without taking additional action. *Common Cause/N.Y. v. Brehm*, 432 F. Supp. 3d 285, 318-19 (S.D.N.Y. 2020) (NVRA violations where state failed to count ballots of inactive voters); *see also A. Philip Randolph Inst. v. Husted*, 907 F.3d 913, 919 (6th Cir. 2018) (implying that requiring re-registration would be "functional equivalent of being purged from the rolls").[4] In fact, Alabama has a

---

[3] The Secretary's recent assertion to Organizational Plaintiffs in an NVRA response letter that voters on the Purge List will be allowed to vote by filling out a form at the polls on Election Day, Exh. 8, is inconsistent with the Purge Letters and the plain language of the voter registration form enclosed with the letters. Nor is it clear how any proposed "verif[ication]" would occur under those circumstances. Exh. 1. And the Secretary does *not* say he has provided any training to counties on Election Day voting by people on the Purge List. But, in any event, even if this occurs, many of the reasons the Purge Program will create disenfranchisement remain. Moreover, voters on the Purge List nevertheless (1) have been "placed on a path for removal," (2) cannot vote absentee if they otherwise qualify until they undergo re-registration, and (3) cannot vote at all until they take additional steps not required of other voters. Exh. 3. For these reasons alone, the Purge Program violates the 90 Day Provision's plain text.

[4] In *A. Philip Randolph Institute,* the Court concluded that Ohio's program "arguably" did not amount to the functional equivalent of being purged from the rolls because, aside from re-registration, a voter could avoid removal "by voting in an election in the next four years." *Id.* That

history of discriminatorily labeling some voters as "inactive" while requiring them to complete additional steps to vote. *Woodall v. City of Gadsden*, 179 So. 2d 759, 761 (Ala. 1965) (voter "placed in an 'inactive' file until poll tax was marked paid or an exemption was claimed").

Moreover, eligible voters who follow the Purge Letter's instructions to fill out a voter removal request form certainly have been "removed" for purposes of the NVRA. Such removals are not free and voluntary but are instead the result of intimidation, coercion, and duress. That is because they are in response to a letter that directs *all* recipients to "[p]lease complete and submit" that form to "become compliant with state and federal law requirements." Exh. 3.

The Purge Program is exactly what the 90 Day Provision was intended to prevent. *See Arcia*, 772 F.3d at 1346 (explaining that "Congress decided to be more cautious" by prohibiting systematic voter list maintenance in the 90 days before an election). Plaintiffs are likely to succeed on this claim.

> **2. Plaintiffs are likely to succeed on Count Two, their claim that the Purge Program is nonuniform and discriminatory.**

Section 8(b) of the NVRA provides that "any state program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll" must be "uniform [and]

---

is different from the Purge Program, which requires voters to submit a new voter registration form and undergo verification.

nondiscriminatory." 52 U.S.C. § 20507(b).[5] Programs that single out naturalized citizens are, by their nature, discriminatory. *See, e.g.*, *United States v. Florida*, 870 F. Supp. 2d 1346, 1350 (N.D. Fla. 2012). The Purge Program is nonuniform and discriminatory because it singles out naturalized citizens for removal from the voter rolls and subjects only them, not U.S.-born citizens, to the Re-Registration Process.

Secretary Allen's Purge Program targets naturalized but not U.S.-born citizens for removal from the voter rolls. It is designed to require only naturalized citizens to undergo the Re-Registration Process to be registered and vote. *See* Exh. 1. The Purge Program's sole basis for a voter's inclusion on the Purge List is Secretary Allen's belief that the voter at some point had a noncitizen identification number. *See id.* *Every* naturalized citizen was once issued a noncitizen identification number, because every naturalized citizen was once a legal permanent resident. 8 U.S.C. § 1427(a). By contrast, no U.S.-born citizen has ever had a noncitizen identification number, because no U.S.-born citizen has previously been a noncitizen. The Purge Program therefore, by design, treats U.S.-born citizens and naturalized citizens differently: *only* naturalized citizens are required to undergo the Re-Registration Process to be registered to vote and to vote.

---

[5] As explained *supra* Part III.A.1, the term "any program" in the NVRA "has a broad meaning," *Arcia*, 772 F.3d at 1344, and encompasses the Purge Program.

Again, this feature is baked into the Purge Program. Secretary Allen admitted from the beginning the virtual certainty that the Purge List includes naturalized citizens. Exh. 1. The plain implication of this admission is that by design the Purge Program removes naturalized citizens from the active voter rolls. Secretary Allen even described the Re-Registration Process as specifically for naturalized citizens, even though they are eligible voters just like U.S.-born citizens. *Id.*[6]

Courts have routinely held that such citizenship matching protocols that systematically target naturalized citizens are unlawful. Florida, Texas, and Arizona have been forced to abandon similar programs that targeted naturalized voters for removal from the rolls. *Florida*, 870 F. Supp. 2d at 1350; *Tex. League of United Latin Am. Citizens v. Whitley*, No. SA-19-CA-074-FB, 2019 WL 7938511, at *1 (W.D. Tex. Feb. 27, 2019); *Mi Familia Vota v. Fontes*, No. 2:22-cv-00509, 2024 WL 862406, at *41 (D. Ariz. Feb. 29, 2024) (appeal pending). The program at issue in *Florida* imposed additional verification processes for any Floridian who "as a noncitizen, obtained a driver's license," subsequently became a citizen, and lawfully registered to vote. 870 F. Supp. 2d at 1347. That program "probably ran afoul" of

---

[6] The fact that some U.S.-born citizens have also ended up on the Purge List does not change the fact that the Purge Program systematically targets naturalized citizens. In addition to being flawed by design, the Purge Program is plainly also relying on error-riddled data to erroneously identify some U.S.-born citizens as having had a noncitizen identification number—as Mr. Stroop's and Mr. Cozadd's experiences demonstrate. Stroop Decl. ¶ 8; Cozadd Decl. ¶ 7. That additional arbitrariness in implementation does not negate the systemic design targeting naturalized citizens such as Mr. Hazelhoff and Mr. Sampen, a design that Secretary Allen has admitted. *See* Exh. 1.

the NVRA's "uniform and nondiscriminatory" requirement because the methodology meant "[t]he program was likely to have a discriminatory impact on these new citizens." *Id.* at 1350.[7] Texas's program "burdened" naturalized voters with "ham-handed and threatening correspondence from the state," while "[n]o native born Americans were subjected to such treatment." *Whitley*, 2019 WL 7938511, at *1. An Arizona statutory provision that scrutinized the registrations of only naturalized citizens likewise "ha[d] a non-uniform and discriminatory impact on naturalized citizens" in violation of Section 8(b). *Mi Familia Vota*, 2024 WL 862406, at *41.[8]

And like other states' programs, non-uniformity and discrimination are built into the Purge Program. The Purge Program's "discriminatory impact on these new citizens" violates the NVRA because "[a] state cannot properly impose burdensome demands" like removal, re-registration, and fear of prosecution "in a discriminatory manner." *Florida*, 870 F. Supp. 2d at 1350.

---

[7] Secretary Allen's Purge Program goes even further than Florida's, in targeting naturalized citizens not only for removal but also for referral for criminal investigation and potential prosecution.
[8] Alabama driver's licenses last for four years. Exh. 10. Over the four-year period from Fiscal Year 2019 to 2022, 12,084 Alabama residents became naturalized citizens. Exh. 26. To the extent that Alabama is relying on driver's licenses for data on whether someone is a citizen, that reliance is— as in other states—based on inherently flawed data and thus incorrect.

**3.     Plaintiffs are likely to succeed on Count Four, their claim that the Purge Program violates the Equal Protection Clause.**

"All persons *born or naturalized* in the United States . . . are citizens." U.S. Const., 14th Am., § 1 (emphasis added). "Under our Constitution, a naturalized citizen stands on an equal footing with the native citizen in all respects, save that of eligibility to the Presidency." *Luria v. United States*, 231 U.S. 9, 22 (1913); *see also Schneider*, 377 U.S. at 165. Discrimination based on naturalized citizenship and national origin is presumptively unconstitutional and subject to strict scrutiny. *Graham v. Richardson*, 403 U.S. 365, 371-72 (1975); *Fernandez v. Georgia*, 716 F. Supp. 1475, 1478 (M.D. Ga. 1989) (strict scrutiny required for law that "creates two classifications of citizens[,] native-born . . . and foreign-born naturalized citizens").

As described *supra* Part III.A.2., Secretary Allen's Purge Program targets naturalized but not U.S.-born citizens for removal from the voter rolls: to be placed on the Purge List, by design, an individual must have been born outside the United States. Secretary Allen's Purge Program therefore imposes barriers to registering to vote and voting for naturalized but not U.S.-born citizens who are eligible voters, and refers for criminal investigation only naturalized but not U.S.-born citizens. The Purge Program thus classifies by citizenship status (U.S.-born versus naturalized) and national origin, and imposes different burdens on naturalized citizens' fundamental right to vote based on this classification.

As a result, Secretary Allen's Purge Program can stand only if it can survive strict scrutiny—and it cannot. *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (strict scrutiny applies "when a statute classifies by race, alienage, or national origin"). As an initial matter, Secretary Allen bears "the burden of demonstrating that the measure is constitutional" under strict scrutiny. *Hispanic Int. Coal. of Ala. v. Governor of Ala.*, 691 F.3d 1236, 1248 (11th Cir. 2012). But the Purge Program is not "narrowly tailored to further compelling governmental interests," *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003), and so does not withstand exacting scrutiny.

The Purge Program's blanket approach—with the sole criterion for removal from the voter rolls being Defendants' belief that a person at one point had a noncitizen identification number—is not narrowly tailored to any compelling government interest. *See Dunn v. Blumstein*, 405 U.S. 330, 351-52 (1972) (duration of residence as "all too imprecise" "classification"). A program that by design purges naturalized but not U.S.-born citizens, imposing only on them additional barriers to voting and the burden of criminal investigation, is not narrowly tailored to serve a legitimate objective. To the contrary, it targets a group of people who unquestionably have the right to vote, and places that right at risk. In fact, the Purge Program is well suited to a *discriminatory* objective.

Federal courts have invalidated similar laws that burden only naturalized citizens. In *Boustani v. Blackwell*, 460 F. Supp. 2d 822 (N.D. Ohio 2006), the court

21

struck down a law that burdened the fundamental right to vote only for naturalized citizens by requiring only naturalized citizens to provide documentary proof of citizenship. *Id.* at 827. *Fernandez* invalidated a state law that barred only naturalized, not U.S.-born, citizens from becoming state troopers. 716 F. Supp. at 1479 (strict scrutiny analysis, concluding that discrimination against naturalized citizens was "a distinction [that] is constitutionally impermissible"). And, as described above, Florida, Texas, and Arizona were forced to abandon similar systematic targeting of naturalized citizen voters. *Florida*, 870 F. Supp. 2d at 1350; *Whitley*, 2019 WL 7938511, at *1; *Mi Familia Vota*, 2024 WL 862406, at *41. The same result should obtain here.

Requiring naturalized citizens to respond to notice is not a matter of "little import." *Florida*, 870 F. Supp. 2d at 1350; *see also League of Women Voters of Fla. v. Detzner*, 314 F. Supp 3d 1205, 1217 (N.D. Fla. 2018) (creating "secondary class of voters" by subjecting identifiable group of voters to heightened burdens is "constitutionally untenable"). Data on response rates from similar notices sent to Texas voters regardless of citizenship status shows that the vast majority will likely not be returned: when similar notices were sent under the NVRA between the 2014 and 2016 elections, only 14 percent of voters responded to confirm whether they were eligible to vote. Exh. 9 ¶ 22.

Secretary Allen has proffered no reason, and there is none, for subjecting one group of people—naturalized citizens—to severe additional barriers to successfully registering to vote and voting. Alabama's interests are harmed rather than served by the Purge Program. While preventing noncitizen voter registration may be a legitimate state interest, the policy "disproportionately impacts duly qualified registration applicants" and "may have the . . . effect of eroding, instead of maintaining, confidence in the electoral system given the confusing, evolving, and inconsistent" policy. *Fish v. Kobach*, 309 F. Supp. 3d 1048, 1113 (D. Kan. 2018). By contrast, all available reliable evidence demonstrates that noncitizen voting is rare. *See, e.g.*, *id.* at 1108 (limited instances of noncitizen registration likely attributable to "administrative anomalies," and assertions of large-scale noncitizen voting problem not credible). Florida's purge initially identified nearly 180,000 registered voters as potential noncitizens, but due to methodological flaws, this conclusion "was plainly wrong." *Florida*, 870 F. Supp. 2d at 1348. All evidence here likewise shows that the Purge Program's targeting of naturalized voters is not narrowly tailored to a compelling interest; it is unconstitutional discrimination.

### B.   An injunction is necessary to prevent irreparable harm.

"[M]issing the opportunity to vote in an election is an irreparable harm." *Gonzalez v. Governor*, 978 F.3d 1266, 1272 (11th Cir. 2020). "Courts routinely deem restrictions on fundamental voting rights irreparable injury," especially

"discriminatory voting procedures." *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1026 (N.D. Ala. 2022) (collecting cases). "[O]nce the election occurs, there can be no do-over and no redress for voters whose rights were violated." *Id*. at 1027.

Individual Plaintiffs, Organizational Plaintiffs' naturalized citizen members, and naturalized citizens throughout Alabama are immediately threatened with the injury of disenfranchisement and, furthermore, criminal investigation due to Defendants' unlawful Purge Program. Absent an injunction before the November election, and each day that the Purge Program continues, Individual Plaintiffs, Organizational Plaintiffs' naturalized citizen members, and other naturalized citizens risk being deprived of their right to vote and/or being subjected to criminal investigation and prosecution, and they face severe confusion about whether and how they can exercise their fundamental right. *See* Exh. 21, Hazelhoff Decl. ¶¶ 13-15; Exh. 24, Stroop Decl. ¶¶ 7, 16-17; Exh. 17, Coe Decl. ¶¶ 14-18; Exh. 23. Jortner Decl. ¶¶ 31-35; Exh. 25, Hamilton Decl. ¶ 9; Exh. 19, Simelton Decl. ¶ 20; Exh. 22, Jones Decl. ¶ 24; Exh 20, Cozadd Decl. ¶¶ 14-15; Exh. 18, Rowland Decl. ¶¶ 12-14; Exhs. 27-28, Sampen Decl. ¶¶ 15-16. They further risk being identified for continuing "reviews" at any time. *See* Exh. 12.

Mr. Sampen's experience demonstrates the severe harms of the Purge Program, particularly for naturalized citizens. Mr. Sampen is a naturalized citizen originally from Peru who is a delivery driver and a single parent to his U.S.-born

son. Sampen Decl. ¶¶ 4, 5. He was initially unable to re-register because the Lee County Board of Registrars insisted he provide his naturalization certificate, and had to argue with the employees at the Board's office before they would accept his passport (a document not listed in the Purge Letter) as proof of citizenship and re-register him. *Id.* ¶¶ 12-13. This illustrates the risk that naturalized citizens may not in fact be able to re-register under the Purge Program, and the confusion and chaos the Purge Program injects into registration shortly before the general election.

Further, Mr. Sampen believed—based on his understanding of the Purge Letter—that he would be subject to criminal penalties if he did not provide the documentation the Purge Letter asked for before voting again. *Id.* ¶ 16. His understanding of the Purge Letter demonstrates the chill on voting that the Purge Program creates for eligible voters on Secretary Allen's Purge List.

Moreover, the Purge Program directly interferes with Organizational Plaintiffs' core organizational activities and perceptibly impairs their work. Exh. 25, Hamilton Decl. ¶¶ 10-11; Exh. 19, Simelton Decl. ¶¶ 14, 16-19; Exh. 22, Jones Decl. ¶¶ 21-23. Helping Alabamians register to vote and vote is a core organizational activity for each group. Exh. 25, Hamilton Decl. ¶ 4; Exh. 19, Simelton Decl. ¶ 6; Exh. 22, Jones Decl. ¶¶ 5, 8. Further, providing services specifically to Alabama's immigrant community—including naturalized citizens—is core to ACIJ's mission. Exh. 25, Hamilton Decl. ¶¶ 3-4, 7. The Purge Program threatens to purge voters that

Organizational Plaintiffs helped register, and may have already done so, and chills voting by naturalized citizens with whom Organizational Plaintiffs work to encourage to vote. *See, e.g.*, Exh. 22, Jones Decl. ¶¶ 4, 24. As with the Individual Plaintiffs, that harm is irreparable: voters whom the Organizations seek to assist who are unable to stay registered and vote in November or any particular election will never get that vote back. *See League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (finding irreparable harm where policies "ma[d]e it more difficult for [plaintiff organizations] to accomplish their primary mission of registering voters" prior to voter registration deadline).

Further, the Purge Program interferes with Organizational Plaintiffs' core voter registration activities by forcing them to continue to divert limited resources from voter registration to respond to the Purge Program prior to the election, and by making it more difficult for each Plaintiff to successfully register as many voters as possible. Exh. 25, Hamilton Decl. ¶ 10; Exh. 19, Simelton Decl. ¶¶ 14, 16-19; Exh. 22, Jones Decl. ¶¶ 21-22.

Specifically, Plaintiff ACIJ has had to rewrite its canvassing scripts to train canvassers on the Purge Program's effects and how to address this issue with voters to ensure they are registered to vote. Exh. 25, Hamilton Decl. ¶ 6. ACIJ canvassers are now trained to raise the Purge Program with each voter, look up their registration status with consent, and answer any questions that result. *Id.* This results in longer

door-knocking conversations, greater training needs, fewer door visits overall (meaning fewer voters reached), a shrunken canvassing geography, and higher costs of canvassing, since ACIJ's canvassers are paid by the hour. *Id.* ACIJ staff have already spent 20 hours already to amend their canvassing program. *Id.* ¶ 7. ACIJ also anticipates expenditures to print materials about the Purge Program to distribute at public events where they register and educate voters. *Id.*

Similarly, voter assistance activities are a core LWVAL organizational function, and the period just before a general election is critical to LWVAL's work. Exh. 22, Jones Decl. ¶¶ 5, 7-9, 10-12, 23. Rather than focusing on helping register eligible unregistered voters, LWVAL must expend time and effort ensuring that already registered voters remain active and assisting eligible purged voters in re-registering. *Id.* ¶ 21. For example, LWVAL has already spent volunteer time, as well as $1,000, to develop and distribute a public service announcement partially responding to the Purge Program. *Id.* ¶ 20. LWVAL must divert resources for these efforts away from additional voter registration drives, get-out-the-vote organizing for the 2024 general election, and planning and advocacy activities for 2025. *Id.* ¶ 22. The Purge Program has and continues to directly impair LWVAL's ability to provide voter registration services to as many Alabamians as possible, including impairing its work to ensure that naturalized citizens in the state are—and remain—active voters. *Id.* ¶ 23.

AL NAACP's President has already spent hours on a fruitless quest to determine the names of eligible voters on the Purge List, to aid eligible voters on the List (including AL NAACP members) in accordance with AL NAACP's mission. Exh. 19, Simelton Decl. ¶ 15. AL NAACP has spent time designing written materials like pamphlets to tell Alabamians to double-check their voter registration statuses in light of the Purge Program. *Id.* ¶ 16. It plans to spend additional time and money printing and distributing those materials. *Id.* AL NAACP must spend additional resources to help members and other eligible voters determine if they remain registered to vote, help purged voters re-register, help purged voters communicate with election officials as needed to ensure that they can vote in the 2024 general election, and educate voters about naturalized citizens' rights. *Id.* ¶¶ 13-17. Absent injunctive relief, Plaintiffs and the public will suffer immediate and irreparable harm.

### C.   Balance of Equities and the Public Interest

The ongoing injury to Plaintiffs and the public, which threatens the fundamental right to vote, outweighs any interest that the Defendants may have in carrying out the Purge Program, and the public will be best served by an injunction. Plaintiffs and other Alabamians are suffering violations of their constitutional and statutory rights. The State has no interest in defending actions that violate federal law. *See United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012)

("Frustration of federal statutes and prerogatives are not in the public interest."); *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).

Congress, in creating the NVRA, has already struck the balance in the Plaintiffs' favor. "Though the public certainly has an interest in a state being able to maintain a list of electors that does not contain any false or erroneous entries, a state cannot remove those entries in a way which risks invalidation of properly registered voters." *U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 388 (6th Cir. 2008).

Here, an injunction serves the public interest, because "protection of the Plaintiffs' franchise-related rights is without question in the public interest." *Charles H. Wesley Educ. Found., Inc. v. Cox,* 408 F.3d 1349, 1355 (11th Cir. 2005). "By definition, the public interest favors permitting as many qualified voters to vote as possible." *Ga. State Conf. NAACP v. Georgia,* No. 1:17-cv-01397-TCB, 2017 WL 9435558, at *5 (N.D. Ga. May 4, 2017); *see also Madera v. Detzner*, 325 F. Supp. 3d 1269, 1283 (N.D. Fla. 2018)*.* Moreover, there is an inherent public interest in fulfilling the NVRA's purpose of ensuring that every voter can vote. 52 U.S.C. § 20501. Finally, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (en banc).

## IV.   Conclusion

Plaintiffs respectfully request the entry of a preliminary injunction in accordance with the proposed order;

1. Ordering Secretary Allen to rescind his Press Release, Exh. 1;

2. Ordering Secretary Allen to direct County Boards of Registrars to rescind all Purge Letters sent; to ensure all individuals on the Purge List except those who have provided affirmative evidence of noncitizen status are active, registered voters; and to notify individuals on the Purge List except those who have provided affirmative evidence of noncitizen status that they are active, registered voters, may vote in the November election, and will not be criminally investigated or prosecuted for voting;

3. Ordering Secretary Allen to release a statement and post information on the Secretary of State's website indicating that pursuant to Court order the Purge Program has been halted; that individuals on the Purge List are active, registered voters absent having provided affirmative evidence of noncitizenship; and further indicating that eligible naturalized citizens have the right to vote and will not be criminally investigated or prosecuted for voting;

4. Ordering Defendant Chairs of Boards of Registrars to ensure Individual Plaintiffs may vote in the 2024 general election without impediment; and

5. Ordering Defendant Attorney General Marshall to cease criminal investigations based on Secretary Allen's Purge List.

Date:  Sept. 23, 2024                                Respectfully submitted,

/s/ *Joseph Mitchell McGuire*
Joseph Mitchell McGuire (ASB-8317-S69M)
MCGUIRE & ASSOCIATES, LLC
31 Clayton Street
Montgomery, Alabama 36104
334-517-1000 Office
334-517-1327 Fax
jmcguire@mandabusinesslaw.com

/s/ *Michelle Kanter Cohen*
Michelle Kanter Cohen (D.C. Bar No. 989164)**
Nina Beck (WI State Bar No. 1079460)**
Jon Sherman (D.C. Bar No. 998271)**
FAIR ELECTIONS CENTER
1825 K St. NW, Ste. 701
Washington, D.C. 20006
(202) 331-0114
mkantercohen@fairelectionscenter.org
nbeck@fairelectionscenter.org
jsherman@fairelectionscenter.org

/s/ *Kathryn Huddleston*
Danielle Lang
Brent Ferguson
Kathryn Huddleston
Kate Hamilton
Shilpa Jindia
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, DC 20005
(202) 736-2200
dlang@campaignlegalcenter.org
bferguson@campaignlegalcenter.org
khuddleston@campaignlegalcenter.org
khamilton@campaignlegalcenter.org
sjindia@campaignlegalcenter.org

/s/ *Ellen Degnan*
Ellen Degnan, ASB 3244I12V
Southern Poverty Law Center
400 Washington Ave.
Montgomery, AL 36104
(334) 313-0702
ellen.degnan@splcenter.org

/s/ *Jess Unger*
Bradley Heard*
Sabrina Khan*
Jess Unger*
Southern Poverty Law Center
1101 17th Street NW
Suite 550
Washington, DC 20036
bradley.heard@splcenter.org
sabrina.khan@splcenter.org
jess.unger@splcenter.org

/s/ *Ahmed Soussi*

31

Ahmed Soussi*
Southern Poverty Law Center
201 St. Charles Avenue, Suite 2000
New Orleans, LA 70170
ahmed.soussi@splcenter.org

*Motions for admission or pro hac vice participation forthcoming.
** Motions for pro hac vice participation pending.

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 23, 2024, I electronically filed the above document with the Clerk of Court using the ECF system, which will provide electronic copies to counsel of record.

/s/ *Kathryn Huddleston*
Kathryn Huddleston