

FILED
2024 Oct-02  PM 01:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| ALABAMA COALITION FOR IMMIGRANT JUSTICE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>WES ALLEN, in his official capacity as Alabama Secretary of State, *et al.*,<br><br>Defendants. | Case No. 2:24-cv-1254 (AMM) |
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF ALABAMA and WES ALLEN, in his official capacity as Alabama Secretary of State,<br><br>Defendants. | Case No. 2:24-cv-1329 (AMM) |

## UNITED STATES' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

I.   Introduction ...................................................................................................1

II.  Background ....................................................................................................2

  A.  Statutory Background ...................................................................................2

  B.  Factual Background .....................................................................................4

    1.  ALEA Driver's License and ID Card Records ...........................................6

    2.  ADOL Unemployment Records ...................................................................8

    3.  Impact of the Program.................................................................................9

    4.  The Secretary of State's September Form Letter.......................................11

  C.  Procedural History .....................................................................................12

III. Legal Standard .............................................................................................13

IV.  Argument .....................................................................................................14

  A.  The United States Is Likely to Establish that the Program Violated
    the Quiet Period Provision..........................................................................14

    1.  The Program Was Subject to the Quiet Period Provision...........................16

    2.  The Program Targeted Allegedly Ineligible Voters. ..................................17

    3.  The Program Was Systematic. ...................................................................17

4.    The Purpose of the Program Was to Remove Ineligible Voters

from the Rolls................................................................18

5.    The Program Was Implemented During the Quiet Period.........................20

B.    The United States and Eligible U.S. Citizens Will Be Irreparably

Harmed Absent an Injunction.........................................................21

C.    The Balance of Equities Favors Enjoining and Unwinding Quiet

Period Violations. ............................................................24

D.    Compliance with Federal Law and Protecting the Right to Vote

Are in the Public Interest. ...............................................28

E.    The Requested Injunction Is Appropriate and Meets the Requirements of

Rule 65.......................................................................29

V.    Conclusion..........................................................................30

# TABLE OF AUTHORITIES

## Cases

*Ali v. Federal Bureau of Prisons*, 552 U.S. 214 (2008) ...........................16

*Arcia v. Fla. Sec. of State*, 772 F.3d 1335 (11th Cir. 2014) ............................ passim

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013)............... 22, 23, 27

*Ass'n of Cmty. Orgs. for Reform Now v. Edgar*, 56 F.3d 791
  (7th Cir. 1995) .........................................................................21

*Benisek v. Lamone*, 585 U.S. 155 (2018) (per curiam)..........................................14

*Buckley v. Valeo*, 424 U.S. 1 (1976).................................................................21

*Burroughs v. United States*, 290 U.S. 534 (1934) ...............................................21

*Burton v. City of Belle Glade*, 178 F.3d 1175 (11th Cir. 1999) ..............................30

*Common Cause Ind. v. Lawson*, 327 F. Supp. 3d 1139 (S.D. Ind. 2018)...............23

*Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312 (11th Cir. 2019).............23

*Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28 (2020).............26

*Dunn v. Blumstein*, 405 U.S. 330 (1972) ............................................................27

*Eu v. S.F. Cnty. Democratic Central Comm.*, 489 U.S. 214 (1989).......................24

*Ex parte Siebold*, 100 U.S. 371 (1880) .............................................................22

*Ex parte Yarbrough*, 110 U.S. 651 (1883)...........................................................21

*Glossip v. Gross*, 576 U.S. 863 (2015) .............................................................26

*Jones v. Governor of Fla.*, 950 F.3d 795 (11th Cir. 2020) ...................................23

*KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261 (11th Cir. 2006) ..............29

*League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th
  1363 (11th Cir. 2022) ..............................................................................27

*League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224
  (4th Cir. 2014) ........................................................................................23

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016)...............23

*Madera v. Detzner*, 325 F. Supp. 3d 1269 (N.D. Fla. 2018) ..................................29

*Majority Forward v. Ben Hill Cnty. Bd. of Elections*, 509 F. Supp. 3d
  1348 (M.D. Ga. 2020) ..............................................................................18

*Merrill v. Milligan*, 142 S. Ct. 879 (2022).........................................................27

*Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 1077 (D. Ariz. 2023).........................17

*NAACP v. Cortes*, 591 F. Supp. 2d 757 (E.D. Pa. 2008)........................................29

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350
  (1989).....................................................................................................22

*Obama for Am. v. Husted*, 697 F.3d 423 (6th Cir. 2012) ......................................23

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) ............................................... 16, 23, 26, 27

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500
  (D.C. Cir. 2016).......................................................................................14

*Reynolds v. Sims*, 377 U.S. 533 (1964) ............................................................... 22, 24

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ........................................... 25

*Rubin v. Islamic Republic of Iran*, 583 U.S. 202 (2018) ...................................... 26

*Salazar v. Buono*, 559 U.S. 700 (2010) ................................................................ 29

*SEC v. Goble*, 682 F.3d 934 (11th Cir. 2012) ...................................................... 30

*Singleton v. Merrill*, 582 F. Supp. 3d 924 (N.D. Ala. 2022)
    (three-judge court) .......................................................................................... 23

*Tex. Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d
    200 (5th Cir. 2010) .......................................................................................... 14

*U.S. Student Ass'n Found. v. Land*, 546 F.3d 373 (6th Cir. 2008) ....................... 15

*United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012) ................. 21, 24, 25, 29

*United States v. Florida*, 870 F. Supp. 2d 1346 (N.D. Fla. 2012) ......................... 20

*United States v. Raines*, 362 U.S. 17 (1960) ........................................................ 29

*United States v. Texas*, No. 1:24-cv-8, 2024 WL 861526
    (W.D. Tex. Feb. 29, 2024) ............................................................................... 22

*Voting Rights Coal. v. Wilson*, 60 F.3d 1411 (9th Cir. 1995) ............................... 22

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765
    (2000) ............................................................................................................... 21

*Williams v. Rhodes*, 393 U.S. 23 (1968) .............................................................. 29

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ..................................... 13

*Yorktown Sys. Grp. Inc. v. Threat Tec LLC*, 108 F.4th 1287
    (11th Cir. 2024) ............................................................................................... 14

## Constitutional Provisions

U.S. Const. art. I, § 4, cl. 1 ................................................................................... 21

## Federal Statutes

18 U.S.C. § 611 ............................................................................................... 17, 25

52 U.S.C. § 20501 ............................................................................................. 3, 24

52 U.S.C. § 20503 .................................................................................................. 2

52 U.S.C. § 20507 ........................................................................................ passim

52 U.S.C. §§ 20501-11 ........................................................................................... 2

## Federal Legislative Materials

H.R. Rep. No. 103-9 (1993) ............................................................................ 3, 4, 21

S. Rep. No. 103-6 (1993) ................................................................................ 3, 4, 21

## State Statutes and Regulations

Ala. Admin. Code § 820-2-2-.01 ............................................................................ 2

Ala. Code § 17-3-56...............................................................................23
Ala. Code § 17-4-9............................................................................ 5, 9, 11
Ala. Const. art. VIII, § 177 ...............................................................17

**Other Authorities**

Fed. R. Civ. P. 65.................................................................................29
Stephen Ansolabehere et al., *The Perils of Cherry Picking: Low Frequency Events in Large Sample Surveys*, 40 Electoral Studies 409 (2015)....................................................................................................25
U.S. Dep't of Justice, *National Voter Registration Act of 1993 (NVRA): Questions and Answers*..................................................................2

## I.     INTRODUCTION

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, the United States respectfully moves for a preliminary injunction against the State of Alabama and the Alabama Secretary of State (the Secretary of State) to address violations of the Quiet Period Provision, Section 8(c)(2) of the National Voter Registration Act of 1993 (NVRA), 52 U.S.C. § 20507(c)(2).  The Quiet Period Provision requires states to complete systematic programs intended to remove the names of ineligible voters from registration lists by no later than 90 days before federal elections, including efforts intended to remove noncitizens.  *See Arcia v. Fla. Sec. of State*, 772 F.3d 1335, 1346 (11th Cir. 2014).

Despite this bright-line rule, on August 13, 2024—84 days before the November 5, 2024, federal general election—the State of Alabama announced a "Process to Remove Noncitizens Registered to Vote in Alabama" (the Program). This Program relied on outdated and inaccurate state records to flag 3,251 individuals for removal from the voter rolls, a list that included both natural-born and naturalized U.S. citizens, and Eleventh Circuit precedent conclusively resolves that the Program violated the Quiet Period Provision.  *See id.* at 1343-48.  There is no question that systematic list maintenance can be a useful tool and that only U.S. citizens are eligible to vote in federal elections.  But there is also no evidence of widespread noncitizen voting in the United States, and the risk that errors in

systematic list maintenance will harm or even disenfranchise qualified voters increases as Election Day approaches.  *See id.* at 1346.  In fact, the Program has confused and deterred citizens who are eligible, registered voters—the very scenario that Congress tried to prevent when it enacted the Quiet Period Provision. Prompt relief is justified to address this Quiet Period violation and is necessary to ensure that these eligible voters may cast ballots unimpeded on Election Day.  The United States respectfully requests that this Court exercise its equitable discretion and judgment and enter the proposed preliminary injunction attached.

## II.   BACKGROUND

### A.   Statutory Background

Enacted in 1993, the NVRA establishes uniform procedures and practices for voter registration and voter registration list maintenance for federal elections. *See* 52 U.S.C. §§ 20501-11.[1]  The purposes of the Act are:

(1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;
(2) to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;
(3) to protect the integrity of the electoral process; and
(4) to ensure that accurate and current voter registration rolls are maintained.

---

[1] The NVRA applies to all states except those that continuously since August 1, 1994, either do not require voter registration or permit election-day registration at the polls during federal general elections.  *See* 52 U.S.C. § 20503(b).  Alabama does not fall within those exceptions. *See* U.S. Dep't of Justice, *National Voter Registration Act of 1993 (NVRA): Questions and Answers*, https://perma.cc/UXM4-CQ2X; *see also* Ala. Admin. Code § 820-2-2-.01.

*Id*. § 20501(b).  Passage of the NVRA followed extensive hearings, which

grounded Congress's findings that

> (1) the right of citizens of the United States to vote is a fundamental right;
> (2) it is the duty of the Federal, State, and local governments to promote the exercise of that right; and
> (3) discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities.

*Id.* § 20501(a); *see also* S. Rep. No. 103-6, at 2-4 (1993) (Senate Report);

H.R. Rep. No. 103-9, at 2-5 (1993) (House Report).

Section 8 of the NVRA sets out requirements for the administration of voter

registration for elections for federal office.  *See* 52 U.S.C § 20507.  Section 8(c)(2),

the Quiet Period Provision, specifically directs that a "State shall complete, not

later than 90 days prior to the date of a primary or general election for Federal

office, any program the purpose of which is to systematically remove the names of

ineligible voters from the official lists of eligible voters."  *Id.* § 20507(c)(2).  "It is

intended by this requirement that the State outreach activity, such as the mailing of

list verification notices or conducting a canvas, must be concluded not later than 90

days before an election."  Senate Report at 18-19; *see also* House Report at 16

("This requirement applies to the State outreach activity such as a mailing or a

door to door canvas and requires that such activity be completed by the 90-day

deadline."). This general prohibition does not preclude removal of names from official lists of voters at the request of the registrant, by reason of criminal conviction or mental incapacity, or by reason of the death of the registrant or the correction of registration records pursuant to the NVRA. *See id.* § 20507(c)(2)(B); *see also* Senate Report at 19; House Report at 16. But the Quiet Period Provision does govern removals based on failure to meet initial eligibility criteria, including programs that attempt to remove noncitizens. *Arcia*, 772 F.3d at 1343-48.

### B.    Factual Background

On August 13, 2024—84 days before the November 5, 2024, federal general election—the State of Alabama began a process to remove 3,251 individuals who had allegedly been issued "noncitizen identification numbers" from Alabama's voter rolls. *See* Press Release, Ala. Sec'y of State, *Secretary of State Wes Allen Implements Process to Remove Noncitizens Registered to Vote in Alabama* (Aug. 13, 2024) (Ex. 1) (Aug. 13 Press Release). When announcing the Program, the Secretary of State's office conceded that "it is possible" that some of these individuals are naturalized U.S. citizens but did not explain what efforts, if any, had been taken to determine current citizenship. *Id.*

As part of the Program, the Secretary of State instructed county boards of registrars to place the 3,251 targeted individuals in "inactive" status and to initiate steps towards removal. *See id.* An "inactive" Alabama voter cannot cast a regular

ballot without first submitting paperwork to reactive their voter registration. *See*

Ala. Code § 17-4-9. Local officials then sent each targeted individual a form letter

that stated,

> Secretary of State Wes Allen has provided our Office with information that shows you have been issued a noncitizen identification number by the Department of Homeland Security. You are also a registered voter in Alabama. This letter is informing you that only eligible United States citizens that reside in Alabama may register to vote in the state. Therefore, your voter record has been made inactive and you have been placed on the path for removal from the statewide voter list. Please complete and submit the enclosed Voter Removal Request form to immediately be removed from the voter list and become compliant with state and federal law requirements. If you are a citizen of the United States, and are otherwise eligible to register to vote in Alabama, please complete and submit the enclosed State of Alabama Voter Registration Form, and include your current Alabama driver license number or nondriver ID number, or the last four of your social security number (if you do not have an Alabama driver license).

Aug. Form Let. (Ex. 2); *see also Voter Removal Request* (Nov. 23, 2021) (Ex. 3).

The enclosed voter registration form prominently stated, "Deadline for submitting

application: Voter registration and updating of voter records is closed during the

14 days prior to each election in Alabama." *Alabama Voter Registration Form*

(July 5, 2022) (Ex. 4). The August form letter did not notify recipients that they

could restore their voter record to active status by completing a voter registration

form online or by completing a reidentification form at their polling place on

Election Day. *See* Ala. Code § 17-4-9; *Voter's Reidentification/Update Form* (Ex.

5).

The Secretary of State created the list of 3,251 purported noncitizen registered voters by comparing voter rolls against driver's license and ID card data from the Alabama Law Enforcement Agency (ALEA) and against unemployment data from the Alabama Department of Labor (ADOL).  *See* Let. from Michael L. Jones Jr. to R. Tamar Hagler (Ex. 6) (Sept. 19 Let.).  Both matching processes were fundamentally flawed, and the Program has resulted in confusion and distrust among eligible voters.

## 1.    ALEA Driver's License and ID Card Records

ALEA may record that an individual is a noncitizen when they apply for an identification document, such as a driver's license or non-driver ID card.  Sept. 19 Let. at 2.  Alabama driver's licenses issued to foreign nationals remain valid for up to four years.  *Id.* at 4.  Alabama ID cards issued to foreign nationals remain valid for up to eight years.  *Id.* at 4 n.2.  If a foreign national becomes a naturalized U.S. citizen, ALEA does not require them to update agency records or obtain new identification until their foreign national driver's license or ID card expires.  *Id.* at 3-4.  The ALEA driver's license database also incorporates data received since 1970, which may contain further inaccuracies.  *See* Press Release, Office of Ala. Gov., *Governor Ivey Announces New Statewide Driver License System* (Feb. 4, 2022) (Ex. 7).

The ALEA component of the Program labeled 1,241 registered voters as noncitizens. *See* Sept. 19 Let. at 3. However, the Program labeled more than 50 individuals as noncitizens who had previously presented a naturalization or citizenship certificate to ALEA. Aust Decl. ¶¶ 9-10 (Ex. 8). The Program also did not distinguish between ALEA records predating an individual's application to register to vote and ALEA records postdating the registration application. The ALEA component thus failed to account for individuals who became naturalized U.S. citizens after obtaining a foreign national driver's license or ID card.

As a result, the Program incorrectly identified naturalized citizens based on outdated or incorrect ALEA data. For example, Saul Jimenez renewed his foreign national driver's license shortly before his 2022 naturalization ceremony, and he registered to vote soon after becoming an American citizen. Jimenez Decl. ¶¶ 7-9 (Ex. 9). Even though he is a U.S. citizen, Mr. Jimenez received a form letter in August 2024 alerting him that the state had inactivated his voter record and placed him on the path for removal from the statewide voter list. *Id.* ¶ 5. Jimenez took time off from work to renew his driver's license before reregistering to vote so that his license would not have a foreign national designation when he corrected his registration status. *Id.* ¶ 9-11; *see also* Sampen Decl., *Alabama Coalition for Immigrant Justice v. Merrill*, No. 2:24-CV-1254 (*ACIJ*), ECF No. 23-28 (describing naturalized U.S. citizen flagged as noncitizen based on outdated

records).  Although Mr. Jimenez had no issues using his foreign national driver's license until he received the August form letter, he was concerned that the foreign national designation might inhibit his ability to reactivate his voter registration.  *Id.* ¶ 9.

### 2.    ADOL Unemployment Records

The Program also matched voter registration records against ADOL records of unemployment claims dating back to January 10, 2020, based on whether an applicant selected a "noncitizen" box in application paperwork.  Sept. 19 Let. at 3. ADOL does not require a newly naturalized U.S. citizen who previously received unemployment benefits to update agency records.  Moreover, ADOL has confirmed shortcomings in its process to verify the accuracy of submitted paperwork.  *See* Ala. Dep't of Examiners of Pub. Accounts, *Special Report on Unemployment Compensation Payments Issued by the Alabama Department of Labor* (2023) (Ex. 10).

The ADOL component of the Program labeled 2,010 registered voters as noncitizens.  *See* Sept. 19 Let. at 3.  As with ALEA, the Program did not distinguish between ADOL records predating the individual's application to register to vote and ADOL records postdating the individual's registration application.  Sept. 19 Let. at 3.  The ADOL component of the Program thus failed to account for voters who became naturalized U.S. citizens after January 10, 2020.

As a result, the Program incorrectly identified naturalized citizens based on stale or faulty ADOL data and on errors in complex paperwork.  In one instance, Jennifer Berg—a native-born U.S. citizen—was identified by ADOL as a noncitizen even though she had never applied for unemployment benefits.  Berg. Decl. ¶¶ 11-12 (Ex. 11).  In fact, Ms. Berg had received a letter from ADOL saying she was ineligible to receive unemployment benefits because she had not completed the application.  Berg. Decl. ¶¶ 12.  Ms. Berg also did not receive the August form letter until August 29, more than two weeks after the Secretary of State announced the Program.  *Id.* ¶ 6; *see also* Stroop Decl. ¶¶ 7-16, *ACIJ* ECF No. 23-25 (describing native-born U.S. citizen flagged as noncitizen based on paperwork error that had been corrected in 2022).  The Program also targeted Roald Hazelhoff, a naturalized U.S. citizen, based on an application for unemployment benefits that preceded his 2022 naturalization ceremony and his registration to vote.  *See* Hazelhoff Decl. ¶¶ 6-12, *ACIJ* ECF No. 23-22.

### 3.    Impact of the Program

As of September 19, 2024, 717 individuals targeted by the Program have restored their registration to active status.  Sept. 19 Let. at 1-2.  To reactivate their registration under Alabama law and procedures, each of these individuals submitted paperwork confirming that they are U.S. citizens.  *See* Ala. Code § 17-4-9; *Alabama Voter Registration Form*; *Voter's Reidentification/Update Form*.  This

list includes only half of the voters flagged by ALEA for removal from the registration rolls despite having presented naturalization or citizenship certificates. Aust Decl. ¶¶ 14, 18, 21.  On the other hand, as of September 19, 2024, only approximately 106 individuals targeted by the Program had submitted a voter removal request form.  Sept. 19 Let. at 2.  Moreover, submission of the removal request form does not establish that the signatory is not a U.S. citizen, as the form does not require a basis for the request.  *See Voter Removal Request*.  In fact, the 106 individuals include one naturalized citizen known to ALEA, who followed instructions on the August form letter and submitted a voter registration removal request.  Aust Decl. ¶¶ 16, 20.  The Secretary of State's office has also corrected local officials who have assumed that anyone who submitted a voter removal request in response to the August form letter is not a U.S. citizen.  *See, e.g.*, Email from Sheila Barbuck, Marshall Cnty., to Candace Payne, Ala. Sec'y of State (Sept. 5, 2024) (Ex. 12); *see also* Email from Candace Payne to Jeff Elrod (Aug. 26, 2024) (Ex. 13) (describing need for guidance).

The Program has confused and frustrated voters who are U.S. citizens, in large part because they received official correspondence in August unjustifiably questioning their citizenship and announcing that their voter registration was on a path for removal.  *See* Berg Decl. ¶ 7; Jimenez Decl. ¶ 6; *see also, e.g.*, Hazelhoff Decl. ¶ 13-15; Sampen Decl. ¶ 12; Stroop Decl. ¶¶ 7, 16-17.  The letter itself also

provided confusing, contradictory, and incomplete instructions, directing all recipients to submit a voter removal request form to "become compliant with state and federal law requirements" while at the same time directing eligible U.S. citizens to complete a new voter registration form.  Aug. Form Let.  The voter registration form conspicuously stated "Voter registration and updating of voter records is closed during the 14 days prior to each election in Alabama," suggesting that reactivation was impossible after October 21.  *See Alabama Voter Registration Form*.  The letter also failed to advise voters that they could restore voter registration records to active status by re-registering online or—if they failed to re-register by the application deadline—by completing paperwork at the polling place on Election Day.  *See* Aug. Form Let.; *see also* Ala. Code § 17-4-9; Ala. Sec'y of State, *Register to Vote / Update Your Information Voter's Reidentification/Update Form*.  Some voters targeted by the Program concluded that the only reliable way to restore their voting rights is to submit paperwork in person at their local board of registrars.  *See* Jimenez Decl. ¶ 10-11; *see also, e.g.*, Hazelhoff Decl. ¶ 13.

### 4.    The Secretary of State's September Form Letter

On September 18, 2024, the Secretary of State's office sent a message directing local boards of registrars to send a second form letter to the 2,428 individuals targeted by the Program who had, to date, neither re-registered to vote nor submitted a voter removal request form.  *See* Sept. Form Let. (Ex. 14).  The

11

September form letter informs U.S. citizens that they have three options to ensure that they can vote in the upcoming November 5, 2024, federal general election: (1) submit a voter registration form, postmarked by the October 21, 2024, Alabama voter registration deadline; (2) complete a voter registration form online by the October 21, 2024, Alabama voter registration deadline if the voter has an Alabama driver's license or non-driver ID; or (3) complete an Alabama Voter's Reidentification/Update form at the voter's assigned polling place on Election Day prior to voting.  *See id.*  The September form letter notes that registrants who vote absentee "are encouraged to first update" their information with their local Board of Registrar.  *Id.*  The September form letter then provides, "Regardless, you will be allowed to vote absentee pursuant to the normal process."  *Id.*  The Secretary of State's office did not provide a deadline by which local boards of registrars were to mail the September form letter.  *See id.*

### C.   Procedural History

On September 4, 2024, the United States notified Alabama officials of concerns that the Program may violate the Quiet Period Provision.  *See* Let. from R. Tamar Hagler, U.S. Dep't of Justice, to Jeff Elrod, Ala. Dir. of Elections (Ex. 15).  State officials responded on September 6, *see* Let. from Michael L. Jones Jr., Office of the Ala. Sec'y of State, to R. Tamar Hagler (Ex. 16) (Sept. 6 Let.), and the United States and Alabama officials met to discuss the matter on September 11.

Alabama provided a set of requested documents on September 19, *see* Sept. 19 Let., and the United States informed Alabama and the Secretary of State the next day that litigation had been authorized to enforce the Quiet Period Provision, *see* Let. from Kristen Clarke, Ass't Att'y Gen., U.S. Dep't of Justice, to Steve Marshall, Ala. Att'y Gen. (Sept. 20, 2024) (Ex. 17).  Following another meeting on September 23, settlement negotiations reached an impasse on September 24.

The United States filed suit on September 27, 2024.  Compl., *United States v. Alabama*, No. 2:24-cv-1329 (N.D. Ala. Sept. 27, 2024), ECF No. 1.  The complaint alleges that commencement of the Program on August 13, 2024—less than 90 days before the November 5, 2024, federal general election—violated the Quiet Period Provision, 52 U.S.C. § 20507(c)(2).  Compl. ¶¶ 4-8, 80-83.  The following day, this Court consolidated the instant suit with *Alabama Coalition for Immigrant Justice v. Allen*, No. 2:24-cv-1254, a challenge to the Program brought by individual voters and civil rights groups.  Order, ECF No. 2.

### III.   LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also, e.g.*, *Yorktown Sys. Grp. Inc. v. Threat Tec LLC*, 108

F.4th 1287, 1293 (11th Cir. 2024).  If state action "is expressly preempted, a

finding with regard to likelihood of success fulfills the remaining requirements."

*Tex. Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 206 (5th

Cir. 2010).  Moreover, where the federal government seeks a preliminary

injunction, the second and fourth factors—irreparable harm and the public

interest—merge because "the government's interest is the public interest."

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir.

2016).  Each preliminary injunction request requires this Court to exercise its

"equitable discretion."  *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (per curiam).

## IV.   ARGUMENT

### A.   The United States Is Likely to Establish that the Program Violated the Quiet Period Provision.

The United States is likely to succeed on the merits of its single claim: that

Alabama and the Secretary of State have violated the Quiet Period Provision,

Section 8(c)(2) of the NVRA.  Under the Provision, Alabama was required to

complete any systematic list maintenance program no later than 90 days prior to

the date of a primary or general election for Federal office.  52 U.S.C.

§ 20507(c)(2)(A).  The Eleventh Circuit's decision in *Arcia v. Florida Secretary of

State*, 772 F.3d 1335 (11th Cir. 2014), resolves the core legal questions before this

Court:

- The Quiet Period Provision applies to programs intended to remove noncitizens.  *See id.* at 1343-48.

- Noncitizens are "ineligible voters" for purposes of the Quiet Period Provision.  *See id.* at 1344.

- Voter removal based on database matching is "systematic."  *See id.*

- The "purpose" of a program that removes registrants from the active voter list is to "remove the names of ineligible voters" from the rolls.  *See id.* at 1344-45.

What remains is arithmetic:  The Program's August 13 launch date was less than 90 days before the November 5 general election.  The errors and confusion that accompanied the Secretary of State's new voter removal program—initiated less than 90 days before a federal general election—illustrate why Congress included the Quiet Period Provision in the NVRA.  *See id.* at 1346 ("At most times during the election cycle, the benefits of systematic programs outweigh the costs because eligible voters who are incorrectly removed have enough time to rectify any errors. In the final days before an election, however, the calculus changes."); *see also U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 388 (6th Cir. 2008) ("Though the public certainly has an interest in a state being able to maintain a list of electors that does not contain any false or erroneous entries, a state cannot remove those entries in a way which risks invalidation of properly registered voters."); *cf.*

*Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006) (noting "[a]s an election draws closer," the risk that changes in election rules will result in voter confusion and deter participation "will increase").

### 1.    The Program Was Subject to the Quiet Period Provision.

The Secretary of State's "Process to Remove Noncitizens" was subject to the Quiet Period Provision.  During the Quiet Period, states may not conduct "*any program* the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A) (emphasis added).  Binding Eleventh Circuit precedent affirms that the phrase "any program" carries a "broad meaning."  *Arcia*, 772 F.3d at 1344; *see also Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 219 (2008) (explaining that "the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind'" (citation omitted)).  The NVRA sets out only three categories of removals not subject to the Quiet Period Provision—those (1) at the request of the registrant, (2) because of a criminal conviction or mental incapacity, or (3) because the registrant has died, 52 U.S.C. § 20507(c)(2)(B)—and those categories are exclusive, *see Arcia*, 772 F.3d at 1345. "Noticeably absent from the list of exceptions" to the Quiet Period Provision "is any exception for removal of non-citizens."  *Arcia*, 772 F.3d at 1345; *see also see also Mi Familia Vota v. Fontes*,

691 F. Supp. 3d 1077, 1092-93 (D. Ariz. 2023) (same), *appeal pending*, No. 24-
3188 (9th Cir.).[2]

>    **2.     The Program Targeted Allegedly Ineligible Voters.**

The Program targeted alleged noncitizens for removal as "ineligible voters,"
52 U.S.C. § 20507(c)(2)(A), through flawed database matching.  "Only a citizen of
the United States" may be eligible to vote in Alabama.  *See* Ala. Const. art. VIII,
§ 177(a); *see also Arcia*, 772 F.3d at 1344 (describing the NVRA as "premised on
the assumption that citizenship is one of the requirements for eligibility to vote");
18 U.S.C. § 611 (establishing federal criminal liability for noncitizen voting in
elections for federal office).  Thus, the Secretary of State's process to remove
noncitizens was a program to remove "'ineligible voters'" as contemplated by the
Quiet Period Provision.  *Arcia*, 772 F.3d at 1344.

>    **3.     The Program Was Systematic.**

The Program was also systematic for purposes of the Quiet Period Provision.
The Eleventh Circuit has explained that a removal program that "use[s] a mass

---

[2] The Secretary of State has suggested that the Quiet Period Provision has no role here because
the Program relied only on removals "at the request of the registrant" and "correction of a
registrant's information."  Sept. 6 Let. at 2.  However, the Program immediately placed voters in
inactive status and on the path to removal before letters went out and voter could request
removal.  *See* Aug. 13 Press Release.  And the structure of the NVRA makes clear that
"correction of registration records" does not include removal.  *Compare* 52 U.S.C.
§ 20507(c)(2)(B)(i) (removal programs) *with id.* § 20507(c)(2)(B)(ii) (corrections).  A broader
reading of "correction of registration records" would nullify the Quiet Period Provision.

computerized data-matching process to compare the voter rolls with other state and

federal databases, followed by the mailing of notices" is systematic. *Arcia*, 772

F.3d at 1344; *see also, e.g.*, *Majority Forward v. Ben Hill Cnty. Bd. of Elections*,

509 F. Supp. 3d 1348, 1355 (M.D. Ga. 2020) (contrasting systematic programs and

"individualized inquiries").  Rigorous individualized inquiries lead to less potential

for mistakes, whereas the Quiet Period Provision protects against systematic

programs "when the risk of disfranchising eligible voters is greatest." *Arcia*, 772

F.3d at 1346.

     The Secretary of State relied on computerized data-matching processes

indistinguishable from those employed in *Arcia*.  Specifically, the Secretary's

office compared state database information from ALEA and ADOL to compare

against Alabama's voter rolls.  Aug. 19 Let. at 2-3.  The Program did not depend

on "individualized information or investigation" to identify voters or even to

supplement information gathered from databases. *Arcia*, 772 F.3d at 1344.  To the

contrary, the Program even incorporated erroneous data corrected years ago. *See*

Stroop Decl. ¶¶ 7-16.

### 4.    The Purpose of the Program Was to Remove Ineligible Voters from the Rolls.

     The Program was intended to remove ineligible voters from the official lists

of eligible voters and therefore meets the final requirement of the Quiet Period

Provision.  The Secretary of State declared as much when he issued a press release

entitled, "Secretary of State Wes Allen Implements Process to Remove Noncitizens Registered to Vote in Alabama." Aug. 13 Press Release. The Secretary of State then specifically directed local officials to "immediately inactivate and *initiate steps necessary to remove* all individuals who are not United States Citizens." *Id.* (emphasis added). That the Program removes voters from the active voter list but does not immediately purge them from the rolls entirely is of no import. The Quiet Period Provision prohibits states from completing "any program the *purpose of which* is to systematically remove" ineligible voters from the voter rolls. 52 U.S.C. § 20507(c)(2)(A) (emphasis added). In other words, removal need not be immediate, automatic, and complete for a program to run afoul of the Quiet Period Provision. *See* Senate Report at 32 (requiring that "State outreach activity such as *a mailing* or door to door canvas" must be completed by the 90-day deadline (emphasis added)).

*Arcia* makes clear that programs ending in removal are—from the start—subject to the Quiet Period Provision. The programs ultimately struck down by *Arcia* did not immediately remove voters from the rolls. Rather, less than 90 days before the 2012 primary elections, the Florida Secretary of State provided local officials with lists of potential noncitizens and a form letter including "a statement that if the person failed to respond with 30 days, the person might be removed from the voter roll." *United States v. Florida*, 870 F. Supp. 2d 1346, 1347 (N.D.

Fla. 2012).  Similarly, less than 90 days before the 2012 general election, the

Florida Secretary of State required local officials to "send[] certified mailings"

warning voters that "failure to respond to th[e] mailing within 30 days may result

in the person's removal from the voter rolls."  Sancho Decl. ¶ 16, *Arcia v. Detzner*,

No. 1:12-cv-22282 (S.D. Fla.), ECF No. 65-3, at 2 (Ex. 18).  *Arcia* nonetheless

held that these programs were "attempt[s] to systematically remove names from

the voter rolls."  772 F.3d at 1339.  The same is true in this case.  By placing voters

in inactive status and "on the path for removal," the Secretary of State commenced

a process to "remove" voters from the rolls under the Quiet Period Provision.

### 5.    The Program Was Implemented During the Quiet Period.

Finally, the Secretary of State implemented the Program within the

statutorily protected 90-day window before a federal election.  For the November

5, 2024, general election, the last day for systematic list maintenance was August

7, 2024.  The Secretary of State announced the Program on August 13, 2024, 84

days before the November 5, 2024, general election, and on that day directed local

election officials to place targeted voters in inactive status.  *See* Aug. 13 Press

Release.  This covered list maintenance activity occurred during the quiet period.

*See Arcia*, 772 F.3d at 1338-39 (addressing changes to registration lists "less than

90 days" before a federal election).  Moreover, local officials mailed initial form

letters at least through the end of August.  *See, e.g.*, Berg Decl. ¶ 6.  Thus, the

Program remained incomplete even closer to the election.  *See* Senate Report at 18-19 (noting that mailings following voter inactivation must be complete before the Quiet Period); House Report at 16 (same).  This provided little time for voters to understand their rights and respond to the mailing before the election.

**B.      The United States and Eligible U.S. Citizens Will Be Irreparably Harmed Absent an Injunction.**

The United States continues to suffer an irreparable injury based on Alabama and the Secretary of State's violation of the Quiet Period Provision.  "The United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state" action.  *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012); *see also Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000) (recognizing that the United States may suffer "injury to its sovereignty arising from violation of its laws").  The Elections Clause, U.S. Const. art. I, § 4, cl. 1, provides, "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."[3]  When

---

[3] The Elections Clause does not refer to presidential elections. However, Article II, Section 1, which does address that subject, "has been interpreted to grant Congress power over Presidential elections coextensive with that which Article I section 4 grants it over congressional elections." *Ass'n of Cmty. Orgs. for Reform Now v. Edgar*, 56 F.3d 791, 793 (7th Cir. 1995) (citation omitted); *see also Buckley v. Valeo*, 424 U.S. 1, 13 n.16 (1976); *Burroughs v. United States*, 290 U.S. 534, 545 (1934); *Ex parte Yarbrough*, 110 U.S. 651, 662 (1883).

Congress exercises its authority to "alter" state regulations of federal elections, that authority "is paramount, and may be exercised at any time, and to any extent which it deems expedient." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 9 (2013) (quoting *Ex parte Siebold*, 100 U.S. 371, 392 (1880)).  Congress's preeminent power under the Elections Clause authorizes the NVRA, including the Quiet Period Provision.  *See, e.g.*, *Voting Rights Coal. v. Wilson*, 60 F.3d 1411 (9th Cir. 1995), *cert. denied*, 516 U.S. 1093 (1996).  Thus, Alabama's violation of the Quiet Period Provision constitutes an ongoing and irreparable harm to the United States, absent a curative injunction.  *See New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 366-67 (1989); *see also, e.g.*, *United States v. Texas*, No. 1:24-cv-8, 2024 WL 861526, at *38-39 (W.D. Tex. Feb. 29, 2024) (collecting cases), *stay denied*, 96 F.4th 797 (5th Cir. 2024).

Absent immediate injunctive relief to remedy the Quiet Period violation, eligible U.S. citizens targeted by the Program also risk imminent disenfranchisement based on confusion, distrust, and deterrence and denial of their right to participate on the same grounds as other voters during the November 5, 2024, federal general election.  The right to vote is "the essence of a democratic society," meaning that "any restrictions on that right strike at the heart of representative government."  *Reynolds v. Sims*, 377 U.S. 533, 555 (1964); *see also, e.g.*, *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1315 (11th Cir.

2019).  Thus, "[c]ourts routinely deem restrictions on fundamental voting rights irreparable injury." *Singleton v. Merrill*, 582 F. Supp. 3d 924, 1026 (N.D. Ala. 2022) (three-judge court) (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)), *aff'd sub nom. Allen v. Milligan*, 599 U.S. 1 (2023).[4]  In turn, the NVRA protects voters from systematic list maintenance activities that are prone to creating voter confusion and deter participation at a time when errors are most likely to harm eligible voters.  *See Inter Tribal Council*, 570 U.S. at 17; *see also Purcell*, 549 U.S. at 4-5.  Voters have already expressed fear, frustration, and concern, *see, e.g.*, Jimenez Decl. ¶¶ 6, 10, Berg Decl. ¶¶ 7, 13-14, and the Quiet Period Provision recognizes that many "[e]igible voters removed days or weeks before Election Day will likely not be able to correct the State's errors" before an election and may not attempt to vote if they have not yet done so, *Arcia*, 772 F.3d at 1346.[5]

---

[4] *See also, e.g.*, *Jones v. Governor of Fla.*, 950 F.3d 795, 828-29 (11th Cir. 2020); *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9, 12-13 (D.C. Cir. 2016); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Common Cause Ind. v. Lawson*, 327 F. Supp. 3d 1139, 1154 (S.D. Ind. 2018) (collecting cases).

[5] Although Alabama law protects voters from re-registration requirements, *see* Ala. Code § 17-3-56, the August form letter directed eligible U.S. citizens to submit another voter application if they wished to remain registered, *see* Aug. Form Let.  The NVRA also protects registrants from removal from the voting rolls "by reason of the person's failure to vote."  52 U.S.C. § 20507(b)(2).  However, individuals targeted by the Program will be removed from the rolls if they do not vote in the next two federal election cycles.  *See* Sept. 19 Let.

C. **The Balance of Equities Favors Enjoining and Unwinding Quiet Period Violations.**

"The equities weigh in favor of enjoining [state actions] that are preempted by federal law." *Alabama*, 691 F.3d at 1301.  Once state election procedures have been found to be unlawful, "it would be the unusual case in which a court would be justified in not taking appropriate action" before the next election.  *Reynolds*, 377 U.S. at 585.  In this case, the balance of equities favors a preliminary injunction that enjoins the violation of the Quiet Period Provision and requires tailored remedial measures to protect the rights of impacted eligible voters.

The Quiet Period Provision "is designed to carefully balance the[] four competing purposes [of] the NVRA," *Arcia*, 772 F.3d at 1346; *see also* 52 U.S.C. § 20501(b) (establishing purposes), and so the equities favor injunctive relief when the Congressional balance is upset through noncompliance.  *See also Arcia*, 772 F.3d at 1346 ("At most times during the election cycle, the benefits of systematic programs outweigh the costs because eligible voters who are incorrectly removed have enough time to rectify any errors.  In the final days before an election, however, the calculus changes.").  Although the "State indisputably has a compelling interest in preserving the integrity of its election process," *Eu v. S.F. Cnty. Democratic Central Comm.*, 489 U.S. 214, 231 (1989), that interest alone does not justify casting doubt on the validity of voter registration in the weeks before Election Day, when eligible voters "will likely not be able to correct" errors,

*Arcia*, 772 F.3d at 1346.  "This is why the [Quiet Period] Provision strikes a careful balance: It permits systematic removal programs at any time *except* for the 90 days before an election because that is when the risk of disfranchising eligible voters is the greatest."  *Arcia*, 772 F.3d at 1346.  Thus, states may rely on both citizenship questions on registration forms, *see, e.g.*, *Alabama Voter Registration Form*, and timely systematic list maintenance to ensure that only U.S. citizens are registered to vote, and in the rare instance where noncitizens nonetheless vote, they are subject to prosecution.  *See* 18 U.S.C. § 611; *see also, e.g.*, Press Release, U.S. Att'y Office: N.D. of Ala., *Undocumented Individual Charged in Connection with Voting Fraud and Passport Fraud* (Sept. 5, 2024) (Ex. 19).  *See generally* Stephen Ansolabehere et al., *The Perils of Cherry Picking: Low Frequency Events in Large Sample Surveys*, 40 Electoral Studies 409 (2015) (Ex. 20) ("[T]he likely percent of non-citizen voters in recent US elections is 0.").[6]

---

[6] On the other hand, Alabama has provided no evidence of harm in response to the United States' document requests.  As of September 19, the State had compiled evidence of only four individuals targeted by the Program who have acknowledged that they are noncitizens.  Of those four, three individuals never registered to vote and were added to the rolls based on a state agency error, and the fourth asserted that they had never voted.  *See* Email from Meridith Blackburn, Ala. Sec'y of State, to Clark Morris, Ala. Att'y Gen. (Sept. 19, 2024) (Ex. 21) (redacted); *see also* F. Antunes Driver License Form (July 13, 2023) (Ex. 22) (redacted); L. Antunes Driver License Form (July 13, 2023) (Ex. 23) (redacted); D. Baca Driver License Form (July 29, 2020) (Ex. 24) (redacted); G. Leddon Voter Removal Request (Sept. 3, 2024) (Ex. 25) (redacted).  In any case, there is "no harm from the state's nonenforcement of invalid" procedures.  *Alabama*, 691 F.3d at 1301; *see also Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (confirming that states "cannot suffer harm from an injunction that merely ends an unlawful practice").

The Supreme Court's decision in *Purcell v. Gonzales*, 549 U.S. 1 (2006)
(per curiam), does not stand in the way of immediate relief for violations of the
Quiet Period Provision.  *Purcell* recognized that "[c]ourt orders affecting elections,
especially conflicting orders, can themselves result in voter confusion and
consequent incentive to remain away from the polls" and that "[a]s an election
draws closer, that risk will increase."  *Id.* at 4-5.  However, the Quiet Period
Provision rests upon similar concerns, albeit applied to systematic voter
registration list maintenance.  *See Arcia*, 772 F.3d at 1345-46.  Thus, the equitable
considerations articulated in *Purcell* weigh in favor of relief for a Quiet Period
violation, which has unlawfully disturbed the status quo.  *See Democratic Nat'l
Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J.,
concurring) ("When an election is close at hand, the rules of the road should be
clear and settled.").  Moreover, a violation of the Quiet Period close to an election
is the fault of the offending jurisdiction.  *Cf. Glossip v. Gross*, 576 U.S. 863, 898
(2015) (Scalia, J., concurring) (describing invocation of self-generated delay as
"call[ing] to mind the man sentenced to death for killing his parents, who pleads
for mercy on the ground that he is an orphan").  To suggest that *Purcell* precludes a
remedy would effectively nullify the Quiet Period Provision because violations of
the Provision by definition occur shortly before an election.  *See, e.g.*, *Rubin v.
Islamic Republic of Iran*, 583 U.S. 202, 213 (2018) ("[A] statute should be

construed so that effect is given to all its provisions." (internal citation omitted));

*see also Inter Tribal Council*, 570 U.S. at 15 ("There is no compelling reason not

to read Elections Clause legislation simply to mean what it says.").[7]

Systematic errors in the Program reinforce the equities favoring an

injunction.  As described above, the Program relied on ADOL data that are nearly

five years old and ALEA data up to eight years old.  Since an individual last

applied for a driver's license or sought unemployment benefits, they may have also

become a naturalized U.S. Citizen.  *See* Jimenez Decl. ¶ 7; Sampen Decl. ¶¶ 5, 7;

Hazelhoff Decl. ¶¶ 6, 8-9.  These new Americans have a "strong interest in

exercising the 'fundamental political right' to vote."  *Purcell*, 549 U.S. at 4

(quoting *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972)).  The Program also targeted

---

[7] The Eleventh Circuit has applied *Purcell* to challenges to registration and voting procedures but never to enforcement of the Quiet Period Provision.  *See, e.g.*, *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1370-72 (11th Cir. 2022).  Outside of the Quiet Period context, Justice Kavanaugh has proposed a four-part test for last-minute injunctions impacting election administration, suggesting that *Purcell* might be overcome when "(i) the underlying merits are entirely clearcut in favor of the plaintiff; (ii) the plaintiff would suffer irreparable harm absent the injunction; (iii) the plaintiff has not unduly delayed bringing the complaint to court; and (iv) the changes in question are at least feasible before the election without significant cost, confusion, or hardship."  *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring) (citations omitted); *see also League of Women Voters of Fla.*, 32 F.4th at 1372 (adopting first consideration).  Even if these requirements were to apply to enforcement of the Quiet Period Provision—and they should not—the equities would nonetheless continue to favor relief.  The underlying merits and the potential for irreparable harm are clear.  *See* Sections IV.A-B, *supra*.  The United States promptly pursued its concerns along a timeline that afforded Alabama and the Secretary of State appropriate consideration and an opportunity to avoid contested litigation.  *See* Section II.C, *supra*.  And the requested relief is feasible and appropriate, particularly in light of the nature of the statutory violation.  *See* Section II.E, *infra*.

native-born U.S. citizens erroneously labeled as foreign nationals in the ADOL database.  *See* Berg Decl. ¶¶ 8-12; Stroop Decl. ¶¶ 7-16.  Here too, innocent citizens risk confusion, disenchantment with the political process, and ultimately disenfranchisement.

Finally, the September form letter does not cure the violation of the Quiet Period Provision or tilt the equities against injunctive relief.  Although the Secretary of State sent the September form letter to county officials on September 19, the slow mailing of the August form letter—in combination with election officials' intensive duties in the weeks before a presidential election—suggests that the September form letter still may not have reached many of the impacted, eligible voters.  And though the letter informs the targeted individuals of additional pathways for restoration to active status, it also provides very different instructions from the August form letter, which directed citizens to re-register on a paper form that could not be processed in the final weeks before an election.  *Compare* Aug. Form. Let. *with* Sept. Form Let.  This shifting, last-minute rollout encourages further confusion, particularly among eligible U.S. citizens surprised to be labeled noncitizens in the first place.

**D.    Compliance with Federal Law and Protecting the Right to Vote Are in the Public Interest.**

The public interest favors injunctive relief as well, principally because "[f]rustration of federal statutes and prerogatives are not in the public interest."

*Alabama*, 691 F.3d at 1301; *see also KH Outdoor, LLC v. City of Trussville*, 458

F.3d 1261, 1272-73 (11th Cir. 2006) (recognizing that the "public has no interest"

in state action that violates federal law); *Madera v. Detzner*, 325 F. Supp. 3d 1269,

1283 (N.D. Fla. 2018) ("[S]tate and local officials serve the public interest when

they conform their conduct to federal law's requirements.  This is especially so

when the law is so clear in its requirements.").  The public has a clear interest in

the enforcement of federal statutes that protect constitutional rights, including—

and especially—voting rights.  *See United States v. Raines*, 362 U.S. 17, 27 (1960).

Ultimately, "[t]he public interest is always served by more equitable, easier access

to the ballot."  *Madera*, 325 F. Supp. 3d at 1283; *see also Williams v. Rhodes*, 393

U.S. 23, 30 (1968) (reiterating that the right to vote "rank[s] among our most

precious freedoms"); *NAACP v. Cortes*, 591 F. Supp. 2d 757, 767 (E.D. Pa. 2008)

(recognizing that protecting the right to vote "is without question in the public

interest").

### E.    The Requested Injunction Is Appropriate and Meets the Requirements of Rule 65.

The United States requests relief appropriately tailored to remedy Alabama

and the Secretary of State's violations of the Quiet Period Provision, taking into

account the "injury that has been established" and "ongoing . . . circumstances."

*Salazar v. Buono*, 559 U.S. 700, 718 (2010).  The proposed order also meets all

technical requirements.  *See* Fed. R. Civ. P. 65(d).  The order states the reasons

why it issued.  Proposed Order ¶¶ i-ix.  The order states its terms specifically.

Proposed Order ¶¶ 1-7.  The order describes in reasonable detail the act or acts

restrained or required.  Proposed Order ¶¶ 1-7.  And the order binds only the

parties, their officers, their agents, their servants, their employees, their attorneys,

and those working in active concert or participation with them.  Proposed Order

¶¶ 1-7.  Thus, the proposed order would "clearly let defendant[s] know what [they

are] ordered to do or not to do . . . in terms of objective actions, not legal

conclusions," *SEC v. Goble*, 682 F.3d 934, 950 (11th Cir. 2012) (internal citation

and quotation marks omitted), and does not merely instruct Alabama and the

Secretary of State to "obey the law," *cf. Burton v. City of Belle Glade*, 178 F.3d

1175, 1201 (11th Cir. 1999).  This Court can and should restore eligible U.S.

citizens to active voter registration status and order relief needed to avoid voter

confusion and deterrence from participation in the upcoming federal general

election.

## V.   CONCLUSION

For the foregoing reasons, the United States respectfully requests that the

Court grant its motion for a preliminary injunction and enter the attached proposed

order granting immediate relief for the Quiet Period violations described herein.

Date:  October 2, 2024

Respectfully submitted,

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

*/s/ Daniel J. Freeman*
R. TAMAR HAGLER
RICHARD A. DELLHEIM
DANIEL J. FREEMAN
KELLI M. SLATER
Attorneys
Voting Section, Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W
Washington, D.C. 20530
(202) 305-5451
daniel.freeman@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 2, 2024, I electronically filed the foregoing with the Clerk of the court using the CM/ECF system, which will send notification of this filing to counsel of record.

*/s/ Daniel J. Freeman*
Daniel J. Freeman
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave, NW
Washington, DC 20530
(202) 305-5451
daniel.freeman@usdoj.gov
