FILED

2024 Oct-02  PM 11:48
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| ALABAMA COALITION FOR IMMIGRANT JUSTICE, *et al.*, | ) ) ) | |
| *Plaintiffs,* | ) ) | |
| v. | ) ) | Case No.: 2:24-cv-01254-AMM |
| WES ALLEN, in his official capacity as Alabama Secretary of State, *et al.*, | ) ) ) ) | |
| *Defendants.* | ) ) | |
| | | |
| UNITED STATES OF AMERICA, | ) ) | |
| *Plaintiff,* | ) ) | |
| v. | ) ) | Case No.: 2:24-cv-01329-AMM |
| STATE OF ALABAMA and WES ALLEN, in his official capacity as Alabama Secretary of State, | ) ) ) ) ) | |
| *Defendants.* | ) | |

## STATE DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 3

LEGAL STANDARDS ............................................................................................ 6

ARGUMENT .......................................................................................................... 7

   I.   Private Plaintiffs' Shotgun Complaint Should Be Dismissed. ........................ 7

   II.  All Private Plaintiffs Lack Standing. ............................................................. 8

     A.  The private Organizational Plaintiffs lack standing. ................................ 8

     B.  The Individual Plaintiffs lack standing under Article III and the NVRA. 10

   III. The Private Plaintiffs Lack Standing to Sue Marshall and Allen. ................ 14

   IV. The U.S. and the Private Plaintiffs Fail to State an NVRA Claim. .............. 17

     A.  The National Voter Registration Act requires a general removal program and permits other efforts to protect election integrity. .............. 17

     B.  The noncitizen letter process does not violate the 90-day rule. .............. 18

     C.  The noncitizen letter process is "uniform" and "nondiscriminatory." ...... 23

     D.  The noncitizen letter process does not violate the requirement to "ensure" applicants are registered. ......................................................... 25

   V.  Private Plaintiffs Fail to State a Discrimination Claim. .............................. 27

   VI. Private Plaintiffs Fail to State a *Bush v. Gore* Claim. ................................. 29

   VII. Private Plaintiffs Fail to State an *Anderson/Burdick* Claim. ...................... 31

   VIII. Private Plaintiffs Fail to State a VRA §11(b) Claim. ................................. 32

CONCLUSION ..................................................................................................... 35

## INTRODUCTION

Noncitizens are not eligible to vote, but they sometimes do. Alabama Secretary of State Wes Allen wants to deter that conduct. When the federal government did not cooperate, he worked with the Alabama Law Enforcement Agency (ALEA) and the Alabama Department of Labor (ADOL), which regularly interact with noncitizens. He determined that 3,251 individuals who had identified themselves to those agencies as noncitizens also appeared on the State voter rolls. In August 2024, he instructed the Boards of Registrars, who handle voter registration at the county level, to write to those individuals using a letter template he provided. This letter prompted (1) ineligible noncitizens to remove themselves from the rolls and (2) eligible citizens to fill out the voter registration form with their current information.  A September 2024 follow-up letter reiterated the easy process and noted that, eligible citizens  update could on the enclosed form, online, or at the polls on Election Day.[1]

---

[1]     Both letters are referenced in the U.S. complaint, DE1 at ¶¶ 24, 26-29, 31-32, 71, 74-77, and the August letter is referenced in the private Plaintiffs' complaint, *e.g., ACIJ* DE1 ¶¶67, 75-76, 121-22. (All citations to the record are to the *U.S.* case, unless otherwise indicated.)

   The court may consider an exhibit without converting the motion to dismiss into one for summary judgment if it is "(1) central to the plaintiff's claim" and "(2) … the authenticity of the document is not challenged." *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005). Moreover, "documents attached to a complaint or incorporated in the complaint by reference can generally be considered by a federal court in ruling on a motion to dismiss under Rule 12(b)(6)." *Saunders v. Duke*, 766 F.3d 1262, 1270 (11th Cir. 2014). To the extent that the U.S. and the private Plaintiffs attached or incorporated by reference exhibits that "contradict the general and conclusory allegations of the pleading, the exhibits govern." *Griffin Indus. v. Irvin*, 496 F.3d 1189, 1205-06 (11th Cir. 2007).

*The Secretary's process calls for no one to be administratively removed from the voter registration rolls based on the noncitizen letter process until after the 2028 General Election*, more than four years away. Until then, noncitizens should continue voluntarily removing themselves. Citizens who received the noncitizen letters will be able to vote in the 2024 General Election upon completing a simple form (even at the polls) that thousands of Alabamians complete every year.

The U.S. and private Plaintiffs nonetheless filed suit. The U.S. alleges that the noncitizen letter process violates the 90-day bar in the National Voter Registration Act of 1993 (NVRA). However, because *no* administrative removals will happen before the upcoming election, the 90-day bar on removals is not violated.  The private Plaintiffs also bring the 90-day claim, but they add six more claims.  They were not privy to much relevant information, and they have filed a complaint full of panic, speculation, and conclusory allegations. But speculation does not establish standing, and conclusory allegations do not state a claim. Moreover, the private Plaintiffs' complaint is due to be dismissed for its shotgun form as well as on the merits.

Ultimately, both complaints are due to be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim, and the private Plaintiffs' complaint is also due to be dismissed pursuant to Fed. R. Civ. P. 12(b)(1) for lack of jurisdiction.

## BACKGROUND

Absent constitutional amendment, States decide who votes in elections. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 15-17 (2013) (*ITCA*). The Alabama Constitution restricts voting to those who satisfy certain criteria, including age, residence, and citizenship. Ala. Const. art. VIII, §177(a). Alabama applies those same "Qualifications" to voters for a candidate to represent them in the U.S. House of Representatives, U.S. Const. art. I, §2, and in the U.S. Senate, U.S. Const. amend. XVII.[2]  The Constitution has no quarrel with States restricting the franchise to U.S. citizens,[3] and federal law prohibits noncitizens from voting in federal elections, *see, e.g.*, 18 U.S.C. §611. Indeed, the U.S. Attorney is prosecuting a noncitizen who voted in federal elections in Alabama in violation of 28 U.S.C. §1015(f), which makes it *a felony* to "knowingly make[] any false statement or claim that he is a citizen of the United States in order to register to vote or to vote in any Federal, State, or local election." *U.S. v. Francisco*, No. 3:24-cr-00356 (N.D. Ala., pending).

Secretary Allen's noncitizen letter process consists of identifying and corresponding with registered voters who State records show have recently

---

[2] Presidents are chosen by Electors selected by the States. U.S. Const. art. II, § 1.
[3] *See e.g.,* U.S. Const. amend. XIV §2 (reducing representation if certain "citizens of the United States" are denied the right to vote); U.S. Const. amend. XV §1 (referring to the "right of citizens of the United States to vote"); U.S. Const. amend. XIX (similar); U.S. Const. amend. XXIV §1 (similar); U.S. Const. amend. XXVI §1 (similar).

identified themselves as noncitizens. The letters, which were accompanied by a voter registration form and a voter removal form, (1) ask citizens to update their registration and (2) encourage noncitizens to remove themselves. Eligible citizens can easily update their information by submitting the voter registration form mailed to them or completing a voter registration form through any of the normal avenues (including online) by October 21, 2024—more than two months after the Secretary commenced the process on August 13, 2024[4]—*or* by completing a voter reidentification/update form at their polling place on Election Day. Noncitizens can easily remove themselves by completing a one-page voter removal form.[5]

Allegations that the instructions were confusing are conclusory and speculative. *See e.g.,* DE1 ¶¶ 28, 65, 71, 78; *ACIJ* DE1 ¶¶ 75. Moreover, there is nothing unusual about some voters being Inactive. Many individuals are Inactive pursuant to a general program Alabama conducts in compliance with the NVRA. *See* 52 U.S.C. § 20507(a)(4) (NVRA's requirement); Ala. Code § 17-4-30 (revised general program to begin in February 2025); Ala. Act No. 2006-570 § 18 (setting out the program running from January 2021 to early next year).

---

[4] *See* n.1, *supra;* DE1 ¶ 4 (discussing press release); *ACIJ* DE1 ¶ 2 (same); DE11-1 at 109-10 (press release).

[5] *See* n.1, *supra;* DE11-1 at 65-66 (Voter Registration Form); *id.* at 112-20 (emails to Registrars, template letters, and Voter Removal Request); *id.* at 123-24 (Voter's Reidentification/Update Form); *Electronic Voter Registration Application, available at* www.alabamainteractive.org/sos/voter_registration/voterRegistrationWelcome.action (last visited Oct. 2, 2024).

The U.S. is aware that no individuals will be administratively removed from the voter rolls before the 2024 General Election, and no allegations in the U.S. complaint suggest otherwise. DE1, generally. In some parts of their complaint, the private Plaintiffs seem to also appreciate this reality. For instance, they refer to the simple ask to fill out an update form as *constructive removal*. *ACIJ* DE1 ¶¶4, 9, 136. Whatever *constructive removal* means, it appears to be a concession that no voters will actually be removed from the voter rolls—absent discrete self-removal, which is always available under the NVRA, 52 U.S.C. § 20507(a)(3)(A), (c)(2)(B). Properly understood in light of only well-pleaded allegations, the noncitizen letter process is completely lawful.

Secretary Allen shared his list Attorney General Marshall, who is dutybound to enforce a variety of election laws, *see, e.g*., Ala. Code §§17-5-16(d), 17-5-19(d), 17-5-19.1(d), 17-17-24, 17-17-46. Secretary Allen did not ask the Attorney General to prosecute anyone who has *not* violated the law. For his part, the Attorney General said: "*Violations* of state election laws will be prosecuted to the fullest extent of the law." *ACIJ* DE1¶ 119 (emphasis added). He did not commit to—or even suggest he would—prosecute anyone who has *not* violated the law. Additionally, the private Plaintiffs' conclusory allegations that the Attorney General is implementing the noncitizen letter process, *see e.g., ACIJ* DE1 ¶ 4, despite not being an election official, lack any supporting factual allegations.

5

## LEGAL STANDARDS

"To survive a motion to dismiss," brought under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Plaintiffs must plead all facts establishing an entitlement to relief with more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Resnick v. AvMed, Inc.,* 693 F.3d 1317, 1324 (11th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). The "allegations must permit the court based on its 'judicial experience and common sense … to infer more than the mere possibility of misconduct.'" *Kornegay v. Baretta USA Corp.,* 614 F. Supp. 3d 1029, 1033-34 (N.D. Ala. 2022) (quoting *Iqbal,* 556 U.S. at 679).

"A Rule 12(b)(1) motion to dismiss may assert either a factual or facial attack on subject matter jurisdiction. A factual attack challenges "the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered." *Adell v. Macon Cnty. Greyhound Park*, 785 F. Supp. 2d 1226, 1231 (M.D. Ala. 2011) (cleaned up).

6

ARGUMENT

## I.    Private Plaintiffs' Shotgun Complaint Should Be Dismissed.

The private Plaintiffs' complaint, *ACIJ* DE1, "is an incomprehensible shotgun pleading" that "employs a multitude of claims and incorporates by reference all of its factual allegations into each claim, making it nearly impossible for Defendants and the Court to determine with any certainty which factual allegations give rise to which claims." *Jackson v. Bank of Am.*, 898 F.3d 1348, 1356 (11th Cir. 2018). The complaint is more than 60 pages long and contains seven counts, all of which "reallege, as though fully set forth in this paragraph, all the allegations of this Complaint." *ACIJ* DE1 ¶¶140 (p. 52), 140 (p. 53), 144, 148, 159, 165 & 168.  *See Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1321-22 (11th Cir. 2015) (calling such a complaint a "mortal sin").

This tactic results in contradictory and confusing pleadings, including every count at once alleging a systematic removal process, a merely "constructive" removal process, and a process for making voters Inactive. Because a complaint of this kind "patently violates" Rule 8, the Court "should strike the pleading and instruct counsel to replead the case" *Jackson*, 898 F.3d at 1356 (cleaned up), or dismiss, *id.* at 1357 ("we have repeatedly held that a District Court retains authority to dismiss a shotgun pleading on that basis alone").

7

## II.    All Private Plaintiffs Lack Standing.

Private Plaintiffs must show all three elements of standing "for each claim that they press against each defendant, and for each form of relief that they seek." *Murthy v. Missouri*, 144 S. Ct. 1972, 1988 (2024) (cleaned up). Because the private Plaintiffs seek injunctive relief, this showing requires an "imminent" (*id.*) and "substantial risk of future injury that is traceable to the Government defendants and likely to be redressed by an injunction against them," *id.* at 1993.

### A. The private Organizational Plaintiffs lack standing.

An organization can establish standing if (1) the organization itself suffers an Article III injury or (2) one of its members suffers such an injury. None of the advocacy groups here have clearly alleged either form of standing.

**1.** When an organization sues on its own behalf, it must meet the traditional three-part test for standing. *See FDA v. All. for Hippo. Med.*, 602 U.S. 367, 394 (2024). The Organizational Plaintiffs allege only a diversion of resources and an abstract harm to their missions. Neither is enough.

In the past, the Eleventh Circuit has blessed a diversion-of-resources theory of standing. *See, e.g.*, *Florida N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2008); *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009). The Court thought "*Havens* held that an organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its

projects by forcing the organization to divert resources to counteract those illegal acts." *Browning*, 522 F.3d at 1165. But, as the Supreme Court recently explained, that reading of *Havens* is "incorrect." *FDA*, 602 U.S. at 395. Rather than cementing "an expansive theory of standing," *Havens* was an "unusual case" where the plaintiff had standing against the defendant providing false information regarding housing availability because it "operated a housing counseling service" which was "directly" harmed. *Id.* at 395-96. A plaintiff cannot "manufacture its own standing" by spending money to oppose the defendant's action. *See id.* at 394.

The private Organizational Plaintiffs allege a diversion of resources, *ACIJ* DE1¶¶14, 21-22, 27-29, 38-39, but that broad theory no longer suffices for standing, *see FDA*, 602 U.S. at 394; *Ariz. All. for Retired Americans v. Mayes*, No. 22-16490, 2024 WL 4246721, at *2 (9th Cir. Sept. 20, 2024) (explaining how *FDA* limited *Havens*). Nor are their "core business activities" "directly" harmed in a way resembling "a retailer who sues a manufacturer for selling defective goods to the retailer." *FDA*, 602 U.S. at 395. They also allege interference with their missions of, *e.g.*, seeing increasing voter turnout, *ACIJ* DE1¶¶23, 31, 39, but such a "setback" to their "abstract social interests" does not establish a concrete injury. *See FDA*, 602 U.S. at 393-94; *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1250 (11th Cir. 2020).

**2.** The private Organizational Plaintiffs would have standing if one of their "members would have standing to sue in their own right." *S. River Watershed All., Inc. v. Dekalb Cnty.*, 69 F.4th 809, 819 (11th Cir. 2023). Instead of "a statistical probability," an organization needs "specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009); *see Georgia Republican Party v. SEC*, 888 F.3d 1198, 1204 (11th Cir. 2018). Here, the private Organizational Plaintiffs did not identify a member who has standing. Their vague allegations about their members, *ACIJ* DE1 ¶¶24, 33, 41, make it no more than speculative that any one of them faces an "actual and imminent" threat "traceable to the challenged action." *Summers*, 555 U.S. at 498.

**B. The Individual Plaintiffs lack standing under Article III and the NVRA.**

*Article III Standing*. Because there is no plausible allegation that any of the four Individual Plaintiffs will be unable to vote on Election Day (or even need to fill out another form), there is no live controversy.

Two of the four, Carmel Michelle Coe and Emily Jortner, were not among the 3,251 individuals identified in the noncitizen letter process. *ACIJ* DE1¶55, 59. They are both Active voters. *See id.*; *see also* DE11-1 at 29-30. They have no personal stake in other voters, so their only possible source of harm is from the potential that they will be made Inactive in the future.

That alleged harm is highly speculative.  For them to suffer a concrete injury, the Secretary would need to again search for non-citizens, their names would need to come up, the Secretary would need to request they be made Inactive, and the Plaintiffs' Registrars would need to comply. This "highly attenuated chain of possibilities" falls short of the requirement that Plaintiffs face a "certainly impending injury." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). The Secretary has already used his method of finding potential non-citizens and these Plaintiffs weren't made Inactive. And given the small proportion of naturalized citizens who were, *compare ACIJ* DE1¶2 *with ACIJ* DE1¶¶90, 91, there is no reason to believe these two are likely to be made Inactive in the future. *Cf. Corbett v. Transportation Sec. Admin.*, 930 F.3d 1225, 1236 (11th Cir. 2019). That is especially true because the Secretary plans no  further review before the 2024 General Election, and for any future reviews to "involve getting updates of only new persons who have identified themselves to [ALEA or Labor] as noncitizens since the prior data pull"). DE 11-1 at 26-27. Finally, because any injury is not "certainly impending," any harm from Plaintiffs' actions because they fear future harm is not fairly traceable to the State Defendants. *Clapper*, 568 U.S. at 415-18; *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983).

The other two, Roald Hazelhoff and James Stroop, received letters pursuant to the noncitizen letter process, completed a registration form, and became Active

voters on Alabama's voter rolls. DE11-1 at 28-29. If they had cognizable claims upon receiving the letters, they did not by the time they sued. *Compare id. with ACIJ* DE1 (filed Sept. 13, 2024). *See Alvarez v. Smith*, 558 U.S. 87, 92-93 (2009). These plaintiffs cannot be any more Active than they are now, and if they were to receive an injunction ordering them back on the rolls, there would be nothing to do. Thus, an injunction along those lines is not "meaningful relief." *Graham v. Att'y Gen., State of Georgia*, 110 F.4th 1239, 1244 (11th Cir. 2024).

Moreover, obtaining "forward-looking relief" requires "a substantial risk of future injury," *Murthy*, 144 S. Ct. at 1993, but they offer no plausible allegations that either is likely to be inactivated again, *see Lyons*, 461 U.S. at 111 (requiring likelihood that the plaintiff "will again be wronged in a similar way"); *Koziara v. City of Casselberry*, 392 F.3d 1302, 1306 (11th Cir. 2004). The Secretary requested that Registrars make potential non-citizens Inactive until they submitted a form, and these Plaintiffs have done that. *Compare Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014) (plaintiffs removed from 2012 election voter rolls based on suspected non-citizenship had standing to challenge later non-citizen removal program using different criteria). Their fear of an investigation is not an injury-in-fact, *see infra* Part III.A, but the private Plaintiffs' complaint also fails to supply facts making it plausible that an Attorney General investigation of either of these two Plaintiffs is impending at all, much less certainly impending.

*NVRA Standing.* To bring their NVRA claims, private Plaintiffs had to "provide written notice" and then sue only if "the violation is not corrected." 52 U.S.C. §20510(b)(1)-(2). "No standing is … conferred if no proper notice is given, since the [notice] period never runs." *Ga. State Conf. of NAACP v. Kemp*, 841 F.Supp.2d 1320, 1335 (N.D. Ga. 2012). Notice is "mandatory." *Black Voters Matter Fund v. Raffensperger*, 508 F. Supp. 3d 1283, 1293 n.9 (N.D. Ga. 2020).

"All Plaintiffs" purport to bring Counts One, Two, and Three, *ACIJ* DE1 at 52-54, but only the Organizational Plaintiffs provided notice, *see ACIJ* DE1-2; *see also ACIJ* DE1 ¶¶123, 143 (p.51), 143 (p.53). The Individual Plaintiffs cannot "piggyback" on the notice provided by the Organizational Plaintiffs. *Bellitto v. Snipes*, 221 F. Supp. 3d 1354, 1363 (S.D. Fla. 2016); *see also Scott v. Schedler*, 771 F.3d 831, 835 (5th Cir. 2014); *Am. C.R. Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 795 n.10 (W.D. Tex. 2015) (rejecting "attempt[] to take credit for communication sent by third parties"); *Voice of the Exp. v. Ardoin*, 2024 WL 2142991 at *29-31 (M.D. La. May 13, 2024).

This is not a technicality. Each potential plaintiff may be "aggrieved" in different ways. For example, Plaintiff Stroop alleges that he told Labor that he was a noncitizen but later provided a copy of his birth certificate. *ACIJ* DE1 ¶51. This unique situation could have been "corrected," 52 U.S.C. §20510(b)(2), without the drastic demands by the private Organizational Plaintiffs and without litigation.

### III.   The Private Plaintiffs Lack Standing to Sue Marshall and Allen.

**A.** The private Plaintiffs have not alleged plausible facts to show injury-in-fact, traceability, or redressability as to the Attorney General. While the private Plaintiffs' complaint repeats *ad nauseam* that the Secretary of State transmitted the list of 3,251 people to the Attorney General's Office, *ACIJ* DE1 ¶¶2, 10, 46, 54, 55, 59, 61, 69, 70, 118, 146, 161, 164, 170, 173, 174, all they allge that the Attorney General did is tweet:   "Alabama knows how to run elections. Well done by @alasecofstate Wes Allen. BE ADVISED: Violations of state election laws will be prosecuted to the fullest extent of the law."   That does not support standing.

The private Plaintiffs' complaint alleges "an intent to engage in prosecutions pursuant to" the noncitizen letter process. *ACIJ* DE1 ¶61. But that's not a fair reading of the statement, which advises that *violations of law* will be prosecuted. Nothing in the private Plaintiffs' complaint makes plausible the fear that Alabamians will be prosecuted if they do *not* violate the law.

And that's all the private Plaintiffs allege—a generalized and speculative "chilling effect," *ACIJ* DE1 ¶120, which is not an injury-in-fact. "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972). "It is the *reality* of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions." *Lyons*, 461 U.S. at

107 n.8.  Alleged "emotional consequences … simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury." *Id.*

To the extent that individuals change their behavior "based on their fears of hypothetical future harm," they cannot "manufacture standing merely by inflicting harm on themselves." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013); *see also Murthy v. Missouri*, 144 S. Ct. 1972, 1995 (2024). Self-imposed harms, especially those caused by a person's subjective mental state, are not traceable to the Attorney General nor redressable by him.

Any alleged injury from filling out a form is also not traceable to the Attorney General, who has no "responsibility" over the voter registration process and has sovereign immunity against any challenge to it, *Summit Med. Assocs. P.C. v. Pryor*, 180 F.3d 1326, 1341 (11th Cir. 1999). The private Plaintiffs do not allege any specific facts to support their allegation that the Attorney General is implementing the noncitizen letter process.  *See ACIJ* DE1, generally.

Finally, Plaintiffs cannot show redressability as to the Attorney General, who has no power to cure the alleged violations with respect to the noncitizen letter process. The sole relief they seek applicable to the Attorney General—a public commitment not to investigate or prosecute certain people on certain grounds, *ACIJ* DE1 at 65—would not cure the alleged violations of statutory and constitutional law. Further, such an order is unavailable as a matter of equity. There

is no dispute about the validity of any Alabama laws making it unlawful for noncitizens to vote. Hampering the State's ability to enforce those unchallenged laws in the way Plaintiffs propose would plainly violate "normal principles of equity, comity and federalism that should inform the judgment of federal courts when asked to oversee state law enforcement." *Lyons*, 461 U.S. at 112 (citing, *inter alia*, *Rizzo v. Goode*, 423 U.S. 362, 380 (1976)); *see also Seminole Tribe v. Florida*, 11 F.3d 1016, 1028 (11th Cir. 1994), *aff'd*, 517 U.S. 44 (1996) (discussing sovereign immunity over discretionary acts).

**B.** The private Plaintiffs' suit is properly brought against the Registrars alone. To be sure, Secretary Allen began the noncitizen letter process by sending instructions to the Registrars. But he does not *control* the Registrars; they are not his employees, and they are independently appointed. Ala. Code §17-3-2(a); DE11-1 at 27-28. Case in point: the Registrars in Tuscaloosa never made any voters Inactive pursuant to the noncitizen letter process. DE11-1 at 21-22. Because any order to the Secretary may or may not produce a desired result, any claim against him poses serious redressability and sovereign-immunity problems. *Cf. Murthy*, 144 S. Ct. at 1994.[6]

---

[6] *See Jacobson*, 974 F.3d at 1253-58; *Lewis v. Gov. of Ala.*, 944 F.3d 1287 (11th Cir. 2019). While *Jacobson* involved a directly controlling state statute, its analysis of redressability in light of the powers of independent local election officials is analogous. An injunction directed at the Secretary simply cannot guarantee plaintiffs a remedy in a case like this one.

## IV.    The U.S. and the Private Plaintiffs Fail to State an NVRA Claim.

### A.    The National Voter Registration Act requires a general removal program and permits other efforts to protect election integrity.

Congress enacted the National Voter Registration Act of 1993, 52 U.S.C. §§20501 *et seq.*, to encourage registration while "protect[ing] the integrity of the electoral process" and "ensur[ing] that accurate and current voter registration rolls are maintained," 52 U.S.C. §20501(b); *see also Bellitto v. Snipes*, 935 F.3d 1192, 1198 (11th Cir. 2019).

To encourage voter registration, the NVRA requires States to incorporate an opportunity to register to vote into the driver license process, to accept a federal voter registration application by mail, to make voter registration available through designated agencies, and to register eligible applicants in a timely fashion. 52 U.S.C. §§20504, 20505, 20506, 20507.

To promote the accuracy and integrity of voter rolls, the NVRA requires regular list maintenance, including "a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of—(A) the death of the registrant; or (B) a change in the residence of a registrant ...." 52 U.S.C. §20507(a)(4).

Section 20507(d)(2) of the NVRA requires that States removing voters based on a change in residence first provide notice by mail. Registrants "should return the card not later than the time provided for mail registration." *Id.*

17

§20507(d)(2)(A). If the voter fails to return the card, a State may (1) require "affirmation or confirmation of the registrant's address … before the registrant is permitted to vote," *id.* §20507(d)(2)(A), and (2) remove the voter if he or she "has not voted or appeared to vote (and, if necessary, correct the registrar's record…)" in two consecutive general elections for federal office, *id.* §20507(d)(1)(B)(ii).

In compliance with that requirement, Alabama has an on-going general program, *see* Ala. Act No. 2006-570 §18 (setting out the program that began in January 2021 and will conclude early next year), and will begin a new program in February 2025, *see* Ala. Code §17-4-30. The program beginning next year will operate differently, but still in compliance with the NVRA. Both the current and the upcoming general programs involve making certain individuals Inactive.

### B.     The noncitizen letter process does not violate the 90-day rule.

Although every State is required by federal law to conduct a "general program" for list maintenance, the NVRA restricts some systematic removals in the run up to a federal election. The 90-day rule states:

> [A] State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters.

52 U.S.C §20507(c)(2)(A). The provision is designed to "balance" the NVRA's dual purposes, and its rationale is plain: "At most times during the election cycle, … eligible voters who are incorrectly removed have enough time to rectify any

18

errors," but "voters removed days or weeks before Election Day will likely not be able to correct the State's errors in time." *Arcia*, 772 F.3d at 1346. Thus, the NVRA halts systematic removal for 90 days preceding an election, *id.*, except for programs to remove voters (1) at their request, (2) who are ineligible under State law by reason of criminal conviction or mental incapacity, or (3) who have died. *See* 52 U.S.C. §20507(c)(2)(B), *inc'g by ref.* §§20507(a)(3)(A)-(B), 20507(a)(4)(A). Additionally, the NVRA permits targeted "removals based on individualized information at any time." *Arcia*, 772 F.3d at 1346.

**1.** As explained, the noncitizen letter process did make certain registered voters Inactive, but this does not violate the 90-day bar. The Court need look no further than the face of the Section 20507, which requires a "general program … to remove" voters when they pass away or change residence. 52 U.S.C. §20507(a)(4). This is a "program the purpose of which is to systematically remove the names of ineligible voters." *Id.* §20507(c)(2)(A). Under Plaintiffs reading, the State would need to terminate the program before every election. But the NVRA *requires* States to operate the program *through* each cycle.  We know this for at least two reasons.

First, the "period" during which an Inactive voter who fails to update must vote runs from "the date of the notice" through "the second general election for Federal office." *Id.* §20507(d)(1)(B)(ii). By definition, the general program must be ongoing for at least two consecutive years.

Second, under the general program, a voter's status on Election Day is determined by whether he or she has "return[ed] the [notice] card not later than the time provided for mail registration," *id.* §20507(d)(2)(A). In Alabama, that time is fourteen days before the election (*i.e.*, within the 90-day period). So the NVRA contemplates that a voter could be made Inactive mere weeks before an election.

If private Plaintiffs were right that "complete" means no "steps" may be taken during the 90 days, *ACIJ* DE1 ¶141 (p.52), then operating the NVRA's required program would violate the NVRA. This absurdity can be avoided by recognizing that to "complete" a program before an election means to *remove voters* pursuant to such a program; actual removal is what must pause for 90 days.

The State's view is, in fact, how the Eleventh Circuit panel in *Arcia* understood the 90-day rule there. Citing the statute's limitation to "systematic" programs, the Eleventh Circuit explained that the 90-day bar gives "eligible voters *who are incorrectly removed* [] enough time to rectify any errors." 772 F.3d at 1346 (emphasis added). Not only did *Arcia* emphasize the 90-day bar as a bar on *removals*; its rationale about having "enough time" to correct mistakes plainly distinguishes the facts here. Inactive voters among the 3,251 do not need 90 days or even a day "to correct the State's errors," *id.*, because they can vote on Election Day without having taken any prior action—they will be given the update form at the polls. *See ACIJ* DE1 ¶¶9, 133; *ACIJ* DE1-3 at 2; Ala. Code §17-4-9.

That should be the end of Count One, but it is worth dwelling on *Arcia* to see the distinction between that case and this one. The Florida Secretary not only began "a notice and removal process" during the 90 days; "non-citizens continued to be removed from the voter rolls" in the days before an election. *Id.* at 1339. Then, during the next cycle, the Secretary "renewed his efforts to remove non-citizens" and "announced that he would resume the removal" *during* the 90-day period. *Id.* at 1339-40. Thus, the Florida Secretary had removed registered voters pursuant to a systematic program.

Here, in contrast, Secretary Allen's noncitizen letter process does not call for administrative removal of anyone from the voter rolls before the 2024 General Election. The private Plaintiffs' complaint does not identify anyone who has been removed or will be removed.[7] While anyone can request removal at any time, there is zero risk of "State's errors" for which voters need time to rectify. *Arcia*, 772 F.3d at 1346. Every eligible voter among the letter recipients remains eligible to vote.

Plaintiffs invent a concept they call *constructive removal*, which cannot be found in the NVRA.[8] Inactive status is not removal under State or federal law.

---

[7] Although the private Plaintiffs' complaint posits a "program" to "systematically remov[e] voters" "occurring entirely within the [90-day] period," *ACIJ* DE1 ¶142 (p.52), that bare allegation is so conclusory, implausible, and badly contradicted by the private Plaintiffs' complaint itself (*see, e.g.*, *ACIJ* DE1 ¶¶4, 9, 136 (admitting the alleged removal is "constructive")) and by materials attached to it (DE1-3) that it need not be credited. *See supra*.

[8] Courts have "no authority to alter statutory language" and "cannot add to the terms" that Congress adopted. *CBS v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1228 (11th Cir. 2001).

"Removal" is a term of art; it occurs when the "names of ineligible voters" no longer appear on "the official lists of eligible voters." 52 U.S.C §20507(c)(2)(A).[9] Inactive voters, in contrast, still appear on the voter rolls and can vote on Election Day, once they update. *See* Ala. Code §17-4-9;  Ala. Act No. 2006-570 at §18. Plaintiffs appear to admit this crucial fact. *ACIJ* DE1 ¶¶9, 133.[10] While Inactive status can be a "path toward removal," *ACIJ* DE1 ¶136, until the path is completed, the Inactive voter has more in common with an Active voter than someone who has been removed because Active and Inactive voters can vote on Election Day. The mere operation of a process that ultimately results in removals cannot violate the 90-day bar; else, the NVRA-required 2-year path to removal would itself violate the NVRA, as discussed above. The 90-day bar claims should be dismissed.[11]

**2.** The complaints also fail to allege facts to show "systematic[]" removal. 52 U.S.C §20507(c)(2)(A). *Arcia* allows "individualized removals" after

---

[9] In Section 20507, the word "remove" is used exclusively alongside phrases like "from the official list of eligible voters." *Id.* §§20507(a)(3), (a)(4), (b)(2), (c)(2)(B)(i), (d)(1), (d)(2)(A), (f).

[10] The claim that Alabama is somehow "requiring voters to re-*register*" is another distortion. *ACIJ* DE1 ¶9; *see also ACIJ* DE1 ¶131. Inactive voters are legally registered under State law; their names appear on the list of registered voters. They may vote on Election Day by completing an update form (not a registration form) at the polls, and by that time, registration will have been closed for two weeks. If by "registration" Plaintiffs mean asking for *any* information is tantamount to removal, the result is absurd. Asking for a photo ID is not tantamount to removal, and neither is requiring an update.

[11] The private Organizational Plaintiffs noticed alleged violations based on their assumption that Alabama was "systematically remov[ing] voters from the rolls within 90 days of an election." DE1-2 at 2 (capitalization altered). Every paragraph in the letter's 90-day argument referred to removals or systematic removals, *id.* at 2-4. Now, their theory has shifted, but notice for every claim is mandatory. *See Bellitto v. Snipes*, 268 F. Supp. 3d 1328, 1332-33 (S.D. Fla. 2017).

"individual correspondence." 772 F.3d at 1346. Here, the only removals happening as a result of the noncitizen letter process are those at the request of the voter, which are always permitted, 52 U.S.C. §20507(a)(3)(a); *id.* §20507(c)(2).

**3.** Alternatively, the State is constitutionally empowered to remove people who are categorically ineligible to vote at any time. The NVRA expressly accommodated this power by permitting individual or systematic removals of felons and the deceased during the 90-days period, and the same should be the case for noncitizens; accordingly, the State Defendants also preserve for appeal the argument that *Arcia* was wrongly decided and should have interpreted the NVRA to avoid unconstitutionality. The State's "power to establish voting requirements is of little value without the power to enforce those requirements," and in particular, "it would raise serious constitutional doubts if [the NVRA] precluded a State from" being able "to enforce its voter qualifications." *ITCA*, 570 U.S. at 17.

### C.  The noncitizen letter process is "uniform" and "nondiscriminatory."

An "activity to protect [election] integrity" must be "uniform, nondiscriminatory, and in compliance with the [VRA]." 52 U.S.C. §20507(b)(1). The noncitizen letter process complies. As an initial matter, the private Plaintiff's Count Two exemplifies the shotgun-pleading problem: The violation is stated in two sentences, *ACIJ* DE1 ¶142 (p.53); it is impossible to know which allegations support the claim.

As to uniformity, there is no allegation that the noncitizen letter process did not apply the same criteria across the State. Secretary Allen communicated with Registrars in every county. *E.g.*, *ACIJ* DE1 ¶¶60, 67. The August 13 press release explained that the letter process was an effort to "examine[] the current voter file … to identify anyone" who may be a noncitizen. *ACIJ* DE1 ¶65.

The fact that only a fraction of voters received letters makes no difference. Of course, any real effort to confirm eligibility will not "burden[]" every person on the roll equally. *ACIJ* DE1 ¶142. In a recent case, Ohio "thought that nonvoting for two years was sufficiently correlated with a change of residence to justify sending a return card." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 776 (2018). Despite serious scrutiny under the NVRA, there was no suggestion that Ohio's program, ultimately enforced against a subset of voters, somehow failed to be "uniform." *Id.*; *see also Bell v. Marinko*, 367 F. 3d 588, 592-93 (6th Cir. 2004).

As to nondiscrimination, Count Two asserts without elaboration that the letter process (1) "targets and disproportionately burdens naturalized citizens" and (2) "is designed to affect only naturalized … citizens." *ACIJ* DE1 ¶142 (p. 53). The allegations and theory behind Plaintiffs' discrimination charge are discussed fully below with respect to Count Four. But the NVRA discrimination claim should fail for the additional reason that States by default have the constitutional power to enforce their qualifications to vote, including citizenship. An interpretation of the

NVRA that countenances claims based on "disproportionate[] burdens" should be rejected as a matter of constitutional avoidance. *ITCA*, 570 U.S. at 17.

**D.    The noncitizen letter process does not violate the requirement to "ensure" applicants are registered.**

States must "ensure that any eligible applicant is registered to vote in an election." 52 U.S.C. §20507(a)(1). Despite the allegations of the private Plaintiffs, this provision is not relevant here. What Section 20507(a)(1) proscribes are "restrictions that would permit denial of an application that otherwise satisfies" the NVRA. *Charles H. Wesley Educ. Found. v. Cox*, 324 F. Supp. 2d 1358, 1367 (N.D. Ga. Jul. 1, 2004), *aff'd*, 408 F.3d 1349; *Bellito v. Snipes* 935 F.3d 1192, 1201 (11th Cir. 2019). The letter process does not result in the denial of anyone's application to register to vote. Indeed, Plaintiffs concede (*e.g.*, *ACIJ* DE1 ¶100) that the Secretary identified the letter recipients based on their presence on the official list of registered voters.

Private Plaintiffs further allege that any removal pursuant to "self-requests under the [Process] are not free and voluntary requests for removal." *ACIJ* DE1 ¶146. Their allegation is entirely conclusory and speculative. Instead of well-pled facts, private Plaintiffs advance an idiosyncratic and implausible misreading of the letters—the idea that they "direct all recipients" to remove themselves, *id.*, despite the paragraph directing eligible citizens to submit an enclosed voter registration form. The only two Plaintiffs who received the letter did not misread it the way

Plaintiffs suggest they would. Moreover, Plaintiffs concede that eligible voters have the option "to complete an additional process" (*i.e.*, update) and vote; their choice is not forced in any way. *ACIJ* DE1 ¶147. Nor has the Attorney General threatened anyone by saying that *violations* of the law will be prosecuted.

Third, "free and voluntary" are not conditions found in the statute. The NVRA permits removal "at the request of the registrant" at any time. 52 U.S.C. §20507(a)(3)(a); *id.* §20507(c)(2). If there were an allegation someone who did *not* request removal was removed, that might violate the statute in other ways, but it would not violate the requirement to "ensure" applicants become registered.

Finally, Plaintiffs allege that the State has required "an additional process" for certain voters, *ACIJ* DE1 ¶147, but that is the inevitable result of any voter list maintenance program or election integrity measure contemplated by the NVRA. For instance, a voter to whom a mailed notice is returned as undeliverable might become Inactive and need to update his or her address. This is not a violation of the "ensure" provision. States must retain "considerable leeway" to verify and enforce qualifications to vote. *Teel v. Darnell*, No. 1:07-CV-271, 2008 WL 474185, at *7 (E.D. Tenn. Feb. 20, 2008) (quoting *Clements v. Fashing*, 457 U.S. 957, 962-63 (1982)).

### V.   Private Plaintiffs Fail to State a Discrimination Claim.

Count Four alleges "discrimination based on naturalized citizenship and on national origin," *ACIJ* DE1 ¶150, but the alleged facts suggest nothing of the sort. Plaintiffs admit that the "sole criterion" for inclusion in the letter process was whether a registered voter had self-identified as a noncitizen to Alabama agencies. *E.g. ACIJ* DE1 ¶100. This criterion does not facially discriminate against a protected class. And it is a "more likely explanation[]" for the official act than discrimination, warranting dismissal under Rule 12(b)(6). *Iqbal*, 556 U.S. at 681.

Count Four relies on highly conclusory recitations of the elements of an Equal Protection claim.  Even if Count Four were well pleaded, it must be dismissed as a matter of law. In *Geduldig v. Aiello*, the Supreme Court held that a classification based on pregnancy did not discriminate against women even though only women can become pregnant. 417 U.S. 484, 496 n.20 (1974). Likewise here, classification based on self-identification as a noncitizen does not discriminate against naturalized citizens *even if* only naturalized citizens had self-identified as noncitizens. The question is whether the classification is based on protected status, and neither pregnancy nor having-identified-as-a-noncitizen is a protected status under the Supreme Court's Equal Protection jurisprudence.

Further, Plaintiffs have no allegations that, if proven, would amount to direct evidence of discriminatory purpose—an integral element of their claim.  *GBM v.*

*Sec'y of State of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021) ("If Plaintiffs are unable to establish both intent *and* effect, their constitutional claims fail."). The bare allegation that the letter process targets naturalized citizens is not enough and at odds with the undisputed (and valid) goal of the letter process to identify *noncitizens*. The mere fact that such process affects some naturalized citizens is not remotely indicative of invidious discrimination. *See id.* at 1327-28. Plaintiffs may disagree with the efficacy or wisdom of the State's policy choices, but that does not "support an inference of discrimination." *Cf. League of Women Voters v. Fla. Sec'y of State*, 66 F.4th 905, 931 (11th Cir. 2023) (cleaned up). To the extent that Count Four relies on a "long history" dating to 1893, DE1 ¶138, the "original sin" theory of equal protection is a nonstarter. *League of Women Voters*, 66 F.4th at 922-24; *cf. Alexander v. S.C. Conf. of NAACP*, 144 S. Ct. 1221, 1236 (2024) (presumption of good faith).

Finally, even if the private Plaintiffs were right that some form of heightened scrutiny applies, Count Four should be dismissed because it identifies no more narrowly tailored means of achieving the State's compelling interest. Not only is election integrity on its own an "indisputably … compelling interest," *Alabama State Conf. of NAACP v. Marshall*, No. 224-cv-00420, 2024 WL 3893426 at *1 (N.D. AL. Aug. 21, 2024), the State's "historical power to exclude aliens ... is part of the sovereign's obligation to preserve the basic conception of a political

community." *Bluman v. FEC*, 800 F. Supp. 2d 281, 287-88 (D.D.C. 2011), *aff'd*, 565 U.S. 1104 (2012). Because of the "special significance of citizenship," the State has a "compelling interest" and "wider latitude in limiting the participation of noncitizens." *Id.* The private Plaintiffs have no allegation as to how the letter process could have been better tailored to advance the State's interests.

## VI.    Private Plaintiffs Fail to State a *Bush v. Gore* Claim.

The crux of the private Plaintiffs' Count Five is the allegation that "similarly situated" voters are being "treated differently." *ACIJ* DE1 ¶161. "This 'equal right to vote' is not absolute," however, because "the States have the power to impose voter qualifications and to regulate access to the franchise." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972) (citation omitted); *see also Oregon v. Mitchell*, 400 U.S. 112, 144 (1970); *Carrington v. Rash*, 380 U.S. 89, 91 (1965). Inevitably, voters have differing experiences. For example, some may need to acquire photo ID or update their addresses. But these differences do not violate the Constitution, even if they subject a known class of voters to extra burdens. Being "subject to [some] process" to which others "are not subject" is not enough. *ACIJ* DE1 ¶161.

First, in this context, the alleged burden on a class of voters must rise to such a level that it denies the right to vote "by a debasement or dilution of the weight of a citizen's vote." *Bush v. Gore*, 531 U.S. 98, 105 (2000). A State may not "value one person's vote over that of another." *Id.* Aside from the fact that the private

Plaintiffs premise their cause of action on four words from an opinion decidedly "limited to the present circumstances," *id.* at 109, they have not come close to alleging that Alabama has devalued any citizen's vote. *At most*, Plaintiffs have alleged that certain voters must fill out a form, *ACIJ* DE1 ¶161, which in no way dilutes or diminishes the weight of their votes relative to those of other voters. This case is a far cry from "residency requirements [that] *completely bar from voting* all residents not meeting the fixed durational standards." *Blumstein*, 405 U.S. at 336 (emphasis added); *cf. Bush*, 531 U.S. at 106 (citing "unequal evaluation of ballots" across jurisdictions due to "different standard[s] in defining a legal vote"); *Friedman v. Snipes* 345 F. Supp 2d 1356, 1381 (S.D. Fla. Nov. 9, 2004); *Curling v. Raffensperger*, 403 F. Supp. 3d 1311, 1343 (N.D. Ga. 2019) (sustaining claim that electronic voting system plausibly "put[] [plaintiffs] at imminent risk of deprivation of their fundamental right to cast an effective vote (i.e., a vote that is accurately counted)"); *id.* at 1336 (citing "alteration of ballots" and "dilut[ion] by ballot box stuffing" as illustrative violations of equal protection). The private Plaintiffs have not plausibly alleged that a vote will count for more or less depending on one's appearance on the list of 3,251.

Second, neither of the proposed comparison classes is similarly situated. As Plaintiffs admit, the list of 3,251 was compiled based on registered voters who were matched to persons who had previously provided the State with information

suggesting noncitizenship. Voters who have not given the State reason to doubt their eligibility are not "similarly situated." *ACIJ* DE1 ¶161. Likewise, the allegation that registered voters "on Alabama's ordinary inactive list" are treated differently (*id.*) is without support. All Inactive voters in Alabama can become Active in the exact same ways. Without an adequate comparator class, this equal protection claim fails as a matter of law.

## VII.   Private Plaintiffs Fail to State an *Anderson/Burdick* Claim.

"A court evaluating a constitutional challenge to an election regulation [must] weigh the asserted injury to the right to vote against the precise interests put forward by the State as justifications for the burden imposed by its rule." *Crawford v. Marion Cnty. Election Bd.,* 533 U.S. 181, 190 (2008). An "evenhanded restriction that protects the integrity and reliability of the electoral process itself" is neither unlawful nor invidious. *Id.* (quoting *Anderson v. Celebrezze,* 460 U.S. 780, 788 (1983)). A burden "must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Id.* at 191 (cleaned up). If the burden is a "reasonable, nondiscriminatory restriction[]," not a "severe burden," then the law survives if "important regulatory interests" are "generally sufficient to justify [it]." *Burdick v. Takushi,* 504 U.S. 428, 434 (1992); *see also New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020) ("When the alleged burdens are not severe, a compelling state interest is not required.").

The slight burden imposed by noncitizen letter process is reasonable, and it serves important regulatory interests. Voters made Inactive pursuant to the letter process can update their information by completing a voter registration form, including online, by the voter registration deadline or by completing an update form at the polls on Election Day. These forms are the same ones completed by thousands upon thousands of voters every year. Any burden is slight; the private Plaintiffs offer the conclusion that the process is "burdensome" without pleading specific factual content to render that allegation plausible.   Indeed, the private Plaintiffs cannot state a claim in light of the constitutionality of Alabama's voter ID requirements. The State is well within its powers to ask voters for identification, which a voter must complete some paperwork to acquire. *See, e.g.*, *GBM*, 992 F.3d at 1319-20; *see also Crawford,* 553 U.S. 181 (upholding voter ID law against burdensomeness claim). It follows States can ask voters to complete a simple and familiar form without unduly burdening the right to vote.[12]

### VIII.  Private Plaintiffs Fail to State a VRA §11(b) Claim.

**A.** Section 11(b) of the Voting Rights Act (VRA) is not privately enforceable because it does not create "new individual rights" "in clear and unambiguous

---

[12] Even if Plaintiffs have plausibly alleged a severe burden, the letter process should still survive because it is "narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 428. It is difficult to fathom a lesser burden than completing a form at the polls, and Plaintiffs have not identified one. They call the process "arbitrary" but offer no more narrowly tailored means by which the compelling State interest could be vindicated.

terms." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 286, 290 (2002). Thus, "there is no basis for a private suit" under §11(b) directly or under §1983. *Id.* at 286. The critical question is "whether Congress *intended to create a federal right*," *id.* at 283, which requires analysis of "the text and structure," *31 Foster Child. v. Bush*, 329 F.3d 1255, 1270 (11th Cir. 2003). If there is "some indication that Congress may have intended to create individual rights, and some indication it may not have, that means Congress has not spoken with the requisite 'clear voice.'" *Id.*

Here, the text, structure, and history provide at least "some indication" that Section 11(b) creates no new private right. *See Schilling v. Washburne*, 592 F. Supp. 3d 492, 498-99 (W.D. Va. 2022) (dismissing on such grounds). In the words of its preamble, the VRA was enacted "to enforce" extant rights guaranteed by "the fifteenth amendment." 79 Stat. 437. The text places enforcement solely in the hands of the U.S. Attorney General, *see* 52 U.S.C. §10308(d), suggesting "a congressional intent to avoid the multiple interpretations … that might arise if the act created enforceable individual rights." *31 Foster Child.*, 329 F.3d at 1270. And the text focuses on the conduct prohibited and the party regulated, *see* 52 U.S.C. §10307(b) ("No person … shall intimidate …."). "It is a general proscription of [intimidation], not a grant of a right to any identifiable class." *Ark. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204, 1209 (8th Cir. 2023) (cleaned up). Any "[a]mbiguity precludes enforceable rights." *Id.*

33

**B.** Plaintiffs fail to state a claim that Secretary Allen or Attorney General Marshall is "intimidating, threatening, or coercing … any person for voting or attempting to vote[,]" DE1 ¶169, or that either official is attempting to do so.

First, the private Plaintiffs' reading of Section 10307(b) to prohibit a law enforcement official from saying he will enforce valid laws is absurd. Subsection (a) is about ensuring eligible voters can vote. Subsection (c) establishes penalties for falsely establishing eligibility to vote, while Subsections (d) and (e) establish more election crimes. There is no prohibition on enforcing election crimes nestled in the middle of Section 10307. Section 10307(b) is about not intimidating, threatening, or coercing *eligible* voters; it is not about telling ineligible voters to stay away from the polls.

Enforcing the law is what the Attorney General does. Consistent with principles of federalism and sovereign immunity, Section 10307(b)  should not be lightly interpreted to preempt the exercise of law enforcement powers—an arena traditionally left to State control. *See, e.g.*, *U.S. v. McLeod* 384 F.2d 734, 744 (5th Cir. 1967) (no violation stemming from otherwise valid law enforcement with "incidental[] … intimidating effect"); *cf. Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976). Plaintiffs cannot get a prophylactic injunction against the routine

enforcement of non-controversial election laws.[13]

Moreover, Plaintiffs' allegations are conclusory and speculative, not factual. Paragraph 174 asserts that "the letters intimidate and coerce recipients." Paragraph 177 claims that the Secretary of State's and Attorney General's "statements and conduct are intimidating" because some "worry that they are included on the [list of 3,251] or will be included" in the future. These allegations just recite the statutory text. The words "intimidate," "threaten," and "coerce" imply (1) the threat of injury for voting and (2) an intent to deter the exercise of voting rights. *Fair Fight Inc. v. True the Vote*, 710 F. Supp. 3d 1237, 1283 (N.D. Ga. 2024); *cf. Ariz. All. for Retired Americans v. Clean Elections U.S.A.,* 638 F.Supp.3d 1033, 1041 (D. Ariz. Oct. 28, 2022), *vacated*, 2023 WL 1097766 (9th Cir. 2023). There is no well-pled factual allegation here that any *eligible* citizen will face reprisal for voting, and the private Plaintiffs have made no effort to explain why this Court should superintend the State's chief law enforcement officer when it comes to the enforcement of a clearly valid law.

## CONCLUSION

The complaints should be dismissed.

---

[13] Further, Section 1983 is concerned with "the misuse of power." *Lindke v. Freed*, 601 U.S. 187, 199 (2024). Plaintiffs cannot state any 1983 claim without identifying specific "illegal conduct of the defendant." *See, e.g.*, *Barber v. Charter Twp. of Springfield*, 31 F.4th 382, 389-90 (6th Cir. 2022). Anxiety from the mundane statement that violations of law will be prosecuted is not enough; if it were, this theory of VRA liability would be limitless.

*Respectfully Submitted,*

Steve Marshall
  *Attorney General*

/s/ Robert M. Overing
James W. Davis (ASB-4063-I58J)
  *Deputy Attorneys General*
Robert M. Overing (ASB-8736-M14Q)
  *Deputy Solicitor General*
Misty S. Fairbanks Messick (ASB-1813-T71F)
Scott Woodard (ASB-1001-F94C)
  *Assistant Attorneys General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 3538400
Jim.Davis@AlabamaAG.gov
Robert.Overing@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov
Scott.Woodard@AlabamaAG.gov

**Counsel for the State Defendants**