

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| ALABAMA COALITION FOR IMMIGRANT JUSTICE, *et al.*, | ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | Case No.: 2:24-cv-01254-AMM |
| WES ALLEN, in his official capacity as Alabama Secretary of State, *et al.*, | ) ) ) ) ) | |
| *Defendants*. | ) | |
| | | |
| UNITED STATES OF AMERICA, | ) ) | |
| *Plaintiff*, | ) ) | |
| v. | ) ) | Case No.: 2:24-cv-01329-AMM |
| STATE OF ALABAMA and WES ALLEN, in his official capacity as Alabama Secretary of State, | ) ) ) ) ) | |
| *Defendants*. | ) ) | |

**STATE DEFENDANTS' RESPONSE IN OPPOSITION TO
ACIJ'S MOTION FOR PRELIMINARY INJUNCTION**

TABLE OF CONTENTS

INTRODUCTION...................................................................................................1

I.   Background ...............................................................................................3

II.  Legal Standard ........................................................................................9

III. Argument................................................................................................10

 A. Private Plaintiffs are not likely to succeed because they lack standing. .......10

 B. Private Plaintiffs are not entitled to a preliminary injunction based on the
    alleged violation of the 90-day bar (Count One)..........................................11

 C. Private Plaintiffs are not entitled to a preliminary injunction based on
    alleged discrimination (Counts Two and Four). ...........................................16

 D. Private Plaintiffs have not shown a substantial risk of immediate and
    irreparable harm.........................................................................................19

 E. The balance of equities favors the State Defendants....................................23

 F. The motion demands remedies of improper scope........................................28

CONCLUSION .................................................................................................30

## INTRODUCTION

The private Plaintiffs misunderstood Secretary Allen's August 13 press release, thinking he was announcing an "untimely systematic voter purge targeting naturalized citizens." *ACIJ* DE1-2 at 9. They were just wrong about the nature of the process, which they said would "immediately inactivate … and remove" thousands of naturalized citizens. *Id.* at 2. There's a world of difference between that accusation and the reality hidden by the ellipsis: Secretary Allen instructed registrars to "inactivate and *initiate steps necessary to* remove all individuals who are not United States Citizens." *ACIJ* DE1-1 at 2 (emphasis added).

In response to their pre-suit notice letter, the Secretary's office explained:

> None of the 3,251 registered voters addressed in recent media coverage have been removed or purged from Alabama's voter rolls as a result of data associating a noncitizen identification number with their voter registration record. … Individuals on the list who do not self-remove and are otherwise eligible may still cast a regular ballot in the upcoming general election on November 5, 2024, simply by completing an update form.

*ACIJ* DE1-3 at 3. Reality should have led the private Plaintiffs to reconsider. But they doubled down on their "purge" narrative and filed this sprawling suit a week later. They are now stuck in the awkward position of asking for extraordinary relief on the basis that some *registered voters*, who have *not been removed* from the rolls and who *can show up and vote* on November 5, are nonetheless *constructively removed*. This is not a federal emergency. It is not even a violation of federal law.

1

The private Plaintiffs will not show a violation of the 90-day bar, which generally prevents States from systematically *removing* voters before a federal election. *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1346 (11th Cir. 2014). The expansive and novel view that States must cease taking "any steps" pursuant to "any program" would render unlawful the general program *required* by the NVRA.

Nor are Plaintiffs likely to show the kind of purposeful and invidious discrimination that violates federal law. The State did not draw lines based on a protected class, and there is no evidence of discriminatory intent. The noncitizen letter process was designed to protect election integrity.

While it is true that the right to vote is fundamental, the private Plaintiffs cannot show a substantial risk of immediate and irreparable harm because the noncitizen letter process does not prevent any eligible citizen from voting in the 2024 General Election. *See* Declaration of Clay Helms at ¶¶40, 47-38, 65, 71-79 (DE11-1 / *ACIJ* DE48-1) (Helms Decl.). Any Inactive voter can show up on Election Day, complete an update form, and vote. The equities thus favor the State, which has strong sovereign and constitutional interests in election integrity.

Lastly, the motion seeks improper statewide relief for thousands of nonparties. It is a fundamental rule of remedies that the Court ought not award injunctive relief beyond that necessary to give complete relief to *plaintiffs* for the violation that caused the *plaintiff's* injuries.

## I.    Background

**A.** Secretary Allen has made election integrity a priority of his tenure in office. Helms Decl. ¶15. There are nearly four million registered voters in Alabama. It happens that some registered voters are not eligible to vote. In 2023, for example, the Secretary assisted federal, state, and local law enforcement with the arrest and prosecution of three noncitizens for voter fraud. *Id.* ¶¶90-91. The U.S. attorney's office in Birmingham is currently prosecuting a noncitizen for unlawfully voting in multiple elections. *Id.* ¶¶ 92-95. This past July, a man contacted a Registrar in Colbert County asking to be removed from the rolls in advance of becoming a citizen; he had registered by hand in 2008 and voted in the 2020 General Election. *Id.* ¶61 (citing Ex. 27). These problems are not limited to Alabama.[1]

**B.** Among other efforts, Secretary Allen has made repeated attempts to collaborate with the federal government on the issue of noncitizen voting. He first contacted U.S. Citizenship and Immigration Services (USCIS) in October 2023 to request a list of legal noncitizens known to the agency to be residents of Alabama.

---

[1] *See, e.g.*, Office of Va. Governor, *Executive Order Number Thirty-Five (2024): Comprehensive Election Security Protecting Legal Voters and Accurate Counting*, perma.cc/7YZ2-DD48; *Secretary LaRose Refers Evidence of Non-Citizen Voter Registrations to Ohio Attorney General for Potential Prosecution*, Press Release (Aug. 21, 2024), www.ohiosos.gov/media-center/press-releases/2024/2024-08-21/; *see also, e.g.*, Jesse T. Richman et al., *Do non-citizens vote in U.S. elections?*, 36 ELECTORAL STUDIES 149, 153 (2014) (discussing how fraud can affect close elections); James D. Agresti, *Study: 10% to 27% of Non-Citizens are Illegally Registered to Vote*, JUST FACTS (May 13, 2024), www.justfacts.com/news_non-citizen_voter_registration.

Helms Decl. ¶17. He never received a response to that letter, so he wrote the agency headquarters, which rejected his request. *Id.* ¶¶18-20. Months of correspondence and meetings with various personnel and components of the Executive Branch bore little fruit. *Id.* ¶¶22, 25-37. On July 10, 2024, USCIS staff suggested the possibility of sharing citizenship information pursuant to a Memorandum of Agreement with Alabama—an arrangement the agency had with other States. *Id.* ¶35. Within a week, Secretary Allen tendered a concrete proposal to USCIS. *Id.* ¶36. The agency never responded. *Id.* ¶37.

**C.** Undeterred, Secretary Allen developed the noncitizen letter process based on citizenship information already in the State's possession. Helms Decl. ¶¶38-45. Certain registered voters on the official rolls had either "(1) identified himself/herself as a noncitizen to obtain a foreign national driver license in the State of Alabama or (2) marked that he/she was a noncitizen to apply for unemployment benefits with the Alabama Department of Labor." *Id.* ¶41. Consequently, the Secretary's Director of Elections Jeff Elrod "instructed the Registrars to contact these 3,251 individuals." *Id.* ¶42. The Director's template letter would have Registrars ask recipients who are not U.S. citizens to request removal from the voter rolls and recipients who are U.S. citizens and otherwise eligible to vote to complete a voter registration form. *Id.* ¶45.

At the same time, the Registrars were instructed to change the status of individuals on the list within their respective jurisdictions to Inactive. *See* Helms Decl. ¶¶44, 46, 47 (citing Exs. 17, 18). Alabama's voter registration list includes Active and Inactive voters. Helms Decl. ¶85.  Both can vote on Election Day.  *Id.* Inactive voters simply need to complete a reidentification/update form at the polls (or a voter registration form before the deadline). *Id.* This is a longstanding reality. *See* Ala. Code §17-4-9 ("Once on the inactive list, the voter shall reidentify with the local board of registrars in order to again have his or her name placed on the active voter registration list. Notwithstanding the foregoing, if a voter on the inactive list goes to his or her polling place to vote on an election day and identifies himself or herself to the election official responsible for the voter registration list update, such voter shall be permitted to vote provided the voter completes a voter reidentification form."); *accord* Helms Decl. ¶19 (explaining how to become Active); *ACIJ* DE1-3 at 3 (explaining the same in letter to private Organizational Plaintiffs). Moreover, what Alabama calls Inactive is expressly contemplated by the NVRA. *See* 52 U.S.C. §20507(d)(2)(A) (providing that voters who fail to return a notice by the registration deadline may be required to submit an "affirmation or confirmation … before the registrant is permitted to vote").

On September 18, 2024, Director Elrod sent a follow-up email to the Boards of Registrars. Helms Decl. ¶¶46-48. The email explained that "there are now 2,428

voters of the initial group that are inactive." *Id.* ¶46 (quoting Ex. 19). For those 2,428 individuals, Director Elrod included a new letter template, which reiterated that recipients who are not U.S. citizens should request removal, while recipients who are U.S. citizens and otherwise eligible to vote should complete a voter registration form or otherwise update their registration. *Id.* ¶48. The letter template further explained that recipients who do not update their voter registration or vote in the 2024 General Election "will be placed on a path to be removed from the voter list in four years, following the 2028 General Election." *Id.* ¶47 (quoting Ex. 19). At any time during those four years, the letter continued, recipients "can complete a State of Alabama Voter Registration Form …, or the Federal Voter Registration Form or … an update form at the polls on any Election Day and your voter registration status will be updated to 'Active.'" *Id.* (quoting Ex. 19); *accord* Ala. Code §17-4-9.

Among the original group of 3,251 letter recipients, about 100 have self-removed. Helms Decl. ¶¶56-57. Some individuals were apparently registered in error; for example, there were registered voters, the Secretary's office learned, who had completed a driver license form but *not* the voter registration portion, yet were registered anyway. *Id.* ¶60 (citing Ex. 26).  Four such individuals have self removed. *Id.*

At least three individuals specifically wrote notes on their forms indicating that they are not citizens. Helms Decl. ¶58 (citing Ex. 24). A fourth person wrote a letter to the Jefferson County Registrar explaining that he never registered in the first place. *Id.* ¶59. He asked if the Secretary would "open an intensive investigation into this matter." *Id.* (quoting Ex. 25).

As of this past week, 902 of the original letter recipients are Active voters. Helms Decl. ¶62. Secretary Allen has no plan to expand or renew the noncitizen letter process in advance of the November 2024 General Election. *Id.* ¶¶65-67.

**D.** Meanwhile, on August 19, 2024, representatives from the Alabama Coalition for Immigrant Justice, League of Women Voters of Alabama, Alabama State Conference of the NAACP, and other groups had sent a letter alleging violations of the National Voter Registration Act of 1993 (NVRA). Their letter came six days after Secretary Allen's press release about the noncitizen letter process. Among other things, the letter charged that "Alabama cannot systematically remove voters from the rolls within 90 days of an election." *ACIJ* DE1-2 at 2 (capitalization altered).

The private Organizational Plaintiffs' letter was premised on a mistake, which the Secretary explained in response. *See ACIJ* DE1-3. Alabama is *not* systematically removing voters before the election, and eligible voters on the list

7

"may still cast a regular ballot in the upcoming general election … simply by competing an update form" at their "polling place on election day." *Id.*

On September 13, 2024, some of organizations who sent the NVRA notice letter brought the instant suit, joined by four individual plaintiffs—Roald Hazelhoff, James Stroop, Carmel Michelle Coe, and Emily Jortner. *See ACIJ* DE1.

All four private individual plaintiffs are Active voters on Alabama's official voter registration list. According to his declaration, James Stroop checked a box identifying himself as a noncitizen when he applied for unemployment compensation in 2021. *ACIJ* DE23-25 ¶11. He received a noncitizen letter from his Registrar and then completed a voter registration application online. *ACIJ* DE23-25 ¶16. Plaintiff Stroop was made Active on August 27, 2024. Helms Decl. ¶73. According to his declaration, Roald Hazelhoff also received a letter from his Registrar and then completed a voter registration form. *ACIJ* DE23-22 ¶¶13-14. Plaintiff Hazelhoff was made Active on September 6, 2024. Helms Decl. ¶71. Plaintiffs Coe and Jortner were not on the list of 3,251, remain Active voters, and, if otherwise eligible, may vote without taking any additional action before or on Election Day.

On September 23, 2024, the private Plaintiffs moved for preliminary injunctive relief, requesting, *inter alia*, an order that Secretary Allen rescind his Press Release, instruct all Registrars to make all 3,251 individuals Active and

registered voters (unless those voters have "provided affirmative evidence of noncitizen status"), publicize that all 3,251 individuals are Active and registered voters and will not be investigated or prosecuted; an order that the four Registrars sued "ensure" the four Individual Plaintiffs may vote "without impediment" in the upcoming election; and an order that Attorney General Marshall "cease criminal investigations" based on the list of 3,251 individuals.

## II.     Legal Standard

A preliminary injunction is an "extraordinary and drastic" remedy never awarded as of right. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). Movants must show (1) a substantial likelihood of success on the merits, (2) a likelihood of suffering irreparable injury without the injunction, (3) that the threatened injury outweighs the harm the injunction would cause the State, and (4) that the injunction would not be adverse to the public interest. *See Winter v. NRDC*, 555 U.S. 7, 24 (2008).

Movants seeking a preliminary injunction bear both the burden of proof and the burden of persuasion. *See, e.g.*, *Nnadi v. Richter*, 976 F.2d 682, 690 (11th Cir. 1992). They must satisfy their burdens on all four elements "by a clear showing." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (per curiam).

Even if the movants satisfy the four-factor test, the Court must determine the proper remedy and scope of relief. *Alley v. U.S. Dep't of Health & Hum. Servs.*,

590 F.3d 1195, 1205 (11th Cir. 2009) (discussing Fed. R. Civ. P. 65(d)). The Court must "thoroughly analyze the extent of relief necessary to protect the plaintiffs from harm, taking care that the remedy issued is not more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Georgia v. President of the United States*, 46 F.4th 1283, 1306 (11th Cir. 2022) (cleaned up).

## III.   Argument

### A. Private Plaintiffs are not likely to succeed because they lack standing.

The private Individual Plaintiffs do not have standing to seek injunctive relief because there is no threat of imminent harm to them. To the extent that the two individuals who received letters and became Inactive were injured, their harms are purely retrospective and cannot qualify for prospective injunctive relief. *See Murthy v. Missouri*, 144 S. Ct. 1972, 1987 (2024). The other two individual private Plaintiffs were not among list of 3,251 individuals, did not receive letters, and did not become Inactive.  Their asserted harms are speculative.

Additionally, the private Individual Plaintiffs do not have standing to bring claims under the NVRA because they did not provide notice. 52 U.S.C. §20510(b)(1)-(2). One plaintiff cannot piggyback on the notice of another. *Bellitto v. Snipes*, 221 F. Supp. 3d 1354, 1363 (S.D. Fla. 2016); *see also Scott v. Schedler*, 771 F.3d 831, 835 (5th Cir. 2014); *Am. C.R. Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 795 n.10 (W.D. Tex. 2015) (rejecting "attempt[] to take credit for

communication sent by third parties"); *Voice of the Exp. v. Ardoin*, 2024 WL 2142991 at *29-31 (M.D. La. May 13, 2024).

The private Organizational Plaintiffs do not have standing after *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 394 (2024), which severely undercut the resource-diversion theory of standing pressed here. This is not the "unusual case" where plaintiffs have standing through "direct[]" interference with "core business activities." *Id.* at 395-96. And the abstract desire to see as many voters with Active status as possible is not a concrete and particular injury. The organizations could have standing if one of their individual members had standing, but their complaint failed to identify any such member. *ACIJ* DE1, generally.

**B. Private Plaintiffs are not entitled to a preliminary injunction based on the alleged violation of the 90-day bar (Count One).**

**1.** The private Plaintiffs will lose on the merits of their 90-day claim. Their novel view that a State cannot implement "*any step in a voter removal program within the 90 days*" is wrong and unsupported. DE30:9. What States cannot do (with certain exceptions) is *remove* voters immediately preceding a federal election. As the Eleventh Circuit explained, "voters removed days or weeks before Election Day" may not "be able to correct the State's errors in time." *Arcia v. Florida Sec'y of State*, 772 F.3d 1335, 1346 (11th Cir. 2014). Thus, "individualized removals are safe to conduct at any time," but systematic removals are not because they risk "disfranchising eligible voters" without "time to rectify any errors." *Id.*

The Eleventh Circuit's interpretation of the rule does not apply to just "any step" in a program. It applies exclusively to removal.

Removal is the step that, if erroneous, would require "time" for a voter to correct prior to Election Day. In contrast, a voter's Inactive status under Alabama law need not be corrected prior to Election Day.  Ala. Code §17-4-9; Helms Decl. ¶85. So, making a voter Inactive is not the kind of step that must be "complete" before the 90-day period, 52 U.S.C. 20507(c)(2)(a). Understanding the bar as a bar on removals also makes sense of the provision's express exceptions, which include systematic *removals* due to the voter's death or conviction of a disqualifying felony.

The private Plaintiffs seem to acknowledge the force of this distinction, which is why they urge a theory of *constructive removal*. But the NVRA does not speak of *constructive removal*. Instead, it concerns programs that remove names "from the official lists of eligible voters." 52 U.S.C. 20507(c)(2)(a). The voters who received the letters were not removed from the list, and they can vote on Election Day by completing a form at their polling place. *Contra* DE23:15 & n.4 (citing *Common Cause/New York v. Brehm*, 432 F. Supp. 3d 285, 318-19 (S.D.N.Y. 2020)). Plaintiffs miss the fundamental distinction between an Inactive voter and an *unregistered* voter, who cannot show up and vote on Election Day.

The text and structure of the NVRA confirm *Arcia*'s understanding that the 90-day bar is concerned with actual removal rather than any "step" of a process that might result in removal. *Contra ACIJ* DE23:12-13. The NVRA's "general program" requires States to remove voters who have passed away or moved. 52 U.S.C. §20507(a)(4). The State must continue this program through multiple consecutive election cycles, *id.* §20507(d)(1)(B)(ii), even if it means taking certain "steps" during the 90 days. For example, the required program contemplates that States will make certain voters Inactive if they do not return a notice card by "the time provided for mail registration," *id.* §20507(d)(2)(A). In Alabama, that time is fourteen days before the election (*i.e.*, within the 90-day period). Moreover, an Inactive voter may be required (and certainly is permitted) to submit an "affirmation or confirmation of the registrant's address" before voting. *Id.* States may receive and process such forms within the 90-day period and use them to change a voter's status from Inactive to Active at that time. Consequently, States can (and do) operate general programs for removal before, during, and after every election, including by changing a voter's status from Active to Inactive or vice versa. *Indeed, the NVRA requires it.*[2]

---

[2] For the avoidance of doubt, when the Secretary said that Inactive voters are placed on a "path for removal," *ACIJ* DE23:12, 15 n.3, this is not materially different than what occurs under the NVRA-required general program. Any Inactive voter must act—either by voting or by

Nor does the noncitizen letter process result in "systematic[]" removal. 52 U.S.C §20507(c)(2)(A). The NVRA permits "individualized removals" after "individual correspondence." 772 F.3d at 1346. Under the letter process, the only recipients who face removal are those who respond to a Registrar's letter with a request to be removed. This is the kind of "individualized information" a State may act upon even during the 90-day period, *Arcia*, 772 F.3d at 1344; *accord Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 1077, 1093 (D. Ariz. Sept. 14, 2023) (affirming the distinction); *Bell v. Marinko*, 367 F.3d 588, 590 (6th Cir. 2004).

**2.** The Court can reject the motion as to Count One without reaching the merits, *Arcia*, or §20507 of the NVRA because "the scope of injunctive relief is dictated by the extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). the alleged statutory violation is *only* that Secretary Allen announced the process on August 13, which is 84 days before the election instead of 90 days. If Secretary Allen had announced the process on August 7, Plaintiffs would be in precisely the same position they are now. Plaintiffs Hazelhoff and Stroop were made inactive and then regained active status weeks ago. Helms Dec. ¶¶71, 73. Plaintiffs Coe and Jortner were never made inactive, so the timing had no effect on them whatsoever. *Id.* ¶¶74, 75. As to the advocacy groups, they have not

---

completing a registration or update form—in order to prevent removal years down the line, per Section 20507(d) of the NVRA.

made a clear showing of any injury due to timing. The alleged interference with their activities would not be any different had the Secretary announced the program six days earlier; in fact, to the extent they suffer due to their "confusion" and diversion of resources, an earlier announcement may well have *exacerbated* their alleged injuries, not cured them. DE30:25-28.

It might be a different story if the private Plaintiffs had said, "John Doe was made inactive 84 days before the election, but due to individual circumstances, he needs 6 more days to become active again."[3] Perhaps Doe would ask for a six-day exemption from the law that inactive voters complete a form, Ala. Code §17-4-9. But the private Plaintiffs have not produced such a person or asked for any individualized relief. Instead, they asked for *statewide* relief that has *nothing* to do with the timing of the process. *ACIJ* DE23:30. They are not entitled to an order that the Secretary "rescind his Press Release" and the like. If they are entitled to any relief, it must "be limited to the inadequacy that produced the injury," *i.e.*, the

---

[3] *See, e.g.*, Office of Va. Governor, *Executive Order Number Thirty-Five (2024): Comprehensive Election Security Protecting Legal Voters and Accurate Counting*, perma.cc/7YZ2-DD48; *Secretary LaRose Refers Evidence of Non-Citizen Voter Registrations to Ohio Attorney General for Potential Prosecution*, Press Release (Aug. 21, 2024), www.ohiosos.gov/media-center/press-releases/2024/2024-08-21/; *see also, e.g.*, Jesse T. Richman et al., *Do non-citizens vote in U.S. elections?*, 36 ELECTORAL STUDIES 149, 153 (2014); James D. Agresti, *Study: 10% to 27% of Non-Citizens are Illegally Registered to Vote*, JUST FACTS (May 13, 2024), www.justfacts.com/news_non-citizen_voter_registration.

[3] Of course, the hypothetical is fanciful because no one actually needs more time in this case; anyone can complete an update form on Election Day to become Active, and no one suffers any injury, let alone irreparable harm, from being inactive in the meantime. It is also hard to fathom a plaintiff whose circumstances would allow him to sue the State but not to complete a simple form, *see AJIC* DE48-1 at 65-66, 123-24.

alleged statutory violation, *Gill v. Whitford*, 585 U.S. 48, 68 (2018), and thus provide only aggrieved individuals exactly the time they need to avoid alleged irreparable harm.

### C.    Private Plaintiffs are not entitled to a preliminary injunction based on alleged discrimination (Counts Two and Four).

The private Plaintiffs are not likely to succeed on their discrimination claims when they admit that the "sole criterion" for inclusion in the letter process was whether a registered voter had self-identified as a noncitizen to Alabama agencies. *E.g. ACIJ* DE1 ¶100. They cannot show discrimination in "both intent *and* effect" against a protected class. *GBM v. Sec'y of State of Ala.*, 992 F.3d 1299, 1321 (11th Cir. 2021). And even if they could, the burden would shift to the State, *id.*, which likely could show that it would have pursued the same election security measures without the alleged discrimination, *see* Helms Decl. ¶¶15-37, 90-95.[4]

For starters, the noncitizen letter process did not involve a classification based on a protected class. In *Geduldig v. Aiello*, for example, the Supreme Court held that a classification based on pregnancy did not discriminate against women even though only women can become pregnant. 417 U.S. 484, 496 n.20 (1974).

---

[4] In their motion, private Plaintiffs do not distinguish between "uniformity" and "discrimination" or argue that there is an independent basis for awarding injunctive relief based on alleged nonuniformity alone. Rather, their allegations center on discrimination. Nonetheless, Defendants note that the list of 3,251 individuals was compiled by examining the entire voter file for matches with someone who had self-identified to the State as a noncitizen. *See* Helms Decl. ¶41.

Likewise, classification based on self-identification as a noncitizen does not discriminate against naturalized citizens *even if* only naturalized citizens had self-identified as noncitizens. There is no equal-protection violation because there is no discrimination against naturalized citizens "as such." *Id.*

Moreover, the central factual allegation that the State is targeting or singling out naturalized citizens is false. *ACIJ* DE1 ¶156; *ACIJ* DE23:17. The overwhelming majority of naturalized citizens in Alabama are *not* part of the letter process. *ACIJ* DE1 ¶¶90-91. Nor does the letter process apply only to naturalized citizens; it applies to *anyone* on the voter roll who was matched to someone who suggested noncitizen status to the State. Most importantly, several people on the list of 3,251 *admitted* they are noncitizens. *See* Helms Decl. ¶¶58-61.

The Court should reject the apparent invitation to find a statutory violation based on disparate impact alone, which is what the district court seemed to do in a short paragraph in *United States v. Florida*, 870 F. Supp. 2d 1346, 1350 (N.D. Fla. 2012) ("The program was likely to have a discriminatory impact on these new citizens."); *Mi Familia Vota v. Fontes*, No. CV-22-00509-PHX-SRB, 2024 WL 862406, at *41 (D. Ariz. Feb. 29, 2024). If that were the law, then (unbeknownst to anyone) the NVRA would have obviated much of the Supreme Court's careful development of the standard for discrimination claims under the Fourteenth Amendment. The Court should interpret both discrimination claims the same way.

The private Plaintiffs have no direct evidence of discriminatory purpose and are therefore unlikely to succeed. The motion adds nothing to the complaint's bare allegation that the noncitizen letter process targets naturalized citizens. Any inference of discriminatory purpose is undermined by the undisputed goal of the letter process to identify ineligible *noncitizens* and thereby enhance election integrity, confidence in elections, and undo unlawful dilution of lawful votes—to the benefit of all Alabamians. "The Fourteenth Amendment does not regard neutral laws as invidious ones, *even when their burdens purportedly fall disproportionately on a protected class*." *GBM*, 992 F.3d at 1327. In other cases, plaintiffs offering more evidence than disparate impact have failed to satisfy the much more favorable summary-judgment standard. *See generally id*.

The private Plaintiffs repeatedly chastise the State for relying on "flawed data," *ACIJ* DE23:19 n.8, but this is not close to enough to infer intentional discrimination. *Cf. League of Women Voters v. Fla. Sec'y of State*, 66 F.4th 905, 931 (11th Cir. 2023) (cleaned up). What Plaintiffs call flaws just go to show that the noncitizen letter process did not classify based on type of citizenship status. Rather than "target[]" a protected class, the State sent letters to those who identified themselves as noncitizens. Whether naturalized, native born, or not a citizen, anyone who has self-identified as a non-citizen is treated the same. *ACIJ* DE1¶47, 49, 51, 53.

Case 2:24-cv-01254-AMM   Document 51   Filed 10/02/24   Page 21 of 32

The private Plaintiffs also have not proposed an alternative dataset available to the State that would have achieved the same legitimate ends without the alleged discrimination. Whatever the appropriate level of scrutiny, the State will succeed because election integrity is an "indisputably … compelling interest," *Alabama State Conf. of NAACP v. Marshall*, No. 224-cv-00420, 2024 WL 3893426 at *1 (N.D. AL. Aug. 21, 2024), and the State's "historical power to exclude aliens ... is part of the sovereign's obligation to preserve the basic conception of a political community." *Bluman v. FEC*, 800 F. Supp. 2d 281, 287-88 (D.D.C. 2011), *aff'd*, 565 U.S. 1104 (2012). Because of the "special significance of citizenship," the State has a "compelling interest" and "wider latitude in limiting the participation of noncitizens." *Id.*

### D.     Private Plaintiffs have not shown a substantial risk of immediate and irreparable harm.

The right to vote is "a fundamental political right, because preservative of all rights," *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886), but that right has not been endangered by the Secretary's noncitizen letter process. Plaintiffs simply do not face "the kind of serious and *immediate* injury that demands the extraordinary relief of a preliminary injunction." *Siegel*, 234 F.3d at 1177; *Fish v. Kobach*, 840 F.3d 710, 751 n.24 (10th Cir. 2016) (irreparable harm should not be presumed for NVRA violation). Without that "indispensable prerequisite," their motion should be denied. *Seigel*, 234 F.3d at 1179.

**1.** As to the individuals, all four of them are Active and registered voters who may vote on Election Day without taking any additional action. *See* Helms Decl. ¶¶71-75. Their right to vote in the upcoming election is not threatened, and it never was; every Inactive voter remains a registered voter who can on Election Day complete an update form at the polls and vote; the Plaintiffs are no exception. For those made Inactive due to the noncitizen letter process, there is no *imminent* harm of administrative *removal* (and consequently, no threat to the right to vote) because the Secretary's office has explained that "any potential administrative removals" associated with the noncitizen letter process will not take place until *after* the 2028 General Election. Helms Decl. ¶¶4, 40, 47, 63.

For claims seeking injunctive relief, any past injuries are relevant only for their predictive value. *Murthy*, 144 S. Ct. at 1987. The private Plaintiffs cannot prove a likelihood that Secretary Allen will imminently conduct any *new* process that will harm them in the same way they allege they have been harmed. Secretary Allen's Chief of Staff reports that the office does not plan to conduct any further reviews like the noncitizen letter process in advance of the November 2024 General Election. Helms Decl. ¶65. He also testified:

- "Roald Hazelhoff … will be able to vote in the 2024 General Election without taking any further steps attributable to the noncitizen letters."

- "James Stroop … will be able to vote in the 2024 General Election without taking any further steps attributable to the noncitizen letters."

- "Carmel Michelle Coe … will be able to vote in the 2024 General Election without taking any further steps attributable to the noncitizen letters."

- "Emily Jortner … will be able to vote in the 2024 General Election without taking any further steps attributable to the noncitizen letters."

*Id.* ¶¶71, 73-75. Accordingly, these four individuals face no "immediate[] threat[] ... of disenfranchisement." DE23:28. The other declarants whose statements are attached to the motion are also Active registered voters. *See* Helms Decl. ¶¶76-79.

The private Plaintiffs' alleged risk of "being identified for continuing 'reviews' at any time" is wholly speculative. *ACIJ* DE23:24. Other than the Secretary's general commitment to protect voter integrity on an ongoing basis, private Individual Plaintiffs can point to no concrete facts that would make it likely that they will be unable to vote. *Cf. Florida*, 870 F. Supp. 2d at 1351 ("There is no need for an injunction prohibiting the Secretary from continuing with a program he has unequivocally said he will not continue."); *id.* at 1350-51 (citing the "rebuttable presumption" that discontinued conduct "will not recur").[5]

---

[5] Elsewhere in the motion, private Plaintiffs suggest that "respond[ing] to notice is not a matter of 'little import.'" DE23:22 (quoting *Florida*, 870 F. Supp. 2d at 1350). That may be, but no one needs to respond to any notice if he or she can complete an update form at the polls, and the

**2.** As to the Organizational Plaintiffs, to the extent that they allege interference with their missions to maximize the number of votes in Alabama, this is the kind of abstract policy goal that does not suffice to show standing, let alone irreparable harm. To the extent that they allege interference with the right to vote of their members, the harms are completely speculative and generalized, and there is no likelihood of irreparable harm for all the reasons discussed above. Moreover, only four Registrars have been sued; the allegedly threatened members may not even live within those four counties.[6] Similarly, the organizations fail to identify a single one of their members who requested removal under "duress" as the motion hypothesizes. DE23:16.[7]

The private Plaintiffs simply have not shown the kind of irreparable harm that courts look for when asked to fashion extraordinary relief. *See, e.g.*, *Siegel*, 234 F.3d at 1177; *Action NC v. Strach*, 216 F. Supp. 3d 597, 642 (M.D.N.C. 2016).

---

individual Plaintiffs have shown no likelihood that they would face the same burden again. Their frustration with the noncitizen letter process is not a candidate for irreparable harm. DE23:4-6.

[6] Secretary Allen does not control the Registrars, who are independently appointed. As the Helms Declaration details, for example, the Board of Registrars in Tuscaloosa did not change any voter's status to Inactive pursuant to the noncitizen letter process. Decl. ¶51. This makes speculative the prospect of irreparable harm absent an injunction because an injunction against the Secretary and the four Chairs sued here would not necessarily help the anonymous members.

[7] Further, there is no record evidence that any member of the private Organizational Plaintiffs faces a "risk of being placed" on a new list. DE23:7. There is no reason to believe the list will expand before the election, and the Secretary's office testifies that it will not. Helms Decl. ¶65. The organizations also state that their members could be required to complete a registration or update form "on short notice," DE23:7, but that makes no sense because anyone can update at the polls on Election Day.

### E.      The balance of equities favors the State Defendants.

The private Plaintiffs bear a heavy burden to show the threatened harm outweighs the harm a proposed injunction would cause and that such injunction would not run afoul of the public interest. *Georgia*, 46 F.4th at 1292.

**1.** The requested relief will interfere with the State's historic and constitutional powers to regulate elections within the State. Such powers are reflected in the NVRA itself, which has dual purposes to promote registration while also ensuring States can and do protect election integrity. *See* 52 U.S.C. § 20501(b)(3). "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Black Voters Matter Fund v. Raffensperger*, 508 F. Supp. 3d 1283, 1303 (N.D. Ga. 2020). Accordingly, when the Court considers the "burdens[]" of any relief, *Califano*, 442 U.S. at 702, it should consider whether such relief would "impinge upon rights that would otherwise by constitutionally protected," *Nat'l Soc. of Pro. Eng'rs v. United States*, 435 U.S. 679, 697-98 (1978).

Here, much of the requested relief—especially changing any individual voter's status to Active—would implicate the Constitution's delegation to States of the power to set "Qualifications" for voters, U.S. Const. art. I, §2, which "is of little value without the power to enforce those requirements." *Arizona v. Inter Tribal Council of Ariz.*, 570 U.S. 1, 17 (2013); *see also Crawford v. Marion Cnty.*

*Election Bd.*, 553 U.S. 181, 196 (2008) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."); *New Georgia Project v. Raffensperger*, 976 F.3d 1278, 1285 (11th Cir. 2020) (Lagoa, J., concurring). The requested relief is also highly intrusive and poses sovereign-immunity concerns to the extent that it compels the exercise of discretion. *See, e.g.*, *Seminole Tribe v. Florida*, 11 F.3d 1016, 1028 (11th Cir. 1994), *aff'd*, 517 U.S. 44 (1996); *Richardson v. Texas Sec'y of State*, 978 F.3d 220, 241-42 (5th Cir. 2020).

Likewise, the private Plaintiffs have no authority for their demand that this Court order the Attorney General "to cease criminal investigations." *ACIJ* DE23:30. The Attorney General is a law enforcement officer who said only that he would enforce an unchallenged, and unassailable, law. The motion contains no arguments to support such an extraordinary, preliminary, and purely prophylactic injunction against the Attorney General.

The equities weigh heavily against such intrusions, especially in light of the State's evidence that there were noncitizens among the 3,251 who were unlawfully registered. *See* Helms Decl. ¶¶58-61. Some individuals who requested removal provided "affirmative evidence of noncitizen status" (*ACIJ* DE23:30), but they were not required to do so. The private Plaintiffs would have this Court force Defendants to register approximately 100 individuals who self-removed—*even if*

24

*they are noncitizens*, so long as they did not admit as much to the State. This would inflict a severe and immediate harm to the sovereignty of the State, its constitutional powers to protect election integrity, and democracy.

On the other side of the ledger, private Plaintiffs rely almost exclusively on cases in which voters were removed from the voter rolls. But private Plaintiffs have not sought preliminary relief on their constitutional right-to-vote claim. And even if the Court deems them likely to succeed on their NVRA or discrimination claims, private Plaintiffs are still unlikely to show that they or their members will be removed from the voter rolls or otherwise stopped from voting in the 2024 General Election. Thus, authorities like *U.S. Student Ass'n Found v. Land*, 373, 388 (6th Cir. 2008) are inapposite; the *Land* plaintiffs challenged a Michigan law that actually removed registered voters from the State's voter rolls. *Id.* at 376. In contrast here, the "hassle" (DE23-25 at 8) of completing a form on Election Day is more akin to "ordinary burdens … arising from life's vagaries" that do not warrant such drastic and immediate intervention by the federal judiciary. *Cf. Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1354 (11th Cir. 2009) (quoting *Crawford*, 553 U.S. at 196) (upholding voter-ID law after final judgment); *see also Siegel*, 234 F.3d at 1178 ("Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction").

To enter injunctive relief, the Court must conclude not only that the requirement to complete a registration or update form causes the private Plaintiffs to suffer a cognizable injury, not only that they will suffer irreparable harm from that injury, but also that the harm is so extraordinary that it outweighs the interests and constitutional powers of a sovereign State to protect election integrity. That requires an extraordinary showing that the private Plaintiffs have not made.

**2.** The private Plaintiffs' delay in bringing suit and moving for preliminary injunctive relief severely undercuts their demand for equitable relief. The Secretary announced the noncitizen letter process on August 13, 2024, and the private Plaintiffs did not request emergency relief until September 23, 2024. To be sure, the Organizational Plaintiffs had a 20-day period before they could bring their NVRA claims under the statute, but that does not explain why they used an *additional* 21 days nor why they did not file and seek preliminary relief on their constitutional claims immediately. Further, the NVRA's notice period should have accelerated the preparation of any motion because, in theory, the claims on which plaintiffs seek relief must be the same ones alleged in the notice.

Undue delay of even "a few months" militates against a finding of irreparable harm because "the very idea of a *preliminary* injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights." *Wreal, LLC v. Amazon.com*, 840 F.3d 1244, 1248 (11th Cir. 2016). Particularly where the primary

26

claim alleges that the Secretary's 6-day delay in commencing the noncitizen letter process caused irreparable harm, the private Plaintiffs' own 41-day delay should heavily count against them. *Cf. Alabama v. Cardona*, 2024 WL 3607492, at *42 (N.D. Ala. July 30, 2024) (waiting "seven-and-a-half-week[s]" cut against argument for irreparable harm).

**3.** In balancing the equities, the Court may consider the serious efforts that Secretary Allen's office undertook to secure the federal government's cooperation well in advance of the 2024 election. *See* Helms Decl. ¶¶17-37. The noncitizen letter process was not a "ham-handed" last-minute decision, DE23:19, but the result of nearly a year of back-and-forth with federal agencies, who long had notice of the Secretary's goals to improve election security in Alabama. After being rebuffed for months, despite the federal government's mandatory duty under federal law, 8 U.S.C. 1373(c), Secretary Allen addressed the problem with the tools he had available.

All things considered, the result was a much less drastic process than other States have taken in similar positions: No one was administratively removed from the voter rolls, and as a practical matter, no one who wishes to vote in the upcoming election and is eligible to do so will be stopped. While it may or may not be Plaintiffs burden to show a more tailored means of advancing the compelling state interest here, one cannot help but notice the upshot of their overall pleadings

that the Secretary cannot take *any* meaningful action to address noncitizen voting. That can't be right. The Court may consider, as a matter of equity, the Secretary's belief that after facing inexplicable non-cooperation from the federal government, the noncitizen letter process was the only remedy he had.

### F.   The motion demands remedies of improper scope.

Private Plaintiffs seek sweeping injunctive relief that is plainly overbroad and seeks to benefit numerous unnamed nonparties. In the main, the motion requests that Secretary Allen instruct all Registrars to rescind "all" letters and ensure that "all individuals" who received letters ("except those who have provided affirmative evidence of noncitizen status") are Active and registered voters. It is easy to see the improper scope of such relief. Many of the intended beneficiaries are already Active voters (Helms Decl. ¶62); many of them had Inactive status for other reasons before the noncitizen letter process began (*id.* ¶63); about 100 individuals have removed themselves (*id.* ¶56-57) without providing "affirmative evidence of noncitizen status." *ACIJ* DE23:30. In all likelihood, there are unknown noncitizens among the 3,251 individuals that private Plaintiffs demand be permitted to vote. For these reasons, as a practical and equitable matter, it would abuse discretion to order relief for thousands of people who have not shown this Court any injury.

Further, as a matter of black-letter law, an injunction should extend no further "than necessary to provide complete relief *to the plaintiffs*." *Califano*, 442 U.S. at 702 (emphasis added); *Gill*, 585 U.S. at 73 ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."); *Georgia*, 46 F.4th at 1302, 1306 (Courts should be "skeptical" of injunctions "premised on the need to protect nonparties."). To be sure, nonparties may enjoy "collateral" benefits from an injunction, but it cannot be the aim of the Court's equitable order to provide such relief. *Georgia*, 46 F.4th at 1304. This is not a class action.

Yet almost all of what the private Plaintiffs demand is *statewide* relief, including at least the rescission of Secretary Allen's Press Release, the rescission of all letters sent, and the demand for a "statement" and "information on the Secretary of State's website." *ACIJ* DE23:30. The same reasons for caution when asked to impose nationwide relief apply no less to requests for statewide relief. *See, e.g.*, *Labrador v. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J. concurring) (district-court order barring enforcement of state law "against anyone" "strayed from equity's traditional bounds" and "defied these foundational principles [of equity]" because "[i]t did not just vindicate the plaintiffs[]").

## CONCLUSION

The Court should deny the private Plaintiffs' motion for preliminary injunction.

*Respectfully Submitted,*

Steve Marshall
  *Attorney General*

/s/ Robert M. Overing
James W. Davis (ASB-4063-I58J)
  *Deputy Attorney General*
Robert M. Overing (ASB-8736-M14Q)
  *Deputy Solicitor General*
Misty S. Fairbanks Messick (ASB-1813-T71F)
Scott Woodard (ASB-1001-F94C)
  *Assistant Attorneys General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 3538400
Jim.Davis@AlabamaAG.gov
Robert.Overing@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov
Scott.Woodard@AlabamaAG.gov

**Counsel for the State Defendants**