

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| ALABAMA COALITION FOR IMMIGRANT JUSTICE; LEAGUE OF WOMEN VOTERS OF ALABAMA; LEAGUE OF WOMEN VOTERS OF ALABAMA EDUCATION FUND; ALABAMA STATE CONFERENCE OF THE NAACP; ROALD HAZELHOFF; JAMES STROOP; CARMEL MICHELLE COE; and EMILY JORTNER, | Case No. 2:24-cv-01254-AMM<br>Judge Anna M. Manasco<br><br>**Opposed Motion** |
| *Plaintiffs*, | |
| v. | |
| WES ALLEN, in his official capacity as Alabama Secretary of State; STEVE MARSHALL, in his official capacity as Alabama Attorney General; and JAN BENNETT, BARRY STEPHENSON, CINDY WILLIS THRASH, and SHEILA COX BARBUCK, in their official capacities as Chairs of Boards of Registrars of Elmore, Jefferson, Lee, and Marshall Counties, | |
| *Defendants*. | |

## <u>REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION</u>

902 voters on the Purge List are now again in active status—more than 225 times more voters wrongly removed than the *four* individuals on the List Defendants have identified as noncitizens.[1] It is Defendants' Purge Program that threatens election integrity, by unlawfully creating chaos for, especially, naturalized citizen voters within the 90-day quiet period. Defendants' belated changes to the Purge Program have only added to that confusion. For example, according to a second letter sent by Defendants, wrongly disenfranchised voters on the Purge List have *no* remedy between October 21 and Election Day. Instead, they must roll the dice that if they show up at the polls workers will implement a previously undisclosed process for them, and they will be able to vote. A preliminary injunction is necessary to end this confusion for Plaintiffs and all voters.

## I.    Individual and Organizational Plaintiffs Have Standing.

The Individual Plaintiffs' allegations of threatened, probabilistic injury are sufficiently "imminent" to satisfy injury-in-fact. *Arcia v. Fla. Secy' of State*, 772 F. 3d 1335, 1341 (11th Cir. 2014) ("probabilistic harm is enough" for imminence).

As in *Arcia*, Individual Plaintiffs have standing: they have alleged "a realistic probability that they would be"—or already had been—"misidentified due to . . . mistakes in the Secretary's data-matching process" and that harm will accrue. *Id.*

---

[1] All four appear to have been added to the rolls due to state agency error. Three left the "Voter Declaration" section on the driver license form blank. ECF 49-23; ECF 49-24; ECF 49-25. The fourth attests to "hav[ing] never voted." ECF 49-26.

Defendants' belated efforts to disclaim this risk of disenfranchisement and criminal investigation, through declarations filed in this litigation, do not alter the standing analysis. *See Farmworker Ass'n v. Moody*, No. 23-cv-2265, 2024 WL 2310150, at *7 (S.D. Fla. May 22, 2024) ("government cannot, in its response to a preliminary-injunction request, introduce a novel, narrowing construction . . . and then demand that [a court] make standing determinations" on that basis).

Nor does whether Individual Plaintiffs signed the NVRA letter affect standing. First, other Plaintiffs are signatories. *Wollschlaeger v. Governor*, 848 F.3d 1293, 1306 n.3 (11th Cir. 2017) (one party suffices for standing). Second, numerous courts have held that a person may rely on another's NVRA notice letter. *E.g.*, *ACORN v. Miller*, 129 F.3d 833, 838 (6th Cir. 1997); *Jud. Watch v. King*, 993 F. Supp. 2d 919, 922–23 (S.D. Ind. 2012). Requiring *specific* "plaintiffs to give actual notice" is "unnecessary" because notice is meant to "provide states in violation of the Act an opportunity to attempt compliance before facing litigation." *ACORN*, 129 F.3d at 838. Third, *no* notice is required "[i]f the violation occurred within 30 days before" a federal election—i.e., now. 52 U.S.C. § 20510(b)(3).

Organizational Plaintiffs have both associational and direct organizational standing. As to associational standing, Organizational Plaintiffs have in fact established that they have naturalized citizen members who, like Plaintiffs Coe and Jortner, face threatened future harm—purge and criminal investigation—due to the

2

Purge Program. Simelton Decl. ¶ 3; Jones Decl. ¶ 4; Hamilton Decl. ¶ 2. These are identified members.[2] And, where it is "highly likely that one of [an organization's] members would be" injured, an organization need not identify a specific injured member. *See Dunn v. Dunn*, 219 F. Supp. 3d 1163, 1170 (M.D. Ala. 2016).

Organizational Plaintiffs also have direct organizational standing. *FDA v. Alliance for Hippocratic Medicine* re-affirmed that when defendants' "actions directly affect[] and interfere[] with [plaintiffs'] core business activities," organizational plaintiffs suffer injury in fact. 602 U.S. 367, 395 (2024). Like in *Havens*, Organizational Plaintiffs provide direct services: they engage in *voting* counseling (i.e., voter registration assistance). *See id.* They have established that Defendants' Purge Program "directly affect[s] and interfere[s] with" their "core business activities" of direct voter registration assistance: registering eligible voters and ensuring those voters can in fact vote. *See* Mot. at 12; Hamilton Decl. ¶¶ 10-11; Jones Decl. ¶¶ 20-22; Simelton Decl. ¶¶ 16-18. Courts routinely recognize that policies that directly harm voter registration activities confer organizational standing, including post-*FDA*. *See, e.g.*, *Get Loud Arkansas v. Thurston*, No. 5:24-CV-5121, 2024 WL 4142754, at *13 (W.D. Ark. Sept. 9, 2024); *Fla. State Conf. of NAACP v. Byrd*, 680 F. Supp. 3d 1291, 1308-09 (N.D. Fla. 2023).

---

[2] Organizational Plaintiffs can provide under the Protective Order at least one member name if necessary.

II.     **Plaintiffs Are Likely to Succeed on Their Claim That the Purge Program Violates the 90-Day Provision.**

Both statutory text and Eleventh Circuit precedent are clear: states cannot implement programs that end in removal in the 90-day quiet period. The 90-Day Provision plainly states: if a state begins "any program the *purpose of which* is to systematically remove" ineligible voters, the state must "complete" that program by the start of the 90-day window. 52 U.S.C. § 20507(c)(2)(A) (emphasis added). The statute does not ask whether affected voters have been fully removed before the election, but whether the program's *purpose* is to remove voters and whether the state has completed the program before the 90-day window. There can be no doubt that Defendants' program has the purpose of removal. ECF 23-2 at 2 (Allen announcement that Purge Program is "[p]rocess to [r]emove"); ECF 23-5 (letter to voters on Purge List stating they have been placed on the "path for removal").

Defendants' argument that the Program does not "result in *systematic*" removal because the only voters removed are those who request it, Resp. at 14, has key flaws. First, the Program's *purpose* is to systematically remove voters from the rolls, including through long-term "[i]nactiv[ity]" and eventual removal. ECF 48-1 ¶ 40. Second, the Program chose the voters on the Purge List based on systematic criteria—database matching—and asked *only those voters* to remove themselves to "become compliant with state and federal law." ECF 23-5 at 2. *See Arcia*, 772 F.3d at 1339 (Florida's program systematic because it relied on database matching, even

4

though local officials required to "conduct additional research" before initiating removal).

Defendants contend that because a different part of the NVRA contemplates inactivating voters within the 90-day window in one specific situation, the 90-Day Provision must only apply to complete removal. Resp. at 13. But that ignores a cardinal rule of statutory interpretation: if a general prohibition is contradicted by a "specific . . . permission," "[t]o eliminate the contradiction, the specific provision is construed as an exception to the general one." *RadLAX Gateway Hotel v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). In any event, that is not the case. The NVRA's "general program" for removal of voters who have moved does *not* require (or allow) a State to take any affirmative steps towards removal of voters during the 90-day period. 52 U.S.C. § 20507(a)(4). The notices sent out pursuant to the "general program" are not (and cannot be) sent during the 90-day period. The notices here were. That the NVRA allows *voters* to take a step to confirm their address during the 90-day quiet period (and thus avoid being in inactive status) is of no consequence.

Further, the Purge Program's purpose and effect is to remove many voters from the rolls *now*. As Plaintiffs argued, immediate inactivation is *de facto*—or "constructive"—removal. Mot. at 19. Defendants' apparent alteration of the Program pursuant to a second letter sent at least five days after Plaintiffs filed this case, ECF 48-1 at 115-17, does not make it lawful. People on the Purge List cannot re-register

5

between October 21 and November 5, placing them in limbo as to whether they can successfully re-register at the polls. *See* ECF 48-1 at 116. The Election Day process is fraught with confusion and uncertainty. It's unclear whether Defendants will require "verification" of voters on the Purge List, and it's highly likely the Program's last-minute, changing nature and ongoing mistakes in implementation will lead to voters being turned away. *See* ECF 23-29 ¶¶ 12-15; ECF 48-1 at 125. Absentee voting is likewise confusing and uncertain. *See* ECF 48-1 at 116.

And at least one naturalized citizen has filled out a voter removal form following receipt of the first letter. ECF 49-9 ¶¶ 16, 20. More likely have done and will do so due to confusion and intimidation. At least one naturalized citizen was also asked for proof of naturalization to re-register. Sampen Decl. ¶ 12.

Finally, Defendants' suggestion that the Court should somehow take into account that they implemented the Program six days into the 90-Day Period, Resp. at 15, is unworkable and not how courts approach injunctive relief. *See, e.g.*, *Arcia*, 772 F.3d at 1339; *Wesley Educ. Found. v. Cox*, 408 F.3d 1349, 1351 (11th Cir. 2005).[3]

## III. Plaintiffs Are Likely to Succeed on Their Equal Protection and NVRA Uniform and Non-Discriminatory Claims.

No court has ever upheld the kind of flawed voter removal process that Defendants have undertaken, which specifically and predictably—as Secretary Allen

---

[3] Further, Defendants' focus on the press release date is nonsensical, as the Program did not end on the date of the press release, but is ongoing.

6

himself predicted at the outset—discriminates based on national origin and citizenship and thus targets naturalized citizens on the rolls.

First, Defendants err in collapsing the NVRA's requirement that voter list maintenance be "uniform" and "nondiscriminatory," 52 U.S.C. § 20507(b)(1), and the Fourteenth Amendment's equal protection guarantee. These are distinct legal provisions. Congress created the NVRA to advance specific voter registration goals, including to "increase the number of eligible citizens who register to vote" and to "enhance[] the participation of eligible citizens as voters," in light of concerns about "discriminatory and unfair registration laws and procedures" that "disproportionately harm voter participation by various groups." 52 U.S.C. § 20501. The NVRA sought to eliminate non-uniform, discriminatory practices such as "selective purging of voter rolls"—with a specific concern that "[s]uch processes must be structured to prevent abuse which has a disparate impact on minority communities." S. Rep. No. 103-6, at 3, 18; *see also* H. Rep. No. 103-9, at 15. Voter list maintenance programs must accordingly be applied *uniformly* throughout the jurisdiction and cannot single out specific subsets of voters, such as voters born outside the United States (i.e., naturalized citizens), for purging under the NVRA—regardless of the Equal Protection analysis. Alabama's Purge Program is exactly the sort of discriminatory, selective purge that violates the NVRA. *See United States v. Fla.*, 870 F. Supp. 2d 1346, 1350 (N.D. Fla. 2012) (selective purge that swept in

7

"primarily newly naturalized citizens" likely violated the NVRA's uniform and nondiscriminatory requirement); *Mi Familia Vota v. Fontes*, No. 2:22-cv-00509, 2024 WL 862406, at *41 (D. Ariz. Feb. 29, 2024) (where "[o]nly naturalized citizens would be subject to scrutiny," "non-uniform and discriminatory impact on naturalized citizens").[4] In any event, as discussed below, the program on its face discriminates based on national origin (and thus also citizenship classification).

Second, Defendants do not even attempt to argue that the Purge Program is *narrowly tailored* under equal protection analysis to any compelling interest. Nor could they. So far at least 902 voters on the Purge List—27.7% of the originally identified voters—are now confirmed active-status voters. ECF 48-1 at 25. This is a huge lower-bound error rate and has generated confusion and the risk of erroneous disenfranchisement in a critical period close to the election. Indeed, the Purge Program erroneously labeled as noncitizens more than 50 individuals who had previously provided ALEA with a naturalization or citizenship certificate. ECF 49-9 ¶¶ 9-10. At least one of those voters submitted a voter removal request pursuant to Secretary Allen's initial letter to Purge List voters. *Id.* ¶¶ 16, 20. Defendants claim that there was no alternative method available to them, Resp. at 19, but Defendants made no effort to exclude naturalized citizens by relying on *up-to-date* ALEA and

---

[4] Defendants' suggestion that somehow the NVRA "obviated" Fourteenth Amendment discrimination analysis, Resp. at 19, misses the fundamental point that the NVRA is a separate statutory provision subject to distinct interpretation.

ADOL information rather than stale data. Defendants could have compared the date on which voters on the Purge List registered with the date on which they received information as to purported lack of citizenship and included only those for whom information as to citizenship status *post-dated* voter registration. They did not do so. *See* ECF 48-1 at 140; ECF 49-11 at 14; *see also* Sampen Decl. ¶ 8; Jones Decl. ¶ 10.[5] Defendants' program is not even rationally, much less narrowly, tailored.

Relatedly, Defendants' cursory assertions do not demonstrate a compelling interest for the Purge Program. Alabama requires that voter registration applicants testify under penalty of perjury that they are U.S. citizens, ECF 48-1 at 41, and federal and state laws provide strict penalties for noncitizens who vote. 18 U.S.C. § 611; ECF 48-1 at 65. Defendants have identified four individuals on the Purge List who have provided affirmative evidence of noncitizenship and have identified four other alleged instances ever in the state of Alabama. ECF 48-1 ¶¶ 58, 90-95. There are 3.84 million voters on the Alabama voter rolls. *Id.* ¶ 85. And the number of duly registered voters whose registrations were thrown into chaos dwarfs the number of identified noncitizens. Defendants have proffered *no* evidence that could justify their Purge Program based on an actual, meaningful threat to electoral integrity. Instead, Defendants have *introduced* an election integrity threat by risking

---

[5] Defendants did not even weed out voters who had provided evidence of U.S. citizenship (though this alone would be insufficient). ECF 49-9 ¶¶ 9-10; Sampen Decl. ¶¶ 12-13.

disenfranchisement of hundreds of registered, eligible Alabama voters based on unsound methodology with no evidence of a widespread problem.[6]

Defendants' efforts to portray the Purge Program as somehow facially neutral are unavailing. Defendants do not contest that the Purge Program discriminates based on national origin. It plainly does on its face: it identifies individuals based on whether they were born outside the United States and then fails to account for whether they have become citizens. And in any event, Secretary Allen expressly admitted *in his announcement* the virtual certainty that some individuals on the Purge List "who were issued noncitizen identification numbers have, since receiving them, become naturalized citizens and are, therefore, eligible to vote." ECF 23-2 at 3. Allen explained that under the Purge Program "those naturalized citizens" would be able to vote only *after* submitting a new registration form and being verified—a process designed *for naturalized citizens*. *Id.* Barriers for voting for naturalized citizens—that similarly situated U.S.-born U.S. citizens are not subject to—are thus baked into the Purge Program by design and by the Purge Program's official announcement. This is classification based on citizenship status and national origin.

Further, Defendants have created a program that immediately inactivates and ultimately seeks to remove *all* naturalized citizen voters whom the state is aware of.

---

[6] If it is true that absentee voters will be "allowed to vote absentee pursuant to the normal process," ECF 48-1 at 116, that undercuts any claimed state interest in the Program.

By Defendants' own admission, the program encompasses all individuals who have "matched to someone who suggested noncitizen status to the State." Resp. at 17. This is not like *Geduldig v. Aiello*, 417 U.S. 484 (1974), where pregnancy did not constitute gender discrimination because "nonpregnant persons" included "members of both sexes." *Id.* at 496 n.20. Rather, here (as Defendants have stated) *all* naturalized citizens identified within Defendants' data set are included on the Purge List.[7] The Purge Program therefore discriminates against naturalized citizens and based on national origin. Being foreign-born is not an accurate proxy for *current* citizenship status. *Cf. Craig v. Boren*, 429 U.S. 190, 198 (1976) (describing cases that invalidated laws "employing gender as an inaccurate proxy").[8]

Because the Purge Program classifies individuals on the basis of naturalized citizenship status and national origin, Plaintiffs need not otherwise demonstrate discriminatory intent: such a policy is flatly unlawful under the NVRA and subject to strict scrutiny under the Equal Protection Clause. *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). However, circumstantial evidence of discriminatory intent is clear: the policy disparately impacts naturalized citizens; Secretary Allen provided contemporaneous statements admitting the effect on naturalized citizens

---

[7] While Alabama notes that the "overwhelming majority of naturalized citizens in Alabama are not part of the letter process," Resp. at 17, that is solely a function of the state's own data limitations. The Purge Program's design identifies all naturalized citizens. And Secretary Allen's stated goal is to expand the program to include as many of these individuals as possible. *See* ECF 23-2 at 3.
[8] Defendants' numerous errors in identifying U.S.-born individuals as having had a noncitizen identification number do not undermine this conclusion.

yet nevertheless subjecting them to the burden of re-registration; Defendants did not use the less discriminatory alternative of only relying on evidence of noncitizenship that *post-dated* voter registration; and the secretive Purge Program departs from ordinary policy and the law. *See, e.g.*, ECF 48-1 at 140; *see Jean v. Nelson*, 711 F.2d 1455, 1485-86 (11th Cir. 1983). Finally, any "wider latitude in limiting the participation of noncitizens" in politics, Resp. at 19, does not extend to latitude to limit the participation of *naturalized citizens*, who are as American as the U.S.-born. *See Schneider v. Rusk*, 377 U.S. 163, 168 (1964).

## IV.    Plaintiffs Will Be Irreparably Harmed Absent Injunctive Relief.

Defendants' Purge Program threatens Individual Plaintiffs, Organizational Plaintiffs' naturalized citizen members, and other Alabamians with disenfranchisement and subjects them to discriminatory treatment by forcing them to re-register, which the Alabama Legislature has deemed a harm and prohibited. *See* Ala. Code § 17-3-56. Forcing targeted voters to jump through an unwarranted, discriminatory hoop is itself irreparable harm. Moreover, this eleventh-hour change in Alabama's voting process has already deterred and, absent an injunction, will continue to deter naturalized voters' participation, as the Purge Program has sown confusion and fear regarding whether and how voters on the Purge List can exercise their fundamental right to vote. Mr. Sampen's initial inability to re-register illustrates the administrative confusion and chaos caused by the Purge Program and the clear

and ongoing risk that naturalized citizens will not be able to re-register or re-identify themselves and vote. *See* Sampen Decl. ¶¶ 9-14.

And while Defendants argue that there is no proof they "will imminently conduct any *new* process that will harm [Plaintiffs] in the same way," Resp. at 20, their August 13 press release in fact explicitly stated the Purge Program "is not a one-time review of our voter file." ECF 23-2 at 3. Further, the Purge Program is ongoing with respect to the individuals on the Purge List, and at least one naturalized citizen has already submitted the requested voter removal request form. ECF 49-9 ¶¶ 16, 20. The confusion and barriers to voting, and the chill on voting for naturalized citizens, will continue absent a halt to the Purge Program. *See* Mot. at 24-26.

Finally, Organizational Plaintiffs have asserted specific, ongoing irreparable harm. Mot. at 26-28; *supra* Sec. I; *see Common Cause v. Lawson*, 937 F.3d 944, 949 (7th Cir. 2019); *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

## V.   The Balance of Equities Strongly Favors Plaintiffs.

In this case, Congress has balanced the equities: removal programs conducted within 90 days of an election risk disenfranchisement and are prohibited. Absent preliminary relief, the quiet period would be largely unenforceable.

Further, it is Defendants' Purge Program that shakes public confidence in the integrity of Alabama's electoral processes. Over 900 voters on the Purge List are now

13

active voters, more than 225 times the four individuals identified as noncitizens. Defendants' Program has generated chaos and distrust. *See supra* Sec. III.

While Defendants claim that relief would interfere with Alabama's power to regulate elections, this is not so: as the Supreme Court has noted, "federalism concerns . . . are somewhat weaker" when—as here—Congress has enacted Elections Clause legislation. *Arizona v. Inter Tribal Council*, 570 U.S. 1, 14 (2013) (NVRA "supplant[s]" conflicting state regulations). Plaintiffs only seek enforcement of longstanding federal law: that list maintenance be uniform and nondiscriminatory, and that programs the purpose of which is to remove voters from the rolls be completed before the 90-day quiet period. 52 U.S.C. §§ 20507(b), (c)(2)(A).

Secretary Allen inexcusably waited until 84 days before an election to launch this program. Particularly given that fact, Defendants' complaints about Plaintiffs' timing also do not affect the balance of the equities. Defendants initiated their secretive Purge Program on August 13, ECF 23-2; Organizational Plaintiffs sent their NVRA letter six days later, ECF 23-8 at 2; Secretary Allen's general counsel responded on September 6, eighteen days after receipt, ECF 23-9 at 2; and Plaintiffs filed suit on September 13, one week after that response, ECF 1. On September 23, Plaintiffs moved for preliminary injunction in a filing with 29 exhibits cataloguing available information about the Purge Program and the experiences of purged individuals and naturalized citizens subject to the Program. Mot.; *see* ECF 23-1.

14

Plaintiffs have acted quickly and have been hampered, throughout this litigation, by Defendants' secrecy and obfuscation regarding the Program and the Purge List. This is no undue delay of "a few months." *Contra* Resp. at 26.

## VI.   The Scope of Non-U.S. Plaintiffs' Requested Injunction Is Proper.

"[C]ourts possess broad discretion to fashion an equitable remedy." *Black Warrior Riverkeeper v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1290 (11th Cir. 2015). Moreover, the NVRA specifically authorizes injunctive relief to remedy violations. 52 U.S.C. § 20510(b)(2). A statewide injunction is necessary here. Given the ongoing injuries caused by this *statewide* Purge Program and the *statewide* nature of Organizational Plaintiffs' core activities, the only way to adequately redress these federal law violations is to enjoin the program as a whole and order Defendants to retract or correct their badly conflicting statements and intimidating misinformation. *See Koe v. Noggle*, 688 F. Supp. 3d 1321, 1361–62 (N.D. Ga. 2023). Any effect on nonparties is incidental to the relief commensurate with a challenge to an unlawful state administrative scheme. Finally, statewide injunctions are commonplace and routine in litigation challenging state action. *See, e.g.*, *Garcia v. Stillman*, No. 22-CV-24156, 2023 WL 3478450, at *2 (S.D. Fla. May 16, 2023).

## CONCLUSION

Preliminary injunctive relief is warranted.

Date: Oct. 7, 2024                              Respectfully submitted,

/s/ *Joseph Mitchell McGuire*                    /s/ *Kathryn Huddleston*
Joseph Mitchell McGuire (ASB-8317-              Danielle Lang
S69M)                                            Brent Ferguson
MCGUIRE & ASSOCIATES, LLC                       Kathryn Huddleston
31 Clayton Street                                Kate Hamilton
Montgomery, Alabama 36104                        Shilpa Jindia
334-517-1000 Office                              CAMPAIGN LEGAL CENTER
334-517-1327 Fax                                 1101 14th Street NW, Suite 400
jmcguire@mandabusinesslaw.com                    Washington, DC 20005
                                                 (202) 736-2200
/s/ *Michelle Kanter Cohen*                      dlang@campaignlegalcenter.org
Michelle Kanter Cohen (D.C. Bar No.             bferguson@campaignlegalcenter.org
989164)                                          khuddleston@campaignlegalcenter.org
Nina Beck (WI State Bar No. 1079460)            khamilton@campaignlegalcenter.org
Jon Sherman (D.C. Bar No. 998271)               sjindia@campaignlegalcenter.org
FAIR ELECTIONS CENTER
1825 K St. NW, Ste. 701
Washington, D.C. 20006                           /s/ *Ellen Degnan*
(202) 331-0114                                   Ellen Degnan, ASB 3244I12V
mkantercohen@fairelectionscenter.org            Southern Poverty Law Center
nbeck@fairelectionscenter.org                    400 Washington Ave.
jsherman@fairelectionscenter.org                 Montgomery, AL 36104
                                                 (334) 313-0702
                                                 ellen.degnan@splcenter.org

                                                 /s/ *Jess Unger*
                                                 Bradley Heard
                                                 Sabrina Khan
                                                 Jess Unger
                                                 Southern Poverty Law Center
                                                 1101 17th Street NW
                                                 Suite 550
                                                 Washington, DC 20036
                                                 bradley.heard@splcenter.org
                                                 sabrina.khan@splcenter.org
                                                 jess.unger@splcenter.org

                                                 /s/ *Ahmed Soussi*

16

Ahmed Soussi
Southern Poverty Law Center
201 St. Charles Avenue, Suite 2000
New Orleans, LA 70170
ahmed.soussi@splcenter.org

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 7, 2024, I electronically filed the above document with the Clerk of Court using the ECF system, which will provide electronic copies to counsel of record.

<div align="center" style="display:block; text-align:right;">

/s/ *Kathryn Huddleston*
Kathryn Huddleston

</div>