FILED

2024 Oct-09  PM 03:30
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |
|---|---|
| ALABAMA COALITION FOR IMMIGRANT JUSTICE, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>WES ALLEN, in his official capacity as Alabama Secretary of State, *et al.*,<br><br>    Defendants. | Case No. 2:24-cv-1254 (AMM) |
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>STATE OF ALABAMA and WES ALLEN, in his official capacity as Alabama Secretary of State,<br><br>    Defendants. | Case No. 2:24-cv-1329 (AMM) |

## UNITED STATES' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

I.  Introduction ...................................................................................................1

II. Background ....................................................................................................2

A.   Statutory Background ................................................................................2

B.   Factual Background ..................................................................................4

C.   Procedural History ...................................................................................7

III. Legal Standard .............................................................................................7

IV. Argument .......................................................................................................8

A.   Systematic Removal Programs Conducted Within 90 Days of a

Federal Election Violate the Quiet Period, Including Programs

That Identify Voters for Notification and Later Removal. ...........................9

1.   No Conflict Exists Between the Quiet Period Provision and the

Multiyear Procedure for Removal of Unconfirmed Movers....................10

2.   No Conflict Exists Between the Quiet Period Provision and the

Preelection Deadline for Voter Reactivation. ...........................................14

3.   *Arcia* Confirms that the Quiet Period Provision Applies to

Programs that Identify Registrants for Future Removal. .........................15

B.   Requests for Immediate Removal from Individuals Targeted by

the Program Do Not Undermine Its Systematic Nature. ...........................17

C.    A Program Whose Purpose Is to Remove Registered Voters Based on Initial Eligibility Criteria May Be Subject to the Quiet Period. ............18

D.    The Alabama Secretary of State Is a Proper Defendant in NVRA Litigation. ....................................................................................23

V.  CONCLUSION ..................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*A&M Gerber Chiropractic LLC v. Geico Gen. Ins. Co.*, 925 F.3d 1205
(11th Cir. 2019) ........................................................................................23

*Ali v. Federal Bureau of Prisons*, 552 U.S. 214 (2008) ...........................19

*Arcia v. Fla. Sec'y of State*, 772 F.3d 1335 (11th Cir. 2014) ......... passim

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013)............... 9, 20, 22

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)................................................7, 8

*Ass'n of Cmty. Orgs. for Reform Now v. Edgar*, 56 F.3d 791
(7th Cir. 1995) .........................................................................................21

*Belanger v. Salvation Army*, 556 F.3d 1153 (11th Cir. 2009)..................7

*Buckley v. Valeo*, 424 U.S. 1 (1976)......................................................21

*Burroughs v. United States*, 290 U.S. 534 (1934) .................................21

*Clark v. Martinez*, 543 U.S. 371 (2005) ................................................20

*Day v. Taylor*, 400 F.3d 1272 (11th Cir. 2005) .......................................5

*Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003)...................................10

*eople First of Ala. v. Merrill*, 467 F. Supp. 3d 1179 (N.D. Ala. 2020) .................24

*Ex parte Siebold*, 100 U.S. 371 (1880) ............................................ 21, 22

*Ex parte Yarbrough*, 110 U.S. 651 (1884).............................................21

*Greater Birmingham Ministries v. Sec'y of State*, 992 F.3d 1299
(11th Cir. 2021) .......................................................................................24

*Harkless v. Brunner*, 545 F.3d 445 (6th Cir. 2008).................................24

*Husted v. A. Philip Randolph Inst.*, 584 U.S. 756 (2018)................................. 13, 14

*Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020)...........................24

*Jennings v. Rodriguez*, 583 U.S. 281 (2018) ...........................................20

*Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183
(10th Cir. 2014) .......................................................................................22

*Majority Forward v. Ben Hill Cnty. Bd. of Elections*, 509 F. Supp. 3d
1348 (M.D. Ga. 2020) .............................................................................17

*Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 1077 (D. Ariz. 2023)........................19

*OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017) ..............................24

*Scott v. Schedler*, 771 F.3d 831 (5th Cir. 2014)......................................24

*Smiley v. Holm*, 285 U.S. 355 (1932) .....................................................21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007).........................8

*Tex. Democratic Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020) ............................25

*United States v. Florida*, 870 F. Supp. 2d 1346 (N.D. Fla. 2012)...........................16

*United States v. Turkette*, 452 U.S. 576 (1981) ......................................12

*Voting Rights Coal. v. Wilson*, 60 F.3d 1411 (9th Cir. 1995)..................................21

**Constitutional Provisions**

U.S. Const. art. I, § 4, cl. 1 ................................................................... 20, 21

**Federal Statutes**

52 U.S.C. § 20507 ........................................................................... passim
52 U.S.C. § 20509 ..................................................................................23
52 U.S.C. §§ 20501-11 ............................................................................2

**Federal Legislative Materials**

H.R. Rep. No. 103-9 (1993) .....................................................................13
S. Rep. No. 103-6 (1993) .........................................................................13

**State Statutes and Regulations**

Ala. Code § 17-1-3 ........................................................................... 23, 24
Ala. Code § 17-2-4 ..................................................................................24
Ala. Code § 17-3-1 ..................................................................................24
Ala. Code § 17-3-52 ................................................................................24
Ala. Code § 17-4-30 ................................................................................11
Ala. Const. art. VIII, § 177 .......................................................................20
Fla. Stat. § 98.065 ...................................................................................14
Ga. Code § 21-2-234 ...............................................................................14
Miss. Code § 23-15-152 ...........................................................................14
Tenn. Code § 2-2-106 ..............................................................................14

**Additional Authorities**

Nat'l Ass'n of Sec'ys of State, *NASS Report: Maintenance of State
  Voter Registration Lists* (Dec. 2017) .....................................................14
U.S. Dep't of Justice, *National Voter Registration Act of 1993 (NVRA):
  Questions and Answers* (2024) ...............................................................11
U.S. Dep't of Justice, *Voter Registration List Maintenance: Guidance
  under Section 8 of the National Voter Registration Act* (Sept. 2024)....................3

## I.      INTRODUCTION

On August 13, 2024—84 days before the November 5, 2024, federal general election—Alabama commenced a voter registration list maintenance program that the Alabama Secretary of State labeled a "Process to Remove Noncitizens registered to vote in Alabama."  Compl. ¶ 4, *U.S.* ECF No. 1.  This Program relied on outdated and inaccurate state records to flag 3,251 individuals for removal from the voter rolls, a list that included both natural-born and naturalized U.S. citizens. Compl. ¶¶ 4, 34-51, 63-64.

In their motion to dismiss, Defendants now claim that this program is not subject to the Quiet Period Provision of the National Voter Registration Act of 1993 (NVRA), 52 U.S.C. § 20507(c)(2)(A), which requires states to complete "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters" by the 90th day before a federal election.  *See* Defs.' Mot. 18-22, *U.S.* ECF No. 14.  This meritless argument— along with other defenses—must be rejected.  The Quiet Period Provision prohibits untimely programs intended to systematically remove the names of ineligible voters from the rolls, even if removal is not immediate or automatic.  A program intended to remove ineligible registrants remains systematic even if some targeted individuals who are marked inactive request to be removed from the voter rolls before the State removes them.  And Alabama is not "constitutionally empowered

to remove people who are categorically ineligible to vote at any time." Defs.' Mot. 23. There is no question that systematic list maintenance can be a useful tool and that only U.S. citizens are eligible to vote in federal elections. But Congress has exercised its preeminent power to regulate the timing of registration for federal office, and the United States has plausibly alleged that Defendants have violated the Quiet Period Provision's clear mandate. As a final matter, Alabama's chief elections official, the Secretary of State, is subject to suit for the NVRA violation alleged by the United States. Defendants' motion to dismiss should be denied.

## II.    BACKGROUND

### A.    Statutory Background

Enacted in 1993, the NVRA establishes uniform procedures and practices for voter registration and voter registration list maintenance for federal elections. *See* 52 U.S.C. §§ 20501-11.[1] Section 8 of the Act sets out numerous requirements for the administration of voter registration for elections for federal office, including when and how jurisdictions may remove voters from the rolls. *See id.* § 20507; *see also* U.S. Dep't of Justice, *Voter Registration List Maintenance: Guidance under*

---

[1] The NVRA applies to all states except those that continuously since August 1, 1994, either do not require voter registration or permit election-day registration at the polls during federal general elections. *See* 52 U.S.C. § 20503(b). Alabama does not fall within those exceptions. *See* U.S. Dep't of Justice, *National Voter Registration Act of 1993 (NVRA): Questions and Answers* ¶ 2, https://perma.cc/UXM4-CQ2X; *see also* Ala. Admin. Code § 820-2-2-.01.

*Section 8 of the National Voter Registration Act* (Sept. 2024),

https://perma.cc/B942-QX2E.

Section 8(c)(2), the Quiet Period Provision, directs that a "State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." *Id.* § 20507(c)(2). This general prohibition does not preclude removal of names from official lists of voters at the request of the registrant, by reason of criminal conviction or mental incapacity, or by reason of the death of the registrant or the correction of registration records pursuant to the NVRA. *See id.* § 20507(c)(2)(B). But the Quiet Period Provision does govern systematic removals based on failure to meet initial eligibility criteria, including programs that attempt to remove noncitizens. *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1343-48 (11th Cir. 2014). Ultimately, the Quiet Period Provision "strikes a careful balance: It permits systematic removal programs at any time *except* for the 90 days before an election because that is when the risk of disfranchising eligible voters is the greatest." *Id.* at 1346. And the Quiet Period Provision "would not bar a state from investigating potential non-citizens and removing them on the

basis of individualized information, even within the 90-day window." *Id.* at 1348.

### B.    Factual Background

On August 13, 2024—84 days before the November 5, 2024, federal general election—the State of Alabama began a process to remove 3,251 individuals who had allegedly been issued "noncitizen identification numbers" from Alabama's voter rolls.  Compl. ¶¶ 4, 20.  When announcing the Program, the Secretary of State's office conceded that "it is possible" that some of these individuals are naturalized U.S. citizens but did not explain what efforts, if any, had been taken to determine current citizenship.  *Id.* ¶ 23.

As part of the Program, the Secretary of State instructed county boards of registrars to place the 3,251 targeted individuals in "inactive" status and to initiate steps toward removal.  *Id.* ¶ 24.  An "inactive" Alabama voter cannot cast a regular ballot without first submitting paperwork to reactive their voter registration.  *Id.* ¶ 25.  Local officials then sent each targeted individual a form letter that stated,

> Secretary of State Wes Allen has provided our Office with information that shows you have been issued a noncitizen identification number by the Department of Homeland Security.  You are also a registered voter in Alabama.  This letter is informing you that only eligible United States citizens that reside in Alabama may register to vote in the state.  Therefore, your voter record has been made inactive and you have been placed on the path for removal from the statewide voter list.  Please complete and submit the enclosed Voter Removal Request form to immediately be removed from the voter list and become compliant with state and federal law requirements.  If you are a citizen of the United

States, and are otherwise eligible to register to vote in Alabama, please complete and submit the enclosed State of Alabama Voter Registration Form, and include your current Alabama driver license number or nondriver ID number, or the last four of your social security number (if you do not have an Alabama driver license).

*Id.* ¶¶ 26-29.  The enclosed voter registration form prominently stated that a voter cannot register in the 14 days prior to an election in Alabama.  *Id.* ¶ 30.  The form letter did not notify recipients that they could restore their voter record to active status by completing a voter registration form online or by completing a reidentification form at their polling place on Election Day.  *Id.* ¶¶ 31-32.

The Secretary of State created the list of 3,251 purported noncitizen registered voters by comparing voter rolls against driver's license and ID card data from the Alabama Law Enforcement Agency (ALEA) and against unemployment data from the Alabama Department of Labor (ADOL).  *Id.* ¶ 33.  Both matching processes were fundamentally flawed, relying on both outdated and inaccurate data, *id.* ¶¶ 34-51, and the Program has resulted in confusion and distrust among eligible voters, *id.* ¶¶ 3, 5, 7-8, 65, 71, 78.

As of September 19, 2024, approximately 717 U.S. citizens targeted by the Program have restored their registration to active status.  *Id.* ¶ 55, 57.[2]  To

---

[2] In their motion, Defendants rely on a declaration to suggest that targeted voters in Tuscaloosa County may never have entered inactive status.  *See* Defs.' Mot. 16 (citing Helms Decl. ¶ 51, *ACIJ* ECF No. 48-1, *U.S.* ECF No. 11-1).  In the present posture, this Court cannot consider a defense declaration.  *See Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (allowing consideration of an exhibit submitted in support of a motion to dismiss only if it is "(1) central to

reactivate their registration under Alabama law and procedures, each of these individuals submitted paperwork confirming that they are U.S. citizens.  *Id.* ¶ 56. As of September 19, 2024, only approximately 106 individuals targeted by the Program had submitted a voter removal request form.  *Id.* ¶ 58.  The Secretary of State's office has also corrected local officials who have assumed that anyone who submitted a voter removal request in response to the form letter is not a U.S. citizen.  *Id.* ¶¶ 61-62.

The Program has confused and frustrated voters who are U.S. citizens, in large part because they received official correspondence in August unjustifiably questioning their citizenship and announcing that their voter registration was on a path for removal.  *Id.* ¶¶ 8, 27.  The letter itself also provided confusing, contradictory, and incomplete instructions, directing all recipients to submit a voter removal request form to "become compliant with state and federal law requirements" while at the same time directing eligible U.S. citizens to complete a new voter registration form.  *Id.* ¶ 71.  The letter also failed to advise voters that they could restore voter registration records to active status by re-registering online

---

the plaintiff's claim and (2) undisputed").  Ultimately, the precise number of targeted voters who have nonetheless established citizenship is not critical to the United States' claim.  On the other hand, the defense declaration indicates that the Secretary of State "instructed the Tuscaloosa Registrars to abandon their plan to belatedly make the individuals Inactive," Helms Decl. ¶ 51, raising concerns that the Program was not "uniform," as required by the NVRA.  *See* 52 U.S.C. § 20507(b)(1).

or—if they failed to re-register by the application deadline—by completing paperwork at the polling place on Election Day. *Id.* ¶¶ 31-32.

### C.   Procedural History

The United States filed suit on September 27, 2024.  Compl., *U.S.* ECF No. 1.  The following day, this Court consolidated the United States' suit with *Alabama Coalition for Immigrant Justice v. Allen*, No. 2:24-cv-1254, a challenge to the Program brought by individual voters and civil rights groups (Private Plaintiffs). Order, *ACIJ* ECF No. 45, *U.S.* ECF No. 2.  Both the United States and Private Plaintiffs have moved for entry of a preliminary injunction. *See* U.S. Mot. for Prelim. Inj., *ACIJ* ECF No. 49, *U.S.* ECF No. 12; Private Pls.' Mot. for Prelim. Inj., *ACIJ* ECF No. 23.  Defendants moved to dismiss both the United States' and Private Plaintiffs' respective complaints on October 3.  Defs.' Mot., *ACIJ* ECF No. 50, *U.S.* ECF No. 14.

## III.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation and quotation marks omitted); *see also Belanger v. Salvation Army*, 556 F.3d 1153, 1155 (11th Cir. 2009) (construing allegations in a complaint "in the light most favorable to the plaintiff").  "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable." *Iqbal*, 556 U.S. at 678.  Consideration of information outside the face of the complaint is limited to "documents incorporated into the complaint by reference[] and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  So long as these materials allow a court to "draw the reasonable inference that the defendant is liable," the motion must be denied.  *Iqbal*, 556 U.S. at 678.

## IV.   ARGUMENT

The United States has alleged sufficient facts to support its single claim: that Alabama has violated the Quiet Period Provision, Section 8(c)(2) of the NVRA. But the Defendants argue that the Program is not subject to the Quiet Period Provision because it did not immediately remove registrants and that the Program is not "systematic" for purposes of the Provision because the only registrants immediately removed had submitted removal requests. They also claim that Alabama is "constitutionally empowered" to remove people who are ineligible to vote "at any time."  Defs.' Mot. 23.  These defenses fail.  First, the Defendants' focus on immediate removal has no basis in the statute's text, corresponding legislative history, or caselaw.  Decisions by targeted registrants to request immediate removal do not change the systematic nature of the Program, which the Secretary of State announced as a "Process to Remove Noncitizens registered to

vote in Alabama." Compl. ¶ 4. Moreover, Defendants' improper constitutional avoidance argument is foreclosed by *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013). Finally, because the Defendant Secretary of State is authorized to provide the relief sought by the United States, he is a proper defendant here. Defendants' Motion to Dismiss should be rejected *in toto*.

A. **Systematic Removal Programs Conducted Within 90 Days of a Federal Election Violate the Quiet Period, Including Programs That Identify Voters for Notification and Later Removal.**

Alabama initiated the Program to "remove" ineligible voters from the official lists of eligible voters for purposes of the Quiet Period Provision. 52 U.S.C. § 20507(c)(2)(A). The Secretary of State declared as much when he announced that his office had begun implementing a "Process to Remove Noncitizens registered to vote in Alabama." Compl. ¶ 4. The Secretary of State then informed targeted voters that they "ha[d] been placed on the path for removal from the statewide voter list." Compl. ¶ 27. Defendants' attempts to recast the Program, Defs.' Mot. 19-22, fail.

Defendants also ignore the statute's plain text by contending that the Program is not subject to the Quiet Period Provision because—to date—registrants targeted by the Program remain on the voter rolls in inactive status but have not been removed—yet. Defs.' Mot. 19-21. The Quiet Period Provision prohibits states from completing "any program *the purpose of which* is to systematically

remove" ineligible voters from registration lists.  52 U.S.C. § 20507(c)(2)(A) (emphasis added).  The United States has plausibly alleged that the purpose of the Program was to remove ineligible voters.  *See* Compl. ¶¶ 4, 20, 27.  Defendants suggest no other purpose.  *See* Defs.' Mot.  Because the Quiet Period Provision turns on the purpose of a list maintenance program, *see Arcia*, 772 F.3d at 1344, removal need not be immediate or automatic for a program to run afoul of the Quiet Period Provision.

### 1.  No Conflict Exists Between the Quiet Period Provision and the Multiyear Procedure for Removal of Unconfirmed Movers.

Avoiding the Quiet Period Provision's plain text, Defendants suggest that a separate NVRA provision—the procedures for removal of unconfirmed movers in Section 8(d)(1)(B)—requires reading the Quiet Period Provision in a manner that does not regulate programs that seek to identify ineligible registrants for notification and later removal.  Defs.' Mot. 19-20.  As an initial matter, the State's misdirected argument warrants no deviation from the Quiet Period Provision's plain text.  *See, e.g.*, *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003) ("[W]here, as here, the words of the statute are unambiguous, the judicial inquiry is complete." (internal citation and quotation marks omitted)).  In any case, the NVRA's structure, legislative history, and common practice confirm that the Quiet Period Provision governs programs intended to remove ineligible voters by placing them in the queue for removal.

Section 8(d)(1)(B) of the NVRA does not limit the scope of the Quiet Period Provision.  Understanding why requires a brief explanation of processes to remove movers from voter registration rolls.  Section 8(d)(1) of the NVRA prohibits states from removing the "name of a registrant from the official list of eligible voters . . . on the ground that the registrant has changed residence" unless the registrant confirms the move or the jurisdiction follows a prescribed procedure.  52 U.S.C. § 20507(d)(1).  Before a jurisdiction may remove an unconfirmed mover, the jurisdiction must mail the registrant a notice that meets the requirements of Section 8(d)(2)—sometimes known as an 8(d)(2) Notice—and wait until the registrant fails to respond and "has not voted or appeared to vote . . . in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice."  *Id.* § 20507(d)(1)(B); *see also id.* § 20507(d)(2) (notice requirements).  A jurisdiction may designate a registrant as "inactive" after mailing an 8(d)(2) Notice.  *See* U.S. Dep't of Justice, *National Voter Registration Act of 1993 (NVRA): Questions and Answers* ¶ 34 (2024), https://perma.cc/UXM4-CQ2X; *see also* Ala. Code § 17-4-30(e).[3]

---

[3] The term "inactive" is an administrative label that does not appear in the text of the NVRA. The NVRA establishes that if registrant has been sent an 8(d)(2) Notice and has failed to respond, "affirmation or confirmation of the registrant's address may be required before the registrant is permitted to vote in a Federal election."  52 U.S.C. § 20507(d)(2)(A).

If the entire process of removing unconfirmed movers—from the mailing of an 8(d)(2) Notice until removal from the list of eligible voters—were a single "program," then it would not be possible to complete the "program" before each federal election, creating an inconsistency within the NVRA. *See* Defs.' Mot. 19-20; *see also, e.g.*, *United States v. Turkette*, 452 U.S. 576, 580 (1981) (counseling that absurd results and internal inconsistencies should be avoided). But simply excluding voter inactivation from the Quiet Period Provision is not the only solution to this potential problem. Rather, the NVRA establishes that identification of suspected ineligible registrants for later removal can be a standalone "program."

Section 8(c)(1) of the NVRA, known as the Safe Harbor Provision, confirms that "a program" may simply identify registrants who should be sent 8(d)(2) Notices. *See* 52 U.S.C. § 20507(c)(1)(B)(ii). Once again, statutory context is necessary. Section 8(a)(4) of the NVRA requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . a change in the residence of the registrant." *Id.* § 20507(a)(4). The Safe Harbor Provision then dictates that states may satisfy this "reasonable effort" requirement by establishing "a program" using Postal Service data to find suspected movers. *See id.* § 20507(c)(1)(A); *see also Bellito v. Snipes*, 935 F.3d 1192, 1203-05 (11th Cir. 2019) (detailing Safe Harbor procedures). Defendants concede that Section 8(a)(4) mandates a program

subject to the Quiet Period Provision, Defs.' Mot. 19, and so the Safe Harbor Provision must meet Quiet Period requirements as well.  In fact, the NVRA applies the header "Voter Removal Programs" to both the Safe Harbor Provision and the Quiet Period Provision.  *See* 52 U.S.C. § 20507(c).  Much like a Safe Harbor "program," the Program at issue here places registrants in the queue for removal. Both are subject to the Quiet Period Provision.

Legislative history confirms that the NVRA prohibits jurisdictions from mailing list maintenance notices to registrants and inactivating voters during the Quiet Period.  For instance, the Senate Committee Report specifically explains that "State outreach activity such as *a mailing* or door to door canvas" must be completed by the 90-day deadline.  S. Rep. No. 103-6, at 32 (1993) (Senate Report) (emphasis added); *see also* H.R. Rep. No. 103-9, at 16 (1993) (House Report) (same); Senate Report at 18-19 ("Any program which the States undertake to verify addresses must be completed not later than 90 days before a primary or general election.").  *See generally Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 763 (2018) (relying on Senate Report).  This directly refutes Defendants' attempt to limit application of the Quiet Period Provision by analogizing the Program to the mailing of 8(d)(2) Notices and claiming that 8(d)(2) Notices are not subject to the Quiet Period Provision.  Rather, the best reading of the Quiet Period

Provision considers any process of moving groups of registrants into inactive status to be a discrete "program" that must be complete 90 days before a federal election.

Finally, it is worth noting that states typically complete programs to identify and inactivate potentially ineligible registrants before the Quiet Period.  In fact, each state that neighbors Alabama has recognized that address verification programs and inactivation cannot occur within 90 days of a federal election.  *See* Fla. Stat. § 98.065(5); Ga. Code § 21-2-234(i); Miss. Code § 23-15-152(6); Tenn. Code § 2-2-106(b).  The National Association of Secretaries of State has also directed its members that "[u]nder NVRA, any program designed to *identify* voters who have moved must be conducted no later than 90 days prior to a primary or general election for federal office."  Nat'l Ass'n of Sec'ys of State, *NASS Report: Maintenance of State Voter Registration Lists* 5 (Dec. 2017), https://perma.cc/CU7K-2GBL (emphasis added); *see also Husted*, 584 U.S. at 762-63 (relying on the NASS Report).  Defendants stand alone in suggesting the Program at issue here is not subject to the Quiet Period Provision.

### 2. No Conflict Exists Between the Quiet Period Provision and the Preelection Deadline for Voter Reactivation.

Defendants further suggest that because an inactive voter may reactivate their registration within the Quiet Period, the Quiet Period cannot apply to programs that target voters for inactivation.  *See* Defs.' Mot. 20.  Not so.  As Defendants note, an 8(d)(2) Notice must inform voters that "[i]f the registrant did

not change his or her residence, or changed residence but remained in the

registrar's jurisdiction, the registrant should return the card not later than the time

provided for mail registration."  52 U.S.C. § 20507(d)(2)(A).  This deadline falls

within the Quiet Period.  *See id.* § 20507(a)(1)(B).  However, the Quiet Period

Provision expressly exempts "correction of registration records pursuant to [the

NVRA]."  52 U.S.C. § 20507(c)(2)(B)(ii).  This includes reactivation of a

registrant deemed potentially ineligible who corrects their registration by

confirming an address or other information.  *See id.*  Fundamentally, the Quiet

Period Provision limits systematic programs in the weeks before an election due to

the likelihood of error.  It does not apply to individualized error correction,

registration updates, or even voter removal.  *See Arcia*, 772 F.3d at 1346, 1348.

Thus, no conflict exists between the preelection deadline for responses to an

8(d)(2) Notice and the Quiet Period Provision.

### 3.    *Arcia* Confirms that the Quiet Period Provision Applies to Programs that Identify Registrants for Future Removal.

Contrary to Defendants' suggestion, Defs.' Mot. 20-21, *Arcia* makes clear

that programs that identify registrants for future removal are subject to the Quiet

Period Provision.  The programs ultimately struck down by *Arcia* did not

immediately remove voters from the rolls.  Rather, less than 90 days before the

2012 primary elections, the Florida Secretary of State provided local officials with

lists of potential noncitizens and a form letter including "a statement that if the

person failed to respond within 30 days, the person might be removed from the voter roll." *United States v. Florida*, 870 F. Supp. 2d 1346, 1347 (N.D. Fla. 2012). The Florida Secretary of State recommended a similar program before the 2012 general election. *See Arcia*, 772 F.3d at 1339-40. *Arcia* nonetheless held that these programs were "attempt[s] to systematically remove names from the voter rolls." 772 F.3d at 1339; *see also id.* at 1344 (defining the "program" as computerized data-matching "followed by the mailing of notices"). The same is true here. By placing voters in inactive status and "on the path for removal," Compl. ¶ 27, the Secretary of State commenced a process to "remove" voters from the rolls under the Quiet Period Provision.

Defendants recognize that *Arcia* held that a "*notice* and removal process" begun less than 90 days before a federal election violated the Quiet Period Provision. Defs.' Mot. 21 (quoting *Arcia*, 772 F.3d at 1339) (emphasis added). The Program at issue here is also a "notice and removal process," although Defendants have afforded erroneously targeted U.S. citizens a longer period to correct records before outright removal occurs. It is of no moment that the program at issue in *Arcia* continued to remove voters from the rolls "in the days before an election." Defs.' Mot. 21. The "purpose" of these removals was "to systematically remove the names of ineligible voters" from the rolls, *Arcia*, 772 F.3d at 1344, but that does mean that targeting voters for future removal cannot

share that same purpose.  Similarly, the fact that the Quiet Period Provision

protects registrants from outright removal in the weeks preceding an election, *see*

*id.* at 1346, does not mean that the Provision cannot protect registrants from other

harms, such as the confusion and deterrence experienced by eligible U.S. citizen

voters targeted by the Program.  *See* Compl. ¶¶ 3, 5, 7-8, 65, 71, 78.

### B.    Requests for Immediate Removal from Individuals Targeted by the Program Do Not Undermine Its Systematic Nature.

The United States has pleaded sufficient facts to show that the Program was

systematic for purposes of the Quiet Period Provision.  The Eleventh Circuit has

explained that a removal program that "use[s] a mass computerized data-matching

process to compare the voter rolls with other state and federal databases, followed

by the mailing of notices" is systematic.  *Arcia*, 772 F.3d at 1344; *see also, e.g.*,

*Majority Forward v. Ben Hill Cnty. Bd. of Elections*, 509 F. Supp. 3d 1348, 1355

(M.D. Ga. 2020) (contrasting systematic programs and "individualized inquiries").

That is exactly what the Program did.  The Secretary compared voter registration

records against ALEA and ADOL databases and directed local officials to mail

letters to registrants suspected of not being U.S. citizens.  Compl. ¶¶ 24, 33.  The

Program did not depend on "individualized information or investigation" to

identify voters, supplement databases, or confirm non-citizenship.  *Arcia*, 772 F.3d

at 1344.

Defendants attempt a sleight of hand, suggesting that the only "removal" occurring is not "systematic" for purposes of the Quiet Period Provision by pointing to individual removal requests from registrants targeted by the Program, rather than the Program in its entirety.  Defs.' Mot. 22-23.  The United States does not contest that removals at the request of a voter are not subject to the Quiet Period Provision.  *See* Compl. PFR ¶¶ 3-4 (excluding registrants who have submitted voter removal requests from requested relief); *see also* 52 U.S.C. § 20507(c)(2)(B)(i).  However, the purpose of the Program in its entirety was to "remove the names of ineligible voters from the official lists of eligible voters." *Id.* § 20507(c)(2)(A); Section IV.A, *supra*.  The mere fact that some targeted voters submitted removal requests does not change that fact, just as the fact that some recipients of an 8(d)(2) Notice may submit a removal request does not change the fact that the Safe Harbor process is subject to the Quiet Period Provision.  *See* Section IV.A.1, *supra*.  The Program did not inactivate voters based on "individual correspondence or rigorous individualized inquiry," and thus *Arcia* establishes that the Program was "systematic" for purposes of the Quiet Period Provision.  772 F.3d at 1346.

### C.   A Program Whose Purpose Is to Remove Registered Voters Based on Initial Eligibility Criteria May Be Subject to the Quiet Period.

Defendants concede that *Arcia* forecloses a reading of the Quiet Period Provision that does not constrain programs intended to remove noncitizens from

the list of eligible voters.  *See* Defs.' Mot. 23.  And for good reason.  During the Quiet Period, states may not conduct "*any program* the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters."  52 U.S.C. § 20507(c)(2)(A) (emphasis added).  *Arcia* affirms that the phrase "any program" carries a "broad meaning."  772 F.3d at 1344; *see also Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) (explaining that "the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind'" (citation omitted)).  The NVRA sets out only three categories of removals not subject to the Quiet Period Provision—those (1) at the request of the registrant, (2) because of a criminal conviction or mental incapacity, or (3) because the registrant has died, 52 U.S.C. § 20507(c)(2)(B)—and those categories are exclusive, *see Arcia*, 772 F.3d at 1345. "Noticeably absent from the list of exceptions" to the Quiet Period Provision "is any exception for removal of non-citizens."  *Arcia*, 772 F.3d at 1345; *see also see also Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 1077, 1092-93 (D. Ariz. 2023) (same), *appeal pending*, No. 24-3188 (9th Cir.).

Despite this binding Eleventh Circuit decision, Defendants argue that *Arcia* "was wrongly decided and should have interpreted the NVRA to avoid unconstitutionality."  Defs.' Mot. 23.  In fact, Defendants do not ask the courts to read the Quiet Period Provision in a plausible manner that avoids serious

constitutional concerns; they ask the courts to read the Provision out of existence.

Defendants assert that Alabama is "constitutionally empowered to remove people who are categorically ineligible to vote *at any time*."  Defs.' Mot. 23 (emphasis added).  This attack on the Quiet Period Provision has no basis in the Constitution or case law.  *See* U.S. Const. art. I, § 4, cl. 1; *see also, e.g.*, *Inter Tribal Council*, 570 U.S. at 8-9, 17-19.

As an initial matter, Defendants present an improper constitutional avoidance argument.  The canon of constitutional avoidance "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction." *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018) (quoting *Clark v. Martinez*, 543 U.S. 371, 385 (2005)).  The Quiet Period Provision requires States to complete programs "the purpose of which is to systematically remove the names of *ineligible voters* from the official lists of eligible voters" not later than 90 days before a federal election.  52 U.S.C. § 20507(c)(2)(A) (emphasis added).  This text cannot be read to permit removal of "people who are categorically ineligible to vote at any time," in accordance with Alabama's proclaimed prerogative.  Defs.' Mot. 23.  Moreover, a noncitizen and a resident of Mississippi are equally ineligible to vote in Alabama elections.  *See* Ala. Const. art. VIII, § 177(a).  Injecting atextual exclusions into the Quiet Period

Provision to permit systematic removals of suspected movers and alleged noncitizens would render the Provision a dead letter.

Congress's preeminent power under the Elections Clause, U.S. Const. art. I, § 4, cl. 1, authorizes the NVRA, including the Quiet Period Provision.  *See, e.g.*, *Voting Rights Coal. v. Wilson*, 60 F.3d 1411 (9th Cir. 1995), *cert. denied*, 516 U.S. 1093 (1996).  The Elections Clause provides, "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators."[4]  The Clause's "comprehensive words embrace authority to provide a complete code for congressional elections," including on the very topics the NVRA addresses: "registration" and "prevention of fraud and corrupt practices."  *Smiley v. Holm*, 285 U.S. 355, 366 (1932); *see also, e.g.*, *Inter Tribal Council*, 570 U.S. at 8-9 (acknowledging that "Times, Places, and Manner" includes "registration" (internal citation and quotation marks omitted)); *Ex parte Siebold*, 100 U.S. 371, 383-384 (1880) (upholding a statute providing for federal supervision of a State's voter registration process as a proper exercise of the "[T]imes, [P]laces and [M]anner"

---

[4] The Elections Clause does not refer to presidential elections. However, Article II, Section 1, which does address that subject, "has been interpreted to grant Congress power over Presidential elections coextensive with that which Article I section 4 grants it over congressional elections." *Ass'n of Cmty. Orgs. for Reform Now v. Edgar*, 56 F.3d 791, 793 (7th Cir. 1995) (citation omitted); *see also Buckley v. Valeo*, 424 U.S. 1, 13 n.16 (1976); *Burroughs v. United States*, 290 U.S. 534, 545 (1934); *Ex parte Yarbrough*, 110 U.S. 651, 662 (1884).

authority).  When Congress exercises its authority to "alter" state regulations of federal elections, that authority "is paramount, and may be exercised at any time, and to any extent which it deems expedient." *Inter Tribal Council*, 570 U.S. at 9 (quoting *Ex parte Siebold*, 100 U.S. 371, 392 (1880)).

The Quiet Period Provision does not stand in the way of Alabama's power "to enforce its voter qualifications."  Defs.' Mot. 23 (quoting *Inter Tribal Council*, 570 U.S. at 17).  The Quiet Period Provision regulates only the time when states may enforce their qualifications via systematic removal programs, and so the provision falls well within Congress's "times, places, and manners" authority under the Elections Clause.  The Provision "permits systematic removal programs at any time *except* for the 90 days before an election," as well as "removals based on individualized information at any time."  *Arcia*, 772 F.3d at 1346; *see also id.* at 1348 (recognizing that the Quiet Period Provision "would not bar a state from investigating potential non-citizens and removing them on the basis of individualized information, even within the 90-day window").  Thus, the Quiet Period Provision does not "preclude[] . . . enforcement," *Inter Tribal Council*, 570 U.S. at 18, and raises no constitutional concerns.  *See also, e.g.*, *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1199 (10th Cir. 2014) (holding that federal voter registration form's lack of a documentary proof of citizenship requirement did not preclude states from "enforcing their laws intended to prevent

noncitizen voting" when there were "at least five alternative means available to the states to enforce their laws"). There is no basis to dismiss the United States' well-pleaded claim so that Alabama may cast doubt on voter eligibility on the eve of a federal election.

### D.   The Alabama Secretary of State Is a Proper Defendant in NVRA Litigation.

As a final matter, the United States has properly brought suit against both the State of Alabama and the Alabama Secretary of State. Defendants have asserted only that Private Plaintiffs lack standing to sue the Secretary of State, but the generalized redressability concerns Defendants raise, Defs.' Mot. 14-16, could be asserted against the United States here or on appeal. Because Article III standing is jurisdictional and can be neither conceded nor waived, *see, e.g.*, *A&M Gerber Chiropractic LLC v. Geico Gen. Ins. Co.*, 925 F.3d 1205, 1210 (11th Cir. 2019), the United States addresses these erroneous arguments at the first opportunity.

As the State of Alabama's "chief elections official," Ala. Code § 17-1-3(a), the Secretary of State is a proper defendant with respect to violations of the Quiet Period Provision. The NVRA requires each chief state election official "to be responsible for coordination of State responsibilities" under the Act, 52 U.S.C. § 20509, which renders that official subject to suit for noncompliance within their

state.  *See, e.g.*, *Scott v. Schedler*, 771 F.3d 831, 838-39 (5th Cir. 2014); *Harkless v. Brunner*, 545 F.3d 445, 451-55 (6th Cir. 2008).

In this case, it defies logic to suggest that the Alabama Secretary of State has the power to direct local officials to carry out the Program—to send letters dictated by the Secretary and to inactivate a list of voters provided by the Secretary, Compl. ¶¶ 24, 26-29—but lacks the authority to direct those same officials to unwind the Program.  *Cf. Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1254 (11th Cir. 2020) (holding that Florida Secretary of State was not a proper defendant "[i]n the absence of any evidence that the Secretary controls" the challenged conduct).  In fact, the Secretary has the authority "to tell election officials how to implement election laws," through the adoption of uniform guidance and standards for voting. *People First of Ala. v. Merrill*, 467 F. Supp. 3d 1179, 1201 (N.D. Ala. 2020) (citing Ala. Code §§ 17-1-3(a), -2-4(f)); *see also* Ala. Code §§ 17-3-1, -52 (authorizing rulemaking governing voter registration).  Thus, the Eleventh Circuit has held that alleged injuries caused by Alabama election laws implemented by local officials are redressable through a decision against the Secretary.  *See Greater Birmingham Ministries v. Sec'y of State*, 992 F.3d 1299, 1316-17 (11th Cir. 2021); *cf., e.g.*, *OCA-Greater Houston v. Texas*, 867 F.3d 604, 613 (5th Cir. 2017) ("The facial invalidity of a Texas election statute is, without question, fairly traceable to and redressable by the State itself and its Secretary of State, who

24

serves as the 'chief election officer of the state.'"); *Tex. Democratic Party v.*

*Abbott*, 961 F.3d 389, 399 (5th Cir. 2020) (same).

## V.     CONCLUSION

The United States has pleaded serious allegations against the Program,

sufficient to state a claim under the Quiet Period Provision, Section 8(c)(2) of the

National Voter Registration Act of 1993.  For the reasons set out above,

Defendants' motion to dismiss the United States' complaint should be denied.

Date:  October 9, 2024

                      Respectfully submitted,

                      KRISTEN CLARKE
                      Assistant Attorney General
                      Civil Rights Division

                      */s/ Daniel J. Freeman*
                      R. TAMAR HAGLER
                      RICHARD A. DELLHEIM
                      DANIEL J. FREEMAN
                      KELLI M. SLATER
                      Attorneys
                      Voting Section, Civil Rights Division
                      U.S. Department of Justice
                      950 Pennsylvania Avenue, N.W
                      Washington, D.C. 20530
                      (202) 746-1557

## CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2024, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send notification

of this filing to counsel of record.

*/s/ Daniel J. Freeman*
Daniel J. Freeman
Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice