FILED
2024 Oct-09 PM 11:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ALABAMA COALITION FOR IMMIGRANT JUSTICE, *et al.*,

*Plaintiffs*,

v.

WES ALLEN, in his official capacity as Alabama Secretary of State, *et al.*,

*Defendants*.

Case No.: 2:24-cv-01254-AMM

UNITED STATES OF AMERICA,

*Plaintiff*,

v.

STATE OF ALABAMA and WES ALLEN, in his official capacity as Alabama Secretary of State,

*Defendants*.

Case No.: 2:24-cv-01329-AMM

**STATE DEFENDANTS' RESPONSE IN OPPOSITION TO**
**UNITED STATES OF AMERICA'S MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

I. INTRODUCTION ........ 1
II. BACKGROUND ........ 3
A. Election Integrity and Noncitizen Voting ........ 3
B. Secretary Allen's Unsuccessful Requests for Federal Cooperation ........ 4
C. Implementation of the Noncitizen Letter Process ........ 7
D. Procedural History ........ 10
III. STANDARD ........ 11
IV. ARGUMENT ........ 12
A. The United States Is Not Likely to Succeed on the Merits. ........ 12
B. The United States Has Not Shown Irreparable Harm. ........ 19
C. The Balance of Equities Favor Defendants ........ 23
D. The United States Demands Remedies of Improper Scope. ........ 26
CONCLUSION ........ 28

## I. INTRODUCTION

The United States has the best information about whether any registered voter on Secretary Allen's list of 3,251 is a citizen.

The United States could have easily provided that information to the Alabama Secretary of State. It could have provided that information when the Secretary asked for it a year ago. Or when he asked for it six months ago. Or after his July 16, 2024 letter, in which he *told* the United States that he would endeavor to identify suspected cases of noncitizens registered to vote based on drivers licenses and asked the United States to verify that information.

Instead, the United States rejected or ignored his requests, waited for the Secretary to act, and then brought this lawsuit. And now the federal government asks this Court for equitable relief to remedy an alleged emergency it could have easily avoided. Even today, the United States could reduce the number of individuals impacted by the Secretary's noncitizen letter process by confirming the citizenship of any of 2,043 remaining Inactive voters on the list who are in fact citizens. The Secretary would instruct the Registrars to make those confirmed individuals Active voters and mail them Voter Information Cards posthaste.

Further, there is no irreparable harm that requires this Court's intervention. Every eligible voter on the list of 3,251 who wishes to vote may show up and vote on Election Day without completing any prior paperwork. Yes, Inactive voters

from the list of 3,251—like all Inactive voters—will be asked to complete a short and simple form at the polls. But the United States cannot show a substantial likelihood of disenfranchisement from the routine process that applies to hundreds of thousands of voters every cycle.

When the Secretary asked the United States for help, the only help on offer was the suggestion—in July 2024—that the Secretary could work with other State agencies who had preexisting relationships with USCIS. The Secretary did just that. The United States's role in the alleged violation cannot be overlooked. Nor can its delay in bringing this motion. Nor its failure to provide clear notice of its position, which is being developed in this litigation for the first time based on legislative history that is not law.

If the Court reaches the merits, it will find that the United States is wrong on the law too. Section 8(c)(2) of the National Voter Registration Act is not a 90-day gag order, nor a catch-all cause of action for alleged voter confusion. As the Eleventh Circuit correctly understood in *Arcia*, the 90-day bar is a bar on removals because the end point of a removal program is removal. That's what it means to "complete" a program for removing ineligible voters. The State's reading is the only way to reconcile the bar with the NVRA's general program, which *by law* must be ongoing, not completed, through every election. And only the State's reading has the virtue of explaining why the 90-day bar exempts certain *removals*,

but not a single kind of communication as one would expect if it were a "Quiet Period." Even if the Court considers snippets of legislative history and finds that they trump the text and structure of the Act, the United States's motion has not made a clear showing on the likelihood of success.

In light of the strong public interest in election integrity, the Secretary's reasonable efforts should not be enjoined on the basis of speculation and a tenuous reading of the NVRA. The motion should be denied.

## II. BACKGROUND

### A. Election Integrity and Noncitizen Voting

Secretary Allen has made election integrity a priority of his tenure. *See, e.g.*, Helms Decl., DE11-1, ¶15. There are nearly four million registered voters in Alabama. It happens that some registered voters are not eligible to vote. In 2023, for example, the Secretary assisted federal, State, and local law enforcement with the arrest and prosecution of three noncitizens for voter fraud. *Id.* ¶¶90-91. The U.S. attorney's office in Birmingham is prosecuting a noncitizen for unlawfully voting in multiple elections. *See* DE59-N (Information); DE59-O (Plea Agreement). This past July, a noncitizen contacted a Registrar in Colbert County asking to be removed from the rolls, and the Registrar learned that the man had registered by handwritten application in 2008 and voted as recently as the 2020 General Election. Helms Decl. ¶61 (citing Ex. 27). Despite the insistence of the

United States that noncitizen voting is not "widespread," DE12 at 7, many States including Ohio, Oregon, and Virginia, have been dealing with similar issues in the lead up to the 2024 General Election.[1]

### B. Secretary Allen's Unsuccessful Requests for Federal Cooperation

Among other efforts, Secretary Allen has made repeated attempts to collaborate with the federal government on the issue of noncitizen voting. His attempts go unmentioned by the United States in its motion for equitable relief. *See* DE12 at 8-13 (Background). Pertinent statutory background is the requirement that when asked by a State official to verify citizenship or immigration status for a lawful purpose, the federal government must comply. In particular, the Department of Homeland Security (DHS) "shall respond … by providing the requested verification or status information." 8 U.S.C. §1373(c) (Section 642 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996); *accord Arizona v. United States*, 567 U.S. 387, 411 (2012) (Congress "obligated" DHS "to respond to

---

[1] *See, e.g.*, Carlos Fuentes, *Oregon DMV only learned it helped register 300 non-citizens to vote after a national think tank raised questions*, The Oregonian (Sept. 23, 2024), https://www.oregonlive.com/politics/2024/09/oregon-dmv-only-learned-it-helped-register-300-non-citizens-to-vote-after-a-national-think-tank-raised-questions.html Office of Va. Governor, *Executive Order Number Thirty-Five (2024): Comprehensive Election Security Protecting Legal Voters and Accurate Counting*, perma.cc/7YZ2-DD48; *Secretary LaRose Refers Evidence of Non-Citizen Voter Registrations to Ohio Attorney General for Potential Prosecution*, Press Release (Aug. 21, 2024), www.ohiosos.gov/media-center/press-releases/2024/2024-08-21/; *see also, e.g.*, Jesse T. Richman et al., *Do non-citizens vote in U.S. elections?*, 36 ELECTORAL STUDIES 149, 153 (2014) (discussing how fraud can affect close elections); James D. Agresti, *Study: 10% to 27% of Non-Citizens are Illegally Registered to Vote*, JUST FACTS (May 13, 2024), www.justfacts.com/news_non-citizen_voter_registration.

any request made by state officials for verification of a person's citizenship or immigration status."). To put it mildly, the treatment Secretary Allen received from the federal government was not close to what Congress envisioned.

Secretary Allen first contacted U.S. Citizenship and Immigration Services (USCIS) in October 2023 to request a list of legal noncitizens known to the agency to be residents of Alabama. Helms Decl. ¶17. He never received a response to that letter, so he wrote the agency headquarters, which rejected his request. *Id.* ¶¶18-20. The agency directed him to the SAVE database, which provides certain immigration status and citizenship verification services to State and local government entities. SAVE could never be a complete solution when it comes to elections for a variety of reasons, including that it requires the requesting entity already possess a correct alien identification number for any individual and that it is not clear whether the service can efficiently process thousands or millions of requests from State election officials. *Id.* ¶¶20-21, 24, 26 (citing Ex. 8).

After months of correspondence and meetings between Secretary Allen, his office, and various personnel and components of the Executive Branch, *id.* ¶¶22, 25-34, USCIS finally seemed open to sharing citizenship information with Alabama, *id.* ¶35. During a meeting on July 10, 2024, USCIS discussed the possibility of a Memorandum of Agreement with Alabama, which the agency represented as an arrangement it had with other States. *Id.* Moreover, individuals

from USCIS demonstrated that certain government entities already had access to SAVE for other purposes, including the Alabama Law Enforcement Agency and the Alabama Department of Labor. *Id.* The Secretary's office inferred from that conversation the suggestion to work with other State agencies to gather citizenship information, and that is exactly what he ended up doing. *Id.*

Secretary Allen also continued to pursue the option of a Memorandum of Understanding with USCIS. *Id.* ¶36. Within a week of the video conference with USCIS, on July 16, 2024, Secretary Allen tendered a concrete proposal to USCIS to procure citizenship information for use in State elections. *Id.* ¶36 (citing Ex. 13). In that letter, the Secretary also wrote:

> To further facilitate the most useful matching process, my team is working to obtain AINs for suspected cases [of noncitizens registered to vote] identified through our Alabama Law Enforcement Agency's Driver License Division for driver licenses issued to foreign nationals so that AINs may be provided to USCIS when available. . . .

Not only did the federal government fail to inform the Secretary that, on its view of the 90-day rule, he had only two weeks to act on any information he received from ALEA, but the agency never responded at all. *Id.* ¶37.

To the extent that the noncitizen letter process "did not depend on individualized information or investigation" of the kind the United States believes would be necessary to render the Secretary's efforts exempted from the 90-day bar, DE12 at 18, the Secretary was denied that information *by the United States*.

**C. Implementation of the Noncitizen Letter Process**

Although he never heard back from USCIS, Secretary Allen pursued the idea to use citizenship information already in the State's possession. Helms Decl. ¶¶38-45. Through cooperation with other State agencies, Secretary Allen identified certain registered voters on the official rolls who had either "(1) identified himself/herself as a noncitizen to obtain a foreign national driver license in the State of Alabama or (2) marked that he/she was a noncitizen to apply for unemployment benefits with the Alabama Department of Labor." *Id.* ¶41. Consequently, the Secretary's Director of Elections Jeff Elrod "instructed the Registrars to contact these 3,251 individuals." *Id.* ¶42. The Director's form letter would have Registrars ask recipients who are not U.S. citizens to request removal from the voter rolls and recipients who are U.S. citizens and otherwise eligible to vote to complete a voter registration form. *Id.* ¶45.

At the same time, the Registrars were instructed to change the status of individuals on the list within their respective jurisdictions to Inactive. *See* Helms Decl. ¶¶44, 46, 47 (citing Exs. 17, 18). Alabama's voter registration list includes Active and Inactive voters. Helms Decl. ¶85. Both can vote on Election Day. *Id.* Inactive voters simply need to complete a reidentification/update form at the polls (or a voter registration form before the deadline). *Id.* This is a longstanding reality. *See* Ala. Code §17-4-9 ("Once on the inactive list, the voter shall reidentify with

the local board of registrars in order to again have his or her name placed on the active voter registration list. Notwithstanding the foregoing, if a voter on the inactive list goes to his or her polling place to vote on an election day and identifies himself or herself to the election official responsible for the voter registration list update, such voter shall be permitted to vote provided the voter completes a voter reidentification form."); *accord* Helms Decl. ¶19 (explaining how to become Active). Moreover, what Alabama calls Inactive is expressly contemplated by the NVRA. *See* 52 U.S.C. §20507(d)(2)(A) (providing that voters who fail to return a notice by the registration deadline may be required to submit an "affirmation or confirmation … before the registrant is permitted to vote").[2]

On September 18, 2024, Director Elrod sent a follow-up email to the Boards of Registrars. Helms Decl. ¶¶46-48. The email explained that "there are now 2,428 voters of the initial group that are inactive." *Id.* ¶46 (quoting Ex. 19). For those 2,428 individuals, Director Elrod included a new letter template, which explained that recipients who are not U.S. citizens should request removal, while recipients who are U.S. citizens and otherwise eligible to vote should complete a voter registration form or otherwise update their registration. *Id.* ¶48. The letter template

[2] None of this discussion is an "attempt[] to recast" the noncitizen letter process, as the United States elliptically suggests in its brief on motion to dismiss. DE26 at 9. It is a matter of fact and of State law that Inactive but eligible voters—whether made Inactive due to the noncitizen letter process or otherwise—can vote in the 2024 General Election by showing up to their polling place, completing an update form, and voting. *See generally* 2nd Helms Decl., DE28-1, ¶¶13-16.

further explained that recipients who do not update their voter registration or vote in the 2024 General Election "will be placed on a path to be removed from the voter list in four years, following the 2028 General Election." *Id.* ¶47 (quoting Ex. 19). At any time during those four years, the letter continued, recipients "can complete a State of Alabama Voter Registration Form …, or the Federal Voter Registration Form or … an update form at the polls on any Election Day and your voter registration status will be updated to 'Active.'" *Id.* (quoting Ex. 19); *accord* Ala. Code §17-4-9.

Of the original group of 3,251 letter recipients, approximately 100 have already self-removed. Helms Decl. ¶¶56-57; *see also* 2nd Helms Decl. ¶3. Some individuals were apparently registered in error; for example, there were registered voters, the Secretary's office learned, who had completed a driver license form but *not* the voter registration portion, yet were registered anyway. Helms Decl. ¶60 (citing Ex. 26). Four such individuals have self-removed. *Id.*

At least three individuals specifically wrote notes on their forms indicating that they are not citizens. Helms Decl. ¶58 (citing Ex. 24). A fourth person wrote a letter to the Jefferson County Registrar explaining that he had never registered in the first place. *Id.* ¶59. He asked if the Secretary would "open an intensive investigation into this matter." *Id.* (quoting Ex. 25).

Approximately 1,049 of the original letter recipients are now Active voters. 2nd Helms Decl. ¶3; *see also* Helms Decl. ¶62. Secretary Allen has no plan to expand or renew the noncitizen letter process in advance of the November 2024 General Election. Helms Decl. ¶¶65-67.

**D. Procedural History**

The United States contacted Director Elrod on September 4, 2024, alleging that Alabama had "systematically removed the names of ineligible voters from the official lists of eligible voters less than 90 days before the November 5, 2024, federal general election." DE12-16 at 2. Of course, the Justice Department's central allegation was not true then and remains untrue now because no one has been administratively removed pursuant to the noncitizen letter process. At the same time, the Justice Department requested thirteen different productions, including *inter alia* certain lists, communications, and descriptions of the noncitizen letter process and its methodology. *Id.* at 3-4. The Secretary of State promptly responded to the letter, and the parties met on September 11.

On September 19, the Justice Department informed Alabama that litigation had been authorized, and the parties met again on September 23 for "settlement negotiations," which were unsuccessful. DE12 at 19.

The United States filed suit on September 27, 2024, *see* DE1, and its case was consolidated with the pending case brought by private plaintiffs in this Court.

*See* DE2; *ACIJ* DE45. On October 2, 2024, approximately one month before the 2024 General Election and fifty days after the Secretary's press release describing the noncitizen letter process, the United States brought the instant motion seeking preliminary injunctive relief.

## III. Standard

A preliminary injunction is an "extraordinary and drastic" remedy never awarded as of right. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). Like any other movant, the United States must satisfy the four *Winter* factors. *C.f. United States v. Abbott*, 110 F.4th 700, 719 (5th Cir. 2024) (suggesting that a more lenient standard for the federal government is obsolete). Movants must show (1) a substantial likelihood of success on the merits, (2) a likelihood of suffering irreparable injury without the injunction, (3) that the threatened injury outweighs the harm the injunction would cause the State, and (4) that the injunction would not be adverse to the public interest. *See Winter v. NRDC*, 555 U.S. 7, 24 (2008). The United States is not excused from showing any of the four elements simply because it alleges the violation of a federal law. *See Fish v. Kobach*, 840 F.3d 710, 751 n.24 (10th Cir. 2016). Additionally, movants seeking a preliminary injunction bear both the burden of proof and the burden of persuasion. *See, e.g.*, *Nnadi v. Richter*, 976 F.2d 682, 690 (11th Cir. 1992). They must satisfy their burdens on all

four elements "by a clear showing." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (per curiam).

## IV. ARGUMENT

### A. The United States Is Not Likely to Succeed on the Merits.

The United States is wrong about the text and structure of Section 8 and wrong about how it works in practice. The Complaint and the Motion operate on the assumption that the rule prohibits "conduct[ing]" any covered program during the 90 days preceding a federal election. DE12 at 16. From this absolute and categorical prohibition, the United States infers that "commenc[ing]" such a program or "placing voters in active status"—both acts in the course of conducting a program—would violate the NVRA. DE12 at 20. But the United States's premise, its unlimited reading of the statute, is wrong for the following reasons.

**1.** Under the 90-day bar, what States cannot do (with certain exceptions) is *remove* voters immediately preceding a federal election "from the official lists of eligible voters." 52 U.S.C. 20507(c)(2)(a). As the Eleventh Circuit explained, "voters removed days or weeks before Election Day" may not "be able to correct the State's errors in time." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1346 (11th Cir. 2014). Thus, "*individualized* removals are safe to conduct at any time," but *systematic* removals are not safe because they risk "disfranchising eligible voters" without "time to rectify any errors." *Id.* (emphasis added). The Eleventh Circuit's

interpretation of the rule and rationale for it *does not apply* to any and all conduct in a removal program. It applies exclusively to removal because removal is the conduct that, if erroneous, would require "time" for a voter to correct prior to Election Day.

In contrast to a voter removed from the roll, a voter with Inactive status under Alabama law need not correct that status prior to Election Day. Ala. Code §17-4-9; 2nd Helms Decl. ¶¶13-16. Helms Decl. ¶85; *contra, e.g.*, DE12 at 21 ("This provide[s] little time for voters to … respond to the mailing *before* the election." (emphasis added)). For this reason alone, making a voter Inactive is not the kind of conduct that must be "complete[d]" before the 90-day period, 52 U.S.C. 20507(c)(2)(a). Here, the voters who received letters were not removed from the list, and they can vote on Election Day by completing a form at their polling place. 2nd Helms Decl. ¶¶13-16. There is a fundamental practical and legal distinction between an Inactive voter and an *unregistered* voter, who cannot show up and vote on Election Day. An Inactive voter faces no serious risk of disenfranchisement, so making a voter Inactive is not the type of risk that the 90-day rule prevents.

In its motion, the United States argues that *Arcia* prohibits any conduct pursuant to systematic programs during a so-called "Quiet Period." According to the United States, Florida, like Alabama here, "did not immediately remove voters

from the rolls." DE12 at 19. But that's not what the *Arcia* record reflects, nor how the case was argued and understood by the Eleventh Circuit.

To begin, the First Amended Complaint in *Arcia v. Detzner*, in Count II, alleges that "Unless this Court enjoins Defendant's planned systematic removal of additional voters, more eligible voters will be removed from the rolls between now and the November election in violation of the NVRA."DE25-1 at ¶ 50. Plaintiffs further alleged that the Florida Secretary's plan would "result in systematic removal of additional voters within 90 days of the general election." *Id.* at ¶41.[3] And, the plaintiffs sought preliminary injunctive relief to "direct the Secretary to ensure that any individual who was removed … be restored to the voting rolls," which suggests that the controversy was about actual removals. *Arcia v. Detzner*, 908 F.Supp. 2d 1276, 1279 (S.D. Fla. 2012).

On appeal, at the merits stage, Florida never raised the argument that the 90-day bar did not apply because no voters were removed within 90 days. *See* DE25-2. Rather, Florida's merits argument was that "The NVRA allows the removal of invalidly registered non-citizens at any time." *Id.* at 41-70 (capitalization and emphasis omitted). And a review of the decision reflects the Eleventh Circuit simply did not consider any such argument. Indeed, it is clear from reading *Arcia*

[3] *See also id.* at ¶¶27. 30-31, 35, 41-42. The complaint demanded injunctive relief on the ground that "more eligible voters will be removed from the rolls between [September 12, 2012] and the November election in violation of the NVRA." *Id.* at ¶50.

that the Eleventh Circuit envisioned removals within 90 days that would require a voter's corrective action within the same 90 days in order to exercise the right to vote. 772 F.3d at 1346.

Perhaps that is, in part, because Members of Congress, as *amici*, told the Court just that. DE25-3. For instance, they explained: ". . . Congress felt it important to create a buffer—eventually settling on a 90-day time frame—between the conclusion of a purge program and a federal election. By doing so, eligible voters who were purged in error would still have time to re-register . . . ." DE25-3 at 9; *see also id.* at 12-13 ("[I]f a systematic purge is completed 90 days or more before an election, an eligible voter who erroneously is purged from the rolls has a minimum of two months to re-submit his or her application and be re-registered."). Accordingly, there is no holding in *Arcia* that other actions—like making certain voters Inactive—could violate the statute, and this Court now confronts the issue as a matter of first impression.

**2.** Aside from *Arcia*, Defendants' interpretation of the 90-day bar as a bar on removals is confirmed by two structural features of Section 8 of the NVRA. First is the clause creating express exceptions to the rule, which, as the United States acknowledges, DE12 at 3-4, permits individual and systematic removals within 90 days due to the voter's request, death, or conviction of a disqualifying felony.

There is a symmetry in the structure of the statute: Removals are generally barred, but some removals are permitted.[4]

Second, the NVRA's "general program" requires "a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of—(A) the death of the registrant; or (B) a change in the residence of a registrant ...." 52 U.S.C. §20507(a)(4). This general program is one of the ways the NVRA seeks "to protect the integrity of the electoral process" and "to ensure that accurate and current voter registration rolls are maintained," 52 U.S.C. §20501(b); *see also Bellitto v. Snipes*, 935 F.3d 1192, 1198 (11th Cir. 2019). In compliance with the NVRA, Alabama has an on-going general program, *see* Ala. Act No. 2006-570 §18 (setting out the program that began in January 2021 and will conclude early next year), and will begin a new program in February 2025, *see* Ala. Code §17-4-30. The program beginning next year will operate differently, but still in compliance with the NVRA.

By definition, a State must continue its general program under the NVRA through multiple consecutive election cycles, 52 U.S.C. §20507(d)(1)(B)(ii), and that may mean certain conduct occurs during the 90 days. For example, the

---

[4] Under the reading advanced by the United States, the statute would create a very anomalous result whereby a State may *remove* certain ineligible voters (e.g. felons) within 90 days, yet the State could not engage in any other conduct with respect to those same voters, such as making them inactive or even communicating with them.

required program contemplates that States will make certain voters Inactive if they do not return a notice card by "the time provided for mail registration," *id.* §20507(d)(2)(A). In Alabama, that time is fourteen days before the election (*i.e.*, within the 90-day period), and so Alabama could, consistent with the statutory text, wait until then to make voter Inactive (though Alabama does not wait that long). Moreover, an Inactive voter may be required (and certainly is permitted) to submit an "affirmation or confirmation of the registrant's address" before voting. *Id.* States may receive and process such forms within the 90-day period and use them to change a voter's status from Inactive to Active at that time. Consequently, States can (and do) conduct general programs for removal before, during, and after every election, including by changing a voter's status from Active to Inactive or vice versa.[5]

Because States can operate the NVRA general program during the 90 days, we know that the "purpose" of the program is not the dispositive issue. *Contra* DE12 at 15-16. The word in the text that constrains a State's actions is "complete."

---

[5] *Accord* Federal Election Commission, *Implementing the National Voter Registration Act of 1993: Requirements, Issues, Approaches, and Examples* (Jan. 1, 1994) ("FEC Guide"), available at https://perma.cc/AE99-PX46, ("States will have to decide *when* to designate recipients of such confirmation mailing as "Inactive." There appear to be at least three possibilities: [1] upon the date of the outgoing confirmation mailing — to be restored to active status (or removed as appropriate) upon receipt of a response to the confirmation notice, [2] at some arbitrary date (such as thirty days after the outgoing confirmation notice if no responsive has been received …, or [3] after the closing date for receiving voter registration applications before the next election. It should be noted that *none of these possibilities has any practical consequences on the registrant* who either will or will not respond." (emphasis added)).

A program must be "complete[d]" by the 90 days, and the only way to read that provision consistent with the general program is that removal must be completed. And again, this reading accords with *Arcia* because only removal can risk disenfranchisement, which was the Eleventh Circuit's sole focus in that case. *Arcia*, 772 F.3d at 1346. To the extent that the noncitizen letter process is a "path to removal," DE12 at 17 n.2, it is a multi-year path to removal after the 2028 General Election *if* the registrant takes no action; this is the kind of path expressly contemplated by the NVRA, not the kind that the 90-day bar prevents.

**3.** The United States develops its contrary view not by citing longstanding agency guidance or rulemaking or other any indication of the federal government's official position. Instead, the motion resorts to snippets of legislative history—a statement that certain Members of the U.S. Senate thought the 90-day bar would stop "outreach activity, such as the mailing of list verification notices or conducting a canvas." DE12 at 3 (citing S. Rep. No. 103-6 (1993)). That's not good enough to overcome *Arcia* and the structure of the Act. And it's not even a full description of the legislative history, which makes clear that the Congressional committee members were worried first and foremost about activity that would result in removal. *See, e.g.*, S. Rep. No. 103-6 at 18 ("[Election integrity] processes, however, must be scrutinized to prevent poor and illiterate voters from being caught in a purge system which will require them to needlessly *re-register*."

(emphasis added)). To the extent that certain legislators thought a State must "conclude[]" *outreach* pursuant to a change-of-address program under the NVRA, the same legislators thought the 90-day bar "would not prevent a State from making the appropriate changes to the official lists pursuant to the Act during the 90 day pre-election period." *Id.* at 18-19. These members of Congress did not share the United States's view that the State must entirely cease all conduct pursuant to general or systematic programs during the 90-day period.

## B. The United States Has Not Shown Irreparable Harm.

### 1. There is no risk of irreparable harm to voters.

The United States seems to admit that the State is not administratively removing anyone within the 90-day period, so there is no risk that "several hundred or even thousands" of U.S. citizens face "disenfranchisement" in the upcoming election, DE1 ¶5; *accord* DE1 ¶19, and no need for federal intervention "to ensure that these eligible voters may cast ballots." DE12 at 8. Indeed, over 1,000 voters have been able to update their voter registration (by mail, in person, or online) since receiving a letter. 2nd Helms Decl. ¶3; *see also* Helms Decl. ¶62.

To receive statewide relief, the movant must show a statewide harm, but the United States cites just a few declarations of frustrated voters. Mr. Jimenez, for example, states that he "did not trust that [his] registration status would be restored to active status by submitting [his] voter registration form in the mail," even

though, he admits, the letter “include[d] a voter registration form.” DE12-10 ¶10; *compare* DE12-12 (citing “trust”). His mistrust does not prove *confusion* about the August letter, which instructed citizens only to submit the enclosed form, not to go “in person [to] their local board of registrars.” *Contra* DE12 at 11. In another declaration on which the United States relies, Mr. Hazelhoff states that he *did* go to his registrar but not that he “concluded that the only reliable way to restore [his] voting rights” was to do so—as the United States mistakenly suggests. DE12 at 11. Both of these voters are Active registered voters as is the United States’s other voter declarant, Jennifer Berg. *See* Helms Decl.  2nd Helms Decl. ¶11 (Jimenez); *id.* ¶¶12 (Berg); Helms Decl. ¶71 (Hazelhoff).

Hundreds of thousands of Alabamians are presently Inactive, and there is no allegation that their Inactive status is inherently confusing to them.  Helms Decl. ¶ 85; 2nd Helms Decl. ¶18. It is State law that Inactive voters remain registered voters, and the NVRA effectively *requires* the State to use Inactive status.

In any event, any alleged confusion should have been dispelled in full by the September letter, which the United States does not suggest was misunderstood by even one person. *Cf.* DE12 at 11-12. There is no serious allegation that the September form letter gave contradictory or confusing instructions. And it should have satisfied many of the federal government’s minor gripes with the August letters, such as the complaint that they did not directly inform voters they could

register to vote online. DE1 ¶31; DE12 at 5. In contrast, the September form letter went above and beyond, explaining in great detail the various means of registering to vote in Alabama, including the option—mandated by State law—for Inactive voters to submit a reidentification/update form at the polls on Election Day.

Finally, there are some references throughout the motion to "deterrence from participation in the upcoming federal general election," which is entirely unsubstantiated. DE12 at 30. The United States has not established that voters will be deterred from voting as a result of the noncitizen letter process. Nor has the United States established that voters have self-removed or will self-remove based on voter confusion or any misunderstanding owing to the process. *Contra* DE12-1 at 5 (requesting injunctive relief based on speculation that such people exist).[6]

**2. It is speculative whether the requested injunction will cure the alleged voter confusion.**

The United States must show that its proposed injunctive relief would, in fact, avoid the alleged harm. If voter confusion is so intractable that the September letter could not cure the alleged deficiencies of the August letter, then it is hard to see how additional mailings would fare much better. *Compare* DE12 at 28 (complaining about "last-minute rollout") *with* DE12-1 at 4-5 (advocating same). To be sure, the United States argues that the September letters "may not have

[6] The individual identified as a removed citizen in the Aust declaration (¶20) "has been Disqualified because the Bullock County Board of Registrars determined, based on information from the voter and their investigation, that the voter moved out of State." 2nd Helms Decl. ¶9.

reached" some people, DE12 at 28, but its own requested relief involves mailings, including one with almost identical information to that found in the September letters. The United States would have this Court order the State to send a mailing:

> a. Informing the registrant that they have been restored to active status;
> b. Explaining that the registrant may cast a regular ballot on Election Day in the same manner as other eligible voters;
> c. Advising the registrant that inclusion in the [noncitizen letter process] does not establish that they are ineligible to vote or subject to criminal prosecution for registering to vote or for voting; and
> d. Advising individuals who are not U.S. citizens that they remain ineligible to cast a ballot in Alabama elections.

DE12-1 at 4-5. This perfectly illustrates the defects of the motion: Aside from the reference to criminal prosecution, Elements (b), (c), and (d) were already communicated to voters on the list through the August and September letters. How can the United States claim that the same words that allegedly *caused irreparable* confusion would now cure it? The sole difference between the proposed injunction and what the State has already done would be the information that the voter's status has been changed to Active. But again, that's a distinction without a difference because the September form letter made clear—and no one suggests otherwise—that eligible recipients can vote on Election Day. Helms Decl. ¶¶47-48; 2nd Helms Decl. ¶¶13-16. Moreover, to the extent that the United States would draft better or different letters, its own pleadings suggest that such "shifting" or "different instructions" would just "encourage[] further confusion." DE12 at 34.

* * *

Apart from voter confusion, the United States seems to argue that it satisfies the irreparable-harm factor *whenever* it alleges a violation of federal law. That is incorrect. *See, e.g.*, *Fish*, 840 F.3d at 751 n.24 (irreparable harm not presumed for NVRA violation); *United States v. Bacaner*, 2021 WL 3508135 (M.D. Fla. Aug. 3, 2021) (explaining that a statute merely authorizing but not requiring injunctive relief for violations does not create a presumption of irreparability) (citing, *e.g.*, *LAO Bedrossian v. N.W. Mem'l Hosp.*, 409 F.3d 849, 843 (7th Cir. 2005)).

### C. The Balance of Equities Favor Defendants.

#### 1. The public interest favors reasonable efforts to promote election integrity *before* the 2024 General Election; the wait-and-see approach risks irreparable vote dilution.

The United States would have had the Secretary do nothing despite the near certainty that there were noncitizens registered to vote in Alabama. But the State has an exceedingly strong interest, a public mandate, and a sovereign duty "to preserve the basic conception of a political community." *Bluman v. FEC*, 800 F. Supp. 2d 281, 287-88 (D.D.C. 2011), *aff'd*, 565 U.S. 1104 (2012). One of the ways it does that is by securing its elections, promoting confidence in its elections, and rooting out fraud. Although the noncitizen letter process did not administratively remove anyone, noncitizens realized they were registered to vote and removed themselves. It is much better to remind noncitizens not to vote than to wait and

then prosecute—hoping to detect unlawful votes after the damage is done. Entering the injunctive relief requested by the United States would cause a less secure election, dilute the votes of eligible voters, and undermine voter confidence.

**2. The United States has significantly contributed to the alleged violation and alleged need for emergency relief.**

As detailed *supra* and in the First Declaration of Clay Helms, the Alabama Secretary of State went to significant lengths to engage the federal government on the issue of noncitizen voting for approximately one year. Instead of cooperating, the United States repeatedly delayed and rejected the Secretary's requests. When a movant's own conduct contributes to the alleged judicial emergency, that fact should count heavily against the Court's exercise of equitable discretion.

Further, the United States can *still* respond to the Secretary's letter of July 16, 2024, or otherwise offer to cooperate on verifying citizenship. Nothing is preventing the United States from verifying the citizenship of the individuals on the list of 3,251 today. Much of the irreparable harm the United States alleged to have occurred over the past fifty days could have been avoided.

### 3. The United States's undue delay in bringing this motion.

As the United States documents, the Secretary announced the noncitizen letter process on August 13, 2024. But the United States neglects to mention that it was the United States that informed the Secretary that other State agencies likely held citizenship data. *See* Helms Decl. ¶35. And the Secretary made known his intention to use that data in a letter to the USCIS on July 16, 2024. *Id.* at Ex. 13. Consequently, the United States had relevant notice for well over two months before bringing the instant motion.

And even if the relevant date for delay purposes is August 13, 2024, when the Secretary first took public action, the United States still waited until October 2, 2024, to move for emergency relief. The United States first wrote the Secretary on September 4, 2024, yet waited an additional month to file its motion. While the United States requested information, it is not apparent what the Secretary of State could have provided that would have changed the United States's analysis of the 90-day claim.

If the Secretary's six-day delay in implementing the letter process created an irreparable harm, it should count heavily against the motion that the United States then waited *fifty days* from the announcement to seek emergency relief. *Wreal, LLC v. Amazon.com*, 840 F.3d 1244, 1248 (11th Cir. 2016). The Court may conclude that even if the alleged harm is irreparable, the United States's own

action suggests it is not one worth immediate attention and intervention. Alternatively, it may consider the United States's delay as a reason to find the harm is not, in fact, irreparable.

**D. The United States Demands Remedies of Improper Scope.**

Even if the United States satisfies the four-factor test for preliminary injunctive relief, the Court must determine the proper remedy and its scope. *Alley v. U.S. Dep't of Health & Hum. Servs.*, 590 F.3d 1195, 1205 (11th Cir. 2009) (discussing Fed. R. Civ. P. 65(d)). The Court must "thoroughly analyze the extent of relief necessary to protect the plaintiffs from harm, taking care that the remedy issued is not more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Georgia v. President of the United States*, 46 F.4th 1283, 1306 (11th Cir. 2022) (cleaned up). Here, the United States asks for preliminary injunctive relief that is either moot, redundant with what the State has already done, unlikely to redress the alleged irreparable harms, and drastically overbroad because it would require (based on the declarations of a few voters) making Active thousands of individuals who may well be noncitizens. *See generally* DE12-1 (proposed order). And, that relief would impact not just the federal elections, as to which the NVRA applies, but also State and local elections, to which it does not. 52 U.S.C. §§ 20501 *et seq.* (repeatedly referring to "elections for Federal office").

The first request is an order to enjoin Defendants from "commencing or continuing any systematic program intended to remove the names of ineligible voters," DE12-1 at 3-4, but this request is moot and speculative because the Secretary's office has already testified in writing that it has no plans to commence or continue any such program before the 2024 General Election. *See, e.g.*, Helms Decl. ¶ 65. The United States also has not made a showing that would require any kind of prophylactic injunction of an indefinite duration.

The second request, an order to enjoin Defendants from contacting voters "to direct or urge such voters to submit requests for removal" suffers from the same defects as the first, DE12-1 at 4, plus it would unconstitutionally encroach on the State's reserved powers to enforce its eligibility requirements, especially with respect to categorically ineligible voters. Such an injunction would be overbroad; there may be many reasons to the State needs to communicate with voters. This request also contradicts the fourth request, which would allow the State to "advis[e] individuals who are not U.S. citizens that they remain ineligible," *id.* at 5. If the State can do the latter within two weeks of an election, the second proposed injunction cannot be necessary to avert irreparable harm.

The third and fourth proposed injunctions are overbroad. As discussed above, the United States has not shown statewide irreparable harm. At most, the United States has identified a handful of individuals (out of 3,251) who were

"confused" or "frustrated" by the August letter, DE12 at 10-11, but reported no irreparable obstacle to exercising their fundamental right to vote. These individuals report no comparable harm (or confusion) owing to the September letter, which by the motion's own lights, should have cured much of the alleged harm. DE12 at 11-12; DE12-1 at 4-5 (demanding "remedial mailings").

Given that many letter recipients have already self-removed or even self-identified as noncitizens, the Court should not enter the statewide injunctive relief requested by the United States. In all likelihood, there are individuals on the list of 2,043 remaining Inactive voters who are *not eligible to vote* and should remain Inactive. For the ones who are eligible, they can fully participate in the electoral process on Election Day upon completion of a form at the polls. The motion seeks intrusive relief on a statewide basis based on speculation and the complaints of a few voters. The United States has not carried its burden.

## CONCLUSION

The motion for preliminary injunction should be denied.

*Respectfully Submitted,*

Steve Marshall
*Attorney General*

/s/ Robert M. Overing
James W. Davis (ASB-4063-I58J)
*Deputy Attorneys General*
Robert M. Overing (ASB-8736-M14Q)
*Deputy Solicitor General*

Misty S. Fairbanks Messick (ASB-1813-T71F)
Scott Woodard (ASB-1001-F94C)
*Assistant Attorneys General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF ALABAMA
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
Telephone: (334) 242-7300
Fax: (334) 3538400
Jim.Davis@AlabamaAG.gov
Robert.Overing@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov
Scott.Woodard@AlabamaAG.gov

***Counsel for the State Defendants***