FILED

2024 Oct-09  PM 11:52
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

ALABAMA COALITION FOR
    IMMIGRANT JUSTICE; LEAGUE
OF WOMEN VOTERS OF
ALABAMA; LEAGUE OF
WOMEN VOTERS OF
ALABAMA EDUCATION FUND;
ALABAMA STATE
CONFERENCE OF THE NAACP;
ROALD HAZELHOFF; JAMES
STROOP; CARMEL MICHELLE
COE; and EMILY JORTNER,

      *Plaintiffs*,


    v.

WES ALLEN, in his official capacity
    as Alabama Secretary of State;
STEVE MARSHALL, in his
official capacity as Alabama
Attorney General; and JAN
BENNETT, BARRY
STEPHENSON, CINDY WILLIS
THRASH, and SHEILA COX
BARBUCK, in their official
capacities as Chairs of Boards of
Registrars of Elmore, Jefferson,
Lee, and Marshall Counties;

      *Defendants*.

Case No. 2:24-cv-01254-AMM

Judge Anna M. Manasco

**Opposed Motion**

## RESPONSE IN OPPOSITION TO MOTION TO DISMISS

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................2

INTRODUCTION..............................................................................6

LEGAL STANDARD ........................................................................7

ARGUMENT ....................................................................................7

    I.  Plaintiffs' Complaint is not a shotgun complaint ........................7

   II.  Plaintiffs have standing ...............................................................9

        A. Individual Plaintiffs............................................................9

        B. Organizational Plaintiffs ..................................................13

        C. Defendants Marshall and Allen are Proper Defendants.........15

   III.  Plaintiffs have stated an NVRA 90-Day Claim .........................19

   IV.  Plaintiffs have stated an NVRA Uniform and Nondiscriminatory Claim22

   V.  Plaintiffs have stated an NVRA Claim under 52 U.S.C. § 20507(a)(1) ..24

   VI.  Plaintiffs have stated an equal protection claim predicated on national origin and citizenship class discrimination ..............................25

   VII.  Plaintiffs stated a Bush v. Gore Claim ....................................28

   VIII.  Plaintiffs stated an *Anderson-Burdick* Claim .........................31

   IX.  Private Plaintiffs stated a VRA §11(b) Claim ..........................34

CONCLUSION ...............................................................................35

CERTIFICATE OF SERVICE........................................................37

## TABLE OF AUTHORITIES

**Case**                                                                               **Page**

*31 Foster Child. v. Bush*, 329 F.3d 1255 (11th Cir. 2003) ...................................9, 11

*ACORN v. Miller*, 129 F.3d 833 (6th Cir. 1997) ......................................................13

*Anderson v. Celebrezze*, 460 U.S. 780 (1983)............................................31, 32, 34

*Arcia v. Florida Secretary of State*, 772 F.3d 1335
    (11th Cir. 2014)........................................ 9, 11, 12, 13, 14, 20, 21, 22

*Ariz. Democratic Party v. Ariz. Republican Party*, No. CV-16-03752, 2016 WL
    8669978 (D. Ariz. Nov. 4, 2016).........................................................................35

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)...............................................................7, 19

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)...............................................7

*Bergland v. Harris*, 767 F.2d 1551 (11th Cir. 1985)..............................................32

*Black v. McGuffage*, 209 F. Supp. 2d 889 (N.D. Ill. 2002)....................................28

*Burdick v. Takushi*, 504 U.S. 428 (1992)...................................................32, 33, 34

*Bush v. Gore*, 531 U.S. 98 (2000)..............................................................28, 29, 30

*City of Los Angeles v. Lyons*, 491 U.S. 95 (1983) ..................................................11

*Clapper v. Amnesty International USA*, 568 U.S. 398 (2013)................................11

*Cleburne v. Cleburne Living Center*, 473 U.S. 432 (1985)....................................27

*Craig v. Boren*, 429 U.S. 190 (1976).......................................................................27

*Democratic Executive Committee of Florida v. Lee*, 915 F.3d 1312
    (11th Cir. 2019).................................................................................................31

*Dunn v. Dunn*, 219 F. Supp. 3d 1163 (M.D. Ala. 2016) .........................................14

*Farmworker Association v. Moody*, No. 23-cv-22655, 2024 WL 2310150
    (S.D. Fla. May 22, 2024) ..................................................................................10

*FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024)....................14, 15

*Florida State Conference of NAACP v. Browning*, 522 F.3d 1153
(11th Cir. 2008)................................................................................14

*Florida State Conference of NAACP v. Byrd*, 680 F. Supp. 3d 1291
(N.D. Fla. 2023)...............................................................................15

*Florida State Conference of NAACP v. Lee*, 566 F. Supp. 3d 1262
(N.D. Fla. 2021)...............................................................................32

*Focus on the Fam. v. Pinellas Suncoast Transit Authority*, 344 F.3d 1263
(11th Cir. 2003)................................................................................10

*Geduldig v. Aiello*, 417 U.S. 484 (1974) ............................................26

*Get Loud Ark. v. Thurston*, No. 5:24-CV-5121, 2024 WL 4142754
(W.D. Ark. Sept. 9, 2024)................................................................15

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).........................14

*Honeyfund.com Inc. v. Governor*, 94 F.4th 1272 (11th Cir. 2024) .........18

*Hunter v. Hamilton County Board of Elections*, 635 F.3d 219 (6th Cir. 2011) ......28

*Isabel v. Reagan*, 987 F.3d 1220 (9th Cir. 2021) ..................................25

*Judicial Watch v. King*, 993 F. Supp. 2d 919 (S.D. Ind. 2012) ...............13

*Lee v. Keith*, 463 F.3d 763 (7th Cir. 2006) ..........................................33

*Libertarian Party v. Merrill*, 476 F. Supp. 3d 1200 (M.D. Ala. 2020) ..................32

*Libertarian Party of Ky. v. Grimes*, 835 F.3d 570 (6th Cir. 2016).........................33

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (2003) .................................9

*Mi Familia Vota v. Fontes*, No. 2:22-cv-00509, 2024 WL 862406
(D. Ariz. Feb. 29, 2024)............................................................23, 24

*Moore v. Cecil*, No. 4:19-cv-1855, 2021 WL 1208870 (N.D. Ala. Mar. 31, 2021),
*aff'd*, 109 F.4th 1352 (11th Cir. 2024)................................................34

*National Cable & Telecommunications Associations, Inc. v. Gulf Power Co.*,
534 U.S. 327 (2002)...........................................................................21

*National Coalition on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457 (S.D.N.Y. 2020) ..................................................................................35

*People First of Alabama v. Merrill*, 467 F. Supp. 3d 1179 (N.D. Ala. 2020).........15

*RadLAX Gateway Hotel v. Amalgamated Bank*, 566 U.S. 639 (2012)...................21

*Rosebud Sioux Tribe v. Barnett*, 603 F. Supp. 3d 783(D.S.D. 2022) .....................12

*Schneider v. Rusk*, 377 U.S. 163 (1964) ..................................................................6

*Sheet Metal Workers Loc. 19 Pension Fund v. ProAssurance Corp.*, 600 F. Supp. 3d 1189 (N.D. Ala. 2021)................................................................7

*Smith v. Meese*, 821 F.2d 1484 (11th Cir. 1987) .....................................................18

*Stone v. Allen*, 2024 WL 578578 (N.D. Ala. Feb. 13, 2024)....................................35

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997) ..............................31

*United States v. Alabama*, 778 F.3d 926 (11th Cir. 2015)........................................21

*United States v. Florida*, 870 F. Supp. 2d 1346 (N.D. Fla. 2012).....................21, 23

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977)................................................................................................27

*Weiland v. Palm Beach County. Sheriff's Off.*, 792 F.3d 1313 (11th Cir. 2015) ......8

*Wollschlaeger v. Governor, Florida*, 848 F.3d 1293 (11th Cir. 2017) ...................12

## Statutes & Rules

52 U.S.C. § 20507(a)(1)......................................................................................24, 25

52 U.S.C. § 20507(b)(1) .....................................................................................23, 24

52 U.S.C. § 20507(c)(2)(A) .......................................................................................20

52 U.S.C. § 20507(d)(2)(A)........................................................................................21

52 U.S.C. § 20510(b)(3) .............................................................................................12

Fed. R. Civ. P. 8(a)(2)...................................................................................................7

Fed. R. Civ. P. 10(b) .................................................................................................7, 8

Fed. R. Civ. P. 12(b)(6)........................................................................7, 19, 30, 32, 33

**Codes**

Ala. Code § 17-1-3(a) ...............................................................................15, 17

Ala. Code § 17-4-3...........................................................................................16

Ala. Code § 17-4-60.........................................................................................15

Ala. Code § 17-4-63.........................................................................................15

Ala. Code § 36-15-14.......................................................................................17

Ala. Code § 36-15-15.......................................................................................17

"[T]he rights of citizenship of the native born and of the naturalized person are of the same dignity and are coextensive." *Schneider v. Rusk*, 377 U.S. 163, 165 (1964). American citizens have the right to vote, regardless of where they were born. Notwithstanding this basic precept, Alabama Secretary of State Wes Allen announced that he would seek to purge registered Alabama voters previously issued noncitizen identification numbers (because they were born outside the United States). He admitted the virtual certainty that naturalized citizens—in other words, U.S. citizens eligible to vote—were among the 3,251 voters his office had identified for purging from the rolls. But he nevertheless directed the immediate inactivation of these voters' registrations and set up a re-registration process specifically for the naturalized citizens he had unlawfully purged. Secretary Allen announced his Purge Program just 84 days before the November 2024 general election—within the 90-day "quiet period" in which federal law bars states from taking steps in programs with the purpose of systematically removing voters.

Plaintiffs sued, alleging that the Purge Program violated the First and Fourteenth Amendments of the United States Constitution, the National Voter Registration Act (NVRA), and the Voting Rights Act. Faced with the clear illegality of their slipshod Purge Program, Defendants have attempted to backpedal. Defendants have filed a Motion to Dismiss, predicated in large part on subsequent ambiguous and contradictory factual assertions about the Purge Program

inappropriate for consideration at this stage of the litigation—where the Court must take as true the allegations in Plaintiffs' complaint, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiffs' Complaint plausibly states claims for relief from Defendants' unlawful Purge Program, Plaintiffs have standing, and Defendants' Motion to Dismiss should be denied.

## LEGAL STANDARD

On a Rule 12(b)(6) motion to dismiss, "the court accepts the allegations of the complaint as true and construes them in the light most favorable to the plaintiff." *Sheet Metal Workers Loc. 19 Pension Fund v. ProAssurance Corp.*, 600 F. Supp. 3d 1189, 1201 n.2 (N.D. Ala. 2021). "Thus, the factual allegations are derived from [plaintiffs'] complaint." *Id.* "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Iqbal*, 556 U.S. at 678.

## ARGUMENT

### I. Plaintiffs' Complaint Is Not a Shotgun Complaint.

Contrary to Defendants' cursory assertions, Plaintiffs' Complaint easily satisfies the pleading requirements of Federal Rules of Civil Procedure 8(a)(2) and 10(b). Consistent with Rule 8(a)(2), Plaintiffs' Complaint supplies "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Consistent with Rule 10(b), Plaintiffs' Complaint "state[s] its claims or

defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 10(b).

Here, Plaintiffs' Complaint clearly delineates seven widely understood federal statutory and constitutional causes of action into seven separate counts. ECF 1 ¶¶ 140-79. Each claim stems from the Purge Program, which the Complaint describes in a common set of factual allegations in a unified facts section, subdivided by clear topical subheadings. *Id.* ¶¶ 64-143. Each count incorporates the factual allegations, but none of the previous counts, of the Complaint, and makes additional specific allegations tailored to address that claim alone. *Id.* ¶¶ 140-79. Each count delineates which Plaintiffs bring that cause of action against which Defendants. *Id.* The Complaint also explains each Plaintiff's standing to sue, and the reasoning for naming each Defendant. *Id.* ¶¶ 19-59.

It is clear from Plaintiffs' Complaint that Defendants' untimely, non-uniform, and discriminatory Purge Program gives rise to each of the claims in Plaintiffs' Complaint. As the Eleventh Circuit has explained of similar complaints:

> [T]his is not a situation where a failure to more precisely parcel out and identify the facts relevant to each claim materially increased the burden of understanding the factual allegations underlying each count.

*Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1324 (11th Cir. 2015). As in *Weiland*, Defendants "did not move for a more definite statement under [Rule] 12(e)," nor do they plausibly assert that they do not understand the theory of liability

underlying the Complaint. *See id.* Defendants' assertions about allegedly differing descriptions of the program in the Complaint ring particularly hollow in light of the changing and contradictory ways in which they themselves have described the Purge Program. *See* ECF 1-1 ("Secretary of State Wes Allen Implements Process to Remove Noncitizens Registered to Vote in Alabama"); ECF 23-5 (first Purge Letter stating that recipient's "voter record has been made inactive and you have been placed on a path for removal"); ECF 23-9; ECF 48-1 ¶¶ 46-47 (Helms Decl.) (description of Purge Program's second letter); *see also* ECF 48-1 at 116-17.[1]

## II. Plaintiffs Have Standing.

### A. Individual Plaintiffs

All four Individual Plaintiffs alleged threatened, probabilistic injury sufficient to establish an injury in fact. Allegations of future injury satisfy the injury-in-fact requirement when the alleged harm is "'imminent' or 'real and immediate.'" *31 Foster Child. v. Bush*, 329 F.3d 1255, 1265 (11th Cir. 2003) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (2003)). As the Eleventh Circuit has explained, a threatened injury need not "occur within days or even weeks" to be imminent. *31 Foster Child.*, 329 F.3d at 1267. Rather, "probabilistic harm is enough." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014).

---

[1] Page citations are to the ECF page number (the PDF number).

After Plaintiffs filed this lawsuit, Defendants produced a declaration claiming to limit the scope of their Purge Program and disclaiming Individual Plaintiffs' risk of disenfranchisement and criminal prosecution. *See* Helms Decl. ¶¶ 40, 71-75. But, of course, such a self-serving declaration is outside the four corners of the Complaint this Court can consider in adjudicating a motion to dismiss. Moreover, "Article III standing must be determined as of the time at which the plaintiff's complaint is filed." *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1275 (11th Cir. 2003). Likewise, the "government cannot, in response to a preliminary-injunction request, introduce a novel, narrowing construction . . . and then demand that [a court] make standing determinations" on that basis. *Farmworker Ass'n v. Moody*, No. 23-cv-22655, 2024 WL 2310150, at *7 (S.D. Fla. May 22, 2024). Defendants' belated attempts at damage control do not alter the standing analysis.

What *does* inform the standing analysis are the facts alleged in the Complaint. Plaintiffs Hazelhoff and Stroop received Purge Letters requiring them to re-register to vote in order to participate in Alabama elections. They received no written confirmation that they were, in fact, re-registered. And, as naturalized citizens, the Purge Program imminently threatened Plaintiffs Coe and Jortner (as well as Plaintiff Hazelhoff)—according to the methodology articulated in Secretary Allen's own press release—with disenfranchisement, investigation, criminal prosecution, and

being swept up in one of Secretary Allen's "continu[ing] . . . reviews" of the voter file. ECF 1-1.

Defendants now dismiss Individual Plaintiffs' alleged prospective harms as "highly speculative," Mot. 11, but these are the very actions Secretary Allen promised in his announcement of the Purge Program. *See id.* Defendants' reliance on *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013), and *City of Los Angeles v. Lyons*, 491 U.S. 95 (1983), is therefore misplaced. Alabama's chief elections official effectuating a program he designed and trumpeted is state policy, not a "highly attenuated chain of possibilities." *Clapper*, 568 U.S. at 410. Similarly, in *Lyons*, the standing inquiry would have been different, as the Supreme Court made clear, had the plaintiff alleged "that the City *ordered or authorized* police officers to [perform illegal chokeholds]." 491 U.S. at 106 (emphasis added). As the Eleventh Circuit has explained, *Lyons* illustrates that "when"—as here—"the threatened acts that will cause injury are" not random acts but "part of a policy, it is significantly more likely that the injury will occur again." *31 Foster Child.*, 329 F.3d at 1266.

The standing inquiry in this case is akin not to *Clapper* or to *Lyons*, then, but rather nearly identical to *Arcia*. As in *Arcia*, Secretary Allen has attempted a voter purge, purportedly for the purpose of removing noncitizens, that is "far from perfect." *See* 772 F.3d at 1339. As in *Arcia*, Plaintiffs are naturalized citizens who alleged "a realistic probability that they would be misidentified due to . . . mistakes in the

Secretary's data-matching process"—or that they already had been—and that harm will accrue from such misidentification. *See id.* at 1341. And, as in *Arcia*, Individual Plaintiffs "sufficiently established standing based on the potential errors that could occur when the Secretary attempted to *confirm* their immigration status in various . . . databases." *See id.* (emphasis added).

Moreover, that Individual Plaintiffs are not signatories of the NVRA notice letter does not affect their standing. First, other Plaintiffs are signatories: where one party has standing, the court "need not address the standing of the other plaintiffs." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1306 n.3 (11th Cir. 2017).

Second, the NVRA provides that *no* notice is required "[i]f the violation occurred within 30 days before" a federal election. 52 U.S.C. § 20510(b)(3). Since the 30-day period has begun, Individual Plaintiffs need not provide notice at all.[2]

Third, Defendants muster no binding case law to support their contention that private Individual Plaintiffs are impermissibly "piggybacking," Mot. 15, on the August 19, 2024, notice letter, because none exists. Rather, "[c]ourts have divided over the question whether a person who is not named in the notice letter has standing under the NVRA as a plaintiff," and the Eleventh Circuit has taken no position. *Rosebud Sioux Tribe v. Barnett*, 603 F. Supp. 3d 783, 791 (D.S.D. 2022). Numerous

---

[2] If there is any lingering doubt about Individual Plaintiffs' standing and, if necessary for relief, the Court may and should allow joinder or amendment.

courts, though, have soundly held that one party may rely on another's NVRA notice letter. *See, e.g.*, *ACORN v. Miller*, 129 F.3d 833, 838 (6th Cir. 1997) (declining to dismiss certain plaintiffs from NVRA case for failing to provide notice where the state received notice from another plaintiff); *Jud. Watch v. King*, 993 F. Supp. 2d 919, 922-23 (S.D. Ind. 2012). As the Sixth Circuit has explained, requiring *specific* "plaintiffs to give actual notice" is "unnecessary with regard to the purpose of the notice requirement" meant to "provide states in violation of the Act an opportunity to attempt compliance before facing litigation." *ACORN*, 129 F.3d at 838. If this Court does reach the question, the Sixth Circuit's logic obtains here: Defendants had actual notice that they were in violation of the NVRA and failed to avail themselves of the opportunity to comply.

### B. Organizational Plaintiffs

Organizational Plaintiffs have both associational and direct organizational standing. As to associational standing, Organizational Plaintiffs allege that they have naturalized citizen members who, like Plaintiffs Coe and Jortner and the plaintiffs in *Arcia*, face threatened future harm—purge and criminal investigation—due to the Purge Program. ECF 1 ¶¶ 19, 25, 35. These are identified members.[3] And where, as here, it is "highly likely that one of [an organization's] members would be" injured,

---

[3] Organizational Plaintiffs can provide under the Protective Order at least one member name if necessary.

an organization need not identify a specific injured member. *See Dunn v. Dunn*, 219 F. Supp. 3d 1163, 1170 (M.D. Ala. 2016); *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1160-61 (11th Cir. 2008). Again, in *Arcia*, the Eleventh Circuit addressed this question and found that the "risk of false positives and mismatches" in voter registration removals created a "realistic danger" that organizational plaintiffs' naturalized-citizen members would be misidentified, conferring associational standing without requiring the organizations to identify specific injured members. 772 F.3d at 1342. And there, as here, the Secretary had "not offered to refrain from similar programs within the 90–day window in the future," *id.* at 1343, amplifying the risk of future harm. Nor is this harm speculative. *Contra* Mot. 12. Both the mechanism of harm—errors and mismatches—and the threatened result—purging naturalized citizens—are actually occurring and entirely traceable to Defendants' actions. *See Browning*, 522 F.3d at 1163-64 (distinguishing *Lyons*).

Organizational Plaintiffs also have direct organizational standing. *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), re-affirmed that when defendants' "actions directly affect[] and interfere[] with [plaintiffs'] core business activities," organizational plaintiffs suffer injury in fact. *Id.* at 395. Like in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), Organizational Plaintiffs not only engage in issue advocacy but also provide direct services: instead of housing counseling as in *Havens*, they provide *voting* counseling (i.e., registering eligible

14

voters and ensuring those voters can in fact vote). *See FDA*, 602 U.S. at 395. They have alleged that Defendants' Purge Program "directly affect[s] and interfere[s] with" those "core business activities" of direct voter registration assistance, including by requiring them to identify and re-reregister purged voters and ensure previously active voters remain active and registered. *Id.*; *see* ECF 1 ¶¶ 21-24, 26-32, 36-39. Courts routinely recognize that policies that directly harm voter registration activities provide organizational standing for organizations that provide voter registration assistance, including post-*FDA*. *See, e.g.*, *Get Loud Ark. v. Thurston*, No. 5:24-CV-5121, 2024 WL 4142754, at *13 (W.D. Ark. Sept. 9, 2024) (recognizing "registering voters" and "assisting voters who have been purged from voter rolls" as supporting organizational standing under *FDA*); *Fla. State Conf. of NAACP v. Byrd*, 680 F. Supp. 3d 1291, 1308-09 (N.D. Fla. 2023).

### C. Defendants Marshall and Allen Are Proper Defendants.

Under Alabama law, the Secretary of State is "the chief elections official in the state" and "shall provide uniform guidance for election activities." Ala. Code § 17-1-3(a); *see also* Ala. Code §§ 17-4-60, 63. "As such, [the Secretary of State] has the authority, and indeed the obligation, to tell election officials how to implement election laws." *People First of Ala. v. Merrill*, 467 F. Supp. 3d 1179, 1201 (N.D. Ala. 2020). Secretary Allen did not simply "beg[i]n the noncitizen letter process by sending instructions to the Registrars." Mot. 18. Not only is the Purge Program

Secretary Allen's creation, but he is chiefly responsible for its implementation, as confirmed by the headline of his Office's Press Release alone. ECF 1 ¶ 129. Defendants' own Motion to Dismiss lays out the exact steps Secretary Allen personally took to create and begin implementing this program and refers to it as "[t]he Secretary's process." Mot. 3-4. Secretary Allen devised a flawed methodology that pulled stale data from Alabama state agencies identifying individuals whose files listed noncitizen identification numbers. *See id.* at 3. Then, "[h]e determined" that these individuals "appeared on the state voter rolls" and "instructed the Boards of Registrars . . . to write to those individuals using a letter template he provided." *Id.* Defendants' argument that county Boards of Registrars alone are proper defendants because Secretary Allen does not "control" them as independent appointees ignores the fact that Secretary Allen has ordered them to act. To be clear, the Registrars of Elmore, Jefferson, Lee, and Marshall Counties are named Defendants due to their roles in removing voters from the rolls pursuant to Alabama law and, specifically, as the Chairs of Boards of Registrars for the counties in which Individual Plaintiffs live. *See* Ala. Code § 17-4-3; ECF 1 ¶¶ 42, 47, 55, 56. And Defendant Registrars are following Secretary Allen's orders. Under the design of the Purge Program, the Registrar Defendants act at the direct instruction of Secretary Allen's Office. *See, e.g.*, ECF 1-1 ("The Secretary announced today that he is instructing the Boards of Registrars in all 67 counties to immediately inactivate and

initiate steps necessary to remove" the 3,251 voters on the Secretary's announced list). The Marshall Country Board of Registrars transferred Plaintiff Stroop's phone call regarding his Purge Letter to the Secretary of State's Office. *See* ECF 1 ¶ 50. Plaintiffs have alleged that Secretary Allen has the requisite direct stake in the Purge Program. Plaintiffs seek relief that only Secretary Allen can provide by rescinding the Purge Program and taking steps to place back on the rolls in active status any person whose registration status was affected as a result of the Purge. ECF 1 at 64-5. There can be no question that Secretary Allen is a proper Defendant in this case.

Attorney General Marshall is likewise a proper Defendant, as both investigation and possible prosecution are essential elements of the Secretary's Purge Program. *See* ECF 1-1. Alabama law permits the Attorney General to "at any time he [] deems proper, . . . superintend and direct the prosecution of any criminal case in any of the courts of this state," Ala. Code § 36-15-14, and "direct any district attorney to aid and assist in the investigation . . . of any case in which the state is interested," *id.* § 36-15-15; *see also* ECF 1 ¶ 61. Secretary Allen does not have such prosecutorial authority under Alabama law. *See* Ala. Code § 17-1-3. Attorney General Marshall is therefore necessary to Secretary Allen's Purge Program as outlined in the Press Release. *See* ECF 1-1. Attorney General Marshall enthusiastically endorsed the program in his official capacity and, in doing so,

indicated intent to use the Secretary's referrals to seek out potential prosecutions. ECF 1 ¶ 119.

The Eleventh Circuit has squarely rejected Defendants' interpretation of *Laird v. Tatum*, 408 U.S. 1 (1972), and it is foreclosed. *Smith v. Meese*, 821 F.2d 1484 (11th Cir. 1987), held that plaintiffs could sue as to "a specifically articulated discriminatory governmental policy which has already had the demonstrable objective effect of limiting, or chilling, the exercise of protected constitutional rights." *Id.* at 1494. The Purge Program is just such a program. *Smith* specifically rejected Defendants' argument that *Laird* broadly held that "a 'chilling' of constitutional rights is insufficient to establish direct injury." *Id.* Secretary Allen's referral of *all* individuals on the Purge List—including Plaintiffs Hazelhoff and Stroop—for investigation and threatened prosecution and Attorney General Marshall's evinced endorsement of the Purge Program create this chill. ECF 1 ¶¶ 69-70, 116-20. This is particularly true in light of Secretary Allen's public statements that he intends to continue the Purge Program. *Id.* ¶¶ 116-117. And the relief that Plaintiffs seek from the Attorney General, ECF 1 at 64-65, would lift the chill of threatened criminal investigation and prosecution. Finally, Defendants' invocation of federalism gets the law wrong. *See Honeyfund.com Inc. v. Governor*, 94 F.4th 1272, 1283 (11th Cir. 2024) ("[T]his injury is not outweighed by any threatened harm to [the state] because

18

the government has 'no legitimate interest' in enforcing an unconstitutional law.").

Attorney General Marshall is a proper Defendant.

### III.        Plaintiffs Have Stated an NVRA 90-Day Claim.

Plaintiffs have stated a plausible claim for relief on their claim under the 90-Day Provision of the NVRA. Defendants' motion errs by assuming all of their own factual assertions are true and ignores the plain text of the 90-Day Provision.

Most notably, Defendants' motion ignores the Rule 12(b)(6) standard, that a court "must take all of the factual allegations in the complaint as true." *Iqbal*, 556 U.S. at 678. Here, Defendants assert that contrary to the Complaint's allegations, *e.g.* ECF 1 ¶¶ 4, 9, every voter on the Purge List is only labeled as inactive and will be allowed to vote on Election Day. But such a promise cannot be accepted for purposes of a motion to dismiss. That is especially true here, where (1) Secretary Allen issued a press release clearly stating that voters on the Purge List would undergo a "verification" process before being allowed to vote; (2) the first Purge Letter made no mention of voters' ability to fill out an "update form" on Election Day and—consistent with Plaintiffs' allegations that the Purge Program would chill voting, ECF 1 ¶¶ 40, 46, 53, 55, 59, 111, 116-22, 174, 177-79—has led at least one U.S. citizen to self-remove, ECF 49-9 ¶¶ 16, 20; and (3) voters have had difficulty re-registering and even been initially required to provide proof of naturalization, ECF 23-29 (Sampen Decl.) ¶¶ 12-13, illustrating the likelihood of similar problems before

19

and on Election Day. In any event, the factual allegations in Plaintiffs' complaint are clear and must be taken as true at this stage of the proceedings.

Even if Defendants' factual assertions were accepted as true, their motion would fail because they are wrong on the law. First, they ignore the plain language of the statute, which provides that if a state begins a program "the *purpose of which is to systematically remove*" ineligible voters, that program must be "complete" by 90 days before the election. 52 U.S.C. § 20507(c)(2)(A) (emphasis added). No part of the statute asks whether affected voters have been fully removed before the election; it asks whether the program's *purpose* is to remove voters and whether the program has been completed before the 90-day window. Defendants' argument to the contrary conspicuously ignores the word "purpose." But this Court must assess "the language employed by Congress," which leaves no room for doubt. *Arcia*, 772 F.3d at 1343 (quotation marks omitted); *see id*. at 1344 (analyzing the "purpose" of Florida's noncitizen removal program).

Defendants' principal argument is that because a separate provision of the NVRA requires states to conduct a general removal program, which they contend requires activity within the 90-day window, the 90-Day Provision must allow for such activity. Mot. 19-20. But contrary to Defendants' assertion, specific provisions of statutes often override more general ones; such a statutory design would not be "absurd." *Id.* at 20. As the Supreme Court has explained, if a general prohibition is

20

contradicted by a "specific" provision "[t]o eliminate the contradiction, the specific provision is construed as an exception to the general one." *RadLAX Gateway Hotel v. Amalgamated Bank*, 566 U.S. 639, 645 (2012); *Nat'l Cable & Telecomms. Ass'n, Inc. v. Gulf Power Co.*, 534 U.S. 327, 336 (2002) ("The specific controls but only within its self-described scope."); *U.S. v. Ala.*, 778 F.3d 926, 936 (11th Cir. 2015). In any event, Defendants exaggerate the similarity between the NVRA's "general program" for removal and the purported operation of the Purge Program. Unlike the Purge Program, the notices sent pursuant to the "general program" are not sent during the 90-day window before an election. *See* 52 U.S.C. § 20507(d)(2)(A); *United States v. Florida*, 870 F. Supp. 2d 1346, 1350 (N.D. Fla. 2012). And it is those notices that tell voters they will become inactive; the fact that a voter can avoid placement on the list by responding to the notice within the 90-day window has no bearing here. *See* 52 U.S.C. § 20507(d)(2)(A).

Defendants' discussion of *Arcia*, which they separately maintain was "wrongly decided,"[4] Mot. 25, is unpersuasive. Unlike Defendants, the *Arcia* court acknowledged that the statute requires assessment of "the purpose" of a program. 772 F.3d at 1344. Further, it is unsurprising that *Arcia* did not address the particular facts here because there the defendants made no argument that the state would

---

[4] Defendants' argument that *Arcia* should be overruled again ignores statutory text, should be rejected, and is in any event foreclosed before this Court by *Arcia*'s status as controlling precedent.

finalize the removal process only after the election. And importantly, the Purge Program here creates a risk that voters "will likely not be able to correct the State's errors in time to vote." *Arcia*, 772 F.3d at 1347. Defendants' argument that the Purge Program does not involve "systematic" removals also ignores the Rule 12(b)(6) standard and is incorrect as a matter of law. *See* Mot. 24-25.[5]

Finally, Defendants' assertion that "'[r]emoval' is a term of art" and only applies if a voter's name is literally moved off the official list of eligible voters is clearly mistaken and would lead to absurd results. *See* Mot. 23-24. That understanding would allow states to avoid the NVRA's requirements completely by maintaining an official list of eligible voters but preventing some of those voters from voting or placing additional burdens on them—exactly what the 90-Day Provision seeks to prevent.

## IV.     Plaintiffs Have Stated an NVRA Uniform and Nondiscriminatory Claim.

Plaintiffs' uniform and nondiscriminatory claim is clear: the Purge Program violates this provision because it "is designed to affect only naturalized . . . citizens, and it knowingly places burdens exclusively on those citizens whom Alabama believes to be naturalized." ECF 1 ¶ 142; *see also id.* ¶¶ 2-6, 77-112, 142-43.

---

[5] The Program is systematic even to those voters who have filled out a removal form. *See Arcia*, 772 F.3d at 1339 (Florida's program systematic because it relied on database matching, even though local officials required to "conduct additional research" before initiating removal).

The NVRA sought to eliminate non-uniform, discriminatory practices such as "selective purging of voter rolls"—with a specific concern that "[s]uch processes must be structured to prevent abuse which has a disparate impact on minority communities." S. Rep. No. 103-6, at 3, 18; *see also* H. Rep. No. 103-9, at 15. Voter list maintenance programs must accordingly be applied uniformly throughout the jurisdiction and cannot discriminatorily single out specific subsets of voters, such as voters born outside the United States (*i.e.*, naturalized citizens), for purging under the NVRA. 52 U.S.C. § 20507(b)(1). Alabama's Purge Program is exactly the sort of discriminatory, selective purge that federal courts have repeatedly held violates the NVRA's uniform and nondiscriminatory provision. *See Florida*, 870 F. Supp. at 1350 (selective purge that swept in "primarily newly naturalized citizens" likely violated the NVRA's uniform and nondiscriminatory requirement); *Mi Familia Vota v. Fontes*, No. 2:22-cv-00509, 2024 WL 862406, at *41 (D. Ariz. Feb. 29, 2024) (where "[o]nly naturalized citizens would be subject to scrutiny," "non-uniform and discriminatory impact on naturalized citizens"). Defendants' citation to *Husted v. A. Philip Randolph Institute*, 584 U.S. 756 (2018), is inapposite: the state defended the non-uniform and discriminatory effects of its purge by arguing that plaintiffs had not

brought a claim under § 20507(b)(1). *Compare Husted*, 584 U.S. at 809 (Sotomayor, J., dissenting) (describing state's position at oral argument) *with* Mot. 26.[6]

Finally, Defendants' cursory assertion that § 20507(b)(1) cannot be constitutionally enforced is inconsistent with federal courts' decisions in similar contexts. *See Mi Familia Vota*, 2024 WL 862406, at *41. Further, Alabama is not "precluded" from enforcing voter qualifications,[7] the situation that *Arizona v. Inter Tribal Council* suggested would raise constitutional questions. 570 U.S. 1, 17 (2013). Instead, subsection 20507(b)(1) regulates *how* Defendants conduct federal elections, including *how* they engage in voter list maintenance, under the power of the Elections Clause—and prevents doing so discriminatorily. *Id.* at 16.

## V. Plaintiffs Have Stated an NVRA Claim Under 52 U.S.C. § 20507(a)(1).

Defendants must "ensure that any eligible applicant is registered to vote in an election" if their "valid voter registration form" is received at least 30 days before the election. 52 U.S.C. § 20507(a)(1). The plain text is clear: Defendants *must* "ensure" an "eligible applicant is registered to vote." *Id.* As Plaintiffs' complaint explained, "Secretary Allen's Purge Program does not ensure that eligible applicants

---

[6] *Bell v. Marinko*, 367 F.3d 588 (6th Cir. 2004), likewise has no bearing: there, the Sixth Circuit explained that bona fide residence requires analysis of factors that indicate an intent to reside at a location, and spousal residence was one of those factors. *Id.* at 592-93. Here, by contrast, U.S. citizenship is a straightforward question, not a factor analysis, and the fact of ever having had a "noncitizen identification number"—in other words, being born outside the country—does not indicate present ability to vote.

[7] Any factual assertion that the poorly planned Purge Program is *necessary* to Alabama's voter qualifications is plainly outside the scope of a motion to dismiss.

remain registered to vote in future elections." ECF 1 ¶ 147. Defendants do not even argue that voters on the Purge List have failed to submit "valid voter registration form[s]." 52 U.S.C. § 20507(a)(1). And instead of ensuring that eligible applicants are initially and remain registered to vote, Secretary Allen's Purge Program removes eligible individuals—Plaintiffs allege, and the evidence has in fact borne out—from the rolls. *See* ECF 1 ¶¶ 42, 44, 48-49; Helms Decl. ¶ 62; *Isabel v. Reagan*, 987 F.3d 1220, 1230 (9th Cir. 2021) (concluding that "the unambiguous terms of" § 20507(a)(1) required state to ensure that eligible voter who submitted timely application be registered for election).[8]

Defendants' apparent claim that a removal at the request of the registrant under the NVRA need not be free and voluntary is outrageous. Mot. 28. Defendants' theory of § 20507(a)(1) seems to be that they may remove eligible voters—long-time voters, and those who have just registered to vote in their first election—and nevertheless "ensure" they are "registered to vote." This is incorrect under the statutory text, and as a matter of logic.

## VI.     Plaintiffs Have Stated an Equal Protection Claim Predicated on National Origin and Citizenship Class Discrimination.

---

[8] Defendants' reliance on *Charles H. Wesley Educ. Found., Inc. v. Cox*, 324 F. Supp. 2d 1358, 1367 (N.D. Ga. 2004), *aff'd*, 408 F.3d 1349 (11th Cir. 2005), is misplaced. *See* Mot. 27. There, the court properly concluded that § 20507(a)(1) does not "permit denial of an application that otherwise satisfies the federal requirements" in response to the state's argument that such denial was permitted. *Id.* at 1367. Nothing in the opinion implied that states are allowed to accept such applications and then purge applicants from the rolls.

Defendants' efforts to portray the Purge Program as somehow facially neutral are unavailing. The Purge Program discriminates on its face based on national origin, because it identifies individuals based on whether they were born outside the United States and then fails to account for whether they have become citizens. And in any event, Secretary Allen expressly admitted *in his announcement* the virtual certainty that some individuals on the Purge List "who were issued noncitizen identification numbers have, since receiving them, become naturalized citizens and are, therefore, eligible to vote." ECF 1-1 at 3. Allen explained that under the Purge Program "those naturalized citizens" would be able to vote only *after* submitting a new registration form and being verified—a process designed *for naturalized citizens*. *Id.* As Plaintiffs alleged, barriers to voting for naturalized citizens—that similarly situated U.S.-born citizens are not subject to—are thus baked into the Purge Program by design and by the Purge Program's official announcement. ECF 1 ¶¶ 105-12. This is classification based on citizenship status and national origin.

Further, Defendants have created a program that immediately inactivates and ultimately seeks to remove *all* naturalized citizen voters whom the state is aware of. This is not like *Geduldig v. Aiello*, where pregnancy did not constitute gender discrimination because "nonpregnant persons" included "members of both sexes." 417 U.S. 484, 496 n.20 (1974). Rather, here (as Defendants have stated) *all* naturalized citizens identified within Defendants' data set are included on the Purge

26

List. *See* Helms Decl. ¶ 41. The Purge Program therefore discriminates against naturalized citizens and based on national origin. Being foreign-born is not an accurate proxy for *current* citizenship status. *Cf. Craig v. Boren*, 429 U.S. 190, 198 (1976) (cases that invalidated laws "employing gender as an inaccurate proxy").

Because the Purge Program classifies individuals on the basis of naturalized citizenship status and national origin, Plaintiffs need not otherwise demonstrate discriminatory intent: such a policy is flatly unlawful under the NVRA and subject to strict scrutiny under the Equal Protection Clause. *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). But in any event, evaluation of the evidence of discriminatory intent that Plaintiffs alleged, *see, e.g.*, ECF 1 ¶¶ 4-6, 12, 40, 66, 70, 77-84, 88, 91-94, 99, 100-03, 110-15, 122, 137-143, would require a highly fact-intensive inquiry. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). It is not a matter for a motion to dismiss.

Finally, Defendants cite no legal authority for their novel and unsound proposal that Plaintiffs must identify in their Complaint an alternative pathway for the state to act based on its asserted interest, and this Court should reject this unsupported heightened pleading burden. And any "wider latitude in limiting the participation of noncitizens" in politics, Mot. 31 does not extend to latitude to limit the participation of *naturalized citizens*, who are as American as the U.S.-born. *See Schneider*, 377 U.S. at 168-69.

## VII.      Plaintiffs Stated a *Bush v. Gore* Claim.

Plaintiffs have plausibly alleged a violation of the standard articulated in *Bush v. Gore*, 531 U.S. 98 (2000). As an initial matter, whether Defendants have implemented a program that subjects voters to arbitrary and disparate treatment is inherently a factual question not ripe for resolution at the motion to dismiss stage.

Defendants mistakenly understand the *Bush v. Gore* doctrine to be limited to unequal weighting of votes. Mot. 29-30. In fact, the U.S. Supreme Court construed the Equal Protection Clause to prohibit not just vote dilution but "arbitrary and disparate treatment" in the "allocation of the franchise." *Bush*, 531 U.S. at 104-05. Accordingly, the decision holds that the Equal Protection Clause reaches beyond the casting and counting of votes—"the manner of [the franchise's] exercise"—to regulate rules and procedures governing voter qualification and registration as well. *Id*. at 104. It is not restricted to a ban on devaluing an already-cast vote.

Defendants also insinuate that *Bush v. Gore* has no precedential effect, Mot. 32, but federal courts have disagreed. For instance, the Sixth Circuit has applied *Bush v. Gore* in a dispute arising out of a juvenile court judge race and enjoined the arbitrary and disparate treatment of provisional ballots. *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 235, 239–42 (6th Cir. 2011) (applying *Bush v. Gore* to conclude "lack of specific standards for reviewing provisional ballots" had resulted in unconstitutionally "arbitrary and uneven" treatment of voters casting such ballots); *see also Black v. McGuffage*, 209 F. Supp. 2d 889, 898 (N.D. Ill. 2002)

28

(relying in part on *Bush v. Gore* to deny motion to dismiss equal protection challenge against use of particular voting technology).

Plaintiffs have plausibly alleged the arbitrary and disparate treatment of voters placed on the Purge List. It appears that Defendants concede that voters on the Purge List are subjected to disparate treatment, principally a re-registration and re-verification regime newly invented by Secretary Allen just several weeks before a general election. ECF 1 ¶¶ 66-70, 77, 105, 107-08, 131, 161; Mot. 31. Further, as Plaintiffs have alleged, how a registered Alabama voter winds up on the Purge List is wholly arbitrary. ECF 1 ¶¶ 75-100, 162. As alleged, the criteria and methodology used to isolate these 3,251 registered Alabama voters are both "arbitrary as a means of ferreting out ineligible voters, and discriminatory in that it targets naturalized citizens." *Id*. ¶ 162; *see also id*. ¶¶ 83-84, 100-02. Targeting voters previously issued a "noncitizen identification number" is an unreliable and arbitrary method of identifying ineligible voters because it willfully ignores that many such voters will have subsequently naturalized before registering to vote. *Id*. ¶¶ 70, 77-102. Unsurprisingly, many eligible, naturalized voters have been ensnared by this arbitrary and discriminatory Purge Program. *Id*. ¶¶ 100-12, 163.

The arbitrariness of Defendants' criteria and methodology is on full display in their motion to dismiss as they argue voters on the Purge List have been singled out because they have "given the State reason to doubt their eligibility." Mot. 33. As

Plaintiffs have alleged, though, "[t]he fact of having once had a noncitizen identification number is neither proof nor a reliable indicator that a registered voter is currently a noncitizen." ECF 1 ¶ 162; *see also id*. ¶¶ 83-84. It is fundamentally irrational and arbitrary to suspect that a person who has attested to their citizenship is not a citizen solely because they were not at some point in the past, just as it would be irrational and arbitrary to assume that a voter who attests to residence but once lived in another state *still* lives in that other state years later. Moreover, even by the articulated bases for inclusion on the Purge List, the program is still unconstitutionally arbitrary because it contains numerous errors and has ensnared "multiple individuals who have never . . . been issued a noncitizen identification number." ECF 1 ¶ 163; *see also id*. ¶¶ 113-15. As Plaintiffs have alleged and as Secretary Allen's public description of the Purge Program makes clear, "the sole criterion for including an individual on the Purge List [is] whether they have ever had a noncitizen identification number." *Id*. ¶¶ 100, 113. Defendants' Motion to Dismiss does not disclose any other criteria or parameters and, in any event, any such information would lie well beyond the scope of adjudicating a Rule 12(b)(6) motion to dismiss.[9] Here, the Complaint's well-pleaded allegations must be taken as true and construed in the light most favorable to the Plaintiffs' *Bush v. Gore* claim.

---

[9] Discovery may shed greater light on the precise details of Defendants' database-matching criteria and methods.

Finally, Defendants rely upon *Carrington v. Rash*, 380 U.S. 89 (1965). This is puzzling, as Defendants are arbitrarily "'[f]encing out' from the franchise a sector of the population" and then forcing those voters to scale that fence to re-enter the electorate. *Id*. at 94. This is the very arbitrary and disparate treatment the Equal Protection Clause forbids.

## VIII.     Plaintiffs Stated an *Anderson-Burdick* Claim.

Plaintiffs have also plausibly alleged that Defendants have unduly burdened the voting rights of registered voters on the Purge List. Such claims invoke the First and Fourteenth Amendments and are analyzed under the *Anderson-Burdick* balancing test, named after the Supreme Court decisions in *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992).

Under this test, courts "weigh the character and magnitude of the asserted First and Fourteenth Amendment injury against the state's proffered justifications for the burdens imposed by the rule, taking into consideration the extent to which those justifications require the burden to the plaintiffs' rights." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019). Regulations that impose "severe burdens" on a plaintiff's rights "must be narrowly tailored and advance a compelling state interest." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). "Regulations that impose lesser burdens trigger 'less exacting review' and a state's 'important regulatory interests' will usually be enough to justify '*reasonable,*

31

*nondiscriminatory* restrictions.'" *Libertarian Party v. Merrill*, 476 F. Supp. 3d 1200, 1205 (M.D. Ala. 2020) (quoting *Burdick*, 504 U.S. at 434) (emphasis added).

As the *Anderson-Burdick* test is highly fact-dependent, such claims are uniquely difficult to analyze under the governing rules for Rule 12(b)(6) motions. "Because the *Anderson-Burdick* test 'emphasizes the relevance of context and specific circumstances,' it is particularly difficult to apply at the motion to dismiss stage." *Fla. State Conf. of NAACP v. Lee*, 566 F. Supp. 3d 1262, 1286 (N.D. Fla. 2021); *Bergland v. Harris*, 767 F.2d 1551, 1555 (11th Cir. 1985). As one court recently put it, any court that does seek to apply this balancing test at the motion to dismiss stage "is liable to find itself 'in the position of Lady Justice: blindfolded and stuck holding empty scales.'" *Id*. The weight of precedent treats Rule 12(b)(6) dismissal of an *Anderson-Burdick* claim as inadvisable.

Regardless, the Complaint's allegations more than sufficiently plead a "severe burden" imposed upon voters on the Purge List. Such duly registered Alabama voters are "subject[ed] . . . to intimidation in the form of a letter threatening them with unjustified criminal prosecution and requires them to re-register under the Re-Registration Process in order to vote and be on the voter rolls." ECF 1 ¶ 167; *see also id*. ¶¶ 66-70, 77, 105, 107-08, 116-22, 131. It is not mere paperwork, as Defendants intimate, but rather an unwarranted reverification and the threat of prosecution that combine to make this a severe burden on these arbitrarily identified

voters. *See Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 575 (6th Cir. 2016) (noting "the 'combined effect' of [election regulations] can pose a severe burden"); *Lee v. Keith*, 463 F.3d 763, 770 (7th Cir. 2006) ("[W]e are required to evaluate challenged ballot access restrictions together, not individually, and assess their combined effect on voters' and candidates' political association rights."). Further, even if the Court were to conclude that registered Alabama voters on the Purge List face a burden that is less than "severe," this conclusion would only trigger a host of fact-intensive questions that cannot be resolved in this Rule 12(b)(6) posture, such as: (1) whether the Purge Program is justified by an "important regulatory interest"; and (2) whether the Purge Program is a "reasonable" and "nondiscriminatory" restriction on voter registration. *Burdick*, 504 U.S. at 434. Plaintiffs' Complaint plausibly states a claim that Defendants' Purge Program is arbitrary, unreasonable, not justified by an important regulatory interest, and discriminatory. ECF 1 ¶ 64; ¶¶ 83-84, 100; ¶¶ 75-99; ¶¶ 101-02; ¶¶ 66-70, 77, 105, 107-08, 131; ¶¶ 68-70; ¶ 127; ¶ 82. All of these allegations plausibly state a claim that Defendants have implemented an unduly burdensome and arbitrary system that is causing an unreasonable and discriminatory impact on naturalized Alabama voters.

Finally, Defendants contend that because Alabama's voter identification law was upheld against intentional racial discrimination and Voting Rights Act challenges, the wholly unrelated program at issue here must survive scrutiny under

*Anderson-Burdick*. *See* Mot. 34. But Defendants do not cite any authority for that proposition. And in any event, Defendants fail to note that the plaintiffs in *Greater Birmingham Ministries v. Secretary of State for State of Alabama* did not even assert any *Anderson-Burdick* claims—and the claims they *did* assert were being adjudicated on a summary judgment posture, not a motion to dismiss. 992 F.3d 1299 (11th Cir. 2021). This illogical argument should be rejected.

## IX.      Private Plaintiffs Stated a VRA §11(b) Claim

Section 11(b) contains a private right of action. Defendants' recycled contention that Section 11(b) of the Voting Rights Act is not privately enforceable plainly misreads the Act's text. Mot. 34-35. As this Court has confirmed, "Section 10302(a) says that 'the Attorney General or an aggrieved person' can institute a proceeding to enforce § 10307. But the 'aggrieved person' under § 10307(b) is the voter who suffers the intimidation, threat, or coercion." *Moore v. Cecil*, No. 4:19-cv-1855, 2021 WL 1208870, at *11 (N.D. Ala. Mar. 31, 2021), *aff'd*, 109 F.4th 1352 (11th Cir. 2024). Here, Plaintiffs are such aggrieved voters. *See* ECF 1 ¶¶ 8-25, 42-59. Just as with the Secretary's identical (and unsuccessful) challenge to the private right of action for Section 2 claims, "[t]he Secretary and [other Defendants] identify

no controlling precedent holding that [Section 11(b)] does not contain a private right of action." *Stone v. Allen*, 2024 WL 578578, at *6 (N.D. Ala. Feb. 13, 2024).[10]

And Plaintiffs allege intimidation. As Defendants rightly point out, "Section 10307(b) is about not intimidating, threatening, or coercing *eligible* voters." Mot. 36. Plaintiffs' Complaint alleges exactly this: that Defendants' actions have unlawfully intimidated eligible Alabamian voters who are United States citizens, and their actions have the effect of discouraging these voters from exercising their political rights. ECF 1 ¶¶ 168-79. Most pointedly, "public reporting has made clear that the Purge List contains many eligible Alabama voters." *Id.* ¶ 176. For these voters, the Complaint clearly alleges that "Secretary Allen's and Attorney General Marshall's actions intimidate and threaten naturalized citizens who are eligible voters for voting and attempting to vote, including by registering to vote." *Id.* ¶ 179. This allegation is grounded in the reality that ACIJ has observed the Purge Program revive fear and concern in Alabama's immigrant community. *Id.* ¶ 40. Plaintiffs' Complaint has alleged unlawful voter intimidation under Section 11(b).

## CONCLUSION

This Court should deny Defendants' Motion to Dismiss Plaintiffs' Complaint.

---

[10] *See also Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 476 (S.D.N.Y. 2020) ("Defendants contend that Section 11(b) affords no private right of action. That is incorrect. Consistent with Section 11(b)'s broad reach, both the government and private parties may sue to enforce Section 11(b)."); *Ariz. Democratic Party v. Ariz. Republican Party*, No. CV-16-03752, 2016 WL 8669978, at *4 (D. Ariz. Nov. 4, 2016) (concluding that Section 11(b) "does not exclude a private right of action for injunctive relief").

Date: Oct. 9, 2024                                  Respectfully Submitted,

/s/ *Joseph Mitchell McGuire*
Joseph Mitchell McGuire (ASB-8317-S69M)
MCGUIRE & ASSOCIATES, LLC
31 Clayton Street
Montgomery, Alabama 36104
334-517-1000 Office
334-517-1327 Fax
jmcguire@mandabusinesslaw.com

/s/ *Michelle Kanter Cohen*
Michelle Kanter Cohen (D.C. Bar No. 989164)
Nina Beck (WI State Bar No. 1079460)
Jon Sherman (D.C. Bar No. 998271)
FAIR ELECTIONS CENTER
1825 K St. NW, Ste. 701
Washington, D.C. 20006
(202) 331-0114
mkantercohen@fairelectionscenter.org
nbeck@fairelectionscenter.org
jsherman@fairelectionscenter.org

/s/ *Kathryn Huddleston*
Danielle Lang
Brent Ferguson
Kathryn Huddleston
Kate Hamilton
Shilpa Jindia
CAMPAIGN LEGAL CENTER
1101 14th Street NW, Suite 400
Washington, DC 20005
(202) 736-2200
dlang@campaignlegalcenter.org
bferguson@campaignlegalcenter.org
khuddleston@campaignlegalcenter.org
khamilton@campaignlegalcenter.org
sjindia@campaignlegalcenter.org

/s/ *Ellen Degnan*
Ellen Degnan, ASB 3244I12V
Southern Poverty Law Center
400 Washington Ave.
Montgomery, AL 36104
(334) 313-0702
ellen.degnan@splcenter.org

/s/ *Jess Unger*
Bradley Heard
Sabrina Khan
Jess Unger
Southern Poverty Law Center
1101 17th Street NW
Suite 550
Washington, DC 20036
bradley.heard@splcenter.org
sabrina.khan@splcenter.org
jess.unger@splcenter.org

/s/ *Ahmed Soussi*

Ahmed Soussi
Southern Poverty Law Center
201 St. Charles Avenue, Suite 2000
New Orleans, LA 70170
ahmed.soussi@splcenter.org

## CERTIFICATE OF SERVICE

I certify that on October 9, 2024, I electronically filed the above document

with the Clerk of Court using the ECF system, which will provide electronic copies

to counsel of record.

/s/ Kathryn Huddleston
Kathryn Huddleston