FILED

2024 Oct-10  PM 04:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

───────────◆───────────

ALABAMA COALITION FOR
IMMIGRANT JUSTICE, et al.,

*Plaintiffs*,

v.                              No. 2:24-cv-01254-AMM

WES ALLEN, in his official capacity as
Alabama Secretary of State, et al.,

*Defendants*.

───────────◆───────────

UNITED STATES OF AMERICA,

*Plaintiff*,

v.                              No. 2:24-cv-01329-AMM

STATE OF ALABAMA and
WES ALLEN, in his official capacity as
Alabama Secretary of State,

*Defendants*.

───────────◆───────────

## PROPOSED BRIEF OF PUTATIVE *AMICI* COOLIDGE
## REAGAN FOUNDATION, SHAUN MCCUTCHEON, AND
## ALABAMA REPUBLICAN PARTY, AND BILL HARRIS
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

<u>**Attorneys for *Amici Curiae*:**</u>

**Dan Backer**
***(pro hac vice pending)***
<u>**dbacker@chalmersadams.com**</u>
**CHALMERS, ADAMS,**
**BACKER & KAUFMAN LLC**
**441 North Lee Street, Suite 300**
**Alexandria, VA 22314**
**Tel.: (202) 210-5431**

**Ed R. Haden**
<u>**ehaden@balch.com**</u>
**BALCH & BINGHAM LLP**
**1901 Sixth Avenue North**
**Suite 1500**
**Birmingham, AL 35203**
**Tel.: (205) 226-8795**

**Tripp DeMoss**
<u>**tdemoss@balch.com**</u>
**BALCH & BINGHAM LLP**
**445 Dexter Avenue**
**Suite 8000**
**Montgomery, AL 36104**
**Tel.: (334) 269-3123**

**October 10, 2024**

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

STATEMENT OF INTEREST OF PUTATIVE *AMICI* ...........................................2

BACKGROUND OF THE CASE ...........................................................................3

      A.    The Alabama Secretary of State Asked Self-Declared Non-Citizens to Confirm Their Eligibility to Vote .........................................................3

      B.    Non-Citizen Voting .............................................................................4

      C.    The NVRA Does Not Allow Alabama to Reject Completed Federal Voter Registration Forms, Even When the State Has Evidence They are Submitted by Non-Citizens ...........................................................9

ARGUMENT ......................................................................................................11

I.    Neither of the Complaints States A Valid Claim Under 52 U.S.C. § 20507(C)(2)(A) for Conducting A Systematic Removal Program Within 90 Days of A Federal Election .............................................................................11

II.    Count VII of the ACIJ Complaint Should Be Dismissed For Failing To State A Valid Claim Under § 11(B) of The Voting Rights Act ...............................21

      A.    Section 11(b) of the VRA is not Privately Enforceable Through 42 U.S.C. § 1983 .....................................................................................22

      B.    The ACIJ Plaintiffs Have Not Plausibly Alleged a § 11(b) Violation ...........................................................................................26

CONCLUSION ...................................................................................................32

CERTIFICATE OF SERVICE ..............................................................................34

i

## **INTRODUCTION**

Putative *amici* Coolidge Reagan Foundation, Shaun McCutcheon, the Alabama Republican Party, and Alabama's RNC National Committeeman Bill Harris respectfully submit this proposed *amicus* brief in the above-captioned consolidated cases in support of Defendants' Motion to Dismiss the Complaints. *See* Mot. to Dismiss by Wes Allen, et al., D.E. #50 (Oct. 2, 2024), *Ala. Coal. for Immigrant Justice*, No. 2:24-cv-01254-AMM (N.D. Ala. filed Sept. 13, 2024) [hereinafter, "ACIJ Case"]; Mot. to Dismiss by Wes Allen, et al., D.E. #14 (Oct. 2, 2024), *United States v. Alabama*, No. 2:24-cv-1329-AMM (N.D. Ala. filed Sept. 27, 2024) [hereinafter, "DOJ Case"].

Putative *amici* wish to demonstrate the NVRA does not preclude election officials such as Secretary Allen from requesting that people confirm their eligibility to vote after they have affirmatively identified themselves as noncitizens to state agencies. Nor does the statute restrict a state's ability to place such voters into "inactive" status until such confirmation has been provided. *Cf.* 52 U.S.C. § 20507(c)(2)(A). Finally, § 11(b) of the Voting Rights Act does not prohibit state election officials from threatening to refer potential violations of the law for investigation and prosecution. *See* 52 U.S.C. § 10307(b).

## STATEMENT OF INTEREST OF PUTATIVE *AMICI*

No counsel for any party authored any part of this brief, or made a monetary contribution to fund its preparation or submission. No person other than *amici*, members and supporters of organizational *amici*, and counsel for *amici* made a monetary contribution in connection with this brief.

Putative amicus Coolidge Reagan Foundation ("CRF") is a § 501(c)(3) nonprofit organization incorporated and having its principal place of business in the District of Columbia. It is dedicated to protecting freedom of speech under the First Amendment and the integrity of the electoral process.

Putative *amicus* Shaun McCutcheon is CRF's Founder and Chairman. He was also the prevailing Petitioner in the landmark First Amendment case *McCutcheon v. FEC*, 572 U.S. 185 (2014) (per curiam). As a registered Alabama voter who intends to exercise his fundamental right to vote in the 2024 election, Mr. McCutcheon has a compelling interest to ensure his vote is not nullified, diluted, or effectively cancelled out by illegal votes from ineligible noncitizens. *See Anderson v. United States*, 417 U.S. 211, 226 (1974); *see also Reynolds v. Sims*, 377 U.S. 533, 555 (1964).

Putative amicus Alabama Republican Party represents Republican voters and candidates throughout the state. It has a strong interest in ensuring the elections in which its candidates run are conducted in accordance with all applicable

constitutional and statutory requirements, and that its candidates are protected from having votes for them effectively cancelled out by illegal votes from ineligible noncitizens. *See Texas Democratic Party v. Benkiser*, 459 F.3d 582, 586-88 (5th Cir. 2006).

Putative amicus Bill Harris is Alabama's National Committeeman of the Republican National Committee. In that capacity, he has a strong interest in helping prevent plaintiffs from advocating an erroneous interpretation of the National Voter Registration Act that prevents election officials from implementing reasonable measures to prevent ineligible noncitizens from illegally registering to vote and illegally casting ballots.

## **BACKGROUND OF THE CASE**

### A.   **The Alabama Secretary of State Asked Self-Declared Non-Citizens to Confirm Their Eligibility to Vote**

On August 13, 2024, Alabama Secretary of State Wes Allen announced his office had identified 3,251 people who had each separately notified a state agency they had received "noncitizen identification numbers [from] the Department of Homeland Security." *ACIJ Complaint*, D.E. #1, ¶ 65; *DOJ Complaint*, D.E. #1, ¶¶ 4, 20. As its name implies, a "noncitizen identification number" is a unique number the federal government provides only to noncitizens. *DOJ Complaint*, D.E. #1, ¶ 21. Under the Alabama Constitution, however, only U.S. citizens may vote. Ala. Const., art. VIII, Sec. 177; *see also* Ala. Code § 17-3-30.

Secretary Allen allegedly instructed county boards of registrars to place these 3,251 people self-identified noncitizens into "inactive" status on the voter registration rolls and mail notices to them. *Id*. ¶ 24. So far, 106 individuals have submitted a voter removal request form, *see id*. ¶ 58. No other individuals have been, or will be, removed from the registration rolls prior to the 2024 general election, except at their individual request. *See* Ala. Code §17-4-9; D.E. #29, pp. 7-8. To the contrary, Secretary Allen recognized some of these self-identified noncitizens may have subsequently become U.S. citizens. *ACIJ Complaint*, D.E. #1, ¶¶ 66, 70, 83. Accordingly, he allegedly directed county election officials to include separate requests for individualized information to each potential noncitizen, directing them to either remove themselves from the voter registration rolls or instead complete a form confirming their eligibility to vote. *DOJ Complaint*, D.E. #1, ¶¶ 24, 29.

Notices to the potential noncitizens included re-registration forms which could be used to provide the required information. In addition, voters could complete reidentification forms at their polling places. *Id*. ¶¶ 31-32.

### B.    Non-Citizen Voting

The Justice Department alleges, "[T]here is no evidence of widespread non-citizen voting in the United States." Complaint, D.E. #1, ¶ 1 (Sept. 27, 2024), *DOJ Case*. This is both misleading and beside the point. Regardless of whether noncitizen

voting is "widespread" compared to the 200+ million registered U.S. voters,[1] non-citizens do, in fact, vote in U.S. elections and states have both a federal constitutional prerogative as well as inherent police power authority to combat it.

During congressional debates over the National Voter Registration Act ("NVRA"), Congress recognized numerous instances of noncitizen voting. The Senate Minority Report accompanying the bill explained, for example, "Illegal aliens have used easy availability of voter registration cards as a means to gain entry into the United States. Voter registration cards have also been used to gain access to federal and state benefits and even to obtain jobs with the federal government." S. Rpt. No. 103-6, at 55 (Feb. 25, 1993) (views of Sen. Stevens et al.). A Chicago Grand Jury identified noncitizens as "[a]nother pool of potential votes for the unscrupulous precinct captain." *Id*.

The minority report went on to discuss a 1989 survey that the Immigration and Naturalization Service ("INS") conducted of a special election in Florida. "In that election, it was confirmed that fully 11 percent of all ballots of foreign-born voters sampled were cast by non-citizens." *Id*. The INS further reported "there is reason to believe that in this federal election, the incidence of illegal alien voting among all ballots examined was as high as 24 percent." *Id*.; *see also* 138 Cong. Rec.

---

[1] *See* U.S. Election Assistance Commission, Election Administration and Voting Survey 2022 Comprehensive Report (2023), *available online at:* https://www.eac.gov/sites/default/files/2023-06/2022_EAVS_Report_508c.pdf.

11, 696 (May 19, 1992) (statement of Sen. Simpson) (outlining various instances of noncitizen voting).

In 2012, NBC2 conducted an investigation of voter registration rolls in only two (2) of Florida's sixty-seven (67) counties.[2] They discovered nearly one hundred non-citizens were registered within those two counties alone even though, **_after_** registering to vote, they had submitted forms declining jury duty on the grounds they were non-citizens. Some of those self-proclaimed non-citizens had cast votes. When the State of Florida later conducted a partial review of only 8% of voters registered in the statewide database, it identified nearly 200 additional non-citizens who were registered to vote, and was unable to confirm the citizenship of the majority of records reviewed.[3] Just last month, Florida officials found another 144 noncitizens on its voter registration rolls.[4]

In recent years, Secretaries of State and Attorneys General throughout the nation have uncovered thousands of apparent noncitizens registered to vote,

---

[2] *See NBC2 Investigates: Voter Fraud*, NBC2 (Feb. 2, 2012), *available online at:* https://web.archive.org/web/20130720211624/https://www.nbc-2.com/story/16662854/2012/02/02/nbc2-investigates-voter-fraud.

[3] FLA. DEP'T OF STATE, Press Release, *Florida's Voter Eligibility Initiative Confirms 207 Non-Citizens on Voter Rolls Using SAVE Database, Around 8 Percent of Voters Checked* (Sept. 12, 2012), *available online at:* https://dos.fl.gov/communications/press-releases/2012/florida-s-voter-eligibility-initiative-confirms-207-non-citizens-on-voter-rolls-using-save-database-around-8-percent-of-voters-checked/.

[4] Gray Rohrer, *Florida Looks to Clamp Down on Noncitizen Voters Despite Outcry That It's a Non-Issue*, TALLAHASSEE DEMOCRAT (Sept. 16, 2024), *available online at:* https://www.tallahassee.com/story/news/politics/2024/09/16/florida-looks-to-clamp-down-on-immigrant-voters-despite-few-incidents/75188399007/.

including some who had, in fact, voted. While some of these individuals may be or subsequently became eligible to vote under Alabama law, if even a quarter or third of these individuals are non-citizens, it reveals substantial cause for concern:

● Chicago—discovered hundreds of non-citizens were erroneously registered through the state's automatic voter registration system;[5]

● Georgia—the state's first "citizenship audit" of its voter registration rolls revealed up to 1,634 "potential noncitizens register[ed] to vote," with 1,319 of those registrations occurring since 2016;[6]

● Texas—Governor Abbott announced the state has removed 6,500 noncitizens from its voter registration rolls since adopting SB 1 in 2021;[7]

● South Dakota—this past week, the Secretary of State removed 273 noncitizens from the voter registration rolls. It is unclear whether any of them had previously voted;[8]

---

[5] *1 Noncitizen Voted in Registration Error, Illinois Officials Say*, 5CHICAGO (Feb. 6, 2020), *available online at:* http://www.nbcchicago.com/news/local/chicago-politics/1-noncitizen-voted-in-registration-error-illinois-officials-say/2214237.

[6] GEORGIA SECRETARY OF STATE, Press Release, *Secretary Raffensperger Refers 1,600 Noncitizen Registrants to Local DAs, GBI, State Election Board* (Apr. 11, 2022), *available online at:* https://sos.ga.gov/news/secretary-raffensperger-refers-1600-noncitizen-registrants-local-das-gbi-state-election-board.

[7] GOVERNOR'S OFFICE OF THE STATE OF TEXAS, Press Release, *Governor Abbott Announces Over 1 Million Ineligible Voters Removed from Voter Rolls* (Aug. 26, 2024), *available online at:* https://gov.texas.gov/news/post/governor-abbott-announces-over-1-million-ineligible-voters-removed-from-voter-rolls.

[8] Staff, *State Officials Remove 273 Noncitizens from Voter Roll, But Provide Few Other Details*, S.D. SEARCHLIGHT (Oct. 7, 2024), *available online at:* https://southdakotasearchlight.com/briefs/state-officials-remove-273-noncitizens-from-voter-roll-but-provide-few-other-details/.

- California—at least 1,500 noncitizens were registered, and an unknown number may have voted in the state's primaries;[9] and

- Virginia—Governor Glenn Youngkin noted Virginia had "discovered and removed more than 6,000 noncitizens registered from voting rolls" over the past several years.[10] *See also* D.E. # 29, pp. 2-3, n. 1 (discussing similar issues that have been identified in Ohio and Oregon).

Again, it is likely some of the individuals identified as non-citizens had in fact become citizens before registering to vote or voting. And the number of non-citizens who have voted is tiny compared to the overall number of valid votes from all U.S. citizens. But if "every vote counts," it is important that states are not hamstrung in enforcing their basic citizenship requirements—particularly in a nation where tens of millions of non-citizens live, including more than 11 million illegal aliens.[11]

---

[9] Editorial Board, *Noncitizens Registered to Vote? Put California's Bungled "Motor Voter" System on Hold Right Away*, L.A. TIMES (Oct. 11, 2018), *available online at:* http://www.latimes.com/opinion/editorials/la-ed-motor-voter-problems-20181011-story.html.

[10] Mandy Taheri, *Thousands of Noncitizen Registered Voters Discovered, Governor Says*, NEWSWEEK (Aug. 11, 2024), *available online at:* https://www.newsweek.com/thousands-non-citizen-voters-discovered-governor-1937025.

[11] *See* Jennifer Van Hook, et al., *A Turning Point for the Unauthorized Immigrant Population in the United States*, PENN STATE SOC. SCI. RES. INST. (Sept. 13, 2023), *available online at:* https://pop.psu.edu/news/turning-point-unauthorized-immigrant-population-united-states.

**C.**     **The NVRA Does Not Allow Alabama to Reject Completed Federal Voter Registration Forms, Even When the State Has Evidence They are Submitted by Non-Citizens**

Alabama must be allowed to identify potential non-citizens on its voter registration rolls, particularly given that federal law makes it impossible for states to prevent non-citizens from being added to those rolls in the first place. The National Voter Registration Act requires state election officials to accept a completed federal voter registration form and register the applicant to vote—at least for elections for federal office—without requiring proof of citizenship. *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 15, 20 (2013) (construing 42 U.S.C. § 1973gg-4(a)(1)). Election officials must accept an applicant's decision to check a box attesting to their supposed U.S. citizenship—despite the fact they may be completing the application while attempting to obtain government benefits, not reading the form carefully, unable to understand English, or have simply erred.

The Supreme Court emphasized in *Inter Tribal Council of Arizona* that a state may contend "a mere oath will not suffice to effectuate its citizenship requirement and that the [U.S. Election Assistance Commission] is therefore under a nondiscretionary duty to include a [proof of citizenship] requirement on the Federal form" for that state. *Id*. at 20.[12] When the State of Kansas attempted to obtain such

---

[12] The federal voter registration form, mandated by the NVRA, *see* 52 U.S.C. §§ 20505(a)(1), 20508(a)(2), with only a checkbox for an applicant to self-report their supposed U.S.

relief, however, the Tenth Circuit upheld the EAC's refusal to amend the instructions for the federal voter registration form to require people seeking to register in Kansas to provide proof of citizenship. *See Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1197 (10th Cir. 2014). The court reasoned Kansas could not require proof of citizenship because it had failed to prove "a substantial number of noncitizens have successfully registered using the Federal Form." *Id*. at 1197-98. When the EAC's Executive Director later approved requests from Alabama, Georgia, and Kansas to require proof of citizenship when people use the Federal Form to register there, the D.C. Circuit reversed the decision. *League of Women Voters of the United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016); *see also League of Women Voters of the United States v. Newby*, 671 F. App'x 820 (D.C. Cir. 2016).

Courts have further held a state is prohibited from requiring proof of citizenship when a person attempts to register to vote in federal elections either through a state's DMV office pursuant to the NVRA's "motor voter" provision, *see Fish v. Kobach*, 840 F.3d 710, 744-46 (10th Cir. 2016), or even using a state-created voter registration form, *see Mi Familia Vota v. Fontes*, No. CV-22-509, 2024 U.S. Dist. LEXIS 36596, at *191 (D. Ariz. Feb. 29, 2024), *stay granted in part*, Nos. 24-3188, 24-3559, 24-4029, 2024 U.S. App. LEXIS 19536 (9th Cir. July 18, 2024), *stay*

---

citizenship, may be found online at: https://www.eac.gov/sites/default/files/eac_assets/1/6/Federal_Voter_Registration_ENG.pdf.

*vacated*, 111 F.4th 976 (9th Cir. 2024), *stay granted in part*, No. 24A164, 2024 U.S. LEXIS 3025 (U.S. Aug. 22, 2024). Accordingly, federal law has been construed to bar states at every turn from attempting to confirm a person's citizenship at the time they register to vote. Instead, states must add applicants to the voter registration database simply because they checked a "citizenship" box, and seek to clear up conflicting information concerning certain applicants' citizenship after the fact.

## ARGUMENT

## I.  NEITHER OF THE COMPLAINTS STATES A VALID CLAIM UNDER 52 U.S.C. § 20507(c)(2)(A) FOR CONDUCTING A SYSTEMATIC REMOVAL PROGRAM WITHIN 90 DAYS OF A FEDERAL ELECTION

This Court should dismiss the DOJ Complaint as well as Count I of the ACIJ Complaint because neither states a valid claim under the NVRA, 52 U.S.C. § 20507(c)(2)(A).[13] This provision states, "A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." *Id*. The report of the U.S. Senate Committees on Rules and Administration which accompanied the NVRA stated that this provision:

---

[13] *Amici* have chosen to focus on the claims where they believe they can add the most value to this Court's analysis as a "friend of the court." This selectivity in discussing certain counts in the ACIJ Complaint should not be understood as an implicit endorsement of the ACIJ's other claims.

11

> requires that a State complete any program the purpose of which is to
> systematically remove the names of ineligible voters from the official
> lists of eligible voters at least 90 days before a primary or general
> election for Federal office. This requirement applies to the State
> outreach activity such as a mailing or a door to door canvas and requires
> that such activity be completed by the 90-days deadline.

S. Rpt. No. 103-6, at 32 (Feb. 25, 1993); *accord* H. Rpt. No. 103-9, at 16 (Feb. 2,

1993). The Joint Explanatory Statement accompanying the final compromise version

of the bill reiterated this provision "does not permit a State to conduct a systemic

procedure to confirm voting lists within 90 days before a federal election." H. Rpt.

No. 103-66, at 20 (Apr. 28, 1993) (conference report).

The U.S. Constitution expressly permits states to determine voter

qualifications for both U.S. House and U.S. Senate elections. *See* U.S. Const. art. I,

§ 2, cl. 1 ("[T]he Electors in each State [for U.S. Representatives] shall have the

Qualifications requisite for Electors of the most numerous Branch of the State

Legislature."); *accord id*. amend. XVII, ¶ 1 (same for U.S. Senate). Similarly, the

Constitution grants the States plenary authority to determine how their presidential

electors shall be appointed, which encompasses the prerogative to set voter

qualifications for presidential elections. *See id*. art. II, § 1, cl. 2 ("Each State shall

appoint, in such Manner as the Legislature thereof may direct, a Number of

[presidential] Electors . . . ."); *see also McPherson v. Blacker*, 146 U.S. 1, 27, 35

(1892).

The constitutional avoidance canon counsels this Court to construe § 20507(c)(2)(A) narrowly to avoid raising serious constitutional questions. *See Nat'l Labor Rel. Bd. v. Catholic Bishop of Chicago*, 440 U.S. 490, 507 (1979) ("[I]n the absence of a clear expression of Congress' intent to bring teachers in church-operated schools within the jurisdiction of the Board, we decline to construe the Act in a manner that could in turn call upon the Court to resolve difficult and sensitive questions arising out of the guarantees of the First Amendment Religion Clauses."); *see also Rust v. Sullivan*, 500 U.S. 173, 191 (1991) (noting the presumption "Congress did not intend" to authorize interpretations of a federal statute which raise "grave and doubtful constitutional questions" (quoting *United States* ex rel. *Attorney Gen. v. Delaware & Hudson Co.*, 213 U.S. 366, 408 (1909))). Interpreting and applying the NVRA to make it difficult or impossible for states to effectively enforce their voter qualifications would raise such a serious constitutional question. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 17-18 (2013) ("[I]t would raise serious constitutional doubts if a federal statute precluded a State from obtaining the information necessary to enforce its voter qualifications."). Accordingly, this Court should reject any such interpretation. Especially viewing § 20507(c)(2)(A) through this important and narrow interpretive lens, Plaintiffs have failed to state a claim under that provision for several reasons.

*First*, the Secretary of State took individualized action based on individualized consideration of each voter's particular circumstances, rather than acting "systematically." A program is "systematic" for purposes of the NVRA when it "did not rely upon individualized information or investigation to determine which names from the voter registry to remove." *Arcia v. Sec'y of Fla.*, 772 F.3d 1335, 1344 (11th Cir. 2014); *see, e.g.*, *N.C. State Conf. of the NAACP v. N.C. State Bd. of Elections*, No. 1:16-cv-1274, 2016 U.S. Dist. LEXIS 153249, at *27 (M.D.N.C. Nov. 4, 2016) (holding "reliance on a single mailing that was returned undeliverable as the basis for sustaining a challenge" to a person's eligibility to vote constituted a systemic removal program in violation of the NVRA). As the Eleventh Circuit explained, "[T]he 90 Day Provision would not bar a state from investigating potential non-citizens and removing them on the basis of individualized information, even within the 90-day window." *Arcia*, 772 F.3d at 1348.

Secretary Allen's efforts do not violate the NVRA because they are based on individualized determinations based on discrete information about—and provided by—each voter rather than rote systemic removal. *See Mi Familia Vota v. Fontes*, 691 F. Supp. 3d 1077, 1092 (D. Ariz. 2023) ("States may continue to implement individualized removal programs within this 90-day window."); *Fair Fight Inc. v. True the Vote*, No. 2:20-cv-302-SCJ, 2024 U.S. Dist. LEXIS 22, at *119 n.63 (N.D. Ga. Jan. 2, 2024) ("The State of Georgia, moreover, in the period before an election

can remove individual voters [during the 90-day window] for appropriate reasons."). Secretary Allen asked county officials to contact only voters who appear to have informed a state agency that they were given a noncitizen identification number and, accordingly, are not U.S. citizens. *DOJ Complaint*, D.E. #1, ¶¶ 20-22, 26. Each contact is based on the individual's distinct identification number, due to a unique disclosure made by that particular person.

Moreover, the notice asks recipients who claim to be eligible U.S. citizens to provide a piece of information about themselves on a form—including a driver's license number, state non-driver identification card number, or last four digits of a social security number—to individually confirm their eligibility. *Id*. ¶¶ 29, 75. Accordingly, this case is distinguishable from *Majority Forward v. Ben Hill Cnty. Bd. of Elections*, 509 F. Supp. 3d 1348, 1355 (M.D. Ga. 2020), in which challenges to voters lacked "the type of individualized information" election officials "would have needed to undertake the individualized inquiry required by the NVRA." Importantly, no one is removed from the voter registration rolls automatically or on the basis of a database match. *See* Ala. Code § 17-4-9; D.E. #29, pp. 7-8. The Secretary's efforts should not be deemed "systematic[]" simply because he has

15

commenced investigation of a few thousand registered voters who appear to be potential non-citizens in a state of nearly 3.8 million registered voters.[14]

**Second**, the Secretary of State is not "remov[ing] the names of ineligible voters from official lists" within 90 days of a federal election. The Eleventh Circuit has emphasized § 20507(c)(2)(A) must be construed according to its "plain meaning." *Arcia*, 772 F.3d at 1344. That provision prohibits only programs which "**remove** the names of ineligible voters from the official list of registered voters." 52 U.S.C. § 20307(c)(2)(A) (emphasis added). Here, the apparent self-identified non-citizens at issue *remain* on the "official list of registered voters." Secretary Allen has placed them on "inactive" status, *DOJ Complaint*, D.E. #1, ¶¶ 24-26, meaning they must simply provide information confirming their eligibility—including at the polling place itself, when they show up to vote—in order to cast a ballot. Ala. Code § 17-4-9. Alabama law expressly distinguishes between individuals on the voter registration list who are in "inactive status," *see id.*, and individuals who are removed from the voter registration list. *See id.* § 17-4-11.

As a matter of state law, the circumstances under which a registered voter may be deemed "inactive" differ from those under which a person may be completely "remove[d]" from the registration database. Under Alabama law, "Any voter who

---

- [14] *See* ALABAMA SECRETARY OF STATE, *Voter Registration Statistics – 2024* (Oct. 8, 2024), *available for download online at:* https://www.sos.alabama.gov/alabama-votes/voter/election-data (showing 3,776,498 registered voters in Alabama).

fails to vote for four years in his or her county shall have his or her name placed on an inactive voter list by the local board of registrars." *Id*. § 17-4-9. In contrast, a person may be "removed" only if, among other things, they have registered in a different county, *id*. § 17-4-5 (county list); died, *id*. § 17-4-6.1; or failed to timely "reidentif[y]" themselves to election officials. *Id*. § 17-4-11. Thus, the triggering conditions for these two materially different conditions—"inactive" and "removed"—differ. *Cf. Fair Fight*, 2024 U.S. Dist. LEXIS 22, at *64 n.34 ("If an ***inactive*** voter does not vote in the next two general election cycles (i.e., over the next four years), then the voter is ***removed*** from the rolls." (emphasis added)).

The Supreme Court itself recognized this distinction in *Husted v. A. Philip Randolph Institute*, 584 U.S. 756, 765-66 (2018) (emphasis added). Under Ohio law, election officials mailed a notice to people who had neither voted nor engaged in certain other election-related activity within the previous two years. *Id*. at 765. Anyone who failed to respond was designated as an "inactive" voter. *Id*. Any "inactive voter" who failed to vote, engage in election-related activity, or update their information with election officials over the following four-year period was subsequently removed from the voter registration database. *Id*. at 765-66.

The NVRA specifies a state program or activity "shall not result in the removal of the name of any person from the official list of voters . . . by reason of the person's failure to vote," with certain exceptions. 52 U.S.C. § 20507(b)(2). Even

though a person could be placed into *inactive* status after the initial two-year period, the Court held: "It is undisputed that Ohio *does not remove* a registrant on change-of-address grounds unless the registrant is sent and fails to mail back a return card and then fails to vote for an additional four years. . . . Combined with the two years of nonvoting before notice is sent, that makes a total of six years of nonvoting *before removal*." *Husted*, 584 U.S. at 766, 767 (emphasis added). Thus, in the Court's view, merely being deemed "inactive" *did not constitute removal* for purposes of the NVRA's § 20507(b)(2).

That term of art—"removal"—should be construed consistently throughout § 20507, including in the immediately following subsection at issue here, § 20507(c)(2)(A). *Morrison-Knudsen Constr. Co. v. Dir.*, 461 U.S. 624, 633 (1983) ("[A] word is presumed to have the same meaning in all subsections of the same statute . . . ."); *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) ("[I]dentical words and phrases within the same statute should normally be given the same meaning."). Since designating a voter as "inactive" did not qualify as "removal" for purposes of § 20507(b) in *Husted*, it should not qualify as "removal" for purpose of the 90-day window under § 20507(c).

*Third*, Secretary Allen's acts did not violate § 20507(c)(2)(A) in light of the "statutory context and purpose of the NVRA." *Arcia*, 772 F.3d at 1345. The Eleventh Circuit has held:

> In the final days before an election, however, the calculus changes. Eligible voters removed days or weeks before Election Day will likely not be able to correct the State's errors in time to vote. This is why the 90 Day Provision strikes a careful balance: It permits systematic removal programs at any time except for the 90 days before an election because that is when the risk of disfranchising eligible voters is the greatest.

*Id*. at 1346.

Although a federal election is less than 90 days away, no one is at risk of being "disenfranchis[ed]" here. Each of the apparent non-citizens who have been designated "inactive" may provide the necessary confirmation at any time, up to and including Election Day, and will be able to vote. Ala. Code § 17-4-9. The notice Secretary Allen had distributed to the apparent non-citizens further specified recipients were also "permitted to vote absentee pursuant to the normal process." *DOJ Complaint*, D.E. #1, ¶ 77. Accordingly, assessed in light of the NVRA's purpose of preventing people from being unexpectedly barred from voting in an impending election, this is not the type of program the statute was intended to prohibit.

**Finally**, this Court must leave state officials with some way to prevent ineligible non-citizens who register within 90 days of a federal election from voting. Voter registration applications typically spike in the weeks before a presidential election.[15] As discussed earlier, federal law does not permit Secretary Allen to

---

[15] Maddie McQueen, *Voter Registration Spikes in Alabama as Election Day Approaches*, CBS42, Aug. 13, 2024, *available online at:* https://www.cbs42.com/news/local/voter-registration-spikes-in-alabama-as-election-day-approaches/.

decline to add a person to the state's voter registration database who checks the "U.S. citizen" box on their federal voter registration form, even if the person is not actually a citizen. *See supra* pp. 10-12.

Accordingly, if state election officials cannot confirm the eligibility of people who register within 90 days of a federal election—even those who had previously told the state they are not U.S. citizens—then Alabama would be unable to enforce this foundational voting qualification. *See Blumen v. FEC*, 800 F. Supp. 2d 281, 288 (D.D.C. 2011) (three-judge court) ("It is fundamental to the definition of our national political community that foreign citizens do not have a constitutional right to participate in, and thus may be excluded from, activities of democratic self-government."), *summarily aff'd*, 565 U.S. 1104 (2012).

"[T]he NVRA does not require a state to allow a noncitizen to vote just because the state did not catch the error more than 90 days in advance." *United States v. Florida*, 870 F. Supp. 2d 1346, 1350 (N.D. Fla. 2012). To the contrary, "the NVRA undoubtedly permits states to remove any non-citizen who somehow becomes registered to vote when such individuals come to the state's attention." *Bellitto v. Snipes*, 2018 U.S. Dist. LEXIS 103617, at *11 (S.D. Fla. Mar. 30, 2018); *see also Bell v. Marinko*, 367 F.3d 588, 592 (6th Cir. 2004) (declaring, regarding a corollary provision of the NVRA, "Congress did not intend to bar the removal of names from the official list of persons who were ineligible and improperly registered to vote in

the first place"). As a result of the Secretary of State's notice, 106 people have already affirmatively requested to be removed from the voter registration rolls due to apparent lack of U.S. citizenship. *See DOJ Complaint*, D.E. #1, ¶ 58. Making it impossible to confirm the citizenship of people who register within the ninety days before an election would raise the very constitutional questions the Court sought to avoid in *Inter Tribal Council*, 570 U.S. at 17 ("[I]t would raise serious constitutional doubts if a federal statute precluded a State from obtaining the information necessary to enforce its voter qualifications."). And because there is no textual statutory basis for distinguishing the Secretary's authority regarding non-citizens who register within 90 days of the election from other apparent non-citizens, Plaintiffs' § 20507(c)(2)(A) claims should be dismissed as a whole.

## II.    COUNT VII OF THE ACIJ COMPLAINT SHOULD BE DISMISSED FOR FAILING TO STATE A VALID CLAIM UNDER § 11(b) OF THE VOTING RIGHTS ACT

This Court should dismiss Count VII of the ACIJ's Complaint, arising under § 11(b) of the Voting Rights Act ("VRA"), 52 U.S.C. § 10307(b), which the ACIJ Plaintiffs bring pursuant to 42 U.S.C. § 1983. First, § 11(b) does not give rise to private rights which are enforceable through a private § 1983 claim, and the Government has conspicuously declined to pursue a § 11(b) claim of its own. Second, Secretary Allen's reasonable caution to apparent non-citizens that he will

refer potential violations of state law to the appropriate authorities for investigation and prosecution does not constitute a VRA violation.

### A.     Section 11(b) of the VRA is not Privately Enforceable Through 42 U.S.C. § 1983

As an initial matter, this Court should dismiss Count VII because § 11(b) of the VRA does not give rise to a private right of action. Only Congress may create a federal cause of action to enforce a federal statute. *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). The U.S. Supreme Court set forth the modern standard for determining whether a federal legal provision is privately enforceable through a § 1983 claim in *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002). It declared, "[I]t is *rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of [§ 1983]." *Id*. at 283. The Court added, "We now reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983. . . . [O]ur implied right of action cases should guide the determination of whether a statute confers rights enforceable under § 1983." *Id*.

Congress adopted the Voting Rights Act prior to the Court's ruling in *Gonzaga*, when courts were more willing to infer the existence of private rights of action. *See Morse v. Republican Party*, 517 U.S. 186, 231 (1996) ("The Voting Rights Act itself was passed one year after this Court's decision in *J. I. Case Co. v. Borak*, 377 U.S. 426 (1964), which applied a highly liberal standard for finding

22

private remedies."). The fact an "enacting Congress" may have "expect[ed]" a legal provision would be privately enforceable, however, is insufficient to meet *Gonzaga*'s standards—particularly where Congress did not choose to re-enact specific language from a particular federal law which the Court "had previously interpreted to create a private right of action." *Sandoval*, 532 U.S. at 287-88.

Section 11(b) does not satisfy *Gonzaga*'s requirement because it does not establish any individual, private rights. *Id*. at 286. To meet *Gonzaga*'s requirements*,* a legal provision must be "'phrased in terms of the persons benefited' and contain[] 'rights-creating,' individual-centric language with an 'unmistakable focus on the benefited class.'" *Health & Hosp. Corp. v. Talevski*, 599 U.S. 166, 183 (2023) (quoting *Gonzaga*, 536 U.S. at 284, 287). For example, the Court has held 42 U.S.C. § 1982 confers an individually enforceable right because it provides, "All citizens of the United States ***shall have the same right*** . . . as is enjoyed by white citizens thereof . . . . [to own property]." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 690 n.13 (1979) (emphasis added) (quoting *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 238 (1969)); *see also Talevski*, 599 U.S. at 184 (holding a statute protecting nursing home residents gave rise to private rights since it expressly recognized residents' "rights" and "focus[ed] on individual residents").

The Court has "reject[ed] the notion" that "anything short of an ***unambiguously conferred right***" may satisfy this requirement. *Gonzaga*, 536 U.S.

at 283 (emphasis added).[16] A person does not acquire privately enforceable rights under a federal law simply because they are "within the general zone of interest that the statute is intended to protect." *Id.*; *see also California v. Sierra Club*, 451 U.S. 287, 294 (1981) ("The question is not simply who would benefit from the Act, but whether Congress intended to confer federal rights upon those beneficiaries.").

Here, § 11(b) completely lacks "the 'rights-creating' language" which is "critical to the Court's analysis" of whether a statute objectively manifests congressional intent to create a private right. *Sandoval*, 532 U.S. at 288; *see, e.g.*, *Armstrong*, 575 U.S. at 331 ("Section 30(A) lacks the sort of rights-creating language needed to imply a private right of action."). Codified in a section entitled, "Prohibited acts," § 11(b) provides:

> No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or . . . for urging or aiding any persons to vote or attempt to vote, or . . . for exercising any powers or duties under [other laws].

As the U.S. District Court for the Western District of Virginia properly concluded, the plain language of this provision does not purport to create any rights. *Schilling v. Washburne*, 592 F. Supp. 3d 492, 498 (W.D. Va. 2022). It is completely bereft of any allusion to a "right to vote" or any other such individual right. *See Sandoval*,

---

[16] *Gonzaga* addressed a plaintiff's ability to sue for federal statutory violations pursuant to § 1983. But "[a] court's role in discerning whether personal rights exist" is the same in both "the § 1983 context" and "the implied right of action context." *Gonzaga*, 536 U.S. at 285.

532 U.S. at 291 ("[W]e have found no evidence anywhere in the text to suggest that Congress intended to create a private right . . . .").

Moreover, rather than focusing on any protected class of people, the statute instead prohibits certain specified misconduct by putative defendants. *Sandoval* explains, "Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.'" *Sandoval*, 532 U.S. at 289 (quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981)). Section 11(b), however, "states no more than a general proscription of certain activities." *Sierra Club*, 451 U.S. at 294. As the Western District of Virginia explained, the language of § 11(b) "is directed to the regulated party, not the party to be protected. [It] clearly prohibits voter intimidation. But it does not, under the Supreme Court's precedents, confer any new right on voters." *Schilling*, 592 F. Supp. 3d at 498.

The Supreme Court has never addressed whether § 11(b) gives rise to an implied private right of action. This case is easily distinguishable, however, from Supreme Court rulings allowing private enforcement of other, materially different provisions of the Voting Rights Act. In *Allen v. State Board of Elections*, 393 U.S. 544, 557 (1969), for example, the Court held § 5 of the VRA gave rise to a private right of action. As the Court explained, however, the relevant portion of § 5 contained explicit rights-creating language: "[N]o person shall be denied ***the right***

*to vote* for failure to comply with [a new state enactment covered by, but not approved under, § 5]." *Id*. (quoting 52 U.S.C. § 10304(a); emphasis added).

Additionally, *Morse v. Republican Party*, 517 U.S. 186, 232 (1996) held that § 10 also creates a private right of action. That section, too, expressly declared, "Congress declares that **the constitutional right of citizens to vote** is denied or abridged in some areas by the requirement of the payment of the poll tax as a precondition to voting." 52 U.S.C. § 10306(a) (emphasis added). Thus, each VRA provision which the Court has held creates an implied private right of action contains the rights-creating language required by *Gonzaga*. Section 11(b), in contrast, lacks such language. Accordingly, neither *Allen* nor *Morse* provide a basis for recognizing a privately enforceable individual right here. Because § 11(b) does not create individual rights, a private plaintiff may not enforce it under § 1983.

**B.    The ACIJ Plaintiffs Have Not Plausibly Alleged a § 11(b) Violation**

The ACIJ Complaint does not "plausibl[y] allege" a violation of § 11(b) of the VRA. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). It alleges when Secretary Allen publicly announced he was distributing notices to apparent non-citizens who were registered to vote, he issued a Press Release stating he "provided the list of registered voters identified as having been issued a noncitizen identification number to the Office of Alabama Attorney General Steve Marshall for further investigation and possible criminal prosecution." *ACIJ Complaint*, D.E. #1, ¶¶ 69, 170.

While section 11(b) prohibits attempts to "intimidate, threaten, or coerce." 52 U.S.C. § 10307(b), this provision should not be construed as prohibiting state officials responsible for enforcing particular legal provisions from publicly expressing their intent to have apparent potential non-compliance investigated and, as appropriate, prosecuted.

A California district court recently held the phrase "force, intimidation, or threat," as used in the closely related Ku Klux Klan Act, 42 U.S.C. § 1985(3), must be "[v]iewed in the light of its origin as a reaction against the 'murders, whippings, and beatings committed by rogues in white sheets in the postbellum South.'" *Gaetz v. City of Riverside*, No. 5:23-cv-1368-HDV, 2024 U.S. Dist. LEXIS 52974, at *30 (C.D. Cal. Mar. 22, 2024) (quoting *Gill v. Farm Bureau Life Ins. Co.*, 906 F.2d 1265, 1269 (8th Cir. 1990)). It "obviously meant . . . something much more serious and terrifying than tweets and public statements." *Id.*; *see also Delegates to Rep. Nat'l Convention v. Rep. Nat'l Convention*, 2012 U.S. Dist. LEXIS 110681, at *40 (C.D. Cal. Aug. 7, 2012); *e.g.*, *Rhodes v. Siver*, 2021 U.S. Dist. LEXIS 78613, at *11 (E.D. Mich. Feb. 1, 2021) (holding intimidation had occurred where the defendants blocked the plaintiff from entering a polling place, "bullied" him, and made "veiled threats"); *Allen v. City of Graham*, 2021 U.S. Dist. LEXIS 103255, at *22 (M.D.N.C. June 2, 2021) ("The use of physical violence and pepper spray to deter an individual from voting or engaging in voting-related activity states a plausible § 11(b) claim.").

27

More saliently, § 11(b) similarly prohibits governments official from baselessly threatening to arrest, or arresting, someone on manufactured charges for voting or registering people to vote. *United States v. McLeod*, 385 F.2d 734, 740-41 (5th Cir. 1967); *United States v. Wood*, 295 F.2d 772, 780 (5th Cir. 1961). In *McLeod*, in the days preceding Dr. Martin Luther King, Jr.'s historic address, the defendant sheriff arrested civil rights organizers in Selma, Alabama, on trumped up charges of vagrancy and disturbing the peace for engaging in voter registration activities. 385 F.3d at 737-38. He also arrested 29 African-Americans who were "attending a registration meeting" for "improper license plate lights." *Id*.

The U.S. Court of Appeals for the Fifth Circuit, in a 1967 ruling binding on this court, *see Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), held the Government could establish a § 11(b) violation if, among other things, it demonstrated the arrests "were for the purpose of interfering with the right to register and vote." The court explained the arrests had to be considered against the backdrop "of contemporaneous events in Selma and the general climate prevailing there at the time." *Id*. The court declared, "It is difficult to imagine anything short of physical violence which would have a more chilling effect on a voter registration drive than the pattern of baseless arrests and prosecutions revealed in this record." *Id*. at 740-41 (quotation marks and citations omitted). The court

added, "We note that all of the defendants' acts took place within the context of a pattern of racial discrimination and of an intensive voter registration drive." *Id*.

Turning to the specific facts of the case, the court declared, "In each case, the person arrested was prominently active in the registration drive. In each, there was no basis for the arrest." *Id*. It noted, however, that while these *particular* defendants had used the criminal law as a subterfuge for racial discrimination and punishing people for exercising their voting rights, in general:

> the state and its subdivisions may reasonably enforce their criminal laws. Often such ***valid enforcement may incidentally have an inhibiting or intimidating effect upon the exercise of a protected right.*** Yet, the unfortunate incidental effect may not be grounds for setting aside or enjoining the otherwise justifiable enforcement of the valid criminal law.

*Id*. (quoting *United States v. Leflore Cnty.*, 371 F.2d 368, 371 (5th Cir. 1967) (emphasis added).

Here, none of the circumstances alleged in either complaint give rise to a plausible assumption of bad faith or an impermissible intent by Secretary Allen. Nor do they suggest he made his statement with knowledge of its falsity. Secretary Allen learned 3,251 people registered to vote in Alabama had apparently previously informed other state agencies that they were not U.S. citizens and had received noncitizen identification numbers from the U.S. Department of Homeland Security. *DOJ Complaint*, D.E. #1, ¶ 33. He candidly declared some of the identified individuals might be U.S. citizens, *id*. ¶ 23, which would be the case if they had

subsequently been naturalized or some of the matches were erroneous. Rather than being evidence of bad faith, this shows Secretary Allen regarded the State's apparent possession of registrants' noncitizen identification numbers as the ***beginning*** of the process, rather than the end.

Secretary Allen invited recipients who were U.S. citizens to provide the information necessary to confirm their status. *Id.* ¶ 29. His public statement that the situation would be investigated, far from being illegal coercion or intimidation, was exactly the correct response—the apparent inconsistency between a person submitting a noncitizen identification number to a state agency and their decision to register to vote required "further investigation." The fact that innocent explanations exist for many of the applicants, *id.* ¶ 57, neither renders investigation of the situation inappropriate nor bars Secretary Allen from publicly discussing it. And since Alabama law prohibits ineligible people from knowingly voting, Ala. Code § 17-17-36(a), Secretary Allen's caution about "possible criminal prosecution" was likewise appropriate.

Section 11(b) prohibits only ***objectively*** threatening, intimidating, or coercive conduct. *Fair Fight, Inc. v. True the Vote*, 2024 U.S. Dist. LEXIS 22, at *118, *123 (N.D. Ga. Jan. 2, 2024) ("[T]he voter intimidation for Section 11(b) liability must be reasonable."); *Nat'l Conf. on Black Civil Part. v. Wohl*, 498 F. Supp. 3d 457, 477 (S.D.N.Y. 2020) ("[T]hreats and intimidation include messages that a ***reasonable***

*recipient* familiar with the context of the message would interpret as a threat of injury tending to deter individuals from exercising their voting rights." (emphasis added)); *see, e.g.*, *Krabach v. King County*, 2023 U.S. Dist. LEXIS 191870, at *17-18 (W.D. Wash. Oct. 25, 2023) (holding plaintiffs stated a valid claim where defendants posted signs stating, "Let's put the FEAR OF GOD in some ballot-trafficking mules!").

The provision does not prohibit election-related expression based on the mere possibility someone "might" or "could" be intimidated. *Pa. Democratic Party v. Republican Party of Pa.*, 2016 U.S. Dist. LEXIS 153944, at *21 (E.D. Pa. Nov. 7, 2016); *Ariz. Dem. Party v. Ariz. Rep. Party*, 2016 U.S. Dist. LEXIS 154086, at *21, *29-30, *35 (D. Ariz. Nov. 4, 2016) (denying injunctive relief in § 11(b) challenge to campaign efforts to recruit monitors for polling locations, collect evidence of illegal ballot harvesting or voter fraud, and interview voters outside the non-solicitation zone). Most people would quite understandably prefer not to be investigated by the Attorney General's office. Nevertheless, a reasonable person would understand that if they previously notified the State of Alabama they are not a U.S. citizen; never modified, updated, or revised that assertion; and later registered to vote, some investigation may be required—which may involve nothing more than submitting a one-page form—to resolve the apparent discrepancy. And a U.S. citizen

could not reasonably fear prosecution for being a non-citizen who registered to vote based on Secretary Allen's generalized, vague assertion.

In short, this case is governed by *LeFlore County*, not *McLeod.* Section 11(b) does not prohibit a state official from stating an intent for the "valid enforcement" of a state law, even if such statements "have an inhibiting or intimidating effect" on potential voters. *LeFlore Cnty.*, 371 F.2d at 371.

## CONCLUSION

For these reasons, *amici* respectfully request this Court dismiss the Government's Complaint, as well as Counts I and VII of the ACIJ Complaint.

Dated: October 10, 2024.

Respectfully submitted,


*Dan Backer (pro hac vice pending)*
Dan Backer
**CHALMERS, ADAMS, BACKER
& KAUFMAN LLC**
441 North Lee Street, Suite 300
Alexandria, VA 22314
(202) 210-5431 - Telephone
dbacker@ChalmersAdams.com


*/s/ Ed Haden*
Ed Haden (ASB- 9922-E60E)
**BALCH & BINGHAM LLP**
1901 Sixth Avenue North, Suite 1500
Birmingham, Alabama 35203
(205) 226-8795 - Telephone
ehaden@balch.com

Tripp DeMoss (ASB-1925-G23T)
**BALCH & BINGHAM LLP**
445 Dexter Avenue, Suite 8000
Montgomery, Alabama 36104
(334) 269-3123 – Telephone
tdemoss@balch.com

*Attorneys for Amici Curiae*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 10, 2024, I electronically filed the above document with the Clerk of Court using the ECF system, which will provide electronic copies to counsel of records.

*Counsel for State Defendants:*
*Wes Allen, Sheila Cox Barbuck, Jan Bennett,*
*Steve Marshall, Barr Stephens, Cindy Willis Threash:*

James W. Davis (ASB-4063-158J)
*Deputy Attorneys General*
Robert M. Overing (ASB-8736-M14Q)
*Deputy Solicitor General*
Misty S. Fairbanks Messick
(ASB-1813-T71F)
Scott Woodward (ASB-1001-F94C)
*Assistant Attorneys General*
**OFFICE OF THE ATTORNEY GENERAL**
**STATE OF ALABAMA**
501 Washington Avenue
Post Office Box 300152
Montgomery, Alabama 36130-0152
(334) 353-8400 - Telephone
Jim.Davis@AlabamaAG.gov
Robert.Overing@AlabamaAG.gov
Misty.Messick@AlabamaAG.gov
Scott.Woodard@AlabamaAG.gov

*Counsel for Plaintiffs: Alabama Coalition for Immigrant Justice, Alabama State Conference of the NAACP, Carmel Michelle Coe, Roald Hazelhoff, Emily Jortner, League of Women Voters of Alabama, League of Women Voters of Alabama Education Fund, James Stroop*

Joseph Mitchell McGuire
(ASB-8317-S69M)
McGuire & Associates, LLC
31 Clayton Street
Montgomery, Alabama 36104
(334) 517-1000 - Telephone
(334) 517-1327 - Fax
jmcguire@mandabusinesslaw.com

Danielle Lang*
Brent Ferguson*
Kathryn Huddleston*
Kate Hamilton*
Shilpa Jindia*
**CAMPAIGN LEGAL CENTER**
1101 14th Street NW, Suite 400
Washington, DC 20005
(202) 736-2200 – Telephone
dlang@campaignlegalcenter.org
bferguson@campaignlegalcenter.org
khuddleston@campaignlegalcenter.org
khamilton@campaignlegalcenter.org
sjindia@campaignlegalcenter.org

Michelle Kanter Cohen
(D.C. Bar No. 989164)
Nina Beck
(WI State Bar No. 1079460)*
Jon Sherman (D.C. Bar No. 998271)*
**FAIR ELECTIONS CENTER**
1825 K Street NW, Suite 701
Washington, D.C. 20006
Telephone: (202) 331-0114
mkantercohen@fairelectionscener.org
nbeck@fairelectionscenter.org
jsherman@fairelectionscenter.org

Bradley Heard*
Sabrina Khan**
Jess Unger*
**SOUTHERN POVERTY LAW CENTER**
1101 17th Street NW, Suite 550
Washington, DC 20036
bradley.heard@splcenter.org
sabrina.khan@splcenter.org
jess.unger@splcenter.org

Ahmed Soussi*
**SOUTHERN POVERTY LAW CENTER**
201 St. Charles Avenue, Suite 2000
New Orleans, LA 70170
Ahmed.soussi@splcenter.org

Ellen Degnan (ASB-3244-I12V)
**SOUTHERN POVERTY LAW CENTER**
400 Washington Avenue
Montgomery, Alabama 36104
(334) 313-0702
ellen.degnan@splcenter.org

*admitted pro hac vice
** application for admission forthcoming

/s/ Ed R. Haden
OF COUNSEL