FILED

2024 Oct-14  PM 04:40
U.S. DISTRICT COURT
N.D. OF ALABAMA



## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |
|---|---|
| ALABAMA COALITION FOR IMMIGRANT JUSTICE, *et al.*, | |
| Plaintiffs, | |
| v. | Case No. 2:24-cv-1254 (AMM) |
| WES ALLEN, in his official capacity as Alabama Secretary of State, *et al.*, | |
| Defendants. | |
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | |
| STATE OF ALABAMA and WES ALLEN, in his official capacity as Alabama Secretary of State, | Case No. 2:24-cv-1329 (AMM) |
| Defendants. | |

## UNITED STATES' REPLY IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

I.      Introduction ............................................................................................1

II.     Additional Background ..........................................................................1

    A.  CIS Process and Correspondences...................................................1

    B.  Updated Status Numbers..................................................................3

III.    Argument.................................................................................................4

    A.  Alabama's Voter Removal Program Violated the Quiet Period Provision. .5

    B.  The United States Has Established Irreparable Harm to Its Sovereign
        Interests and to Alabama Voters. ...................................................9

    C.  The Equities and Public Interest Favor an Immediate Remedy for
        Defendants' Violation of the Quiet Period Provision. ................12

    D.  The United States Has Proposed an Appropriate Injunction. .....13

IV.     Conclusion.............................................................................................15

# TABLE OF AUTHORITIES

## Cases

*Ala.-Tombigbee Rivers Coal. v. Dep't of Interior*, 26 F.3d 1103
   (11th Cir. 1994) ........................................................................9
*Arcia v. Fla. Sec'y of State*, 772 F.3d 1335 (11th Cir. 2014) .................... 2, 5, 8, 14
*Common Cause/Georgia v. Billups*, 554 F.3d 1340 (11th Cir. 2009) .....................11
*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016) ........................................................9
*Food Marketing Inst. v. Argus Leader Media*, 588 U.S. 427 (2019) ........................6
*Hartford Underwriters Inc. Co. v. Union Planters Bank, N.A.*, 530
   U.S. 1 (2000) ........................................................................6
*McCarthan v. Director of Goodwill Indus.-Suncoast, Inc.*, 851 F.3d
   1076 (11th Cir. 2017) ........................................................................7
Order, *Arcia v. Detzner*, No. 12-22282 (S.D. Fla. Feb. 12, 2015) ..........................8
*Purcell v. Gonzalez*, 549 U.S. 1 (2006) ............................................................ 8, 10
*Singleton v. Merrill*, 582 F. Supp. 3d 924 (N.D. Ala. 2022)
   (three-judge court) ........................................................................10
*United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012)................................ 9, 13
*United States v. Bacaner*, No. 8:21-cv-391, 2021 WL 3508135
   (M.D. Fla. Aug. 3, 2021) ........................................................................10
*United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483 (2001) ...............9
*Weinberger v. Romero-Barcelo*, 456 U.S 305 (1982) ...........................................10
*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)........................................4
*Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244 (11th Cir. 2016)........................13

## Federal Statutes

5 U.S.C. § 552a ........................................................................2
52 U.S.C. § 20507 ............................................................................ 5, 6, 7, 13
8 U.S.C. § 1160 ........................................................................2
8 U.S.C. § 1255a ........................................................................2
8 U.S.C. § 1367 ........................................................................2

## Federal Regulations

8 C.F.R. § 244.16 ........................................................................2
*Alien File, Index, and National File Tracking System of Records*,
   78 Fed. Reg. 69864 (Nov. 21, 2013) ........................................................................2

**Federal Legislative Materials**

H.R. Rep. No. 103-9 (1993) ...........................................................................6
S. Rep. No. 103-6 (1993) ...............................................................................6

**State Statutes and Regulations**
Ala. Code § 17-3-56 .....................................................................................11
Ala. Code § 17-4-9 .......................................................................................11

**Additional Authorities**
U.S. Dep't of Justice, *Justice Manual* § 1-20.200 (2023) .......................................12

## I.     INTRODUCTION

Alabama launched a voter registration list maintenance program (the Program) during a time period forbidden by federal law.  U.S. Mot. Prelim. Inj., *ACIJ* ECF No. 49.  Rather than cease the Program and remedy its harms, Defendants blame the federal government for their violation of the Quiet Period Provision.  But Defendants' invective is unwarranted.  U.S. Citizenship and Immigration Services (USCIS) could not provide the Alabama Secretary of State (the Secretary) a list of all noncitizens in the United States or develop a bespoke verification system.  *Cf.* Defs.' Resp. at 1-2, 4-6, 24, *ACIJ* ECF No. 63.  Moreover, the Secretary waited four months after USCIS declined his first request before seeking an alternative.  Ultimately, Defendants devised an inaccurate program that violated the Quiet Period Provision.  Voters remain frustrated and confused. Irreparable harm to the United States and to voters persists, and the equities and public interest favor relief.  This Court should grant the United States' motion.

## II.     ADDITIONAL BACKGROUND

### A.     CIS Process and Correspondences

The issue before the Court is straightforward: whether the Program violated the Quiet Period Provision.  Nonetheless, Defendants' mischaracterization of interactions with USCIS requires clarification.  The Secretary contacted USCIS in the fall of 2023, requesting "a listing . . . of legal non-citizens on file with your

office by their full name, date of birth, and . . . alien registration number."  Nov. 15, 2023 Allen Let., *ACIJ* ECF No. 48-1, at 68.  USCIS promptly responded and explained that "individual privacy protections" prevented fulfilling the request. Dec. 19, 2023 USCIS Let., *ACIJ* ECF No. 48-1, at 69; *see also, e.g.*, 5 U.S.C. § 552a (Privacy Act); 8 U.S.C. §§ 1160(b)(5)-(6), 1255a(c), 1367 (limitations specific to categories of alien records); 8 C.F.R. § 244.16 (same).[1]  USCIS then offered to facilitate access to "voter verification services" USCIS provides through the Systematic Alien Verification for Entitlements (SAVE) program.  Dec. 19, 2023 USCIS Let; *see also Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1339-40 (11th Cir. 2014) (describing use of SAVE).  The Secretary waited four months to reject that offer and repeat his request for a list of every noncitizen legally present in the United States—a list he knew USCIS could not generate.  *See* Apr. 11, 2024 Allen Let., *ACIJ* ECF No. 48-1, at 78.

In July 2024, USCIS met with the Office of the Alabama Secretary of State to discuss a "mutually acceptable solution."  July 16, 2024 Allen Let., *ACIJ* ECF

---

[1] The Privacy Act limits disclosure for systems of records maintained by federal agencies.  5 U.S.C. § 552a.  USCIS may disclose covered records only with written consent from subject individuals or pursuant to a statutory exception, such as a "routine use" listed in a System of Records Notice (SORN).  *See id.* § 552a(a)(7), (b)(3).  The USCIS Alien File SORN authorizes disclosure to a state government "seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law." *Alien File, Index, and National File Tracking System of Records*, 78 Fed. Reg. 69864, 69869 (Nov. 21, 2013).  However, Defendants' request—which encompassed millions of USCIS records without temporal, geographical, or circumstantial limitations—was patently overbroad.

No. 48-1, at 107.  In a letter memorializing that meeting, the Secretary proposed developing a process under which USCIS would verify the citizenship status of registered voters suspected of non-citizenship, using information in the Alabama Law Enforcement Agency (ALEA) driver's license database.  *See id.*  However, between July 2024 and September 2024, USCIS received a series of similar requests for citizenship verification information from several other states, requiring a coordinated response.  *See, e.g.*, Let. from Scott Schwab, Kan. Sec'y of State, to Tammy Meckley (Sept. 16, 2024) (Ex. 1).  On October 10, 2024—less than a month after receipt of the last state letter—USCIS responded to the Secretaries of State of Alabama, Kansas, Montana, Ohio, South Carolina, and Texas, explaining that USCIS "currently cannot offer an alternative [to SAVE] to any state," based on available resources and the potential unreliability of alternative processes.  *See, e.g.*, Let. from Ur Jaddou, Dir. USCIS, to Wes Allen (Oct. 10, 2024) (Ex. 2) (listing ten states that use SAVE for voter verification); Let. from Ur Jaddou to Scott Schwab (Oct. 10, 2024) (Ex. 3) (same).  The letter also explained that USCIS cannot verify voters until a Secretary of State agrees to afford notice and correction opportunities to targeted registrants.  *See* Oct. 10, 2024 USCIS Let.

### B.    Updated Status Numbers

As of October 8, 2024, 1,049 of the 3,251 voters targeted by the Program were active, 2,043 are inactive, and 159 have been disqualified.  2d Helms Decl. ¶

4, *ACIJ* ECF No. 62-1.  The 145 targeted voters in Tuscaloosa County were never inactivated, *see* Helms Decl. ¶ 51, ECF No. 48-1; *Noncitizens by County* (Ex. 4), but at least 904 targeted voters have re-registered and confirmed their citizenship. On October 14, the Secretary confirmed that another 1,025 targeted voters are in fact U.S. citizens and reactivated them.  3d Helms Decl., *ACIJ* ECF No. 79-1.

Defendants also concede that ALEA maintains identification numbers needed to verify voter citizenship using SAVE and that they expected to be able to provide identifiers for most "suspected cases" of noncitizen registration.  July 16, 2024 Allen Let.  Defendants also admit that they did not "delve into the Document Type field" in ALEA data before deeming individuals with requisite identification numbers to be noncitizens because they "did not need" this information to conduct the Program.  2d Helms Decl. ¶ 7.  They now concede that the Program targeted "individuals for whom ALEA is able to confirm citizenship."  *Id.* ¶ 8.  14 remained in inactive status as of October 8.  *Id.*  Defendants do not know how many of the 2,029 remaining inactive registrants targeted by the Program are U.S. citizens.

## III.   ARGUMENT

Defendants have violated the Quiet Period Provision, and all four preliminary injunction factors strongly favor relief.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 24 (2008).  Defendants' merits arguments erroneously ignore statutory text and deride relevant legislative history.  Defs.'

Resp. 12-19.  Their arguments concerning irreparable harm fail to engage with the

United States' direct injury, Defs.' Resp. 19-23, and their equitable arguments both

disagree with the policy enshrined in the Quiet Period Provision and deflect

responsibility for their decision to violate the NVRA, Defs.' Resp. 23-26.  The

United States has proposed a proper injunction, *cf.* Defs.' Resp. 26-28, which the

Court should enter.

### A.    Alabama's Voter Removal Program Violated the Quiet Period Provision.

Repeating the erroneous positions articulated in their motion to dismiss,

Defendants fail to rebut that the United States is likely to succeed on the merits.  It

is true that the Quiet Period Provision prohibits outright removal of voters targeted

by systematic list maintenance.  *See, e.g.*, *Arcia*, 772 F.3d at 1338-39.  But it is no

less true that the Provision prohibits identification and notice programs whose

eventual goal "is to systematically remove the names of ineligible voters."  52

U.S.C. § 20507(c)(2)(A); *see also Arcia*, 772 F.3d at 1344 (requiring broad reading

of "program").  The Program Defendants announced 84 days before the upcoming

presidential election violated that the Quiet Period Provision.

Defendants ignore the statute's plain text to argue that the Quiet Period

Provision should not apply to any removal activities short of removal.  Defs.'

Resp. 12-15.  Yet, this Court's analysis begins and ends with the statute's text,

which compels states to "complete, not later than 90 days prior to [a federal

election], any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters."  52 U.S.C. § 20507(c)(2)(A); *see also, e.g.*, *Hartford Underwriters Inc. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000).  If confirmation from legislative history is needed, this Court should rely on committee reports, not shorthand in an amicus brief submitted nearly two decades after passage.  *See, e.g.*, *Food Marketing Inst. v. Argus Leader Media*, 588 U.S. 427, 437 (2019) (privileging "official committee reports"); *cf.* Defs.' Resp. 15.  Committee materials confirm that the Quiet Period Provision covers mailings, canvasses, and related programs that precede final removal.  *See* S. Rep. No. 103-6, at 18-19, 32 (1993) (Senate Report); H.R. Rep. No. 103-9, at 16 (1993) (House Report).  Defendants point to broader concerns in the Senate Report concerning needless reregistration, Defs.' Resp. 18 (citing Senate Report at 18)— already imposed on over 900 U.S. citizens here, Defs.' Resp. 10—which does not undermine specific legislative history establishing that the Provision covers the Program.[2]

---

[2] Though Defendants suggest that the United States has failed to follow "longstanding agency guidance," Defs.' Resp. 18, this is not so.  The Justice Department publishes longstanding guidance concerning the NVRA, which explains that the Quiet Period "applies to state list maintenance verification activities such as general mailings and door to door canvasses."  *The National Voter Registration Act of 1993 (NVRA)* ¶ 47, https://www.justice.gov/crt/national-voter-registration-act-1993-nvra; *see also, e.g.*, *Stringer v. Pablos*, 274 F. Supp. 3d 588, 600 n.8 (W.D. Tex. 2017) (citing guidance).  Even 1994 Federal Election Commission official guidance advised that the Quiet Period Provision "would apply to confirmation notices mailed on the basis of the [National Change of Address database] or other list maintenance programs."  Fed. Election Comm'n, *Implementing the National Voter Registration Act of 1993* at 5-15 (1994) (Ex. 5).

Defendants' structural arguments, Defs.' Opp. 15-18, fare no better.  First, Section 8(c)(2)(B) clarifies that the Quiet Period Provision "shall not be construed to preclude" either removal of names on specified bases or correction of registration records.  52 U.S.C. § 20507(c)(2)(B).  Because this clarification focuses on "removal" rather than "any program," Section 8(c)(2)(B) suggests a *broader* application for the Provision, including preliminary steps in a systematic process.  *See McCarthan v. Director of Goodwill Indus.-Suncoast, Inc.*, 851 F.3d 1076, 1089 (11th Cir. 2017) ("When Congress uses different language in similar sections, we should give those words different meanings." (cleaned up)).

Similarly, the Quiet Period Provision harmonizes with the NVRA's multiyear procedure for removal of unconfirmed movers.  Under the same "Voter removal programs" heading preceding the Quiet Period Provision, 52 U.S.C. § 20507(c), the NVRA establishes a safe harbor "program" that identifies potential movers but does not include the ultimate removal of targeted voters, *id* § 20507(c)(1)(B)(i).  Defendants concede that Section 8(a)(4) of the NVRA mandates a program subject to the Quiet Period Provision, Defs.' Mot. Dismiss 19, *ACIJ* ECF No. 50, and the safe harbor "program" satisfies states' obligations under Section 8(a)(4), 52 U.S.C. § 20507(c)(1).  Thus, identification of voters for future removal may be a "program" under the Provision, and a waiting period does not require excluding notice and inactivation from Quiet Period protections.

Turning to Defendants' statutory purpose arguments, the United States agrees that the Quiet Period Provision protects against final removals. Defs.' Resp. 12-15. But the Provision also protects against the increased risk that "[a]s an election draws closer" actions "affecting elections, especially conflicting [actions], can themselves result in voter confusion and consequent incentive to remain away from the polls." *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006). These are not mutually exclusive conclusions, and nothing in *Arcia* suggests the contrary. *See* 772 F.3d at 1344 ("Congress intended the [Quiet Period] Provision to encompass programs of any kind, including a program like Secretary Detzner's to remove non-citizens."). In fact, the *Arcia* plaintiffs alleged that "sending out notices" related to future removal along with "eligibility forms" violated the Quiet Period. *Arcia* Am. Compl. ¶¶ 41-42, *ACIJ* ECF No. 59-1. Pursuant to the Eleventh Circuit's mandate, the district court found that "Secretary Detzner's actions were in violation" of the Quiet Period Provision. Order at 5, *Arcia v. Detzner*, No. 12-22282 (S.D. Fla. Feb. 12, 2015), ECF No. 149 (Ex. 6).[3]

---

[3] Nothing in the Coolidge Reagan Foundation's amicus brief, *ACIJ* ECF No. 72, undermines the United States' likelihood of success. Amici omit "purpose" from the statutory text, *id.* at 16, rely on the district court decision reversed by *Arcia*, *id.* at 20, describe a database match as "individualized," *id.* at 14, and implausibly suggest that any orderly pause in list maintenance is irreconcilable with maintaining voter qualifications, *id.* at 20-21.

### B.     The United States Has Established Irreparable Harm to Its Sovereign Interests and to Alabama Voters.

Defendants ignore the United States' interests and the irreparable harm it stands to face absent a curative injunction.  *See* Defs.' Resp. 19-23.  At most, Defendants rely on the Tenth Circuit's decision in *Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016), *see* Defs.' Resp. 11, 23, which stands only for the unremarkable proposition that traditional equity standards apply in NVRA litigation.  *See Fish*, 840 F.3d at 751 n.24; *see also* U.S. Mot. 13-14.  *Fish*—a case brought by private parties—says nothing about how those traditional equitable factors are met when the United States seeks to vindicate its sovereign interest in compliance with federal law.  *Cf., e.g.*, *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012).  Even *Fish* recognized that a court's balancing of equitable factors "does not extend to a choice regarding whether to enforce the statute at all."  *Fish*, 840 F.3d at 751 n.42 (citation omitted).  The critical balance here has been struck by Congress when enacting the Quiet Period Provision.  This Court's choice in equity does not extend to "whether enforcement is preferable to no enforcement at all." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497-98 (2001); *see also Ala.-Tombigbee Rivers Coal. v. Dep't of Interior*, 26 F.3d 1103, 1107 (11th Cir. 1994) ("We find injunctive relief as the only vehicle that carries the sufficient remedial effect to ensure future compliance with [a statute's] clear requirements. Anything less would be tantamount to nothing."); *Fish*, 840 F.3d at

755 (recognizing that traditional equitable practices are "conditioned by the necessities of the public interest which Congress has sought to protect" (quoting *Weinberger v. Romero-Barcelo*, 456 U.S 305, 320 (1982))).[4]

Defendants also baselessly disregard the voter confusion and distrust the Program has caused. Defs.' Resp. 19-20. Mr. Jiminez, Ms. Berg, and Private Plaintiffs' declarants exemplify the harm to voters targeted by the Program, and this Court need not receive duplicative evidence to justify a statewide injunction. *See, e.g.*, *Singleton v. Merrill*, 582 F. Supp. 3d 924, 935-36 (N.D. Ala. 2022) (three-judge court) (granting statewide preliminary injunction on the testimony of "seventeen witnesses (eleven experts and six other fact witnesses)"). Roughly two-thirds of the voters targeted by the Secretary's flawed Program remain in inactive status on a path to removal, resulting in frustration and confusion. Each has received conflicting information across multiple form letters, which may confuse registrants and deter participation. *See Purcell*, 549 U.S. at 4-5; *cf.* Defs.' Resp. 20 (arguing only that the September letter was not internally contradictory). Absent an injunction, some voters will be forced to reregister—despite Alabama

---

[4] Defendants also rely on *United States v. Bacaner*, No. 8:21-cv-391, 2021 WL 3508135 (M.D. Fla. Aug. 3, 2021), an unpublished report and recommendation to deny injunctive relief against former pharmacy owners under the Controlled Substances Act. Defs.' Resp. 23. *Bacaner* turned on whether the former pharmacy owners continued to engage in unlawful conduct, ultimately finding that the United States had not met its burden to show this was so. *See* 2021 WL 3508135, at *8. Here, Defendants will keep thousands of Alabama voters on the path to removal absent relief. This establishes actual and imminent harm to the United States and to the hundreds of U.S. citizens snagged by Defendants' ill-timed voter removal program.

law protecting them from such an obligation, *see* Ala. Code § 17-3-56—and after the close of registration, the remaining voters will have to establish citizenship at the polling place. To be sure, this process has not yet resulted in outright disenfranchisement. But that is not the test here. Alabama's on-going voter removal program is inflicting the very harm Congress intended the Quiet Period Provision to prevent, a harm that cannot be remedied after the fact. *See Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351-52 (11th Cir. 2009).

Finally, Defendants misrepresent the nature of the relief sought to claim no relief is necessary. Defs.' Resp. 21-22. Defendants have not notified targeted registrants that they can "cast a regular ballot on Election Day in the same manner as other eligible voters," Defs.' Resp. 22 (quoting Proposed Order ¶ 4(b), *ACIJ* ECF No. 49-1), and such notice would have been untrue. So long as targeted voters remain inactive, they must confirm eligibility *before* they may vote. *See* Ala. Code § 17-4-9. Moreover, Defendants decline to address the Secretary's proclamation that he had provided the list of all 3,251 registrants targeted by the Program to "the Office of Alabama Attorney General Steve Marshall for further investigation and possible criminal prosecution." Aug. 13 Press Release, *ACIJ* ECF No. 49-2. A remedial mailing directed by this Court would allay voter fears and confusion and put a definitive end to the shifting guidance offered to registrants targeted by the Program.

C.      **The Equities and Public Interest Favor an Immediate Remedy for Defendants' Violation of the Quiet Period Provision.**

Defendants baselessly protest that this Court should not offer relief for their Quiet Period violation because the United States "contributed" to their unlawful acts. *See* Defs.' Resp. 24. The United States did not direct Defendants to conduct systematic list maintenance in the 90 days preceding a federal election or hide the Quiet Period Provision's existence. USCIS merely declined to provide a list of every lawfully present noncitizen in the United States or to develop a custom voter verification solution after the Secretary waited four months to decline to join ten other states using SAVE for that very purpose. *See* Part II.A, *supra*. Defendants' unlawful actions are of their own devising.

Defendants' allegation of improper delay is equally groundless. As previously detailed, U.S. Mot. 12-13, following announcement of the Program and reporting of its impact, the United States conducted an investigation, followed by notice and an appropriate opportunity for Defendants to respond to the United States' allegations, as long-standing Justice Department procedures require. *See* U.S. Dep't of Justice, *Justice Manual* § 1-20.200 (2023) (Ex. 7).[5] The United States filed its complaint and the instant motion in short order. And the Court is

_____

[5] The Secretary's July 16 letter did not inform the United States of an intention to use state databases to conduct independent, systematic list maintenance, Defs.' Resp. 25, let alone to do so during the Quiet Period. *See* July 16, 2024 Allen Let., *ACIJ* ECF No. 48-1 at 107, *U.S.* ECF No. 11-1 at 107 (describing compiling state agency information to "be provided to USCIS").

considering this motion simultaneously with Private Plaintiffs' injunction request, thus creating no meaningful delay. *Cf. Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248-49 (11th Cir. 2016) (addressing "unexplained five-month delay" between complaint and preliminary injunction motion).

Ultimately, the Quiet Period Provision establishes that the public interest favors waiting until after an election before conducting removal programs based on ineligibility. *See* 52 U.S.C. § 20507(c)(2). Defendants invoke "the basic conception of a political community," election security, vote dilution, and voter confidence to justify the Program, Defs.' Resp. 23-24, but fundamentally, they appear simply to disagree with Quiet Period mandates. In this Court, federal law dictates the public interest. *See Alabama*, 691 F.3d at 1301. The balance of equities and the public interest favor an immediate remedy.

### D. The United States Has Proposed an Appropriate Injunction.

The United States' proposed injunctive relief is sufficiently tailored in scope to remedy the harm caused by the Program. *See* Proposed Order, *ACIJ* ECF No. 49-1. Defendants provide no justification for keeping over 2,000 voters in inactive status, setting them on a path to removal, and leaving them without clear notice that they retain the right to vote.

The first request to enjoin Defendants from "commencing or continuing any systematic program intended to remove the names of ineligible voters," Proposed

Order ¶ 1, is neither moot nor speculative.  *See* Defs.' Resp. 27.  The assurances of

the Secretary's Chief of Staff that the Secretary "has no plans" to conduct any

further reviews before the November election, Helms Decl. ¶ 65, are irrelevant.

The relief sought extends to future federal elections as well.  *See* Proposed Order

¶ 1; *see also Arcia*, 772 F.3d at 1343 (recognizing that Quiet Period violations

could be repeated across election cycles).  Moreover, when announcing the

Program, the Secretary proclaimed, "This is not a one-time review of our voter file.

We will continue to conduct such reviews to do everything possible to make sure

that everyone on our file is an eligible voter."  Aug. 13 Press Release; *see also*

Helms Decl. ¶ 64 (acknowledging the Secretary did not state "when any such

further reviews would be conducted or disclose the nature or scope of any future

processes").  The Court is well within its discretion to ensure those future

processes comport with the Quiet Period Provision.

Defendants misrepresent the United States' second request for relief to

suggest an improper scope.  Defs.' Resp. 27.  The proposed order would enjoin

Defendants "from contacting voters identified through a systematic process less

than 90 days before a federal primary or general election to direct or urge such

voters to submit requests for removal from the official list of eligible voters."

Proposed Order ¶ 2.  This narrow limitation would not encroach on Alabama's

voter qualifications, limit general election communications, or preclude

individualized communication.  *See* Defs.' Resp. 27.  Moreover, this relief would not contradict the United States' deferential proposal that notice of relief remind any "registrants who are not U.S. citizens that they remain ineligible to cast a ballot in Alabama elections."  Proposed Order ¶ 4(d); *cf.* Defs.' Resp. 28 (arguing that there are likely individuals targeted by the Program who are ineligible to vote).

Defendants' overbreadth concerns, Defs.' Resp. 27-28, fail to recognize the distinction between the United States and a private litigant.  The United States is harmed by Defendants' violation of federal law, and so the United States may obtain a statewide injunction, correcting all unlawful list maintenance before the next federal election.  Moreover, Defendants diminish the legitimate concerns of U.S. citizens impacted by the Program.  Defs.' Resp. 27-28.  The Program targeted hundreds of U.S. citizens, who have received letters with conflicting instructions. The requested injunction balances informing eligible citizens of their voting rights and advising noncitizens that they are ineligible to vote in accordance with the enacted purposes of the NVRA.  *See* Proposed Order ¶¶ 3-6; *see also* 52 U.S.C. § 20501(b)(1)-(4).  The relief proposed by the United States is well within this Court's discretion and is warranted by the facts of this case.

## IV.   CONCLUSION

For the reasons set forth in the United States' opening brief and set forth above, the United States' Motion for Preliminary Injunction should be granted.

Date:  October 14, 2024

Respectfully submitted,

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

*/s/ Daniel J. Freeman*
R. TAMAR HAGLER
RICHARD A. DELLHEIM
DANIEL J. FREEMAN
KELLI M. SLATER
Attorneys
Voting Section, Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W
Washington, D.C. 20530
(202) 305-5451

## CERTIFICATE OF SERVICE

I hereby certify that on October 14, 2024, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send notification

of this filing to counsel of record.

*/s/ Daniel J. Freeman*
Daniel J. Freeman
Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice