```
 1                IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ALABAMA
 2                       SOUTHERN DIVISION

 3   ALABAMA COALITION FOR      |   CASE NO. 2:24-CV-01254-AMM
     IMMIGRANT JUSTICE; LEAGUE OF |
 4   WOMEN VOTERS OF ALABAMA     |
     EDUCATION FUND; ALABAMA     |
 5   STATE CONFERENCE OF THE     |
     NAACP; ROALD HAZELHOFF;     |
 6   JAMES STROOP; CARMEL        |
     MICHELLE COE; and           |
 7   EMILY JORTNER,              |
                Plaintiffs,      |
 8                               |
     v.                          |
 9                               |
     WES ALLEN, in his official  |
10   Capacity as Alabama         |
     Secretary of State; STEVE   |
11   MARHSALL, in his capacity as |
     Alabama Attorney General;   |
12   and JAN BENNETT, BARRY      |
     STEPHENSON, CINDY WILLIS    |
13   THRASH, and SHEILA COX      |
     BARBUCK, in their official  |
14   capacities as Chairs of     |
     Boards of Registrars of     |
15   Elmore, Jefferson, Lee,     |
     and Marhsall Counties,      |
16                               |
                Defendants.      |
17                               |
     UNITED STATES OF AMERICA,   |   CASE NO: 2:24-cv-01329-AMM
18                Plaintiff,      |
                                 |
19   v.                          |
                                 |
20   STATE OF ALABAMA and WES    |
     ALLEN, in his official      |
21   capacity as Alabama         |
     Secretary of State,         |
22                Defendants.     |

23                    ** MOTION HEARING **

24        BEFORE THE HONORABLE ANNA MANASCO, UNITED STATES
     DISTRICT JUDGE, at Birmingham, Alabama, on Wednesday, October
25   16, 2024, commencing at 10:10 a.m.
```

1                              **APPEARANCES**

2    FOR THE PLAINTIFF, ALABAMA COALITION FOR IMMIGRANT JUSTICE, et
     al.
3
             JOSEPH MITCHELL MCGUIRE
4            McGuire & Associates, LLC
             31 Clayton Street
5            Montgomery, Alabama 36104

6            MICHELLE KANTER COHEN
             Fair Elections Center
7            1825 K Street NW
             Suite 701
8            Washington, DC 20006

9            DANIELLE MARIE LANG
             KATHERINE HAMILTON
10           KATHRYN HUDDLESTON
             SHILPA JINDIA
11           Campaign Legal Center
             1101 14th Street Northwest
12           Suite 400
             Washington, DC 20005
13
     FOR THE PLAINTIFF, UNITED STATES OF AMERICA:
14
             DANIEL JOSHUA FREEMAN
15           KELLI SLATER
             RICHARD DELHEIM
16           United States Department of Justice -
             Civil Rights Division
17           950 Pennsylvania Avenue, Northwest
             Washington, DC 20530
18

19   FOR THE DEFENDANTS:
             MISTY SHAWN FAIRBANKS MESSICK
20           JAMES SCOTT WOODARD, JR.
             ROBERT M. OVERING
21           Office of the Attorney General, State of Alabama
             501 Washington Avenue
22           Montgomery, Alabama 36130

23   Proceedings reported by stenographic court reporter, transcript
     produced using computer-aided transcription.
24
                         **Transcript prepared by:**
25                        Kelli M. Griffin, RPR, CSR
                           Official Court Reporter

```
 1              (Proceedings commenced at 10:10 a.m. in open court.)
 2              THE COURT:  All right.  Good morning, everybody.
 3              MR. FREEMAN:  Good morning, Your Honor.
 4              MR. DELHEIM:  Good morning.
 5              THE COURT:  All right.  While I get set up, let's take
 6    appearances.
 7         Who do I have for the United States?
 8              MR. FREEMAN:  Dan Freeman on behalf of the United
 9    States.
10              MR. DELHEIM:  Richard Delheim for the United States.
11              MS. SLATER:  Kelli Slater for the United States.
12              THE COURT:  All right.  Good morning to all of you.
13         All right.  Who do I have for the private plaintiffs?
14              MS. HUDDLESTON:  Kathryn Huddleston from Campaign
15    Legal Center, Your Honor.  And with me are my colleagues,
16    Danielle Lang, Kate Hamilton, and Shilpa Jindia.
17              MR. MCGUIRE:  Good morning, Your Honor.  Joseph
18    McGuire for the private plaintiffs.
19              THE COURT:  All right.
20              MS. COHEN:  Good morning, Your Honor.  Michelle Kanter
21    Cohen from Fair Elections Center for the private plaintiffs.
22              THE COURT:  Okay.  Is that everybody?  All right.
23    Good morning to all of you.
24         All right.  Who do I have for the State defendants?
25              MR. OVERING:  Robert Overing for State defendants.
```

1    MS. MESSICK:  Misty Messick for the State defendants.

2    MR. WOODARD:  Scott Woodard for State defendants.

3    THE COURT:  All right.  Good morning to all of you.

4    Okay.  I appreciate everyone's diligent work yesterday and

5    received all of the submissions and communications overnight,

6    and so I am prepared to proceed this morning unless anybody has

7    anything else we need to take up.

8    All right.  Okay.  These cases are before the Court on two

9    motions to dismiss by the State defendants, a motion for a

10    preliminary injunction by the United States, and a motion for

11    preliminary injunction by the private plaintiffs.

12    The cases are presently consolidated, and at the hearing

13    on some of the issues raised on the motions for a preliminary

14    injunction yesterday, the Court received evidence and heard

15    testimony from Mr. Clay Helms who serves as the Chief of Staff

16    to the Alabama Secretary of State.  At the Court's direction,

17    the evidence and argument yesterday was to be limited to the

18    issue of the 90-day provision.  During the hearing, all parties

19    agreed that testimony taken was admissible in both cases

20    currently pending before the Court.

21    At the conclusion of the hearing yesterday, I shared my

22    preliminary views of the evidence and argument and afforded the

23    parties a final opportunity to resolve the matter overnight.

24    The parties engaged in discussions but were not able to agree

25    on a resolution.

So in connection with the forthcoming written order, the Court now makes the following findings of fact and conclusions of law.  The Court emphasizes that what follows is limited to the issue of the 90-day provision.  Federal law imposes a deadline for programs like the one currently before the Court and Secretary Allen's office blew the deadline for the 2024 general election with real consequences for thousands of Alabamians who the Secretary now acknowledges are, in fact, legally entitled to vote.  Accordingly, the Court will find that a preliminary injunction should issue and will not harm the State's ability to investigate and prosecute noncitizens who try to vote in Alabama.

At the present time, the Court will make no other findings or conclusions about any of the other issues in the cases.  As to the preliminary injunction standard, the Court first finds that the United States is substantially likely to succeed on the merits of its claim that the Secretary of State violated the 90-day provision of the National Voter Registration Act of 1993, 52 U.S.C. Section 20507(c)(2)(a).  The Court's finding in this regard rests entirely on undisputed facts, testimony by Mr. Helms on behalf of Secretary Allen and the State of Alabama, and concessions by counsel for the State defendants.

The 90-day provision states that a state shall complete, not later than 90 days prior to the date of a primary or general election for federal office, any program, the purpose

of which is to systematically remove the names of ineligible voters from the official list of eligible voters.

The Court first turns to the issue whether the process undertaken by Secretary Allen's office was a program for purposes of the 90-day provision.  Under controlling Eleventh Circuit precedent, the statutory term, "any program" has a broad meaning and encompasses programs of any kind.  That's the Arcia case at page 1344.

In its closing argument, counsel for the State defendant stated his awareness of the discussion of the word "any" by the Eleventh Circuit in Arcia and stated that we're not fighting so much that this isn't a program.  And consistent with that acknowledgment, the Court finds that Secretary Allen's announced process fits within the broad meaning based on a plain reading of the statute and Arcia.  Because the program modified voter lists on a basis, other than registrant's request for removal, criminal conviction, or mental incapacity, or death, the program was subject to the 90-day provision under 52 U.S.C. Section 20507(c)(2)(b).  In deed, if the Secretary's process here is not a program within the meaning of the National Voter Registration Act, it's difficult for the Court to imagine what would qualify as a program.

The Court next turns to the question whether the program was completed 90 days before an election for federal office. Per Secretary Allen's August 13th, 2024 press release, which is

Doc. 49-1 in the CM/ECF record, the Court finds that the program at issue here was initiated 84 days prior to the general election to be held in 2024.  The Court further finds that the program remains ongoing to this day, as reflected by multiple declarations from Mr. Helms detailing the actions his office has taken in recent days and weeks in connection with the program.

     The State defendants conceded, at page 169 of the rough transcript yesterday, that the program was not completed outside the 90-day period.  And in response to questions from the Court, Mr. Helms testified that the program would affect the upcoming 2024 general election.  As to the issue whether the purpose of the program was to remove the names of ineligible voters from the official list of eligible voters, the Court finds Secretary Allen's August 13th, 2024 press release was titled "Secretary of State, Wes Allen, implements process to remove noncitizens registered to vote in Alabama." The Court finds that that press release stated that Secretary Allen is instructing the Board of Registrars in all 67 counties to immediately inactivate and initiate steps necessary to remove individuals who are not United States citizens. Mr. Helms testified yesterday that the Secretary stands behind that press release to this day, and he testified yesterday that the program has multiple purposes, one, for noncitizens to remove themselves and, two, for citizens to update their voter

information.  In his deposition, Mr. Helms testified that the
purpose was to remove noncitizens that were already on the
rolls illegally and were potentially voting.  That's Exhibit 46
at page 74, line 18.  Because the program targeted alleged
noncitizens for ultimate removal from the voter registration
list, and based on Mr. Helms's deposition testimony, the Court
finds that the purpose of the program was to remove ineligible
voters from the official list of eligible voters for purposes
of the 90-day provision.

The Court now addresses the question whether the purpose
of the program was to remove ineligible voters systematically.
Mr. Helms testified that the basic methodology for creating the
list of 3251 Alabamians was to take information on anyone who
provided noncitizenship data to the Alabama Law Enforcement
Agency or the Alabama Department of Labor and crosscheck it
with the voter file.  This methodology was also described by
Secretary Allen's office in a letter to the Department of
Justice on September 19th, 2024, which is at Doc. 49-7 in the
record.  Voter removal programs based on mass computerized
database matching, such as what is done here or what was done
here, are systematic programs under controlling Eleventh
Circuit precedent.  That's at page 1344 of the Arcia case.

Additionally, Mr. Helms testified that he understood that
in any process using data, you're going to have the potential
for false positives for other issues.  And this testimony

indicates that Mr. Helms understood that when the Secretary's office generated lists that put voters on a path to removal as part of the program, that process was systematic in nature.

The State argues that nevertheless, removals in the program are not systematic because the process merely invites individual voters to engage in a case-by-case dialogue with the State about their eligibility to vote.  The Court rejects this interpretation because it, A, misses the reality that putting voters on a path to removal is systematic in this program, B runs afoul of Arcia's rule that programs use a mass computerized data-matching process are definitionally systematic, and, C, would allow mass computerized data-matching programs to completely evade the 90-day provision, which is inconsistent with the text and purpose of the statute.

Finally, the rote use of template letters by County Boards of Registrars in all of Alabama's counties, templates that were provided by the Secretary, illustrates the systematic nature of the path to removal that the program created.

For the following reasons, the Court finds that the United States is likely to establish that the Alabama Secretary of State's program is covered by the 90-day provision and violated it.  The State defendants raised two primary arguments against this finding, and the Court now turns to those.  One is about the timing of removals that may occur as part of the program, and one is about marking voters as inactive on the rolls.  The

Court will reject both arguments.

First, the State defendants argue that there's no statutory violation here because no removals have occurred or will occur before the 2024 election, other than self-removals, and the 90-day provision bars only removals during that time frame.  Testimony from Mr. Helms does indicate that other than self-removals no removals have occurred to date in connection with the program, and the only removals, other than self-removals, that will occur, will happen in connection with the 2028 election.  But this does not undo the reality that the purpose of the program is to systematically remove ineligible voters from the rolls, which is what brings it within the reach of the statute.  And as a practical matter, the Secretary's communications to registrars and voters in August of 2024 were in the context of the 2024 general election.  The August press release and August letters stated that voters were on a path to removal from the rolls, and it directed them about resolving that issue before the 2024 general election.  It said nothing about 2028.  The State defendants make a number of statutory interpretation arguments to the effect that the 90-day provision does not bar the operation of programs within 90 days of an election; it bars only systematic removals within that timeframe.  But based on answers to the Court's questions yesterday, the State defendants take this argument too far, so far as to allow the Secretary of State to commence a program

1    with the purpose of systematically removing ineligible voters

2    from the rolls merely 80 days before the election, tell voters

3    as a part of that program that they have been removed, and

4    escape liability for a statutory violation on a ground that, in

5    truth, that removal has not been accomplished.  This

6    interpretation would read the words "purpose" and "complete"

7    out of the statute and give them no meaning.  The Court thus

8    rejects the State defendants' statutory arguments on those

9    grounds as well as for the other statutory interpretation

10   reasons articulated by the United States on rebuttal at the

11   close of the hearing yesterday.

12       Second, the State defendants argue that there is no

13   violation of the 90-day provision because so far voters have

14   only been inactivated as a part of this program, unless they

15   have self-removed, and inactive voters may still cast a ballot.

16   But the testimony of Mr. Helms and the letters to voters

17   themselves made clear that inactivation is just a precursor

18   step on the path to removal, so the fact that to date the

19   Secretary's office has only inactivated voters as part of the

20   program does not change the fact that the purpose of the

21   program is to remove ineligible voters for the rolls.

22       The Court next turns to the issue of whether irreparable

23   harm will occur in the absence of preliminary injunctive

24   relief, and the Court has no difficulty finding that following

25   the Secretary's violation of the 90-day provision, both the

United States and voters in Alabama will suffer irreparable

harm in the absence of preliminary injunctive relief.  First,

the harm to the United States is clear as a matter of law.

Under controlling precedent, the United States suffers an

injury when its valid laws in a domain of federal authority are

undermined by impermissible State action.  That's United States

versus Alabama 691 f.3rd 1269 at 1301 decided by the Eleventh

Circuit in 2012.  Second, the harm to Alabama voters is obvious

and has been obvious to the Secretary since he began this

program.  Based on the Secretary's own evidence of harm to

voters offered in this case in the last four days, the Court

rejects unequivocally legal counsel's argument that there is no

harm to voters but only a slight inconvenience.  In this

regard, the Court makes the following specific findings:

One, the Secretary's August 13th, 2024, press release made

clear that the Secretary understood that because of the way

that the lists were generated, the program would put some

citizens on a path to removal even though they are eligible to

vote.  In that press release, Secretary Allen stated that some

of the individuals who were issued noncitizen identification

numbers, since receiving them, have become naturalized citizens

and are therefore eligible to vote.

Mr. Helms -- two, Mr. Helms testified yesterday that he

and Secretary Allen understood that this error and other

inclusion errors would occur as part of the program because,

quote, in any process using data, you are going to have the
potential for false positives or other issues, end quote.

Three, Mr. Helms also testified yesterday that he and
Secretary Allen had no idea how high the error rate would be
when the program began back in August.

Four, according to Mr. Helms's declarations and his
testimony yesterday, since the program began, the Secretary has
learned information that has caused his office to conclude that
more than 2,000 of the 3,251 voters originally on the list were
inaccurately inactivated, and those voters have been
reactivated.  Accordingly, the error rate is admitted at well
more than 50 percent.  Of the remaining approximately 1,000
voters, the record does not establish how many were
inaccurately inactivated.

Five, despite knowing that errors would occur, Secretary
Allen referred everyone on the list, all 3,251 people to
Attorney General Marshall via letter, hand-delivered, on August
13th, 2024, for criminal investigation.

Six, despite knowing now that he inaccurately referred
more than 2,000 Alabamians for criminal investigation,
Mr. Helms testified that Secretary Allen has taken no steps to
correct his inaccurate referral.

Seven, counsel from the Attorney General's office told the
Court yesterday that the Attorney General takes referrals of
criminal activity by other constitutional officers very

seriously, which comes as no surprise to the Court.

Eight, additionally, the plaintiffs developed evidence, a podcast interview of Secretary Allen, that before this program was implemented, Secretary Allen was aware of the 90-day provision and knew that under federal law the State could not engage in certain kinds of voter roll maintenance within the 90 days preceding a federal election.

Accordingly, the Court has no difficulty finding that the Alabamians who were and/or remain inaccurately inactivated on the voter rolls and who were and/or remain referred for criminal investigation as a part of this untimely program have been harmed by those actions, and that harm will continue to occur absent preliminary injunctive relief.

The Court now turns to the balancing of the equities knowing that Congress designed the NVRA to carefully balance the four competing purposes of the statute.  The equities favor injunctive relief when the balance Congress struck is upset through noncompliance with the 90-day provision, and as Arcia explains, quote, at most times during the election cycle the benefits of systematic programs outweigh the costs because eligible voters who are incorrectly removed have enough time to rectify any errors.  In the final days before an election, however, the calculus changes, end quote.  The whole point of the 90-day provision as set forth in Arcia is to be very cautious about programs that may systematically remove and have

the purpose of systematically removing voters on the eve of an election.

As previously explained, Mr. Helms's own testimony, together with evidence that is not in dispute, establishes that Alabama's untimely program worked real harms to Alabama voters mere weeks before the 2024 general election.  It led them to believe that they needed to take action to ensure their ability to cast a ballot in that election, and it led the Secretary to inaccurately refer thousands of Alabamians for criminal investigation by the State's chief law enforcement officer. The Secretary's efforts to reactivate large numbers of voters during the pendency of this lawsuit underscores the Secretary's understanding of this harm.

Mr. Helms has submitted three declarations which in total established that the Secretary's office has directed the reactivation of more than 2,000 voters of the 3,251 who were inactivated as part of the program.  Mr. Helms testified about one instance in which a voter was inaccurately instructed by a county registrar to complete a self-removal form even though that voter is eligible to vote.  That evidence was the declaration of Mr. Clarence Hunter, an active Alabama voter from Russell County, and that declaration was submitted by the plaintiffs.  Mr. Helms testified that the registrar did not follow the instructions and that the Secretary's office worked to address that harm.

1    On the other side of the equity scale, based on
2  Mr. Helms's testimony, it appears that through this program,
3  the Secretary has identified a handful, at least four, perhaps
4  as many as ten, perhaps more, noncitizens who were somehow on
5  Alabama's voter rolls.  In any event, Alabama will suffer no
6  undue prejudice as a result of a preliminary injunction
7  because, A, the Secretary can -- could and should have acted
8  earlier and, B, the Secretary still has the ability to remove
9  noncitizens from the rolls on the basis of individualized
10 information despite the 90-day provision.

11    Based on the foregoing admissions and findings, the Court
12 rejects the State defendants' argument that for the purposes of
13 evaluating the equities the program has at most caused only a
14 slight inconvenience to inactivated voters that has now been
15 resolved.  This was not a no-harm, no-foul instance of
16 noncompliance with the 90-day provisions, and the equities
17 counsel strongly in favor of preliminary injunctive relief.

18    As to the public interest factor, the public interest, the
19 public has a clear interest in the enforcement of federal
20 statutes that protect constitutional rights, especially voting
21 rights, under United States v. Raines, which is 362 U.S. 17 at
22 page 27, a 1960 decision of the United States Supreme Court.
23 That public interest is served by enforcing federal statutes
24 that are meant to reduce systematic programs that are
25 disruptive to the last 90 days of a federal election cycle, and

this is especially applicable in the facts of this case.

The State argues that the public interest is served by removing noncitizens from voter rolls in Alabama, and that's certainly true, but the Court's orders today will in no way limit the State's authority to investigate and prosecute noncitizens who try to vote in elections in Alabama. Under Arcia and the Court's orders, the 90-day provision does not, quote, bar a state from investigating potential noncitizens and removing them on the basis of individualized information even within the 90-day window, end quote.

So to repeat what the Court said and expressed earlier, Federal law imposes a deadline for programs like this one. Secretary Allen's office blew the deadline for the 2024 general election, and that had real consequences for the thousands of Alabamians who the Secretary now acknowledges are, in fact, legally entitled to vote.

The Court finds that a preliminary injunction should issue, will not harm the State's ability to investigate and prosecute noncitizens who try to vote in Alabama. And the Court will not make, at this time, any other findings or conclusions about any other issues in the case.

A written order will issue momentarily that will grant, in part, the United States motion for a preliminary injunction, reserve ruling on the motion for preliminary injunction filed by the private plaintiffs, deny, in part, the State defendants'

1  motion to dismiss as to the claim asserted by the United

2  States, and reserve ruling as to the remainder of the motions

3  to dismiss in both cases.

4      Is there anything else we need to take up while we're

5  together?

6      MS. MESSICK:  May we be heard on exactly what the

7  injunction will be?

8      THE COURT:  Well, I won't limit your opportunity to

9  make a record today, but, I mean, the opportunity to submit

10 proposed orders was open until 6:30 this morning.  But if there

11 are arguments you would like to make as to what the injunction

12 should be, I can hear them now.

13     MS. MESSICK:  Okay.  Thank you, Your Honor.  We had

14 some feedback on the proposal that the United States made and

15 some concerns.  Do you want to --

16     MR. OVERING:  Well, it shouldn't be -- shouldn't be

17 long, and I understand that it may already be written and may

18 issue imminently.  But we had concerns primarily about the

19 deadline about three days to comply with all of these things.

20 It takes time not only to figure out the status of the people

21 on the list and provide those updates that are in the Helms'

22 declarations, to communicate with 67 boards of registrars to

23 put together personalized letters and to get those out the

24 door.  And, you know, if three days being Saturday, that's a

25 lot different than three business days, which could mean Monday

1  or Tuesday.  That's the first issue.

2          THE COURT:  Okay.

3          MR. FREEMAN:  Your Honor, we spoke with counsel for

4  defendants this morning regarding these concerns, and we are --

5  we are fine with the notion that all of the paragraphs that

6  reflect a three-day deadline be moved to a five-day deadline

7  with one exception.  Paragraph 5 of the order concerns

8  individuals who have self-removed.  Those individuals must --

9  if there are eligible voters within that population, they must

10  reregister by the 21st.  We would ask that to the extent the

11  State has email addresses on file for any of those individuals,

12  that they contact them within two days so we are staying out of

13  the weekend and urge them, if they are eligible to register to

14  vote and vote, to reregister by mail, online, or in-person

15  prior to that deadline.  Alabama's voter registration form

16  includes a blank where registrants can provide an email option,

17  but it is optional.  So it is our understanding that they may

18  or may not have email addresses for these individuals.  But

19  otherwise, we are -- we understand the administrative concerns

20  that they have raised and don't want to ask the impossible,

21  particularly leading into an election, and we would be

22  comfortable with five days there.

23          THE COURT:  Okay.  I will say --  I mean, I -- that

24  was why I asked a number of the questions I did yesterday.  It

25  was important not to order the impossible.  And so the

1  testimony I heard was helpful to me in gaining an understanding

2  of what might be technologically achievable on certain

3  timetables.

4       You look like you have something else, Mr. Overing.

5       MS. MESSICK:  Well, the -- there's a difference

6  between, like, the process that the registrars were ordered to

7  do yesterday or instructed to do where they would be issuing

8  cards that were already in the system and then actually writing

9  letters.  And like the Secretary has indicated to us today, the

10  office that, you know, they're -- they don't make people

11  inactive.  The registrars do.  If they're going to need to do

12  it with their vendor, they need time to work all of that out.

13  I will also say that counsel for the United States had a

14  question about the voter registration deadline, and we have an

15  answer on that.  The applications would need to be postmarked,

16  not received, by the 21st.  And then, of course, online

17  applications can be received by midnight.

18       MR. FREEMAN:  Your Honor, with respect to the

19  administrability concerns, it was the purpose of the United

20  States in suggesting that mailings go out from the Secretary's

21  office rather than from the individual boards of registrars

22  that we reduce the burden on the individual registrars who are,

23  we very much understand, preparing for an election and place

24  that administrative burden on the Secretary given the

25  Secretary's commencement of the program during the quiet

1  period.

2        MS. MESSICK:  So I didn't catch that part of the order

3  that he was doing that.  We would request any injunction run

4  against the State and allows us the flexibility to figure out

5  how we can get it done in the time that we have to do it.

6        MS. HUDDLESTON:  Your Honor, private plaintiffs just

7  have a couple of quick thoughts.  The first is the third Helms'

8  declaration, at paragraphs, roughly, 19 to 21, describes the

9  process for the 1,025 individuals who were recently identified,

10  and in that process, on Friday night, the Director of Elections

11  emailed the Board of Registrars and said, Dear Registrars,

12  attached is a list of voters currently in inactive status.

13  Upon your review of this spreadsheet, these individuals need to

14  be made active.  Once you have changed these voters to an

15  active status, you then need to mail a voter identification

16  card.  This process has to be completed by the end of business

17  on Tuesday, October 15th.  And then paragraph 21 notes that

18  Monday, October 14th, 2024, is a state and federal holiday.  So

19  for those 1,025 individuals, the State contemplated and

20  instructed boards of registrars to complete both the activation

21  process and the mailing within one business day.  So from the

22  -- they got an email Friday evening and by close of business

23  Tuesday.  So that suggests a faster process, and we would

24  suggest for -- particularly for the individuals who will need

25  to reregister, a faster process than three days would be

warranted given the time frame involved.  And then, the second
thing is we think a press release could also be accomplished
quite quickly, and, obviously, there will be press.  There is
press here about this hearing.  And so in order to deter voter
confusion, we think that issuing a press release from the State
as well, as quickly as possible, and on a timeline shorter than
three days or five days is warranted.

MS. MESSICK:  Your Honor, may I respond?

On the first piece, that's what I was talking about that
sending that voter information card is much easier and faster,
and I believe Mr. Helms testified to this.  That is much easier
and faster than the customized letters that the United States
injunction contemplates.  As to the press release, the
Secretary's position is that they should not have to do that.
If you do order that, I would ask you, though, to very
seriously consider the United States' additional request that
the Secretary then go out and give interviews.  We have some
serious First Amendment concerns that we just haven't had an
opportunity to look into with the suggestions that he needs to
go out and, as a person, not his office, issuing a press
release to correct the first one.  But he, as a person, must go
give interviews in the same caliber that were done before, in
the same quantity.

MR. FREEMAN:  Your Honor, with respect to the press
release and the media availability, we simply seek parody in

terms of the harms that have been imposed, not just on the voters targeted by the program, but on all Alabama voters by being informed that there is a program that exists in this narrow period under which the Secretary has identified 3,251 Alabama registered voters who need to be removed from the rolls.  That suggestion that there is that degree of noncitizen registration has inflicted a harm on voters in the state who may find that they distrust elections more as a result and may be deterred from participating in elections.

Just yesterday, counsel for the State invoked similar press releases from other states to suggest that there is widespread noncitizen voter registration in the United States. That harms the electorate, and we would hope that the Secretary would be ordered to simply provide a similar level of availability as he provided when he announced that those noncitizens were present -- those purported noncitizens were present on the rolls.  We're happy to discuss with the State any concerns that they may have, but we simply have not had an opportunity to discuss those concerns previously in light of the failure of negotiations.

THE COURT:  Mr. Overing?

MR. OVERING:  Well, on -- I think we've made our point on the press release.  The idea that -- it's another level of intrusion for the Court to order specific words to be spoken to all Alabama voters.  We think the case is -- the evidence in

1    the record and your findings suggests that there may have been

2    voter confusion to 3,000 and some people, not 4 million

3    different people.  And we can disagree about the -- still the

4    degree of error or the degree of noncitizen voting and

5    registration, but there's not enough at this stage to say that

6    there was, you know, a kind of deterrent effect on the entire

7    state due to this program.  And so we would ask that relief be

8    targeted and no more burdensome than necessary.  And then, to

9    ask the Secretary to -- will the Court superintend if the media

10   asks the Secretary for an interview and he says no?  Will the

11   Court make him do that?  I mean, this raises a whole other host

12   of questions, and we don't want to be back here arguing about

13   compliance with the order on that type of thing, which may be

14   difficult to manage judicially.

15            MS. HUDDLESTON:  Your Honor, specifically on the voter

16   confusion point, we would point you to the Hazelhoff

17   declaration, the Coe declaration, the Jortner declaration, and

18   the Rowland declaration, particularly Coe, Jortner, and Rowland

19   are naturalized citizens who were not placed on the purge list,

20   and all of them testified to their own confusion and fear about

21   being placed on the purge list.  Ms. Coe, Ms. Jortner both

22   testified that they have been constantly checking and checking

23   for updates.  And so there is clear evidence in the record,

24   also in the organizational plaintiff's declarations, that there

25   is voter confusion beyond merely the individuals placed on the

1  list.

2       MR. FREEMAN:  Your Honor, the other point that I would

3  clarify from my colleague's prior statement is in terms of the

4  burden, in terms of getting the letters out, we are confident

5  that the Secretary of State's office is able to conduct a mail

6  merge.  They have monitored the continued status of the 3,251

7  targeted individuals, and that is, in part, why we asked the

8  Secretary's office -- that the Secretary's office be ordered to

9  conduct the mailings.  We have asked for very specific targeted

10  mailings that are relevant to the status of particular voters,

11  and we believe that that is the most reasonable and narrow

12  injunctive relief that would cure the confusion to those

13  individuals.  And we believe that the press release parody is

14  what would target the broader harm to the State's electorate.

15       THE COURT:  Ms. Overing and Ms. Messick, let me ask a

16  question about the letters specifically.  Does the Secretary's

17  office have the technological ability to accomplish that piece

18  itself, or is that something that has to be accomplished

19  through the registrars?  I understand that thus far in this

20  case it has been accomplished through the registrars.

21       MS. MESSICK:  Yeah.  The normal procedure would be to

22  go through the registrars.  And I will confess I hear what the

23  United States is saying.  I'm a little bit confused about why

24  there would not be an Excel spreadsheet with all of these

25  people's information in it already.  But what the Secretary's

office is telling us is that they would need to -- they would
need to pull the data -- I think that they need the help from
their vendor to be able to actually make people inactive, and
then, they did not seem confident that they could do the
individualized letters easily.  It's not something that they
have ever done.  I understand the part about the mail merge and
that we can go over and help them with the mail merge.  But I
think it's the issue of having the data to be able to send out
the 3,000 letters.  And then, also it is a very small office.
The Secretary of State has one of -- for Alabama -- has one of
the smallest election staffs in the country, and the overall
office, the election and the top executive people is very
small.  It is more like UCC type people.  I don't know if they
would have to be pulled in to get out 3,000 letters, but I
think it would be a big task.

        MR. FREEMAN:  Your Honor, I believe that the State
provided the United States with two spreadsheets, one with the
ALEA individuals and one with the Department of Labor
individuals who had been targeted by the program when they
produced documents on September 19th.  Those spreadsheets,
which have not been submitted to the Court because they, of
course, contain personally identifiable information, contain
individuals' addresses, city, state, ZIP code.  We believe that
those spreadsheets can be used to conduct the mailing so long
as the State is able to identify which individuals are in which

1    status based on those spreadsheets.  I recognize that that may

2    be the rub.

3        MS. MESSICK:  I think that's the trick is that they

4    have to finish -- they have to get -- they have to be able to

5    get the current status of all of these people, and I think they

6    would probably rather do that after they have a couple more

7    hours or the rest of the day to make sure that the 1025 have

8    been activated because the letter or the injunction from the

9    United States contemplates that different letters would go to

10   different people based on what their status is.  And we think

11   that that is appropriate.  We don't want to confuse people by

12   sending the same letter to different people who are in

13   different situations.  And so I think the rub is getting the

14   updated statuses, getting it next to the name and the address,

15   and then physically getting all of the letters out.

16       MS. HUDDLESTON:  Your Honor, just in terms of

17   timeline, I would point again to the third Helms' declaration.

18   Paragraph 9 says on October 11th I received the list back from

19   ALEA with all 1,462 individuals included.  And by the end of

20   the day, there was some data manipulation and a list was sent

21   out from the Chief of the Elections Division to the boards of

22   registrars.  So it does seem like the Secretary's office has

23   been able to accomplish these kinds of steps in a short time

24   frame.

25       MR. FREEMAN:  And, Your Honor, I would add that the

1   spreadsheets provided to the United States also provide a voter

2   unique identifier which is the linkage key between these lists

3   and the State's database.  To the extent that the State has any

4   type of database management consultant, merging -- adding an

5   additional field with the status of those individuals to these

6   spreadsheets should take minutes.  I don't want to speak for

7   their capabilities, but just as a general matter of Excel usage

8   or Sequel or other programming, this is elementary.

9           THE COURT:  All right.  Anything else?

10          MS. MESSICK:  The only other thing that I would say

11  bears mention right now is I believe the United States'

12  proposed injunction talks in terms of who has submitted a voter

13  removal request, and we would rather the injunction categorize

14  those people by who is in disqualified status, because, again,

15  administratively it is much easier to know who is in a

16  particular status than it is to go in and check each individual

17  and see if that form has been completed and scanned into Power

18  Profile.

19          MR. FREEMAN:  The United States has no concern with

20  that.

21          THE COURT:  I'm sorry?

22          MR. FREEMAN:  The United States has no concerns with

23  that modification.

24          THE COURT:  Okay.

25          MR. OVERING:  Right.  And the other reason to say

1  disqualified instead of who submitted a form is that people may

2  be disqualified for other reasons, as Mr. Helms testified.  So

3  if someone passed away during the pendency of this program,

4  that person should not receive the mailer, or if the person

5  moved out of state, should not receive the mailer even if that

6  person did not submit a voter removal request.

7      MR. FREEMAN:  And, Your Honor, the United States

8  states or suggested in paragraph 5 that if there's objective

9  evidence of noncitizenship or other concession ineligibility

10  that the voter should not receive the mailer.  Certainly, if

11  there is information that the State has suggesting that the

12  individual is deceased, they do not need to receive a mailer.

13      MR. OVERING:  Well, that was only in paragraph 5.  So

14  3 and 4 have the same problem -- 2, 3, 4.

15      MR. FREEMAN:  Got it.

16      MR. OVERING:  And there's one other minor point on the

17  proposed order.  So one of the letters, I mean, they say it

18  pretty much what should be in them.  The fifth paragraph does

19  not include the language that if the recipient is a noncitizen

20  or otherwise ineligible to vote then that person should not

21  register to vote and should not vote in the election.  We would

22  want that, if we're contacting people, we don't know if they're

23  citizens.  We want to be able to say that, and I think the

24  United States' consistent position is that we can say that,

25  and, you know, it may have been an oversight that that wasn't

included in paragraph 5, especially for a letter that
encourages people to reregister.  Granted, it is conditional,
if you're eligible, you are encouraged to reregister.  And
that's the Secretary's general position as well.  But if we're
sending letters to people whose citizenship status is unknown
to the State, we want to be able to say, as a reminder, don't
vote if you are not eligible to vote.

THE COURT:  All right.  Let me go back to the bit
about disqualified status, substituting a voter who is in
disqualified status for a voter who has submitted a removal
request form.  If a letter goes to everyone who is in
disqualified status, it seems to me that it is necessarily
going to go to some people who have self-removed and to some
people who are in disqualified status for other reasons.  Is
there a way to send the letter to people who are disqualified
only because they have submitted a self-removal form?

MS. MESSICK:  There -- I think that when you submit a
self-removal form, I think there was an email -- like if you
say that you have moved out of county, then you are
disqualified and the reason is -- or you have moved out of the
county or out of the state, the status reason tells you that
that is what it is.  I think death may also be a status reason.
Maybe the language in the order could say something along the
lines of, if possible.

MR. OVERING:  Or at a minimum, the people who were

1   removed by self-removal receive this letter and then that gives

2   the Registrar or the State the flexibility to send it to people

3   who are deceased or to do it in a broader way, but that is --

4   that could be done more quickly.

5          MR. FREEMAN:  Perhaps, Your Honor, it might go to

6   voters who were disqualified and then the Court might clarify

7   that it shall not include any voter who is specifically known

8   to be disqualified on account of change of address or the death

9   of a registrant.

10         MS. MESSICK:  Or because they said that they're not a

11  citizen.

12         MR. FREEMAN:  Or -- I mean, yes, with the categories

13  already in here also that if it specifically says because they

14  identified that they're not a citizen or otherwise established

15  objective evidence of ineligibility.

16         THE COURT:  All right.  So I think what I hear is a

17  proposal that -- what I will call the self-removal letter goes

18  to everyone in disqualified status, but the Court orders that

19  it need not go to those who are disqualified as a result of

20  death or relocation.

21         MR. FREEMAN:  Or objective evidence of ineligibility.

22         THE COURT:  Or objective evidence of ineligibility,

23  which would cover the people who admitted that they were

24  noncitizens.

25         MS. MESSICK:  We would appreciate that.

```
 1           THE COURT:  Okay.  And that need not -- I think we'll
 2    give the Secretary or the Registrars the ability to use a
 3    search device, if necessary, to timely comply with the order.
 4    But we'll not place them in noncompliance if the letter goes to
 5    somebody who just doesn't need to receive it.
 6           MS. MESSICK:  That would be very helpful, and I'm
 7    sorry to be the typical lawyer who says two more things and
 8    then has more than that.  But I'm remembering that there was
 9    another issue in here where they wanted to -- the United States
10    has requested that there be orders as to training for polling
11    officials.  And we just haven't been able to figure out, since
12    we got this order this morning and had to drive up here, what
13    training is already happening and when it may be happening.  My
14    understanding is that the probate judges do the training in the
15    different counties, and the training -- your poll officials,
16    those are members of the community coming in and helping in the
17    polling place that day.  My understanding is that the training
18    involves those people in the community coming together for a
19    training session.  And we just don't know right now what the
20    status of that training already is, and we do know from
21    Mr. Helms's testimony yesterday that the poll workers are not
22    going to know that somebody is inactive because of this process
23    and since Your Honor is ordering them to be made active, it
24    seems like it would be -- it has the potential to be very
25    problematic to try to implement that particular instruction.
```

1    And it's not clear to me what the value is if they're all going

2    be active anyway.

3         THE COURT:  Well, I mean, I will just say that the

4    reason the United States' motion got granted in part is because

5    I am not entering the proposed order just verbatim.  And when I

6    said yesterday sort of, you know, the -- all of the harm that I

7    see, you know, the mess sort of got made with a press release

8    guidance to registrars and letters to voters.  I think those

9    are the ways to sort of clear it up.  It's not -- poll workers

10   were not provided training on the improper systematic path to

11   removal, and so I don't see the need to train them on the fact

12   that a Federal Court has ordered that to stop, and I worry that

13   that may deepen the chaos and confusion.  And I am sensitive to

14   ordering an achievable remedy that does not make matters worse.

15        MR. FREEMAN:  Understand, your order -- Your Honor.

16   That was why we had, in part, proposed that any poll worker

17   training be what is reasonable and practical.  And we

18   understand Your Honor's concern.  We will say that those poll

19   workers in the community are the folks who received the broader

20   press release and not the individual letters, and those are

21   particular people we are concerned may have been misled to

22   believe that they, at the polling place, should be on the

23   lookout for noncitizens who are registered to vote in Alabama.

24        THE COURT:  Understood.  What else?

25        MR. OVERING:  Your Honor, we have a -- just briefly on

1  the issue of the referral to the Attorney General, we just

2  wanted to be completely clear that the Attorney General is here

3  as counsel and is knowledgeable about the proceedings.  The

4  office is honorable, and any injunction against the State will,

5  of course, include the Attorney General within the State, and

6  he, as the chief legal officer of the state, will be aware of

7  it.  And so, you know, the issue on rescission or providing

8  that particular communication is really unnecessary in our

9  view.

10          THE COURT:  Understood.

11          MR. FREEMAN:  Your Honor, we believe that it is

12  warranted for the public's sake that that action be taken in

13  parody with the action previously taken that a letter be

14  provided in an official manner so that the public may be

15  confident that those US citizens who were identified and

16  targeted as part of the program are no longer subject to any

17  type of notification or excuse me -- any type of investigation

18  for criminal prosecution.  We also don't think it's a

19  particularly burdensome task to ask that a similar request be

20  relayed asking that investigations stop.

21          MS. HUDDLESTON:  And, Your Honor, specifically on the

22  point of harm and the need for this relief, I would point you

23  again to the declarations from plaintiffs and private

24  plaintiffs and to Clarence, and particularly to the Hazelhoff,

25  Stroop, Jortner and Coe declarations, all of which speak to the

1    harm for being referred for criminal investigation, also the

2    Sampen declaration speaks to that.

3         THE COURT:  Okay.  I do want to be really clear that

4    in findings, conclusions, and the injunction, that I have not

5    relied on declarations in the private plaintiffs' case because

6    I am concerned about the necessity to make jurisdictional

7    findings before I rely on any of those, and I have not done

8    that today.  So I was very careful to rely on evidence that is

9    either, you know, not in dispute or not objected to or that

10   came from the State defendants or from the testimony of

11   Mr. Helms such that I can credit it as, you know, a concession

12   or acknowledgment or fact relayed to me by the State.  So I do

13   want the record -- I understand your argument about those

14   declarations speaking to these issues, but I want the record to

15   be really clear that I have not relied on evidence from

16   plaintiffs whose standing I have not made findings about.

17        MR. OVERING:  There's a suggestion about deleting the

18   press release.  We think that that could be narrower, that this

19   is a matter of public record.  These proceedings are public.

20   The Secretary, instead of deleting a press release, could write

21   superseded by court order or see subsequent communications or

22   something to that effect rather than to remove any evidence

23   that this process was conducted.

24        THE COURT:  Okay.  That's a helpful point.  Help me

25   understand that because I do not want to issue an order that

```
 1    drags the Secretary into noncompliance with open records or
 2    public records laws.  I understand that you have obligations
 3    under state laws to preserve these kinds of things.  But when
 4    you say -- I think your suggestion was superseded by a court
 5    order or -- what would the suggestion be, just so I have it
 6    clearly fixed?
 7           MS. MESSICK:  So we were thinking about like when the
 8    Attorney General issues an opinion and a new opinion comes out,
 9    they just literally put a stamp on the top that says superseded
10    by and refers to the other thing.  And I think it would make
11    more sense to simply say that the press release is superseded.
12    We -- I don't know that we knew as -- when we talked before, we
13    were more focused on whether it would be a new release than
14    what would happen with the old one.  I don't know enough about
15    their records and how they do things and what the practical
16    impact of this direction would be.  But I think that it would
17    cure the harm if the existing press release on the website
18    said, superseded by order of this court and pointed you to the
19    new press release if, in fact, you are going to order a new
20    press release.
21           THE COURT:  Does that trigger any state law or First
22    Amendment concerns, if I were to order some kind of public
23    statement, whether it's a stamp on the old press release or a
24    new press release saying that that first one has been
25    superseded by Federal Court Order?
```

 1              MR. OVERING:  Well, our first concern is, does it run

 2     to the Secretary of the State or to an individual person?  And

 3     so our First Amendment concern was primarily with an injunction

 4     that orders Secretary Wes Allen to go out and give interviews.

 5     That triggers all sorts of red flags.  Simply a stamp on the

 6     website, I -- we won't argue that that's barred by the First

 7     Amendment.

 8              MS. MESSICK:  If I am -- I was just going say as far

 9     as the State Open Records Act goes, I don't know that it would

10     be an issue, but if it was, we would point to the federal court

11     order.  I mean, I think that you could order that without it

12     being something that had to --

13              THE COURT:  Okay.

14              MS. MESSICK:  I think that we could --

15              THE COURT:  I will think on that.

16              MR. FREEMAN:  And, Your Honor, we tried to be

17     sensitive to those types of open records concerns, but we have

18     no concern regarding the State's alternative proposal.

19              MS. HUDDLESTON:  Your Honor, I just wanted to loop

20     back for a second on the sort of evidentiary question and

21     particularly as it pertains to irreparable harm.

22         So understood regarding the plaintiff's declarations as in

23     the plaintiff's case.  You know, the United States made an

24     argument about irreparable harm and balance of equities and

25     public interest based on harm to Alabamians, generally

1  speaking, and plaintiffs and other declarants are all

2  Alabamians.  The evidence has been admitted in both cases is my

3  understanding, and the United States has cited, for example,

4  the Sampen declaration in their briefing.  And so we think that

5  it is appropriate, if the Court wishes to consider it, to

6  consider those declarations not as plaintiffs' declarations but

7  as declarations from Alabamians.

8          THE COURT:  All right.  Anything else?

9          MR. OVERING:  Paragraph 1 of the proposed order runs

10  to any program, and we think the Order will be and should be

11  clear that this is about a particular process and the Court has

12  not made findings about other programs or processes, and, you

13  know, our concern there is that their broad reading would

14  interfere with other general ongoing programs that deal with

15  change of address and things like that.  So we'd just ask for

16  clarification that we're talking about the same process, one

17  process, and not anything else that the State might be doing

18  that it does as a general matter of course before the election.

19          MR. FREEMAN:  Your Honor , our concern regarding that

20  is Secretary Allen's statement previously that this was not a

21  one-time review.  We believe that an Order that mirrors the

22  language of the quiet period provision appropriately understood

23  would not constrain any lawful list maintenance programs and

24  that that would be the appropriate relief in this case.  Other

25  courts in, I believe, Georgia and North Carolina have ordered

1 similar relief. And I -- on a moment's notice I could provide
2 the Court citations to those if it would be useful. But if it
3 is not, we will move on.

4    MR. OVERING: Our issue is that we have taken the
5 stance that there are other programs that the State must
6 operate for four years continuously, and so I don't want to be
7 making that argument in this court or some other court down the
8 line and then there's the question, well, if that's your view
9 as the State, did you stop those programs when the Court told
10 you in paragraph 1 of its order, don't continue any systematic
11 program. And the answer will be, well, we understood the
12 United States' view or the Court's view to mean that those
13 programs weren't covered. But it is still an awkward position
14 to be in and so it would be better if it just said this process
15 is the one under review that has been challenged.

16    MR. FREEMAN: And, Your Honor, we believe that problem
17 could be solved by a cross-reference to this Court's opinion in
18 which the Court explains the meaning of the term "any program."
19 And similar relief was offered in Majority Forward v Ben Hill
20 County Board of Elections. That's in the Middle District of
21 Georgia, Case No. 1:20-cv-266 and then US District Court for
22 the Middle District of North Carolina in North Carolina State
23 Conference of the NAACP versus North Carolina State Board of
24 Elections, and that's Case No. 1:6-cv-1274.

25    THE COURT: Okay. All right. I'll reflect on that.

1          MS. MESSICK:  The only other point on that is that the

2     -- you have testimony in the record that there will not be any

3     new program before the election, and I think Your Honor made

4     clear yesterday that you're not looking for -- at an injunction

5     that goes beyond this election.  So I'm not sure that there is

6     the need, moving forward, real concerns on part of the United

7     States there.

8          THE COURT:  All right.

9          MS. MESSICK:  We thank you for hearing us out this

10    morning.

11         THE COURT:  Thank you.  This was helpful.

12         MR. FREEMAN:  And the one potential suggestion that we

13    would offer that really came from -- came into us after 6:30

14    this morning.

15         THE COURT:  I understand this has been an ongoing

16    process.

17         MR. FREEMAN:  In paragraph 4, we referenced voters who

18    were in inactive status as of August 12th.  We think it might

19    be clearer if paragraph 4 were to refer to voters who were in

20    inactive status prior to the commencement of the quiet period.

21    So that would be any voter who was in inactive status as of, I

22    believe, August 7th, 2024.

23         THE COURT:  Okay.  Anything else?

24         MR. FREEMAN:  Nothing from the United States, Your

25    Honor.

1          MS. HUDDLESTON:  Nothing from private plaintiffs, Your

2    Honor.

3          MR. OVERING:  That's all, Your Honor.

4          MS. MESSICK:  Thank you.

5          THE COURT:  All right.  Thank you-all.  This was very

6    helpful.  We will reflect on these considerations, and our goal

7    is to issue an order by the end of the day so that as many days

8    as exists between now and the registration deadline y'all can

9    make use of.

10         Okay.  Anything else?  Thank you.  We're adjourned.

11         (Proceedings concluded at 11:10 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

                                  Dated: 10/16/2024

_____
Kelli M. Griffin, RPR, CSR